IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARGRET M. WISINSKI,       :

              :

      Plaintiff,      :     **No. 1:07 – CV-346**

              :

    v.            :

              :

**AMERICAN COMMERCE GROUP,**    :
**INC. and AMERICAN COMMERCE**    :
**INSURANCE COMPANY,**        :

              :

      Defendants.    :

## APPENDIX – VOLUME II
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| U. | Deposition of Steven Shiner September 5, 2008 |
| V. | Deposition of Joanne Dorger August 7, 2008 |
| W. | Deposition of Diane Herricks August 6, 2008 |
| X. | Deposition of Kelly Bihn August 6, 2008 |

Respectfully submitted,

SCIARRINO TeWINKLE

Dated: January 30, 2009

/s/Anthony J. Sciarrino, Esq.
PA. I.D. #65673
Attorney for Plaintiff
1001 State Street, Ste. 1220
Erie, PA 16501
(814) 454-1100

/s/ J. Timothy George Esq.
PA. I.D. #67107
2525 West 26th Street
Suite 200
Erie, PA 16506
(814) 835-0400

# EXHIBIT U

**Page 1**

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARGARET M. WISINSKI

          VS.                    NO. 1:07-CV-346

AMERICAN COMMERCE GROUP, INC.
and AMERICAN COMMERCE INSURANCE
COMPANY


     VIDEOTAPED DEPOSITION OF STEVEN SHINER,
taken at the request of the Plaintiff pursuant
to the applicable Rules of Federal Procedure
before Debbie J. Diemdowicz, a Notary Public
and Registered Merit Reporter in and for the
Commonwealth of Massachusetts, on
September 5, 2008, commencing at 9:30 A.M. at
the offices of Bay State Reporting Agency,
76 Mill Street, Worcester, Massachusetts.
```

```
          ───────────────────────────────
              BAY STATE REPORTING AGENCY
          76 MILL STREET, WORCESTER, MA  01603
                    (508) 753-4121
```

**Page 2**

A P P E A R A N C E S:

FOR THE PLAINTIFF:

ANTHONY J. SCIARRINO, ESQ.
SCIARRINO & TeWINKLE
Renaissance Centre
1001 State St., Suite 1220
Erie, Pennsylvania  16501


FOR THE DEFENDANT:

JOSEPH F. BUTCHER, ESQ.
ZIMMER KUNZ
3300 U.S. Steel Tower
600 Grant Street
Pittsburgh, Pennsylvania  15219


THE VIDEOGRAPHER:  Odi J. Wong

**Page 3**

I N D E X

DEPONENT:  STEVEN SHINER

|                                    | PAGE |
| EXAMINATION BY MR. SCIARRINO       |  4   |


EXHIBITS

| NUMBER |                        | PAGE |
| 43.    | Deposition Notices     |  8   |
| 44.    | Application for Benefits|  98  |

**Page 4**

1      THE VIDEOGRAPHER:  We are now
2  recording and on the record.  My name is
3  Odi J. Wong and I'm a legal video specialist
4  for National Video Reporters.  Our business
5  address is 58 Batterymarch Street, Suite 243,
6  Boston, Massachusetts 02110.
7      Today's date is September 5, 2008,
8  and the time on the video monitor reads
9  9:34 A.M.  This is the deposition of Steven
10  Shiner also appearing as a designated 30(b)(6)
11  witness in the matter of Margaret M. Wisinski
12  versus American Commerce Group, Inc., et al in
13  the United States District Court for the
14  District of Pennsylvania, Case No. 07-CV-346.
15      This deposition is being taken at
16  the Bay State Reporting Agency at
17  76 Mill Street, Worcester, Massachusetts.
18  The court reporter today is Debbie Diemdowicz
19  of Bay State Reporting Agency.  Counsel will
20  state their appearance and the court reporter
21  will administer the oath.
22      MR. SCIARRINO:  Anthony Sciarrino
23  for the plaintiff, Margaret Wisinski.
24      MR. BUTCHER:  Joseph Butcher for

1 the defendant, The Commerce Group, Inc. and
2 American Commerce Insurance Company.
3

4        STEVEN SHINER was satisfactorily
5 identified by the production of his
6 Massachusetts driver's license, duly sworn,
7 and testified as follows:
8
9 EXAMINATION BY MR. SCIARRANO:
10       Q.   Mr. Shiner, my name is Tony
11 Schiarrino and I'm going to be taking your
12 deposition here today, and I'm going to be
13 taking your deposition in two ways because you
14 were both involved in the handling of this
15 particular file and you are -- and so you are
16 a fact witness, and you are also the corporate
17 designee for American Commerce Insurance
18 Company.  Okay?
19       A.   I understand.
20       Q.   All right.  First, could you
21 identify yourself and spell your name for the
22 record?
23       A.   Sure.  My name is Steven Shiner.
24 My last name is spelled S-h-i-n-e-r.

---

6

1       Q.   And, sir, what is your professional
2 address?
3       A.   The business address is 211 Main
4 Street, Webster, Massachusetts.
5       Q.   Sir, I'm going to be asking you a
6 series of questions here today; and before we
7 begin, I'd like to set out some ground rules.
8            The first ground rule is please be
9 sure to answer all of my questions verbally,
10 because nods and shakes of the head and things
11 like "uh-huh" and "huh-huh" are hard to make
12 sense of later on.  Okay?
13       A.   I understand.
14       Q.   Also, please -- when I'm asking you
15 a question, please let me finish and then give
16 your response.  You may know the answer before
17 I'm done with the question, but please wait so
18 that it's easier for the court reporter and
19 the videographer so that things don't run
20 together.  Okay?
21       A.   Yes.
22       Q.   This is not supposed to be an
23 endurance test or a form of punishment.
24       A.   Mm-hmm.

---

7

1       Q.   If you need to take a break for any
2 reason, you please let me know and we will be
3 -- and we will take a brief adjournment and
4 take care of whatever needs to be handled.
5 Okay?
6       A.   Yes.
7       Q.   If I ask you a question and you do
8 not understand my question, please let me know
9 and I will be happy to either restate it or
10 rephrase it so that you can understand it.
11 Okay?
12       A.   Yes.
13       Q.   I -- I'm not attempting to confuse
14 you in any way so if you let me know, I will
15 be happy to conform my question in such a way
16 that you can understand it.  If you give a
17 response, we are going to assume that you
18 understood the question and gave your best
19 answer.  Is that okay?
20       A.   Yes.
21            MR. SCIARRANO:  Now, before we
22 begin into the heart of the matter, I'm going
23 to mark the notices of deposition for the
24 record and there's -- I'm going to mark them

---

8

1 together and I believe we are on Deposition
2 Exhibit 43.
3            (Deposition Exhibit No. 43 marked.)
4       Q.   And these are the notices of
5 deposition in your capacity as the corporate
6 designee and as a fact witness.
7       A.   Okay.
8       Q.   Have you had the opportunity to see
9 the notices of deposition prior to today?
10       A.   The cover sheet I don't believe I
11 have seen.  The rest of this I believe I did
12 see in a letter --
13       Q.   Okay.
14       A.   -- directed to Joe from your
15 office.
16            MR. BUTCHER:  Just -- just for
17 correction purposes, in attempting to identify
18 the corporate designee, I -- I've provided
19 Mr. Shiner and my client the categories listed
20 in the notice of deposition for corporate
21 designee.
22            I did not provide him with the
23 actual notice, the ones you produced, but it's
24 the same categories that you produced in the

10

1  letter originally requesting what the
2  categories would be.
3      Q.   Okay.  I -- I just want to make it
clear.  You've seen the -- the listing of the
5  various categories that you're going to be
6  questioned on today --
7      A.   Yes, I have.
8      Q.   -- and --
9      A.   Sorry.
10     Q.   -- you would have had the
11 opportunity to prepare in anticipation of
12 being questioned on those various categories?
13     A.   Yes.
14     Q.   Okay.  That -- that's what I -- I
15 wanted to know.
16          MR. BUTCHER:  Thank you.
17     Q.   While we -- when we were off the
18 record and before we started, I pointed out to
19 you that there has been 42 exhibits used in
20 the prior depositions.
21          They are here in a group of
22 binders.  There may come a point during the
23 deposition where referring to a document may
24 aid you in answering one of my questions.

1          Please feel free to refer to any of
2  the documents, and there are also going to be
3  times when I direct your attention to one of
4  the exhibits, and they are basically all Bates
5  stamped so I will identify it by the exhibit
6  and the Bates stamp so that we're sure that
7  we're all looking at the same thing so that
8  you can give your best answer.  Okay?
9      A.   Yes.
10     Q.   And like I said, these exhibits are
11 in these blue books, and I don't want to get
12 them in the way but they're right -- these
13 three binders right here in front of you.
14     A.   Okay.
15     Q.   All right.  Sir, what is your
16 current position with The Commerce Group?
17     A.   My title is assistant vice
18 president of national claims.
19     Q.   And you said your -- your business
20 is address is 211 -- I can't recall the
21 street.
22     A.   It's Main Street.
23     Q.   Oh, 211 Main Street, Webster,
24 Massachusetts?

11

1      A.   Webster, Mass., that's correct.
2      Q.   Okay.  And is that the corporate
3  headquarters for American Commerce and
4  The Commerce Group?
5      A.   Yes, it is.  I'm sorry.  Let me
6  back up.  The corporate headquarters for
7  The Commerce Group is 211 Main Street in
8  Webster.  The corporate headquarters for
9  American Commerce Insurance Company is in
10 Columbus, Ohio.
11     Q.   Okay.  Have you ever been deposed
12 prior to today?
13     A.   No, I have not.
14     Q.   Okay.  Could you briefly outline
15 your educational background for me?
16     A.   Sure.  I graduated from Nichols
17 College with an undergraduate degree in
18 business; I've earned the CPCU designation;
19 and I've taken graduate-level courses and have
enrolled in -- was accepted to the Boston
21 University School of Insurance Management, but
22 I've not completed my graduate degree there as
23 yet.
24     Q.   When did you start your graduate

12

1  degree at Boston University?
2      A.   Gosh, I believe it was in 2005 and
3  I took a leave when I started in a new
4  position.
5      Q.   How long have you been employed in
6  the insurance business?
7      A.   Since 1985, so a little more than
8  23 years.
9      Q.   Okay.  Let's just start with -- you
10 may have had other jobs before.  Let's talk
11 about your -- your career in the insurance
12 business.
13     A.   Sure.
14     Q.   I think you started in 1985.  Where
15 did you start at?
16     A.   I started with the Commerce
17 Insurance Company.
18     Q.   And what was your initial position?
19     A.   It was an entry level position as a
20 claim adjuster trainee.
21     Q.   And you were claim adjuster trainee
22 for a period of time and then you became a
23 claim adjuster?
24     A.   Well, yeah.  I mean, you're --

14

1  you're more or less a claim adjuster as soon
2  as you begin.  You -- you're involved in
3  handling claims, but the types of claims you
   handle increase in complexity and variety as
   you -- as you gain experience so, you know,
6  during the course of probably my first year of
7  employment, I became a full-fledged adjuster.
8       Q.    And have you stayed employed with
9  The Commerce Group pretty much consistently
10 since 1985?
11      A.    Yes, I have.
12      Q.    Okay.  Why don't you just take us
13 through the list of different positions that
14 you have held at The Commerce Group since you
15 started in 1985.
16      A.    Sure.  After spending probably a
17 year to a year and a half as an adjuster, I
18 was promoted to a field adjuster which simply
19 means I was out in the field with a company
20 car involved in adjusting claims in a
21 different capacity, higher exposure, more
22 challenging claims.
23           From there I progressed to a
   supervisor in our physical damage group which

14

1  meant leading a group of adjusters handling
2  automobile physical damage claims.
3           From there I progressed to
4  supervisor of a casualty group, again, leading
5  a group of adjusters that handled bodily
6  injury, liability, and medical claims.
7           My next position was manager of the
8  casualty claim department.  I held that
9  position from, gosh, I think it was 1990 until
10 2004.
11          In 2004 I transferred to our
12 examining division, and I was involved in a
13 temporary assignment.  It was supposed to be a
14 two-year temporary assignment where I would
15 support the examining division and our
16 subsidiaries outside of Massachusetts which --
17 which included at that time Commerce --
18 American Commerce Insurance Company, ACIC, and
19 the various claim offices that -- that
20 comprised our claim operation.
21          After about two and a half years, I
22 returned to my position as a manager in our
23 casualty division, and most recently, in April
24 of 2007, I was promoted to general manager of

15

1  national claims and later was promoted to
2  assistant vice president with basically the
3  same responsibilities as general manager of
4  national claims.
5       Q.    When you were the -- pardon me --
6  the manager of the claims department from 1990
7  to 2004, that was the casualty claims
8  department --
9       A.    That's correct.
10      Q.    -- was there a geographic region
11 which you handled?
12      A.    Yes.  The Commerce Insurance
13 Company is -- was during most of that period a
14 Massachusetts domestic insurer so, by and
15 large, our -- our regional responsibilities
16 included Massachusetts.
17          Later we expanded into some of the
18 New England contiguous states, including
19 New Hampshire and Connecticut, but I also had
   responsibility for a group that -- that
21 handled losses that occurred in other states.
22      Q.    During the time that you started
23 with The Commerce Group in 1985 up until 2004,
24 had you ever been involved in handling un- or

16

1  underinsured motorist claims that would have
2  been Pennsylvania claims, in other words,
3  policies that were Pennsylvania policies?
4       A.    No.
5       Q.    When you entered the examining -- I
6  think you called it the examining
7  department --
8       A.    Yes.
9       Q.    -- in 2004, was that when you first
10 started handling claims that would be outside
11 of the New England states?
12      A.    Well, I had exposure to claims
13 outside of the New England states but written
14 on Massachusetts automobile policies.
15          If there was an occurrence in
16 another state, you'd obviously have to get up
17 to speed on their laws and regulations.
18      Q.    Let me narrow that down --
19      A.    Sure.
20      Q.    -- because, obviously, people who
21 obtain a Massachusetts policy might drive to
22 California and get in an accident and then you
23 have to adjust a -- a California claim.
24      A.    That's correct.

17

1    Q.   I want to talk about first-party
2  claims under a -- a Pennsylvania policy.
3  Would it be fair for me to say that the first
   time you handled a claim under a Pennsylvania
5  policy would have been some time after you
6  started in the examining department in 2004?
7    A.   If I may clarify, as an examiner, I
8  didn't actually handle claims.  We were
9  consulted on claims.  But that's correct.  I
10 did not have any involvement on -- in -- in
11 claims for policies issued in Pennsylvania
12 prior to that time.
13   Q.   The Margaret Wisinski claim, which
14 is the claim which brings us here today, arose
15 from an accident that happened in 2001.
16 It looks from the file that your involvement
17 was sometime in 2006.
18        Prior to the Margaret Wisinski
19 claim, do you recall ever having been involved
20 in any un- or underinsured motorist claims, as
21 an examiner, that were written on Pennsylvania
22 policies?
23   A.   I cannot recall having been
   involved in any specifically, but it's

18

1  certainly possible that I was.
2    Q.   During your time with The Commerce
3  Group in any of the various positions you had
4  up to 2006, were you -- did you ever receive
5  any specific training on Pennsylvania -- on
6  the Pennsylvania motor vehicle financial
7  responsibility law?
8    A.   No, no specific training.
9    Q.   Did you ever receive any training
10 on the Pennsylvania Unfair Insurance Practices
11 Act?
12   A.   No.
13   Q.   Did you receive any training on the
14 Pennsylvania code?  There's a -- a section of
15 Pennsylvania code that is the specific
16 regulations that go with the Unfair Insurance
17 Practices Act.
18   A.   No, I did not.
19   Q.   Okay.  Other than the
20 Margaret Wisinski claim, can you recall ever
21 having been involved on an un- or underinsured
22 motorist claim that was a Pennsylvania policy
23 claim?
24   A.   Not that I can recall.

19

1    Q.   And, again, I'm not trying to put
2  words in your mouth, but it's possible that
3  this might have been your only Pennsylvania
4  claim?
5    A.   It's possible, but I think it's --
6  it's likely that I had others.  I just can't
7  recall specifically --
8    Q.   Okay.
9    A.   -- having been involved in a
10 Pennsylvania claim, because my involvement in
11 claims was obviously frequent and many from a
12 variety of states.
13   Q.   My understanding, from taking the
14 depositions of the various people who were
15 involved in this claim, including Diane
16 Hericks and Joanne Dorger, was that
17 Pennsylvania was a very small part of the ACIC
18 business at the time that the Margaret
19 Wisinski claim was handled.  Is that
   consistent with your understanding --
21   A.   Yes, it is.
22   Q.   -- as well?  I think, and I'm
23 willing to be corrected if my recollection is
24 wrong, but I think Ms. -- Ms. Dorger may have

20

1  said that she didn't recall having any other
2  Pennsylvania claims other than this one, and
3  I'm just trying to see if -- if -- if you have
4  any specific recollection of anyone other than
5  this one?
6    A.   Again, I don't have a specific
7  recollection, but our -- our claim volume from
8  Pennsylvania was very light.
9    Q.   When you were the casualty claims
10 manager, generally, what were your duties and
11 responsibilities?
12   A.   Well, they varied.  First and
13 foremost, I was the leader of -- of a group of
14 roughly four to five supervisors, depending
15 upon the point in time, and in each of those
16 groups there would be five to six adjusters,
17 so my primary responsibilities were overseeing
18 those groups and making certain that they, you
19 know, received the proper training and carried
20 out the claim-handling responsibilities that
21 were expected internally and externally.  I
22 also provided technical oversight on -- at
23 certain levels.
24   Q.   Now, when you say "technical

21

1  oversight," is there a distinction that you
2  are drawing between file analysis and
3  evaluation versus making sure that
   The Commerce Group practices and policies are
5  followed? Are those two different functions?
6      A.   Yes. I would say they are
7  different functions. You know, we -- we
8  certainly did internal auditing to evaluate
9  our adjusters' compliance with our own
10 expectations.
11          At the same time we often became
12 involved in -- in claims to -- to approve
13 evaluations and, you know, dispense settlement
14 authority, provide opinions relative to a
15 variety of matters.
16     Q.   When you took the position as an
17 examiner, did your role change; and if so,
18 how?
19     A.   Yes. My role changed fairly
20 dramatically. I was no longer in a management
21 position in that capacity. My role was more
22 as a technician, providing guidance and
23 oversight on large losses and supporting the
   -- the managers in our regional offices.

22

1      Q.   When you started in 2004 as an
2  examiner, how many different states did you
3  have where you -- how many -- how many claims
4  -- strike that.
5          Let me phrase this better. How
6  many states was -- were -- were writing -- let
7  me try this again. Let me try to use proper
8  grammar.
9          When you started as an examiner,
10 how many different states did The Commerce
11 Group and its subsidiaries write policies in?
12     A.   I -- I can make a fairly accurate
13 estimate, because it's -- it's been sort of a
14 moving target with withdrawing from some
15 states over time.
16          We had -- we were actively writing
17 business in, I believe, 22 states at one
18 point. My role, as an examiner, was
19 supporting principally two regional offices
20 that handled, you know, a portion of those
21 22 states.
22     Q.   The two regional offices that you
23 supported, do you recall what states they
24 covered?

23

1      A.   I do. The central regional office
2  handled claims arising in Oklahoma, Ohio,
3  Kentucky, Tennessee, Indiana, and at that time
4  Pennsylvania. The northwest regional office
5  handled claims arising in Washington state,
6  Oregon, Idaho, and a small amount in Montana.
7      Q.   So you were involved in -- in
8  handling claims for about ten different
9  states?
10     A.   Well, again, not actually handling
11 claims, but providing examining support,
12 that's -- that's accurate.
13     Q.   And when you -- when you left the
14 position as the manager of the casualty claim
15 department in 2004, did you have a maximum
16 authority or limit of the company's money that
17 you could approve spending for payment of a
18 claim?
19     A.   Yes.
20     Q.   And what was that amount?
21     A.   I believe at that time my
22 settlement authority was $100,000.
23     Q.   Okay. Now, when you became an
24 examiner in 2004, did you have a maximum

24

1  authority?
2      A.   Yes.
3      Q.   And what was that?
4      A.   It increased over time. I believe
5  over the course of the two years, two and a
6  half years that I was in examining, my
7  authority may have gone from 100 to perhaps
8  $175,000 is my best recollection.
9      Q.   At the time you were an examiner,
10 what was sort of the -- the chain of command?
11 My understanding is that an examiner would
12 become involved if there was a reserve set at
13 over $50,000. Is that an accurate
14 understanding?
15     A.   That's correct. That's one of the
16 conditions.
17     Q.   Okay. There would be other things
18 that could trigger certain types of injuries
19 or certain types of claims, but from a dollar
20 amount, that was a trigger?
21     A.   That's correct.
22     Q.   Okay. And my understanding, and
23 again, please correct me if I'm wrong, if it
24 was reserved for $50,000, you weren't

25

1   involved; but if it was reserved for $50,001,
2   an examiner was involved?
3       A.   That's correct.
        Q.   Okay.  Now, who did you respond to
5   -- who supervised your -- your duties and
6   performance?
7       A.   The vice president of examining,
8   Donald MacLean.
9       Q.   If there was a claim that the
10  reserve was going to be set above your
11  authority, did you go to Mr. MacLean or did
12  you go to some other person depending upon
13  where the claim arose?
14      A.   I had reserving authority that
15  exceeded my settlement authority.  I believe
16  my reserving authority was -- may have been a
17  million dollars.  I can't recall for certain.
18      Q.   Okay.  Well, let's talk about
19  reserving authority and then settlement
20  authority.  If there was a reserve that you
21  wanted to set above a million dollars, who did
22  you have to go to?
23      A.   In that case, I would confer with
    Don MacLean.

26

1       Q.   All right.  Now, if there was --
2   and you indicated that over time your
3   settlement authority increased, but without
4   regard to what the actual dollar amount was,
5   if there was a settlement evaluation and you
6   felt that the value of the claim exceeded your
7   settlement authority, who did you go to to get
8   additional authority to settle a claim?
9       A.   That would be Donald MacLean.
10      Q.   So it didn't matter where the claim
11  arose, whether it was a Pennsylvania or a
12  Kentucky or Ohio or whatever, if it was a
13  claim that had a valuation above your
14  authority, Mr. MacLean would have been who you
15  went to?
16      A.   That's correct.
17      Q.   Okay.  Now, in your capacity as an
18  examiner, what's your -- what's your role?
19  Is it a supervisory role or is it an
20  analytical role or is it both?
21      A.   Principally, and typically, we did
22  provide more supervision than we would
23  typically provide in an examining role because
24  we were -- we had taken the American Commerce

27

1   Insurance Company under our leadership just a
2   few years before that.
3       Q.   Do you recall when The Commerce
4   Group acquired American Commerce Insurance
5   Company?  Actually, I'm sorry, I think it was
6   called Auto Club Insurance Company at the time
7   it was acquired.
8       A.   That's correct.
9       Q.   Okay.  I apologize.
10      A.   I don't remember exactly the year.
11  I believe it was in the late '90s.  Can I
12  clarify --
13      Q.   Certainly.
14      A.   -- something?  When the acquisition
15  was made, we did not take over the claims
16  operation at that time under The Commerce
17  Group.  They continued to operate
18  independently for several years.
19      Q.   And you raised a good point, and I
    forgot to tell you about when we first started
21  off, if during the course of the deposition
22  you think of something that would change one
23  of your answers or add to one of your prior
24  answers, please let me know and we can -- you

28

1   can state it on the record.
2           This way we can correct it because,
3   occasionally, as you are asked another
4   question, it will jog something in your memory
5   and you'll -- and you'll think of something
6   else, and it's okay, just let us know that you
7   want to do that, and we're happy to
8   accommodate ya.
9       A.   Sure.
10      Q.   Now, when you say that your duties
11  were principally analytical as a claims
12  examiner, what we're talking about is aiding
13  and analyzing and evaluating the value of
14  various types of claims?
15      A.   That was part of my job
16  responsibility, sure.
17      Q.   Okay.  And that would primarily
18  have been bodily injury claims, uninsured and
19  underinsured motorist claims?
20      A.   "Primarily" might be the correct
21  way of stating it, however, I also had
22  involvement in property, homeowner property
23  liability, homeowner property fire losses, and
24  things of that nature.

1    Q.   Did you have any involvement in
2 like first-party medical benefit review or
3 analysis of those types of claims?
        A.   Typically, no, I would not be
5 involved in those claims because they were not
6 reportable to examining.
7    Q.   Because the dollar amount of those
8 claims is typically not $50,000 or above?
9    A.   Correct.
10   Q.   Okay.  If someone had purchased,
11 say, $100,000 in medical benefits --
12   A.   Mm-hmm.
13   Q.   -- and had very serious injuries
14 and had gotten to a point where they were
15 above $50,000, you might then become involved?
16   A.   Yes.
17   Q.   Okay.  So -- and, again, I'm not
18 trying to put words in your mouth, you may
19 have been involved in first-party medical, but
20 because the limits were rarely, if ever, above
21 $50,000, it was a rare or uncommon occurrence?
22   A.   That's correct.
23   Q.   Okay.  Whereas with homeowners,
24 say, because homes can be expensive, that

1 would trigger your involvement?
2    A.   Yes.
3    Q.   Again, because of the dollar
4 amount?
5    A.   Yes.
6    Q.   I'm going to narrow what we're
7 talking about just to bodily injury and
8 uninsured motorist and underinsured motorist
9 for the next series of questions.  Okay?
10   A.   Yes.
11   Q.   With regard to your technical
12 support on an uninsured, underinsured, or
13 bodily injury claim, would it be necessary for
14 you to have a knowledge and understanding of
15 the liability facts of a particular claim?
16   A.   Yes.
17   Q.   Would it be -- would you also have
18 to -- to know the medical facts, in other
19 words, the nature of the injury, the nature of
20 the treatment --
21   A.   Yes.
22   Q.   -- things like that?
23   A.   Yes.
24   Q.   Would you also have to be aware of

1 the American Commerce or Commerce Group
2 coverage involved --
3    A.   Yes.
4    Q.   -- and the coverage limits?
5    A.   Yes.
6    Q.   Would you also need to have an
7 understanding of the tort law of the state in
8 which the claim arose?
9    A.   Yes.
10   Q.   Would you also have to have an
11 understanding of the insurance regulations for
12 the state in which the claim arose?
13   A.   More or less, yes.
14   Q.   Routinely when a file was reserved
15 at above $50,000 and your involvement was
16 triggered, what would be your first step?
17   A.   When a claim was reported to
18 examining, it would be presented to us in a
19 claim file analysis which was a comprehensive
summary of the claim.
21        We would review the claim file
22 analysis and any supporting documentation that
23 we felt that we needed to look at and more or
24 less provide comments, direction, follow-up

1 that we felt was needed.
2        If we felt that the case was headed
3 in the right direction and all the right steps
4 had been taken, we would reflect that in our
5 comments and make a decision as to whether or
6 not it was something we wanted to follow.
7    Q.   Now, I'm going to ask you
8 specifically some questions about your initial
9 involvement in the Margaret Wisinski file, and
10 it's probably going to be helpful for you to
11 look at Exhibit 4 which is the log.
12   A.   Okay.  Is there a particular page
13 number?
14   Q.   Yes.  I'm getting to that page.
15 Now, you reviewed this log in anticipation of
16 your testimony here today, correct?
17   A.   I did read it over.
18   Q.   Okay.  Now, please correct me if
19 I'm wrong, I'm looking at page 1676 on
20 Exhibit 4.
21        MR. BUTCHER:  There's numbers on
22 the bottom there.
23        THE WITNESS:  I see.
24   Q.   By the way, we call those Bates

34

1   numbers.  So if I say "Bates page" or "Bates
2   number," that's what I'm referring to.
3        A.   I understand.  Okay.
4        Q.   It looks, to me, like that was the
5   first involvement in the log by you and it
6   appears that -- on the -- there's also -- each
7   line has a number.  It looks like line 891.
8   Is that correct or were you involved at some
9   point earlier that I may have missed?
10       A.   I did not see any indication of
11   being involved in the case prior to that, so I
12   would say that was my first involvement in the
13   case.
14       Q.   All right.  And it says that you
15   reviewed -- well, it said, "I received Diane's
16   CFA evaluation prepared in conjunction with a
17   reserve increase to $100,000."
18       A.   Yes.
19            MR. SCIARRINO:  I read sort of the
20   first sentence of that log entry and -- are
21   you referring to the -- and I have an exhibit
22   list here.
23            MR. BUTCHER:  It's Exhibit 15.
24            MR. SCIARRINO:  Exhibit 15.  And

35

1            MR. BUTCHER:  -- at the time in
2   preparation of this deposition?
3            MR. SCIARRINO:  Correct.  I
4   apologize.
5            MR. BUTCHER:  That's okay.
6        A.   No.  I wouldn't have reviewed that.
7        Q.   So you would have reviewed what is
8   Exhibit 15?
9        A.   Correct.
10       Q.   Okay.  Did you go back and read the
11   log?
12       A.   In preparation for this deposition?
13       Q.   No, no.  In prepara -- at the time
14   you were working as an examiner on the claim
15   in -- in July of 2006.
16       A.   I'm not certain whether I did or
17   not at this point.  I would if I felt that I
18   needed to, if I had questions and concerns
19   where I wanted to follow the chronology of the
20   claim; if I didn't feel as though I needed to
21   go back, I wouldn't have.
22       Q.   Do you have any recollection as to
23   whether you did or not in this claim?
24       A.   I don't.

34

1   that should also be in that same --
2            THE WITNESS:  Are the exhibits
3   marked by these pink --
4            MR. SCIARRINO:  Yeah.
5            THE WITNESS:  -- pages?
6            MR. SCIARRINO:  Each exhibit is
7   separated by the pink pages.  And then if you
8   look there will be a stamp, a little sticker,
9   on each exhibit.
10            THE WITNESS:  Okay.  I have it
11   here.
12       Q.   And is that what you reviewed?
13       A.   Yes.  Based on the date on that
14   document, I would say that's the CFA that was
15   presented to me.
16       Q.   There had been a prior analysis
17   performed by another adjuster named Kelly Binh
18   which is marked as Exhibit 12.  Did you ever
19   review that?
20            MR. BUTCHER:  Just for
21   clarification, when you mean "ever," you mean
22   at the time of his involvement in the claim,
23   not --
24            MR. SCIARRINO:  Right.

36

1        Q.   If you had gone back and reviewed
2   the log, would that be something you would
3   have put in your notes?
4        A.   It certainly may have been.  Sure.
5        Q.   If you could take a moment and read
6   that note to yourself.
7        A.   I don't see any indication that I
8   commented on reading the prior notes.
9        Q.   Now, in the -- on page 1677 it
10   looks like the first complete sentence reads,
11   "The stacking provision was initially
12   overlooked, but Diane's research (which
13   includes confirmation from underwriting)
14   confirmed that the insured's policy contains
15   the UM coverage endorsement (U1011PA) which
16   allows stacking."  Did I read that properly?
17       A.   Yes.
18       Q.   And is that the entry you made?
19       A.   Yes.
20       Q.   So it was your understanding that
21   the -- the -- initially the coverage was
22   listed incorrectly as $50,000 in coverage
23   when, in fact, there was $100,000 in coverage?
24       A.   Well, it wasn't listed incorrectly.

37

1  The coverage was $50,000.  The fact that the
2  insured had a endorsement to their policy that
3  allowed them to stack and therefore use the
4  additional $50,000 in coverage on another
5  automobile was not considered earlier.
6      Q.    Okay.  So the person had a $100,000
7  limit in their uninsured motorist coverage
8  when you consider the stack?
9      A.    Correct.
10     Q.    And that limit was initially not
11  noted and it -- it was later raised by
12  plaintiff's counsel, correct?
13     A.    I believe plaintiff's counsel
14  raised that.  If I may clarify, they did not
15  have a $100,000 limit.  They had two $50,000
16  limits on two separate automobiles.
17     Q.    Well, the maximum amount of
18  coverage that was available to that person was
19  $100,000?
20     A.    That's correct.
21     Q.    Okay.  So from the standpoint of
22  the most -- the most coverage that was
23  available to Ms. Wisinski, it was $100,000 at
24  all times during the handling of this claim?

38

1      A.    That's correct.
2      Q.    And that was initially not noted?
3      A.    That's correct.
4      Q.    And it was reserved previously at
5  $50,000 which was at that time what the
6  adjuster believed to be the maximum amount of
7  coverage available to Ms. Wisinski?
8      A.    That's my understanding.
9      Q.    It was changed to $100,000, the
10  reserve was changed to $100,000, which was
11  then what triggered your involvement?
12     A.    Yes.
13     Q.    Okay.  Did you go back and review
14  the initial reserving -- I'm sorry -- did you
15  go back and review the entry when the file was
16  reserved for $50,000?
17     A.    Not that I can recall.
18     Q.    Had this file been reserved at the
19  maximum amount of coverage available to
20  Margaret Wisinski, the $100,000, earlier,
21  would that have triggered your involvement
22  earlier?
23     A.    Yes.
24           MR. BUTCHER:  Just -- just for

39

1  point of clarification, his involvement, you
2  mean examining his involvement, because this
3  claim predates Mr. Shiner's position as being
4  in examining.  He did not become an examiner
5  until 2004; is that correct?
6           THE WITNESS:  That's correct.
7           MR. BUTCHER:  And the reserve was
8  set prior to to 2004, $50,000.  So when you
9  say "you," you mean Mr. Shiner or somebody
10  that was his predecessor in the examining
11  position?
12          MR. SCIARRINO:  Correct.
13          MR. BUTCHER:  Okay.  I just --
14          MR. SCIARRINO:  Meaning an
15  examiner, whether it would have been
16  Mr. Shiner --
17          MR. BUTCHER:  I understand.
18          MR. SCIARRINO:  Although it appears
19  to me, and I'm willing to be corrected, that
20  the log -- the log indicates that the reserve
21  was set at $50,000 in March 30 of 2004 which
22  may have been when Mr. Shiner was working as
23  an examiner.
24          THE WITNESS:  I cannot recall the

40

1  exact date that I started in examining, but it
2  was around that time frame.  It may have been
3  April.
4      Q.    Okay.  So just for clarification,
5  whether it would have been you as the examiner
6  or one of the other examiners, had this file
7  been reserved at $100,000 earlier, it would
8  have triggered the involvement of an examiner
9  earlier?
10     A.    Had the file been reserved at
11  $100,000, it would have triggered the
12  involvement of examining earlier.
13          MR. SCIARRINO:  Okay.
14          MR. BUTCHER:  Thank you.  I just
15  wanted to kind of have that clarified.
16  Appreciate it.
17     Q.    And what triggered your involvement
18  was the reserving of $100,000; it wasn't some
19  other factor about the case?
20     A.    That's correct.
21     Q.    Okay.  Do you recall whether you
22  reviewed any of the medical records of
23  Margaret Wisinski?
24     A.    I don't recall.

42

1    Q.   And let me clarify my question.  At
2  or around the time that you made your entry of
3  July 28, 2006, do you recall whether or not
4  you reviewed the -- any of the medical records
5  of Margaret Wisinski?
6    A.   I -- I don't recall whether I did.
7  I would ask for them if I felt that I needed
8  to review them; if I felt that the evaluation
9  and presentation of the CFA was sufficient for
10  my needs, I wouldn't typically ask for them.
11    Q.   If you had asked for them or had
12  reviewed them, would that be in your log
13  entry?
14    A.   Yes.
15    Q.   Okay.  And -- and, again, I don't
16  want to put words in your mouth, but when I
17  read the log entry, I do not see anything in
18  there indicating that you reviewed any medical
19  records.
20    A.   That's probably correct.
21    Q.   From that statement, can we
22  therefore conclude that you didn't review the
23  medical records of Margaret Wisinski?
24    A.   I can't say for certain, but it's

---

1  likely that I relied on the CFA analysis.
2    Q.   Okay.  At the time of your log
3  entry on July 28, 2006, the deposition of the
4  plaintiff's treating physician, Dr. Steele,
5  had already occurred.  It does not indicate in
6  the log that you reviewed that deposition
7  transcript.
8         Do you know whether you reviewed
9  the deposition transcript of Dr. Steele?
10    A.   I don't know whether I did or not.
11    Q.   As a practice, had -- had you
12  reviewed the deposition of Dr. Steele, would
13  that be something you would note in your log?
14    A.   Yes.
15    Q.   Okay.  So, therefore, can we agree
16  that you did not review the deposition of
17  Dr. Steele as you did not note that in your
18  log?
19    A.   Yes.
20    Q.   Did you have an understanding as to
21  whether or not there was any question of
22  liability or comparative or contributory
23  negligence in the analysis of this file?
24    A.   Could you restate that?

43

1    Q.   At the time of your entry of
2  July 28, 2006, did you have an understanding
3  as to whether or not there was any claim or
4  assertion that Margaret Wisinski was either
5  contributorily negligent or comparatively
6  negligent for the accident which caused her
7  injuries?
8    A.   For the accident?  My understanding
9  at that time was that she did not have any
10  liability for the accident.
11    Q.   So, essentially, you were analyzing
12  this case purely on damages?  There was no
13  liability analysis?
14    A.   I would say that's correct.
15    Q.   In your log -- well, let me jump
16  ahead for just a second.  I -- on page 1677
17  there's the continuation of your log entry
18  that starts on 1676, and I do not see any
19  other log entries made by you.
20         Do you recall whether you took any
21  steps or did anything on this file after your
22  log entry of July 28, 2006?
23    A.   Well, I don't believe there's any
24  other entry in the file except perhaps at one

---

44

1  point in time they had consulted me for the
2  name of a defense firm to refer the case to.
3    Q.   Okay.  That would -- would have
4  been prior to July 28, 2006 because Attorney
5  Godshall was involved back in December of
6  2005.
7    A.   Okay.  That's probably correct.  I
8  recall reading a -- an entry from Diane
9  Hericks where she had called me to ask for a
10  referral for a defense firm in the Erie,
11  Pennsylvania, region because we had very
12  little presence there.
13    Q.   Okay.  So there's no entry from
14  you, but you now have a recollection -- do you
15  recall that at all?
16    A.   I don't.
17    Q.   Okay.  But you have an
18  understanding that you were involved, then, in
19  selecting defense counsel?
20    A.   The -- the call would have probably
21  been of a general nature that, "Gee, Steve, I
22  have a claim in Erie, Pennsylvania.  Who would
23  I -- who would you suggest that I use as
24  defense counsel in that region?"

46

1  So it wouldn't -- it wouldn't
2  necessarily be related to any particular
3  claim, just a general question, and it looks
   like she may have recorded an entry in the
   file reflecting that conversation.
6  Q.  Okay.  And did you know Attorney
7  Godshall?
8  A.  Only from having dealt with him on
9  prior cases.  I don't think we've actually
10 ever met.
11 Q.  Okay.  Your -- The Commerce Group
12 or any of its associated subsidiaries didn't
13 have any relationship with any law firms in
14 western Pennsylvania?
15 A.  I'm not certain, but I don't
16 believe we had anyone in -- in the Erie,
17 Pennsylvania, area.
18 Q.  Well, I was being a little bit
19 broader.  Western Pennsylvania also includes
20 like Sharon, Pennsylvania, and -- as well as
21 the greater metropolitan Pittsburgh area.
22 A.  Sure.  I -- I can't recall without
23 looking at our panel.  It may have been that
   Doug -- Doug was just over the border in Ohio

1  and it was, you know, easy access for him to
2  handle this case.
3  Q.  The reason I ask that is we've
4  taken Mr. Godshall's deposition, and he
5  indicated that less than -- well, I believe
6  his exact words were -- he was asked what
7  percentage of his business involves handling
8  Pennsylvania claims and he said not more than
9  five percent.
10 Were you aware of that when you
11 advised Ms. Hericks to retain Mr. Godshall's
12 firm to handle the claim of Margaret Wisinski
13 or to work on the claim of Margaret Wisinski?
14 A.  I -- I wouldn't have been aware of
15 the percentage of claims that he handled in
16 Pennsylvania.  I was aware that he was
17 admitted and certainly handled work in -- in
18 that region.
19 Q.  Did you contact him and make any
20 inquiries as to, you know -- you know, how
21 many cases has he handled in Pennsylvania, is
22 he comfortable handling Pennsylvania claims?
23 A.  I seem to recall having
24 conversation with Doug in the past about his

47

1  ability to take cases in Ohi -- in -- in
2  Pennsylvania and, again, this goes back
3  several years, but I -- my -- my recollection
4  is that he had a -- an eager willingness to
5  take on work in Pennsylvania, was admitted,
6  and had a fair amount of experience in that
7  region.
8  Q.  You don't recall whether you
9  inquired as to, you know, how many files or
10 how many cases he had in Pennsylvania?
11 A.  No.  I don't recall.
12 Q.  And -- and, of course, as someone
13 who handles claims throughout multiple states,
14 you understand that there are substantial
15 differences in the insurance laws and
16 regulations from state to state?
17 A.  I wouldn't say that they're
18 substantial.  There are definitely variances
19 from state to state but, by and large, I think
   there's a lot of -- there are more
21 similarities than there are differences.
22 Q.  Well, for example, you understand,
23 say, that Pennsylvania on an underinsured
24 motorist coverage -- underinsured motorist

48

1  coverage is what's called an excess state
2  whereas Ohio is what's called a gap state?
3  A.  Mm-hmm.  You know, having been away
4  for it for a few years, I'd have to go back
5  and -- and read our policy and research those
6  things, but those are the kinds of things that
7  I would look at from day to day.  Sure.
8  Q.  And -- and that would be a
9  significant difference?
10 A.  I suppose that's true.
11 Q.  And some states require
12 arbitration; other states do not?
13 A.  Most states, arbitration is a -- is
14 a -- is a voluntary -- by agreement between
15 the parties.  I understand that Pennsylvania
16 had a statute that required arbitration at one
17 point in time, but virtually all the other
18 states that ACIC covered, it was by agreement
19 between the parties.
20 Q.  And there are differences in
21 first-party benefits, for example, some states
22 have no-fault medical; some states do not?
23 A.  Sure.
24 Q.  And there are differences regarding

50

1  the liens, some states allow for liens on --
2  for medical payments; other states do not?
3      A.   Yes.
       Q.   So those are all significant
ɔ  differences?
6      A.   I don't know that I would coin them
7  "significant differences," but yes, there are
8  a lot of differences from state to state in
9  terms of how insurance coverages are -- are
10 applied.
11     Q.   And if you were going to have
12 someone represent American Commerce Insurance
13 Company or any of The Commerce Group
14 companies, you would want to know that they
15 are fully aware of the laws of that state?
16     A.   Yes.  I would say that's true.
17     Q.   Now, my -- we kind of got off track
18 here for a moment because you -- you talked
19 about your involvement prior to July of 2006.
20          And if -- if we've already covered
21 this, I apologize, but I want to make sure
22 we're clear.  I did not see any entries made
23 by you after July -- after your July 28, 2006
   entry.

1      Q.   Do you -- do you recall having any
2  other involvement in the file after
3  July 28, 2006?
4      A.   No, I don't.
5      Q.   Do you know whether or not you
6  reviewed any of the other log notes after
7  July 28, 2006?
8      A.   In preparation for this deposition?
9      Q.   I'm sorry.  At the time that the
10 claim was being handled, not in preparation
11 for your deposition here today.
12     A.   No.  I would say that after I
13 reviewed the file and made my entry on July
14 the 28th, that's the last time I had any
15 involvement in this case prior to being
16 noticed for this deposition.
17     Q.   Okay.  I want to, then, talk just
18 about that entry for a moment.  In your
19 July 28, 2006 entry, you authorized the
20 adjuster, Diane Herick -- you give her
21 settlement authorization of 100,000.
22     A.   Yes.
23     Q.   Okay.  In fact, sort of in the
24 bottom third of your entry, there's a sentence

51

1  that begins with the word "accordingly."
2      A.   Yes.
3      Q.   And it reads, "Accordingly, I will
4  extend settlement authorization to the
5  100,000 PL."
6      A.   Yes.
7      Q.   And when you say "PL," that's
8  policy limit?
9      A.   That's correct.
10     Q.   Okay.  And that would be the
11 maximum amount of coverage available to
12 Margaret Wisinski under her uninsured motorist
13 coverage?
14     A.   Yes.
15     Q.   When you made the decision -- well,
16 strike that.  Did you have to consult with
17 anyone higher up at American Commerce or The
18 Commerce Group to extend that $100,000
1ꓱ settlement authorization?
       A.   No, I didn't.
21     Q.   So that was a decision that -- that
22 -- that you made?
23     A.   Correct.
24     Q.   When you made that decision on --

52

1  on or about July 28, 2006, did the cost of
2  expert depositions and the costs -- the other
3  costs associated with litigation, including
4  counsel fees, impact your decision to extend
5  the authorization of $100,000?
6      A.   Yes.
7      Q.   Okay.  And you understood that
8  there were expenses associated with taking
9  doctors' depositions?
10     A.   Yes.
11     Q.   And you understood that there were
12 costs associated with paying your lawyer to
13 attend depositions and -- and attend hearings
14 and do research and things like that?
15     A.   Yes.
16     Q.   And those expenses were factored in
17 your decision to extend the $100,000
18 settlement authorization?
19     A.   Yes.
20     Q.   Okay.  Now, I want to -- I want you
21 to read the last -- I'm going to call it the
22 last quarter or so of your entry beginning
23 with the word "accordingly," and if you could
24 read that to the end.  And I realize part of

54

1 it's been redacted.  You can just note that
2 that -- that that amount has been redacted
3 out.
           MR. BUTCHER:  You want him to read
_  it out loud?
6          MR. SCIARRINO:  Yes, please.
7          MR. BUTCHER:  Okay.
8    A.    "Accordingly, I will extend
9 settlement authorization to the $100,000
10 policy limit.  That said, we should continue
11 negotiating this case as if -- as if we have
12 every intention of taking it to arbitration
13 (with plans of appealing and adverse decision)
14 and, if necessary, proceed with the next
15 scheduled deposition to demonstrate our
16 commitment to that plan to plaintiff's
17 counsel.
18          "I've added this claim to my diary
19 to follow negotiations and the outcome of this
20 claim.  I'll grant expense authority to" --
21 and the amount is -- is redacted -- "at this
22 time for continuing and anticipated legal
23 expenses."
24    Q.    Okay.  Now, at the time that you

1 made the entry of July 28, 2006, authorizing
2 the -- or granting settlement authority to
3 $100,000, it was not your intention to take
4 this matter to arbitration?
5    A.    I -- I would say that's correct.
6    Q.    Okay.  And -- and -- and I don't
7 want to put words in your mouth, but it
8 appears that what you are saying in that entry
9 is attempt to convince the plaintiff's counsel
10 that we will take this to arbitration, if
11 necessary, but, in fact, you would not have
12 gone to arbitration?
13    A.    I would say that my -- my
14 recommendation was that we continue
15 negotiating the claim as if we are planning to
16 arbitrate the claim so that we, you know,
17 maintain the leverage that we would -- we
18 would gain from that and -- and trying to
19 negotiate a reasonable outcome.
20    Q.    But, again, you did not intend to
21 go to arbitration?
22    A.    I would say no, we did not --
23    Q.    And --
24    A.    -- intend to go to arbitration.

55

1    Q.    And as of July 28, 2006, you had
2 essentially decided that if the plaintiff's
3 counsel stuck to his $100,000 policy limit
4 demand, ultimately, you would pay that?
5    A.    Yes.
6    Q.    Okay.  Was the fact that this case
7 was going to go to arbitration a factor which
8 impacted your decision to grant the settlement
9 authority to one hun -- to the $100,000 policy
10 limit?
11    A.    Yes.
12    Q.    Was that a key fact?
13    A.    I would say that it was.
14    Q.    Okay.  And, again, I don't want to
15 put words in your mouth.  You do note that in
16 your log, would it be fair for me to say, that
17 that was the most -- of all the different
18 factors, that was the single most important
19 factor?
     A.    Yes.
21    Q.    And that was known back in March of
22 2006?
23    A.    I'm not sure when exactly that was
24 known but...

56

1    Q.    Well, why don't -- why don't I do
2 this.  And -- and, again, your in --
3 involvement at that time, you may not have
4 known that -- let me ask it as a two-part
5 question.  Why don't I direct your attention
6 to Exhibit 20.
7    A.    This appears to be out of order.
8 Oh, okay.  It goes back.  I have it here.  The
9 letter from Doug Godshall?
10    Q.    Yes.
11    A.    Okay.
12    Q.    And at -- at that point American
13 Commerce had appealed or had asked Judge Bozza
14 to reconsider his order mandating arbitration,
15 and he denied that motion for reconsideration
16 thereby putting the case on the arbitration
17 track?
18    A.    Yes.
19    Q.    Okay.  And that's -- that's March
20 of 2006.
21    A.    Yes.
22    Q.    Now, in July of 2006 when you got
23 involved, did you know that back in March of
24 2006 this case had been put on the arbitration

58

1  track by Judge Bozza?

2      A.    I probably would not have been
3  aware of that point in time when the judge had
4  -- had overruled the motion for
5  reconsideration.  I would have simply known
6  that the case was scheduled for arbitration.

7      Q.    Okay.  So when you got involved in
8  July of 2006, you understand that this case is
9  going to arbitration, but you didn't know when
10  that had already been decided?

11     A.    No.  Probably not.

12         MR. SCIARRINO:  Okay.

13         MR. BUTCHER:  Tony, I don't know
14  how much more you have on this note, but
15  you've been going a little over an hour.

16         MR. SCIARRINO:  Actually, you have
17  very good timing.  I just want to -- I want to
18  ask one or two other quick questions about the
19  log, and then I'm basically done with
20  Mr. Shiner as a claims examiner.

21         MR. BUTCHER:  I assumed so, but I
22  wanted to make sure, so go ahead and ask your
23  couple questions.

24         MR. SCIARRINO:  And I need a break,

1  too, so...

2         MR. BUTCHER:  I know you do.

3      Q.    It says in -- in your note of
4  July 28, 2006 -- it makes some reference to
5  you putting in your diary to follow.

6         Do you recall whether you went and
7  followed -- followed up, had any other
8  dealings, with this case?

9      A.    You know, this was about the point
10  in time when I wrapped up my tenure in the
11  examining division.  I think I may have moved
12  back to the casualty division in August, and I
13  -- I think you'll see that it -- a different
14  examiner appeared on the scene following my
15  July 28 entry.

16     Q.    Could you direct me to that?  I was
17  not aware there was another examiner involved,
18  and if you would be kind enough to -- to -- to
19  point that out to me.

20         MR. BUTCHER:  Yeah.  It's right
21  there.

22     A.    Yes.  Theresa Ellis has an entry in
23  September, September 27 of 2006, where she's
24  simply granting additional expense authority.

59

1      Q.    Okay.  And Ms. Ellis is a claims
2  examiner?

3      A.    She was a claims examiner.  She's
4  no longer with the company.

5      Q.    Okay.  But as of -- as of, it looks
6  like, September of 2006, she was?

7      A.    Correct.

8      Q.    There's also on page 1680 an
9  R. Lucas?

10     A.    Yes.

11     Q.    Who's that?

12     A.    That would be Robert Lucas.  He was
13  also part of the examining division.

14     Q.    Do you know why Mr. Lucas would be
15  involved and Ms. Ellis involved?

16     A.    It may have been, you know,
17  covering for a day out of the office or
18  vacation.  The examiners often stand in for
19  one another if there's a need to approve or
20  authorize something.

21     Q.    Well, the reason I ask is there's a
22  couple entries by -- I think by
23  Mr. Lucas.

24     A.    Yes.

60

1      Q.    There's one on page 1683 that's
2  entirely redacted.

3      A.    Okay.

4      Q.    And then there's -- there is some
5  overlay with Ms. Ellis and Mr. Lucas.

6         Do you know why the two of them
7  were both involved, other than one potentially
8  covering for the other?

9      A.    No.  I'm not certain.

10     Q.    But they would both be examiners?

11     A.    Yes.

12     Q.    So it would be fair for me to say,
13  then, that home office continued to be
14  involved from the -- strike that.

15         It would be fair for me to say that
16  from the date that this case was reserved at
17  about $50,000 until the last entry, home
18  office was involved?

19     A.    Involved to the extent that it
20  looks like they were continuing to evaluate
21  and extend expense authority as -- as was
22  needed.

23     Q.    Okay.  And they would have had the
24  ability to go in and -- and -- and read the

61

1  log and see what was going on?

2     A.   Yes.

3     Q.   Okay.  And you had put it on, I
think you said, your diary so that would be a
-- a triggering, routine follow-up?

6     A.   It would have, had I continued on
7  in the examining division.  My work would have
8  been reassigned to -- I -- I believe it was
9  Theresa Ellis.

10    Q.   Okay.

11    A.   She would have picked up.

12    Q.   So what I'm driving at is, you had
13  put it on your diary, you had done the initial
14  -- you had done your initial review, you had
15  extended the authority to the $100,000 policy
16  limit, you had put it on your diary, but then
17  shortly thereafter you changed positions.

18         The next person who comes in would
19  then similarly diary it to continue to follow
20  the claim?

21    A.   Yes.  If she felt that it was
22  necessary.  In this case, the claim looked
23  like it had been settled, the offer of the
policy limit had been made, so I -- I wouldn't

62

1  expect her to continue to follow it on diary.

2         MR. SCIARRINO:  Okay.  I think we
3  reached a good point for a break.

4         MR. BUTCHER:  Okay.

5         MR. SCIARRINO:  Why don't we take a
6  little break --

7         MR. BUTCHER:  All right.

8         MR. SCIARRINO:  -- and then we'll
9  go back on the record.

10        MR. BUTCHER:  Okay.  Sure.

11        THE VIDEOGRAPHER:  The time is
12  10:48.  We are off the record.  End of video
13  cassette one.

14        (Recess taken.)

15        THE VIDEOGRAPHER:  The time is
16  11:01.  This marks the beginning of video
17  cassette number two in the deposition of
18  Steven Shiner.  Back on the record.

19    Q.   Mr. Shiner, we had a -- a -- a
20  break here and we had a brief conversation off
21  the record, and you indicated that you
22  recalled something that you had inadvertently
23  omitted from one of your prior answers.  Why
24  don't you go ahead and -- and add that to the

63

1  record.

2     A.   Yes.  When you asked me earlier
3  which states the central regional office was
4  responsible for, I -- I neglected to -- to
5  mention West Virginia was one of those states
6  as well.

7     Q.   Okay.  Thank you for -- for making
8  that correction.

9     A.   Sure.

10    Q.   I'm going to be asking, now, a
11  series of questions in your role as the
12  corporate designee for The Commerce Group and
13  American Commerce Company.

14         Unless I state otherwise, I'd like
15  you to assume that for the next series of
16  questions which should basically go to the
17  conclusion of your deposition today.  Okay?

18    A.   Yes.

19    Q.   If we have to double back for some
reason, I will let you know.

21    A.   Okay.

22    Q.   All right.  Now, we've already gone
23  through your -- your history with the company
24  and your positions and responsibilities.

64

1  I want to go through some mat -- some
2  questions regarding the materials that have
3  been identified previously in this case.

4         First and foremost, we have been
5  provided with some materials that were a
6  printout from something called Gateway, and
7  it's Exhibit 3, which is actually the majority
8  of this binder and all of this other binder.

9     A.   Okay.

10    Q.   Did you review those
11  claims-handling materials in anticipation of
12  your deposition here today?

13    A.   I took a quick look at what was
14  produced as -- as part of the discovery
15  materials.  I didn't read through all of them,
16  but I took a quick look to get a sense of what
17  -- what you were given.

18    Q.   Okay.  And you're familiar with
19  these materials because these are internal
20  Commerce Group documents?

21    A.   Yes --

22    Q.   Okay.

23    A.   -- for the most part.

24    Q.   And when I say "documents," I'm --

65

1  I'm using that term globally because I realize
2  some of these things are -- are stored
3  electronically and are accessed electronically
4  so that, you know, there's not necessarily a
5  binder book with all these things in it the
6  way it once was in the past; is that correct?
7      A.   That's correct.  That may -- some
8  of the materials are -- are training materials
9  that I may not have had any reason to look at
10  so I'm not -- I don't have firsthand knowledge
11  of them.  Other materials I would look at more
12  frequently and -- and certainly use in my
13  day-to-day responsibilities.
14      Q.   Now, the materials that are on
15  Gateway, are they accessible to the adjusters
16  who work for American Commerce Insurance Group
17  and The Commerce Group?
18      A.   Yes.  The -- the Gateway has been
19  sort of an evolving Intranet.  Today each
20  subsidiary has their own Gateway page with
21  their own policies, procedures, reference
22  pages and so forth.  At -- at certain points
23  in time, we had one Gateway where the
    subsidiaries that were under our control would

66

1  -- would both access the same home page.
2      Q.   The Margaret Wisinski claim starts
3  in December of 2001.  Back in December of
4  2001, was there a Gateway -- did Gateway
5  exist?
6      A.   No, it did not.
7      Q.   When did the Gateway program or --
8  or -- I'm not quite sure what to call it --
9  storage --
10      MR. BUTCHER:  Intranet.
11      Q.   -- Intranet come into being?
12      A.   I don't know the exact date.  My
13  best -- I don't want to say guess, but to the
14  best of my recollection, it was certainly
15  there when I started in examining in 2004, so
16  I would say probably in the 2002 time frame to
17  perhaps early 2003 it was developed and -- and
18  made available to the folks at ACIC.
19      Q.   All rightie.  Now, in anticipation
20  of your deposition here today, you were -- as
21  -- as you noted earlier, you were given the
22  listing of the -- of the areas of questioning
23  that you were going to be responsible for.
24  What documents did you review?

67

1      A.   Well, the -- the summary of the
2  categories that you were going to be covering
3  in the -- in the deposition notices, we -- we
4  reviewed that and -- and just, I guess,
5  discussed whether or not I'd be able to
6  adequately respond to any questions that may
7  come up in any of those areas.
8      I felt as though I -- I -- I could
9  address your questions.  I had -- didn't
10  specifically study any of the materials in
11  preparation for this deposition.
12      MR. BUTCHER:  Tony, I'd like to
13  just add so it's clear -- clear on the record,
14  Mr. Shiner was given an opportunity to review
15  what are the documents that are contained as
16  Exhibit 3.
17      MR. SCIARRINO:  Okay.
18      MR. BUTCHER:  He was also provided
19  materials that I would call -- what I mean
20  "provided," he was shown materials that I
21  would call "documents" produced by ACIC which
22  included their policy, the CFA evaluation
23  report authored by Diane Hericks, and any
24  other materials that would have been authored

68

1  by ACIC employees that have been marked as
2  Exhibits 1 through 42.
3      He was not provided an opportunity
4  to review correspondence from counsel that
5  have been marked as exhibits or other
6  materials, such as doctors' reports, that are
7  contained in Exhibits 1 through 42.
8      MR. SCIARRINO:  Okay.  That's fine.
9      MR. BUTCHER:  The -- is that a fair
10  statement about --
11      THE WITNESS:  That's correct.
12      MR. BUTCHER:  -- what you were
13  given to review?
14      THE WITNESS:  Yes.  Thank you.
15      MR. SCIARRINO:  And I will
16  represent to you that I think there's only
17  going to be one additional exhibit.  Basically
18  everything -- every document I ask you about
19  is going to be something that's already been
20  marked as an exhibit.  Okay?
21      THE WITNESS:  Okay.
22      MR. SCIARRINO:  Unless something
23  comes up that's a document that you're aware
24  of that hasn't been marked, in which case we

70

1  will use it and mark it if it is helpful.
2  Okay?
3      THE WITNESS:  Okay.
       MR. SCIARRINO:  And I'm not asking
   you about your conversations with counsel.
6      Q.   Prior to today, did you meet with
7  anybody, other than Attorney Butcher, relative
8  to the -- to this case?
9      A.   No, I did not.
10     Q.   Okay.  Have you had any telephone
11 conversations with anybody, other than
12 Attorney Butcher, relative to this case?
13     A.   Yes.
14     Q.   Whom did you speak with?
15     A.   Antoinette Yitchinsky.
16     Q.   Okay.  Did you have more than one
17 -- actually, why don't you spell
18 Ms. Yitchinsky's name for the court reporter.
19     A.   Oh, I wish I could tell you.
20     MR. BUTCHER:  It's
21 Y-i-t-c-h-i-n-s-k-y.
22     THE WITNESS:  Sounds about right.
23     Q.   Okay.  Do you recall about how many
   times you've spoken with her on this --

71

1  the printout of the Gateway materials.  As a
2  general proposition, are those Gateway
3  materials an accurate -- accurate
4  representation of the policies and practices
5  of American Commerce Insurance Company and
6  The Commerce Group?
7      A.   That's sort of a broad question.  I
8  think related to what those topics cover, I
9  would say yes.  Certainly not everything
10 contained within the Gateway.
11     Q.   What was turned over to us and what
12 is the Exhibit 3 deals specifically with claim
13 handling --
14     A.   Okay.
15     Q.   -- and the various components of
16 claim handling.  I'm sure that there may be
17 other things in Gateway regarding personnel
18 and -- and a whole host of other -- other
19 corporate issues, but for the purpose of what
   we're talking about here today and what was
21 turned over, it's my understanding that we
22 only received materials relevant to claim
23 handling.  Okay?
24     A.   Okay.

72

1  relative to this case?
2      A.   Probably twice.
3      Q.   Okay.  And what was the nature of
4  your -- well, do you recall approximately when
5  those conversations took place?
6      A.   Over the past two weeks.
7      Q.   Do you recall the content of your
8  conversation?
9      A.   I do.  The first call from Tony was
10 just to let me know that they -- you were
11 interested in taking my deposition, and she
12 wanted to check my availability.
13     And the second call was more of the
14 same, just sort of coordinating -- we weren't
15 sure whether or not it was going to happen or
16 where it -- or where or when it was going to
17 happen, so it was more about coordinating my
18 availability and just scheduling it and -- and
19 sort of going as a -- an in between Joe and I.
20     Q.   So other than Ms. Yitchinsky, you
21 have not spoken or met with any other Commerce
22 Group or ACIC people relative to this case?
23     A.   That's correct.
24     Q.   The -- the -- what is Exhibit 3 is

1      MR. SCIARRINO:  Is that accurate,
2  Joe?
3      MR. BUTCHER:  I would indicate that
4  we produced a table of contents, or what I'd
5  call a table of contents, that listed various
6  categories, available training materials, and
7  we produced, after request by yourself, the
8  topics that you requested specifically to be
9  printed out.
10     MR. SCIARRINO:  Right.
11     MR. BUTCHER:  And other than that,
12 there may -- there are, obviously, other
13 additional materials on the Gateway, but
14 pursuant to your request based on the top --
15 the materials that were produced initially in
16 response to request for production of
17 documents.
18     MR. SCIARRINO:  Okay.  But what I'm
19 just trying to make clear for the record is
20 that what we requested were all basically
21 documents that dealt with claims handling,
22 training for claims handling, claims handling
23 practices and procedures, and the various
24 components of that.

74

1       MR. BUTCHER:  Just bear with me for
2  a second.  The materials that were produced,
3  Mr. Shiner, were -- were subject to this table
   of contents that -- from the -- what are
ɔ  called the casualty reference guides --
6       THE WITNESS:  Yes.
7       MR. BUTCHER:  -- and then also
8  casualty chapters.
9       THE WITNESS:  Yes.
10      MR. BUTCHER:  So you understand how
11 the materials were generated.  Okay?
12      THE WITNESS:  Right.
13      MR. BUTCHER:  Are those the
14 materials that deal with -- are those the two
15 places on the Gateway, to your knowledge, that
16 deal with how to handle a casualty claim,
17 which includes a bodily injury claim, which
18 could also include an uninsured motorist
19 claim?
20      THE WITNESS:  Yes.
21      MR. BUTCHER:  Okay.  Is that
22 specific enough for you?
23      MR. SCIARRINO:  Right.
        MR. BUTCHER:  Okay.

1       Q.    Now, with regard to those
2  categories, is the Gateway material that's
3  been produced an accurate statement of ACIC
4  and Commerce Group's practices and procedures
5  and policies relative to those categories?
6       A.    To those claim types, yes, I would
7  say that it is.
8       Q.    Okay.  And just so that you
9  understand, I just want to make sure that we
10 know what your company's policies are so that
11 at the time of trial someone doesn't say
12 something different as to the way they do
13 things.
14      A.    I understand.
15      MR. BUTCHER:  I -- I want to make
16 one final distinction regarding the materials.
17 In production of documents, as a result of
18 Ms. Wisinski's claim arising from a policy
19 issued by American Commerce Insurance Company,
20 we produced a training materials policies
21 procedures that relate to American Commerce
22 Insurance Company.
23      The Commerce Group, Inc., itself is
24 an overarching identity that has various

75

1  separate corporate entities that are
2  subsidiaries of it that have different -- may
3  have separate policies, practice, potentially
4  even separate training.
5       We produced materials specific to
6  American Commerce Insurance Company and not
7  what you've termed as The Commerce Group
8  overall.  We've focused our discovery and
9  answers to American Commerce Insurance
10 Company.
11      THE WITNESS:  That's correct.
12      Q.    And -- and so that we all
13 understand, we're talking about American
14 Commerce Insurance Company's practices,
15 procedures, and guidelines as it relates to
16 claim handling.
17      A.    Yes.
18      MR. SCIARRINO:  Okay.
        MR. BUTCHER:  All right.  Thank
1ɔ you.
21      MR. SCIARRINO:  Now, I'm going to
22 apologize in advance because I do not have a
23 Bates stamped copy of the --
24      MR. BUTCHER:  Why don't we do it

76

1  this way.
2       MR. SCIARRINO:  So --
3       MR. BUTCHER:  I'm going to pull out
4  my copy, and then we'll try to put them
5  together.
6       MR. SCIARRINO:  And there's also a
7  copy in here, in these two, for the witness.
8       MR. BUTCHER:  Okay.
9       THE WITNESS:  Okay.  This is the
10 first section?
11      MR. BUTCHER:  Yeah.  That's the
12 top.  Tony, for purposes of your questioning,
13 if you can refer to -- we'll try to match up
14 and then we'll mark the Bates number if we
15 can.
16      MR. SCIARRINO:  Okay.  The first
17 part I want to ask about of the -- of the
18 Gateway materials is the Unfair Claims
19 Settlement Practices Regulations, and it
20 starts with page one and I want to ask
21 specifically about page 15.
22      MR. BUTCHER:  Can I see the page
23 number, see if I'm looking at the right thing?
24      MR. SCIARRINO:  Yes.

77

1      MR. BUTCHER: All right.
2  Mr. Shiner, page P3049.
3          THE WITNESS: Got it.
           MR. BUTCHER: Okay.
5      Q.   All right. And that is Bates page
6  P3049?
7      A.   Yes.
8      Q.   Okay. And on that page the -- and
9  this is part of the Gateway materials that
10 advises anybody at ACIC as to the regulations
11 regarding Pennsylvania Un -- Unfair Claims
12 Settlement Practices Regulations?
13     A.   Well, it's -- it's a -- a reference
14 link within our Gateway, it's actually a PCI
15 publication, and there's a link that brings
16 you to this document which is basically an
17 index of the various Unfair Claim Handling
18 Practices Acts throughout the 50 states and
19 there is a section for Pennsylvania.
20     Q.   All right. So this is a asset
21 available to any -- any adjuster or claims
22 examiner or supervisor so that if they have
23 any questions about the Unfair Claims
24 Settlement Practices Regulations in a given

78

1  state, such as Pennsylvania, they can find out
2  the citation so that they can look it up
3  should they -- should they wish to?
4      A.   Yes.
5      Q.   Okay. And this is something that's
6  available through Gateway so it's basically at
7  their desk via their computer?
8      A.   Yes.
9      Q.   All right. And the purpose of this
10 is to essentially provide a informational
11 asset to the claims handlers and supervisors
12 should they have questions regarding the
13 various states that ACIC does business in?
14     A.   Yes.
15     Q.   Now, the next thing I want to bring
16 your attention to is -- there is a section
17 called American Commerce Insurance Company
18 Claims Training and then the heading is
19 Bad Faith.
20     A.   Okay.
21         MR. BUTCHER: It's P3112. Close.
22 There you go.
23         THE WITNESS: Okay. Go ahead.
24     Q.   Now, that is about a ten-page

79

1  chapter --
2      A.   Okay.
3      Q.   -- and the Bates pages are P3112
4  through P3121; is that correct, sir?
5      A.   Yes, it is.
6      Q.   And, again, this is educational
7  material that is available through the Gateway
8  system to all of the ACIC claims handlers and
9  supervisors and the like?
10     A.   Yes, it is.
11     Q.   And on page -- well, it's page 7 of
12 10 at the top and I -- the Bates page would be
13 P --
14         MR. BUTCHER: 3118.
15     Q.   P3118. And on to the next page,
16 P3119. There is a reference to the Unfair
17 Claims Practices Act.
18     A.   Okay.
19     Q.   Do you see that?
       A.   I do.
21     Q.   And the un -- this section of the
22 training material deals specifically with the
23 model act that was created by the National
24 Association of Insurance Commissioners, also

80

1  known as the NAIC, and it has, going on to the
2  next page, a series of -- a series of
3  prohibitions, things that are considered to be
4  unfair claims handling --
5      A.   Yes.
6      Q.   -- is that correct?
7      A.   That's correct.
8      Q.   And I'm going to represent to you
9  that the Pennsylvania act, which is also in
10 exhibit in this case, Exhibit 6, contains the
11 same principles and in many ways almost the
12 exact same phrasing as the model act from the
13 NAIC. Okay?
14     A.   Okay.
15     Q.   Have you ever reviewed the
16 Pennsylvania act?
17     A.   I can't say that I have reviewed
18 the Pennsylvania act.
19     Q.   Okay. You are familiar, though,
20 with the -- the NAIC model act?
21     A.   Absolutely.
22     Q.   Okay. And that is -- is that model
23 act something that American Commerce Insurance
24 Company trains its -- its adjusters and claims

81

82

1  handlers on?

2      A.   Yes.

3      Q.   All right.  Now, I want to go over
a few of the key components of this.  And on
-- on page P3119 is the -- the listing.  The
6  first -- there's a series of numbered --
7  numbered practices that are considered to be
8  unfair.

9      The first one says,
10  "Misrepresenting pertinent facts or insurance
11  policy provisions relating to coverages at
12  issue."  Did I read that properly?

13     A.   Yes, you did.

14     Q.   Okay.  And is that a -- is that
15  something that ACIC trains its employees and
16  its claims handlers to not do?

17     A.   Yes.

18     Q.   And can we then, from that, state
19  that it is important that an ACIC adjuster not
20  misrepresent the pertinent facts or policy
21  provisions relating to coverages at issue?

22     A.   Absolutely.

23     Q.   Okay.  And just so that we're
clear, although you have not had the

1  opportunity to review the Pennsylvania Unfair
2  Insurance Practices Act or the associated
3  Pennsylvania code, you would agree that when
4  American Commerce Insurance Company does
5  business in the Commonwealth of Pennsylvania,
6  it is bound by the Pennsylvania insurance laws
7  and regulations?

8      A.   Absolutely.

9      Q.   Okay.  And it is incumbent upon
10  American Commerce Insurance Company to be
11  aware of the statutes and regulations and the
12  various states and commonwealths in which it
13  does business?

14     A.   Yes.

15     Q.   The next cat -- the next entry or
16  the next item is, "Failing to acknowledge an
17  act with reasonable promptness upon
18  communications with respect to claims arising
19  under insurance policies."  Did I read that
20  properly?

21     A.   Yes, you did.

22     Q.   Number four is, "Refusing to pay
23  claims without conducting a reasonable
24  investigation based upon all available

83

84

1  information."  Did I read that one properly?

2      A.   Yes, you did.

3      Q.   Number six reads, "Not attempting
4  in good faith to effectuate prompt, fair, and
5  equitable settlements of claims in which
6  liability has become reasonably clear."

7      A.   Yes.

8      Q.   Number seven is, "Compelling
9  insureds to institute litigation recover
10  amounts due under an insurance policy by
11  offering substantially less than the amounts
12  ultimately recovered in actions brought by
13  such insureds."

14     A.   That's correct.

15     Q.   Number eleven is, "Making known to
16  insureds or claimants a policy of appealing
17  from arbitration awards in favor of insureds
18  or claimants for the purpose of compelling
19  them to accept settlements or compromises less
than the amount awarded in arbitration."
21  Did I read that properly?

22     A.   Yes, you did.

23     Q.   Okay.  Now, all of these
24  prohibitions that are listed in the NAIC model

1  act are all things that American Commerce
2  Insurance Group trains its adjusters and
3  claims handlers to not do?

4      A.   That's correct.

5      Q.   Okay.  Now, you indicated
6  previously that the -- you weren't exactly
7  sure when the Gateway Intranet came into
8  being, but these principles, as set forth by
9  the NAIC model act, those existed for many
10  years prior to the Gateway system?

11     A.   Absolutely.

12     Q.   And this would have been something
13  that American Commerce has -- American
14  Commerce Insurance Company has trained on
15  before the Gateway program existed?

16     A.   I can't say for certain that they
17  trained on that before the Gateway program
18  existed.  We, as I mentioned earlier, took the
19  leadership of the ACIC claims department over
20  in the early 2001-2002 time frame.

21     Q.   Okay.  When you -- when -- when
22  The Commerce Group took over the leadership of
23  the American Commerce Insurance Company's
24  claims department or claims component, you

86

1 certainly would have expected that American
2 Commerce Insurance Company's claims handlers
3 abide by the -- the standards set forth by the
   NAIC?
5    A.    I would expect that any seasoned
6 claim handler fully understood the no -- the
7 Unfair Claim Handling Practices Act and -- and
8 probably had been exposed to it many, many
9 times throughout their career and would do
10 everything in their power to avoid violating
11 any of those.
12   Q.    Okay.  Thank you.  Now I want to
13 bring your attention away from the Gateway
14 material for just a moment to what has been
15 marked as Exhibit 5, which is the Pennsylvania
16 code, and it should be in this binder.
17       And I bring your attention to --
18 the -- the code is -- is numbered 31 PA Code,
19 Section 146.1, and then it goes on from there.
20 I want to bring your attention to what is
21 146.4 which is about three or four pages into
22 that exhibit, sir.
23   A.    Okay.
     Q.    I'm going to read 146.4 (a), "An

1 insurer or agent may not fail to fully
2 disclose to first-party claimants pertinent
3 benefits, coverages, or other provisions of an
4 insurance policy or insurance contract under
5 which a claim is presented."  Did I read that
6 properly?
7    A.    Yes, you did.
8    Q.    And that is essentially the same
9 language that we saw in the NAIC model act?
10   A.    Yes, it is.
11   Q.    Okay.  And this is the Pennsylvania
12 Administrative Code which is the regulations
13 for insurance in -- in the Commonwealth of
14 Pennsylvania?
15   A.    I understand.
16   Q.    I'm also going to read (e), "An
17 insurer may not request a first-party climant
18 -- claimant to sign a release that extends
19 beyond the subject matter that gave rise to
20 the claim payment."  Did I read that properly?
21   A.    Yes, you did.
22   Q.    Okay.  And, again, these are
23 regulations in the Commonwealth of
24 Pennsylvania which are binding upon ACIC?

87

1    A.    Yes.
2    Q.    Okay.  And that's fairly clear?
3 You don't have any problem understanding that
4 language?
5    A.    Absolutely not.
6    Q.    Okay.  And those are, again,
7 codification of what are well-accepted
8 insurance principles?
9    A.    Yes.  That's true.
10   Q.    You know what, that's a -- a good
11 -- a good point that we just raised, that the
12 NAIC model act and the Pennsylvania Unfair
13 Insurance Practices Act are essentially basic
14 insurance principles that have been then
15 reduced to written code and law.
16   A.    I would say that's true.
17   Q.    And so when you say -- when you
18 earlier said any experienced or seasoned
19 adjuster would be familiar with those, it's
   because they're basic principles that whether
21 you were in Pennsylvania or here in
22 Massachusetts, or wherever, these basic
23 principles apply pretty much across the board?
24   A.    They're all based on the model act.

88

1    Q.    Okay.  Pardon me.  Going to have to
2 bear with me, we've got so many documents that
3 occasionally I lose track of everything I've
4 got.
5    A.    Sure.
6    Q.    While we're talking about basic or
7 fundamental insurance principles, I want to go
8 through a few of those, and some of them are
9 probably codified and some of them may not
10 appear in the Unfair Claims, or the UIPA, but
11 I want to go through a few of them.  Okay?
12   A.    Sure.
13   Q.    Can we agree that American Commerce
14 Insurance Company had an obligation to treat
15 the insured's interests equal to that of the
16 company's?
17   A.    Yes.  Well, I guess that's very
18 general but...
19   Q.    It's a basic principle.
20       MR. BUTCHER:  I'm going to place an
21 objection to that, whether obligation, as I
22 think that calls for a legal conclusion, but
23 you can answer.
24   A.    Are we talking about the insured's

89

1  interests relative to a particular coverage
2  part or are we talking about the insured's
3  interest in general, because I think they
   differ, depending upon what kind of exposure
ͻ  you're dealing with?
6      Q.  Well, as a general proposition --
7  and we're talking about an insured, not a
8  third-party claimant -- does American Commerce
9  Insurance Company have an obligation to treat
10 the insured's interest equal to that of
11 American Commerce Insurance Company?
12     A.  Well, again, I think -- I think the
13 insurance company has an -- an obligation to
14 put the insured's interests above its own when
15 -- when the insured is being sued by a third
16 party under their liability coverage.
17         Conversely, if the insured is
18 making a claim against the company under an
19 underinsured coverage part, for example, I
20 don't know that the company has to place an
21 insured's interest above its own.
22     Q.  I'm not asking above; I'm saying on
23 equal.
24     A.  Yeah.  I would say on an equal

90

1  basis, sure.
2      Q.  Okay.  So with regard to an
3  insured, because you -- you talked about
4  whether an insured gets sued by a -- a third
5  party --
6      A.  Mm-hmm.
7      Q.  -- and then we also talked about
8  where the insured is making a direct claim --
9  whether it be an un- or underinsured motorist
10 claim or perhaps a claim for medical benefits
11 or wage benefits -- if it's a first-party
12 claim where the insured is making a claim
13 directly to American Commerce Insurance
14 Company, then American Commerce has an
15 obligation to treat the insured's interest
16 equal to its own?
17     A.  Equal to its own.  I guess I would
18 say that's true.
19     Q.  Okay.  And then on those other
20 situations where we're talking about where the
21 insured gets sued by a third party and then
22 American Commerce is providing a defense in
23 indemnity, then it's a little higher.
24     A.  Well, I think that's true, but I'd

91

1  -- I'd also like to -- to point out that an
2  underinsured or uninsured motorist claim by
3  its very -- very nature, can become somewhat
4  adversarial, and there are times when
5  allegations are made that the company has to
6  challenge and investigate further, so I guess
7  when you say the company should put its
8  insured on equal footing, I'm not sure that I
9  can fully agree with that, if you understand
10 what I'm saying.
11     Q.  Well, I want to explore that a
12 little bit.  American Commerce Insurance
13 Company occasionally has insureds who make a
14 variety of first-party claims including un-
15 and underinsured motorist claims.
16     A.  That's true.
17     Q.  When you say "put those claims on
18 equal footing," you are not assuming that
1ᑫ American Commerce Insurance Company just has
   to auto -- that that doesn't mean that they
21 have to automatically believe what the insured
22 says.
23     A.  I'm not sure what your inference
24 is, but no, I would certainly not suggest that

92

1  the company would ever have to believe
2  whatever's been presented to them without
3  conducting a reasonable investigation.
4      Q.  Right.  So when we say -- when I'm
5  asking you -- when a person presents a
6  first-party claim, does American Commerce have
7  to put their interest equal to ACIC, I'm not
8  implying that ACIC has to blindly believe them
9  or blindly accept what they say.
10         I'm saying that ACIC has to weigh
11 their interests against the interests of the
12 insured and place them equally.
13     A.  I guess, phrased that way, I would
14 agree.
15     Q.  Okay.  Now, does ACIC have an
16 obligation to be honest and truthful with the
17 insured?
18         MR. BUTCHER:  I'm going to place an
19 objection and maybe, Tony, just so we don't do
20 this for a few minutes, if I can put a
21 continuing objection to our -- what our
22 obligations are, because I think that's where
23 you're going, that that's a legal conclusion
24 that's defined by both law and our contract,

94

1 and if I could have that as a continuing
2 objection so I don't interrupt every question
3 that you're going to ask Mr. Shiner.
4          MR. SCIARRINO:  I'm not -- you can
5 certainly have the objection.  I just want to
6 make it clear, I'm not asking him for a legal
7 conclusion.  I'm asking him whether these are
8 accepted insurance principles.
9          MR. BUTCHER:  Okay.  Well --
10         MR. SCIARRINO:  Okay?
11         MR. BUTCHER:  -- I made my
12 objection, and maybe if we could just have it
13 as continuing so I don't --
14         MR. SCIARRINO:  Sure.
15         MR. BUTCHER:  -- interrupt the next
16 set of questions that I know you're -- you're
17 intending to ask.
18     Q.   Let me -- let me -- and let me
19 rephrase the question as well.
20          With regard to a first-party
21 claimant, is it an accepted insurance
22 principle that the insurance company should be
23 honest in their dealings with the insured?
24     A.   Yes.

94

1     Q.   Okay.  As an insurance principle,
2 does the insurance carrier or should the
3 insurance carrier disclose all applicable
4 insurance coverages and their limits that
5 would apply to an insured's claim?
6     A.   Yes.
7     Q.   When an insured -- strike that.  As
8 a basic insurance principle, when an insured
9 presents a first-party claim, should the
10 insurance carrier aid them in presenting the
11 claim?
12     A.   Yes.
13     Q.   And when I say "aid," I mean aid in
14 the gathering of information and aid in
15 getting the information necessary to handle
16 and adjust the claim.
17     A.   Yes.  To -- to -- to the extent
18 that they've been given the ability to do so,
19 absolutely.
20     Q.   Okay.
21     A.   And, you know, I'd like to back up,
22 if I may, and clarify two questions back.  You
23 asked me if -- if I thought the insurance
24 company had a duty to advise the insured about

95

1 all of the applicable coverages and their
2 limits.
3          I think, very clearly, the
4 insurance company has an obligation to do
5 that.  Where it -- it can become gray is
6 whether or not the insured has an applicable
7 claim.
8          In other words, when a claim is
9 opened, you -- you may have certain -- there
10 may be certain exposures that are not known
11 early on so you don't share with the insured
12 at that point that, "Oh, by the way, you've
13 got this coverage and these are the limits"
14 because it's really not relevant.  But when a
15 claim is made, then, yes, it becomes important
16 for the insurance carrier to share the
17 information that they need.
18     Q.   Okay.  And as a corollary to that,
19 for example, if -- if there was a motor
20 vehicle accident and the person reported the
21 accident to their insurance company and did
22 not seek medical attention -- attention right
23 away, initially it might be thought that the
24 only coverages that would be applicable --

96

1 applicable would be, say, property damage and
2 then if a week or two later, the insured
3 called up and said, you know, "My leg hurts,"
4 then the adjuster would have the obligation to
5 say, "Oh, by the way, you have medical benefit
6 coverage that could apply to this."
7     A.   That -- that's true.
8     Q.   So -- so as the company gets
9 additional information, if they learn that
10 other coverages would apply, then they should
11 notify the insured as they get those facts in?
12     A.   Yeah, generally, I would say that's
13 true.
14     Q.   Okay.  I think that's what you were
15 expressing, that over the course of a claim,
16 sometimes information comes in and things that
17 might not have been initially thought to be
18 applicable are learned to be applicable, and
19 when you get that information, that's when you
20 disclose it.
21     A.   Correct.
22     Q.   Okay.  We were talking about -- we
23 digressed for just a moment, but we were
24 talking about the obligation to aid the

98

1  insured in presenting the claim, and one of
2  the things that is frequently done by an
3  insurance carrier is sending out a application
   for benefits so that they can learn about an
5  insured's claim.
6      A.   Yes.
7      Q.   And the purpose of that form is to
8  learn about the claim so that information can
9  be gathered to better adjust and assess that
10 claim.
11     A.   An application for benefits is
12 specific to a medical claim and, yes, they're
13 used when authorizations are executed to
14 request medical documentation and wage loss
15 documentation.
16     Q.   And I'm going to show you a
17 document here, and I don't know whether you've
18 seen it prior to today.  It's been marked as
19 an exhibit in the plaintiff's deposition.
20 It was Exhibit D.
21         It's the application for benefits
22 for Margaret Wisinski, and I'm going to put --
23 we're going to call this Exhibit 44.
24     A.   Okay.

1      Q.   And it's Bates page 12987 and
2  12988.
3          (Deposition Exhibit No. 44 marked.)
4      A.   Do I have that in my package?
5      MR. BUTCHER:  No.
6      Q.   No, you --
7      A.   Okay.
8      Q.   -- you don't, and I'm going to give
9  it to you here.  I just have some sort of
10 general questions about this.
11     A.   Sure.
12     Q.   There is a -- a part of this form
13 where the insured is asked to describe their
14 injuries.
15     A.   Yes.
16     Q.   And the purpose of that is to
17 essentially learn what physical injuries, if
18 any, were caused by the motor vehicle
19 accident.
20     A.   Yes.
21     Q.   Okay.  And then underneath that
22 there's also questions about medical services
23 and wage loss.
24     A.   Yes.

99

1      Q.   And this is, again, to learn about
2  the extent and nature of the person's physical
3  injury, and if it has any wage loss component
4  as a result of those physical injuries.
5      A.   That's correct.
6      Q.   Okay.  And then at the bottom --
7  this form, I think, is a longer form so it's
8  been -- been put on two pages, but I -- I
9  think this might be all one page on a -- on a
10 form.
11     A.   Yes, it is.
12     Q.   There are authorizations and those
13 authorizations allow the insurance carrier to
14 obtain work loss information and medical
15 information; is that accurate?
16     A.   Yes, it is.
17     Q.   Okay.  And in this particular case,
18 Margaret Wisinski described that she suffered
19 knee injuries, and she indicated that she had
   medical treatment and that she had wage loss,
21 and then she signed both of those
22 authorizations and returned them to -- to
23 ACIC?
24     A.   Appears as she did, yes.

100

1      Q.   And so the purpose of this form,
2  then, would be so that ACIC could investigate
3  those claims to properly adjust and evaluate
4  them, correct?
5      A.   Yes.
6      Q.   And the authorization for medical
7  records could be used -- could be sent to
8  hospitals and doctors so that copies of
9  medical records can be obtained?
10     A.   Yes.
11     Q.   And the -- the release for work and
12 other loss information can be sent to
13 employers and -- and other -- other entities
14 who would have information regarding wage loss
15 so that those wage loss records, in whatever
16 format they might be, can be produced?
17     A.   Yes.
18     Q.   Okay.  And this is -- as we said,
19 this is part of the insurance company's aiding
20 the insured in presenting their claim by
21 giving the insurance company the information,
22 the basic claim information, and then the
23 authorization to obtain more detailed
24 information?

101

1    A.    Yes.

2    Q.    Okay.  And have I accurately
3 described how this form works and its purpose?

     A.    Yes.

     Q.    Okay.  And, again, I know you
6 didn't see this -- this form, but obviously
7 this -- this form was done in
8 Margaret Wisinski's claim.

9    A.    Yes, it was.

10   Q.    Okay.  You had indicated that the
11 application for benefits form, which was
12 marked as Exhibit 44, is -- is used
13 specifically when there are first-party
14 medical or wage loss claims being made?

15   A.    Yes.  Generally, an application for
16 benefits is a standard form that's used in any
17 no-fault state to -- to provide the insurer
18 with information they need to process the
19 no-fault claim.

20   Q.    Okay.  And Pennsylvania's a
21 no-fault state?

22   A.    Yes.

23   Q.    And with regard to medical
     benefits, the -- in a no-fault state, the --

102

1 the insurer of the injured person pays their
2 medical bills?

3    A.    Provided they're related to the
4 automobile accident, yes.

5    Q.    Well, that was going to be where I
6 was -- actually, you anticipated my next
7 question.  Now, of course, there's a limit,
8 there's a dollar limit, that -- that is
9 applicable on those -- on those coverages,
10 correct?

11   A.    Yes.

12   Q.    And, of course, documentation is
13 required?

14   A.    Yes, it is.

15   Q.    But in order for the insurer to pay
16 the insured's medical bills, that the medical
17 bills have to be for treatment that is related
18 to the motor vehicle accident?

19   A.    Yes.  That's true.

20   Q.    Okay.  That -- that's sort of a
21 threshold question.  So if someone's in a car
22 accident and they send in a bill because they
23 had, say, tonsillitis, that's probably going
24 to create a problem.  I mean, the insurer's

103

1 going to say, "Gee, I don't know if this is
2 related to the car accident."

3    A.    In a situation like that, it's --
4 it's pretty clear that tonsillitis is not
5 related.  In -- in many other situations, it's
6 a little bit less clear.

7         But, generally speaking, the -- the
8 insurance company seeks to make sure that the
9 medical care is reasonable, necessary, and
10 related to the accident.  And once that
11 determination has been made, they are
12 responsible to pay the bills up to the limit.

13   Q.    Okay.

14   A.    Yes.

15   Q.    And, again, that authorization,
16 that medical authorization, that's part of the
17 application for benefits exists so that the
18 insurance company can get the necessary
19 information to make the determination as to
   whether the treatment is reasonable,
21 necessary, and related to the accident?

22   A.    That's correct.

23   Q.    Okay.  And then when the
24 determination is made that it's reasonable,

104

1 necessary, and related to the accident, then
2 payment is made up to the limit?

3    A.    Yes.

4    Q.    Okay.  Pardon me.  I want to get
5 back to the Gateway materials for a moment.

6    A.    Sure.

7    Q.    The Gateway materials are
8 electronic.  Are they updated from time to
9 time?

10   A.    Yes.

11   Q.    Is there any record of -- is there
12 a way that one can tell when certain things
13 were added into the system or if certain
14 things were taken out of the system?

15   A.    I don't believe that there's any
16 sort of a -- a transactional history that
17 shows, you know, when something was updated or
18 -- I don't think that there's really -- rarely
19 an occasion where something is removed.  But
20 to answer your question, I don't believe
21 there's any sort of a history.

22   Q.    Occasionally, within the context of
23 -- of insurance claims handling, there are
24 developments that might affect claims handling

1 practices and procedures, for example,
2 sometimes laws change, you know, as there's a
3 new statute and sometimes there's court
decisions, cases, where judges make rulings
that can impact insurance coverages.
6    A.    Sure.
7    Q.    When such events occur, how does
8 American Commerce Insurance Company
9 communicate those changes to the adjusters who
10 are actually actively handling claims?
11    A.    Well, that occurs through a variety
12 of means.  Examining is generally the -- the
13 central point.  Examining receives daily
14 communications from PCI and -- and other
15 regulatory agencies.  We have market conduct,
16 compliance folks in our home office that send
17 out newsletters, making people aware of any
18 changes in the law or regulations.
19         Those that are significant that
20 impact claim handling would -- would generally
21 be published in the Gateway as -- as an
22 announcement or perhaps as a procedure if it
23 was going to be the sort of thing that changed
the way we handle claims going forward.

1         But as you know, there are many
2 nuances and changes in the law, it's very
3 fluid, so we -- we depend on our defense
4 counsel to -- to a great extent to -- to guide
5 us in -- in those matters.
6    Q.    Do you know whether ACIC has any
7 house counsel?
8    A.    ACIC does not have house counsel.
9    Q.    Okay.  If there is something that
10 is put on the -- a change or a notification is
11 put through Gateway, is it -- how is it done
12 so that everybody reads it?  Does it come up
13 initially?  Is it -- or is it just in with the
14 other material, and the only way you would
15 know about it is by going specifically to look
16 for it?
17    A.    Well, as I mentioned earlier, the
18 Gateway is sort of an evolving product.  More
19 and more companies are using technology today
20 to provide their -- their associates with
21 information.
22         Over time, our Gateway has evolved
23 to the point where it's -- it's the home page
24 for, you know, the -- the -- the respective

1 Gateway for American Commerce Insurance
2 Company would be the home page for most of the
3 adjusters, and something topical, something
4 critical, would be announced and be at the
5 forefront of -- of the Gateway if -- if it was
6 felt necessary.  Changes in systems, those
7 kinds of things, that are often announced that
8 way.
9    Q.    Now, who makes that decision?  Who
10 puts that in --
11    A.    It's -- it's generally a
12 combination of claims training and claims
13 examining that determine what something needs to
14 be communicated on a -- on a large scale.
15    Q.    Are ACIC employees trained on the
16 logging requirements of ACIC?
17    A.    You mean --
18    Q.    The claim log.
19    A.    The notes?
20    Q.    Yes.
21    A.    Yeah.  There's -- I'm not sure
22 where that training would be covered in the
23 grand scheme of training an adjuster.  It's
24 certainly a component of one of the training

1 modules.
2    Q.    Okay.  Is there an expectation that
3 the claims log is to be clear?
4    A.    Yes.
5    Q.    So you're clear in the sense that
6 someone who didn't handle the claim or someone
7 who comes in later in the claim, like an
8 examiner, can read it and understand what has
9 occurred?
10    A.    Absolutely.
11    Q.    Okay.  And is it to be -- is it
12 supposed to be accurate?
13    A.    Absolutely.
14    Q.    Would it be fair to say that the
15 actions of the claim handlers are supposed to
16 be entered in the log?  In other words, if the
17 claim handler makes a phone call and speaks to
18 an insured, that should be in the log?
19    A.    Yes.
20    Q.    Okay.  Are there any guidelines as
21 to what activities are to be logged and what
22 activities are not to be logged as they would
23 relate to claims handling?
24    A.    I think the general rule is that

1 the -- the -- all activities should be
2 reflected in the file.
3        I can't think of any reason why
something would not be recorded in the file or
5 nor would there be any policy not to record
6 something in the file unless it was profanity
7 or something like that that was, you know,
8 communicated on a telephone call, but
9 generally the expectation is that all activity
10 should be reflected in the file.
11    Q.    And, again, the purpose of that is
12 so that the supervisory staff or examiners can
13 then come in, review the log, and have an
14 understanding of where they -- where that
15 particular claim is in the event that the
16 examiner or the supervisor's involvement is
17 required?
18    A.    Yes.
19    Q.    And as examiner, you indicated, in
20 this particular case, you reviewed a -- a
21 particular report, but you sometimes also
22 review the log?
23    A.    Yes.
      Q.    And there are times when you are

1 relying on that log to have an understanding
2 of various facts in a particular claim?
3    A.    Some -- some facts I -- I might
4 rely on the log for; other facts I might
5 require other documentation, summary reports.
6    Q.    For example, if the -- if the log
7 entry -- if it indicates that there is not a
8 liability question on a particular claim,
9 you're going to rely on that as opposed to
10 yourself going back and trying to find the
11 police report and read the police report?
12    A.    I -- I wouldn't rely on a statement
13 that said there's not a liability issue.  I
14 would expect that there would be analysis, and
15 I would expect that there'd be reference to
16 the -- the factual materials that we used to
17 make that determination, then I might be able
18 to rely on the notes.
19    Q.    Okay.  So what you're indicating is
20 if an adjuster made an entry, you know, that
21 the insured is -- has no liability, you would
22 expect them to reference how the accident
23 happened and reference the police report, if
24 there is one, and statements, if there were

1 any, so that they -- so that there's a
2 foundation for that statement?
3    A.    Yes.
4    Q.    And then if there's appropriate
5 foundation for the statement, you're going to
6 rely on it because it's been logged properly
7 as opposed to going back and rereading that
8 material?
9    A.    Yes.
10    Q.    Okay.  And in this particular case,
11 that was essentially what happened?  There was
12 not a liability question, but there was a
13 discussion of why there wasn't a liability
14 question in the log?
15    A.    Yes.
16    Q.    Okay.
17    A.    To the best of my recollection,
18 there was a discussion that there was a police
19 report that found that the other party had run
a red light and that the liability was clear.
20    MR. SCIARRINO:  We're kind of at a
21 natural point for a break.  Do you want to
22 take a little break?
23    MR. BUTCHER:  Sure.

1    MR. SCIARRINO:  We're doing pretty
2 well, though, progress-wise.
3    MR. BUTCHER:  Are we?
4    THE VIDEOGRAPHER:  The time is
5 12:06, going off record, end of cassette two.
6        (Recess taken.)
7    THE VIDEOGRAPHER:  The time is
8 12:25.  This marks the beginning of videotape
9 number three in the deposition of Steven
10 Shiner.  We're back on the record.
11    Q.    Mr. Shiner, we -- we took a -- a
12 short break and we are back on the record.
13 I want to bring your attention to the Gateway
14 materials.  There's a part that says "ACIC
15 Claim File Handling Procedures."
16    A.    Yes.  Is it in my package?
17    Q.    It is in your package.  I don't
18 know what the Bates number is.  It's a 24-page
19 chapter.  P3378 is the first page.
20    MR. BUTCHER:  It might be in the
21 other binder, Steve.  In fact, it is.  I know.
22    THE WITNESS:  Oh, 3378.  Is that
23 what you said?
24    MR. BUTCHER:  Mm-hmm.

114

1    THE WITNESS: Okay.

2    A.   I have it.

3    Q.   All rightie. That is a 24-page -- I think it's a chapter on the -- on the Gateway system.

6    A.   Okay.

7    Q.   On page 3 of 24 it identifies the claims handling objective or claims file handling objective.

10   A.   Okay.

11   Q.   And then the next page is the claim file handling overview.

13   A.   Yes.

14   Q.   And the first category that is dealt with is coverage.

16   A.   Yes.

17   Q.   Do you see that?

18   A.   I do.

19   Q.   And is the reason that that is the first category because coverage determinations are essentially threshold determinations?

22   A.   Yes. I think that's true.

23   Q.   Okay. And if you go on, it's page 7 of 24, Bates page P3384.

---

114

1    A.   Okay. I have it.

2    Q.   The first full paragraph reads, "For all liability and un/underinsured motorist claims, a written analysis on coverage will be completed in the file notes or, if applicable, in the CFA under the coverage section.

8    "If a coverage issue on any policy is not resolved within 30 days of claims creation, the file should be referred to the supervisor for review." Did I read that accurately?

13   A.   Yes.

14   Q.   Is it my understanding from -- from -- it is my understanding of this to be that all coverage issues on un- or underinsured motorist claims should be resolved within 30 days of that un- or underinsured motorist claim being opened; and if it's not done within 30 days, then the supervisor should review it?

22   A.   The expectation, once this was introduced, and I'm not sure exactly when that -- that was, the claim file handling

---

115

1    procedures, yes, the -- any -- any open issues should be pursued with dispatch with the expectation that they are resolved within 30 days. To the extent that that's possible.

5    Q.   Okay. And, again, this is because coverage is a threshold issue --

7    A.   Mm-hmm.

8    Q.   -- and you want that done at the -- for lack of a better term, at the front end of the claim?

11   A.   Yes. When -- when a particular coverage issue is known at the front end of a claim, as -- as we talked earlier, sometimes coverages are not exposed until well into the life of the claim.

16   Q.   Okay. Now -- and I apologize. I'm not sure if it's in the claim file handling practices and procedures. Once a file coverage is open, say, uninsured motorist, for example, and an adjuster is assigned, is there a routine scheduling?

22   In other words, is there a time frame during which the adjuster should follow up routinely on a claim?

---

116

1    A.   There's no hard-and-fast procedure dictating that the file should be followed under this particular interval. Every claim is different and should be taken on its merits. Some cases require a more active follow-up; others require, you know, very little as things are developing.

8    Q.   Is there a maximum time under which the file should be reviewed no matter what every so many days?

11   In other words, is there like every file should be -- every UI, UIM file should be reviewed every 90 or 120 days?

14   A.   I don't believe that there's a procedure that -- that, again, dictates a maximum time frame. I -- I -- I -- you know, there are rules of thumb that, you know, claims should be looked at every so often. You know, if -- if there are still outstanding issues, they're followed more aggressively.

21   If -- if there are not outstanding issues, you know, they're probably looked at a minimum of every 60 days or thereabouts.

24   Q.   Okay. So even if a -- a file were

117

1  in, say, a holding pattern, waiting for
2  information, you would still expect there to
3  be some activity every 60 days or so?
4        A.   As a rule of thumb, I -- I would
5  say that's true.  There are -- there are
6  exceptions, for sure.  If the claim was set up
7  just out of precautionary measures and we're
8  waiting for a time frame to expire before we
9  close it, you know, those may be followed less
10  actively.
11        Q.   Are there any guidelines for the
12  time frame for supervisory reviews?
13        A.   We have 15-month reviews where
14  supervisors are expected to review the file
15  and make certain that, you know, steps have
16  been taken to bring the case toward
17  disposition.
18             I'm not sure if that procedural
19  expectation was in place at the time of the
20  case in question, but offhand I can't think of
21  any -- any other procedural requirements
22  regarding the supervisor's involvement.
23             Actually, there's a -- there's a
   six-month review requirement to make sure that

118

1  the reserving is -- is being followed.
2        Q.   In the materials, the Gateway
3  materials that are Exhibit 3, there is a
4  portion on arbitration.
5        A.   Okay.
6        Q.   And --
7             MR. BUTCHER:  Actually, don't flip
8  through it yet.  Tony, if you can, can you
9  tell what sections are before and after?
10             MR. SCIARRINO:  Well, there's a
11  workshop before it, the Yellow Brick Physical
12  Therapy, it's the one where there's --
13             MR. BUTCHER:  Oh, okay.
14             MR. SCIARRINO:  -- all the bills
15  and it's about -- literally about halfway
16  through the packet.
17             MR. BUTCHER:  Yeah.  Yeah, I have
18  it now.  All right.  Bates number 3324.
19  Same document.
20             MR. SCIARRINO:  Okay.
21        A.   Okay.
22        Q.   Okay, sir.  There's a portion of
23  the ACIC training materials.  There's a
24  chapter on arbitration.  It begins at page

119

1  3324 --
2        A.   Yes.
3        Q.   -- and it goes on for six pages.
4        A.   Okay.
5        Q.   And this essentially discusses the
6  arbitration process and describes the process.
7        A.   Yes.
8        Q.   Okay.  And on page 3 of 6 --
9        A.   Yes.
10        Q.   -- there's a -- a discussion and it
11  indicates that -- a general description and it
12  indicates that "Arbitration is perceived to be
13  a very good alternative to litigation because
14  arbitration is typically less expensive and
15  less time-consuming."
16        A.   Yes.
17        Q.   Did I read that properly?
18        A.   You did.
19        Q.   And is that an accurate description
20  of one of the benefits of arbitration?
21        A.   I would say typically that is true,
22  yes.
23        Q.   Okay.  And then beneath there are
24  -- on this page, on page 3 and on page 4, they

120

1  discuss the sort -- they -- the benefits and
2  the disadvantages of arbitration.
3        A.   Yes.
4        Q.   Call it the pros and cons of
5  arbitration.
6        A.   Sure.
7        Q.   And there's a list.  And the
8  benefits are "cost savings, time savings,
9  convenience, flexibility, choice of neutral
10  privacy, finality, and preserving ongoing
11  relationships" --
12        A.   Yes.
13        Q.   -- and "risk management."
14        A.   Mm-hmm.  I see that.
15        Q.   And the disadvantages are "limited
16  discovery, no jury, relaxed rules of evidence,
17  lack of appeal rights, and limited development
18  of the law."
19        A.   Yes.
20        Q.   Okay.  Now, is that an accurate
21  description of the benefits -- the sort of
22  pros and cons -- of arbitration?
23        A.   I think so.
24        Q.   And have you, in your time as a --

121

1  in your various capacities, had occasion to be

2  involved in cases that were concluded by

3  arbitration?

   A.    Yes.

5  Q.    Okay.  And were you aware that in

6  the Commonwealth of Pennsylvania that

7  arbitration of un- and underinsured motorist

8  benefits has been -- had been mandated for

9  many, many years?

10     A.    I am aware of that.

11     Q.    Okay.  In fact, I want to say it

12 goes back to the '60s, but I'm not -- not sure

13 of that.  Our current law, the motor vehicle

14 financial responsibility law, dates back to

15 1984.

16     A.    Okay.

17     Q.    Have you, in the time that you've

18 been involved in claims, ever been involved in

19 a Pennsylvania claim that was resolved by

20 arbitration?

21     A.    Not that I can recall.

22     Q.    Okay.  The benefits of arbitration

23 also would impact the insured in a un- or

underinsured motorist setting, correct?

122

1  A.    I'm not sure if I understand your

2  question.

3  Q.    The benefits of arbitration, like

4  the cost savings, the time savings, the

5  convenience, those would also be benefits in

6  arbitration that would be beneficial to both

7  the insurance companies, ACIC, and the

8  insured?

9  A.    Yes.  I think so.

10     Q.    And, again, this material is

11 available for -- available to all of the

12 adjusters?

13     A.    Yes, it is.

14     Q.    Now, do you know whether or not

15 there is any component of the arbitration

16 materials that indicates what states

17 arbitration is mandated by and what states it

18 is not?

19     A.    I don't believe there's any such

20 material that -- that covers that.  We would

21 generally look to our policy, our contract, to

22 determine what the -- the statutes are in a

23 particular jurisdiction.

24     Q.    You have a general understanding of

123

1  -- of Pennsylvania law that if a policy does

2  not conform with Pennsylvania law, the pol --

3  policy will be reformed to comply with the

4  law?

5  A.    I think that's true in any state.

6  Q.    Okay.  And that's -- again, that's

7  sort of a general insurance principle, that if

8  your policy doesn't conform with the laws of

9  the state or commonwealth you're doing

10 business in, the courts of that state will

11 reform the policy in such a way that it

12 complies with the -- with the laws of that

13 state or --

14     A.    Yes.

15     Q.    -- commonwealth?

16     A.    I understand.

17     Q.    Okay.  And that's your

18 understanding?  And that's -- not just your

19 understanding, that's the position at American

Commerce?

21     A.    Absolutely.

22     Q.    Okay.  Quickly lay my hands on this

23 section, but there -- there are materials that

24 address the utilization of an IME, an

124

1  independent medical examination.

2  A.    Yes.

3  Q.    Okay.  And I have some general

4  insurance principles to discuss about that.

5  Is it important that if an

6  insurance carrier chooses to perform a medical

7  examination, that they select a doctor of the

8  appropriate specialty?

9  A.    Yes, I think it is.

10     Q.    Okay.  In other words, if you had

11 someone who had a hip injury, you would not

12 bring in a neurosurgeon?

13     A.    Correct.

14     Q.    Okay.  Is it also important that a

15 -- the doctor who is selected be a neutral or

16 unbiased person?

17     A.    Absolutely.

18     Q.    All right.  So you do not want

19 someone who has a -- a tilt one way or the

20 other?  You want a down-the-middle evaluation?

21     A.    We want an honest and reliable

22 medical evaluation by a competent physician.

23 Absolutely.

24     Q.    And your policy entitles ACIC to

126

1    require the insured to submit to such an
2    examination?

3        A.    Under certain coverage parts, yes,
     it does.

5        Q.    Right.  And -- and particularly
6    with regard to uninsured motorists and
7    underinsured motorists, the ACIC can require a
8    physical examination?

9        A.    Yes.

10       Q.    And, actually, I think you can also
11   require physical examination under the
12   first-party medical as well?

13       A.    Yes.

14       Q.    Okay.  Does ACIC maintain any lists
15   of doctors who it uses in a given area?

16       A.    I don't believe there are lists for
17   ACIC, because we're relatively spread out
18   across the countries and we don't have
19   penetration in any particular market that
20   allows us to develop lists.  We generally rely
21   on our defense counsel for -- for referrals
22   and recommendations.

23       Q.    Okay.  With regard to the defense
     counsel, you do have a list of -- of approved

---

1    counsel?

2        A.    Yes, we do.

3        Q.    Okay.  And when I say "you," I mean
4    American Commerce Insurance Company.

5        A.    I understand.

6        Q.    Now, when defense counsel is
7    involved in a un- or underinsured motorist
8    situation, they are representing the insurance
9    company, ACIC --

10       A.    That's correct.

11       Q.    -- as opposed to a third-party
12   claim where they are representing the insured
13   who has been sued?

14       A.    Yes.

15       Q.    Nevertheless, the same obligations
16   of good faith and fair dealing that exist for
17   the company exist to the first-party benefit
18   insured also exist from the counsel to the
19   first-party benefit insured?

20       MR. BUTCHER:  I'm going to just
21   place an objection again.  I believe that may
22   call for a legal conclusion, but go ahead and
23   answer.

24       A.    I -- I believe that our rights and

---

127

1    obligations extend to the representative that
2    we had hired -- we've hired to -- to represent
3    us.

4        Q.    And when you hire defense counsel,
5    they are to work with the adjuster or
6    supervisor who is involved in -- in actively
7    handling the claim?

8        A.    Yes.

9        Q.    And the counsel is supposed to be
10   updating and keeping the adjuster apprised of
11   what's going on, and the adjuster is supposed
12   to be reviewing the materials that are coming
13   in to ensure that the file is moving along and
14   being handled appropriately?

15       A.    Yes.

16       Q.    So it's not as though you hand the
17   file over to the defense counsel and wash your
18   hands of it?

19       A.    No.

20       Q.    The ACIC remains actively involved
21   in adjusting the claim?

22       A.    That's correct.

23       Q.    And with regard to the evaluation
24   process, that is not turned over to defense

---

128

1    counsel?  The evaluation of the -- of the
2    claim is -- is done by the adjuster
3    assimilating the information as provided by
4    defense counsel?

5        A.    Yes.  It becomes the adjuster's
6    responsibility to prepare an evaluation and
7    make recommendations, but it certainly largely
8    depends upon information that our defense
9    counsel gathers and shares with us.

10       We've hired them to make
11   recommendations so we certainly lean on them
12   to help us with that -- with that process.

13       Q.    So, for example, if the defense
14   attorney takes a deposition, he will then
15   provide a deposition summary to the adjuster?

16       A.    Yes.

17       Q.    The adjuster then reviews the
18   deposition summary, logs what they've
19   reviewed, and assimilates that information in
20   their evaluation?

21       A.    Yes.

22       Q.    And they may discuss various
23   components of evaluation with the -- with the
24   defense counsel?

129

1    A.   Sure.

2    Q.   And they would weigh their -- they

3 would weigh the recommendations of the defense

counsel?

5    A.   Yes.

6    Q.   Is it accurate, though, that the

7 final determination, the ultimate say, as to

8 settlement lies with -- or settlement

9 authority lies with the company and not with

10 the attorney?

11   A.   Yes.

12   Q.   I think we're mostly done with

13 Exhibit 3, but I don't promise. I want to

14 talk about -- you indicated earlier that you

15 had reviewed the log in anticipation of your

16 deposition today.

17   A.   Yes, I have.

18   Q.   Okay. I want to bring your

19 attention to a couple of different aspects of

20 the log and ask you some questions about that.

21   MR. BUTCHER:   Could you remind me

22 of the exhibit number?

23   MR. BUTCHER:   Exhibit 4.

     MR. SCIARRINO:   It's Exhibit 4.

130

1       MR. BUTCHER:   It would be at the

2 beginning of this. That wouldn't be it. You

3 have a separate binder.

4       THE WITNESS:   Oh, am I in the wrong

5 binder?

6       MR. BUTCHER:   Yeah.

7       THE WITNESS:   Wait. No. There are

8 the log notes right there.

9       MR. SCIARRINO:   It's the first one

10 in the vinyl binder.

11      THE WITNESS:   I'm sorry, what page

12 are you referring to?

13      MR. SCIARRINO:   I am referring to

14 Bates page -- it's March of 2006 and it's

15 Bates page, I believe, it's 1664. No. I'm

16 wrong. Oh, wait. 1664, that's correct.

17      MR. BUTCHER:   Why don't you flip to

18 the page before that. There's two 1664s.

19 There's a redacted version --

20      THE WITNESS:   Oh, I see.

21      MR. BUTCHER:   -- and then an

22 unredacted version we've subsequently

23 produced.

24   Q.   Okay. There is an entry on

131

1 March 29, 2004.

2    A.   Yes.

3    Q.   And it's at the -- actually, I'm

4 sorry -- it's March 30, 2004. It's where

5 there's a request to increase the reserve to

6 the $50,000 uninsured motorist limit.

7 Do you see that?

8    A.   Is that --

9    Q.   D. Hericks. It starts at line 385.

10   A.   385. Okay. I do.

11   Q.   Okay. Now, I'd like you to read

12 that entry to yourself and then I'm going to

13 ask you some questions on that.

14   A.   Okay.

15   Q.   Now, my understanding, from the

16 prior depositions, is that ACIC's reserving

17 philosophy is that the reserve is to be set at

18 the value of the case -- the valuation that

19 would be set if the claimant's best arguments

were accepted.

21   A.   Yes.

22   Q.   All right. I'm not sure I phrased

23 that perfectly, but is that a --

24   A.   Well, that's -- that's, in part,

132

1 true. The idea is that we -- we reserve for

2 basically the worst-case scenario. We

3 wouldn't -- we wouldn't discount the reserve

4 for liability defenses or causation defenses.

5    Q.   Now, in this case, your

6 understanding is -- is that Mrs. Wisinski had

7 knee injuries which required two arthroscopic

8 surgeries and then later two knee replacement

9 surgeries?

10   A.   Maybe you could rephrase that

11 question. I'm not sure if I follow that.

12   Q.   You understand -- and I'm not

13 asking you the exact dates that these various

14 procedures happened -- but that during the

15 life of this claim, Ms. Wisinski had two

16 arthroscopic surgeries, one to each knee, and

17 then knee replacement surgery on each knee?

18   A.   Yes. I understand she had those

19 procedures.

20   Q.   All right. And Ms. Wisinski

21 claimed that her knee surgeries, the

22 arthroscopic surgeries, were necessitated by

23 the accident and that the replacements were

24 accelerated by the accident.

133

1    A.    I understand that's her claim.

2    Q.    Okay.  Now, the adjuster here

3    indicates, Diane Hericks, indicates that she

4    set the reserve, assuming the worst-case

5    scenario at the full $50,000 UM limit which

6    was what she understood to be the maximum

7    amount of recovery for Mrs. Wisinski.

8    A.    Yes.

9    Q.    Okay.  Now, in fact, $50,000 was

10   not the maximum amount of recovery for

11   Mrs. Wisinski?

12   A.    That's correct.

13   Q.    The maximum amount of recovery for

14   Mrs. Wisinski was $100,000?

15   A.    That's correct.

16   Q.    Okay.  Now, Exhibit 1, which is in

17   the first binder, is the policy --

18   A.    Yes.

19   Q.    -- with a declarations page.

20   A.    Okay.  I have it here.

21   Q.    And -- and a review of the

22   declarations page would indicate that the

23   uninsured motorist coverage endorsement on

24   that particular policy was a stacked

134

1    endorsement.

2    A.    I'd have to look to see if it's

3    reflected on the declarations page or if you'd

4    have to -- it might be just a -- an indication

5    that the -- a particular endorsement.

6    Q.    It's at the bottom of the page

7    you're looking at.

8    A.    Right here?

9    Q.    Right.

10   A.    Yes.  I see it.  The endorsement is

11   listed with the word stacked parenthetically.

12   Q.    And that is page 43 --

13   A.    Yes.

14   Q.    -- Bates page 43?

15   A.    Yes.

16   Q.    So an adjuster who is trained in

17   claims handling, if they looked at the

18   declarations page, would know that the actual

19   maximum recovery for Margaret Wisinski would

20   be $100,000 and not $50,000?

21   A.    Yes.

22   Q.    Okay.  And that policy and

23   declarations page are documents that the

24   adjuster can access?  They can request a copy

135

1    of that and then review them?

2    A.    Yes, they can.

3    Q.    Okay.  Also the adjuster can

4    request a copy of the underwriting file; is

5    that correct?

6    A.    Yes.

7    Q.    Okay.  And if we look at -- bear

8    with me here for a moment -- Exhibit 33, it's

9    going to be in this binder here that your

10   other hand is on.

11   A.    This binder?  Okay.  Looks like an

12   insurance application.

13   Q.    All right.  And if you flip through

14   that, you'll see that there is in the -- at

15   what's called a sign down or a waiver for un-

16   and underinsured motorist coverage.

17   A.    Yes.

18   Q.    Okay.  Do you see that?  And

19   there's -- there's, I think, two pages.  Or

20   there's one -- there's a one-page sign down,

21   and it asks if the person wants to waive a

22   particular un- and underinsured motorist

23   coverage, and it also asks if they want to

24   waive stacking.

136

1    A.    Yes.

2    Q.    Okay.  And those are not signed?

3    A.    No, they are not.

4    Q.    Okay.  And you would know that,

5    under Pennsylvania law, even if the dec page

6    said "nonstacked," if the waivers aren't

7    signed, it's stacked coverage.

8    MR. BUTCHER:  I'm going to place an

9    objection.  I believe that that could call for

10   a legal conclusion, but to the extent that you

11   know, go ahead and answer.

12   A.    Was -- was your question do I know

13   that?

14   Q.    Yes.

15   A.    It's been quite some time since I

16   was involved in a Pennsylvania claim, and I

17   cannot recall whether that's something that I

18   had common knowledge of.  It would be

19   something that I would certainly explore if I

20   were involved in a claim.

21   Q.    Now, in the case of

22   Margaret Wisinski, the underwriting file can

23   be accessed by the adjuster?

24   A.    Yes.

137

1    Q.    And the policy can be accessed by
2  the adjuster?
3    A.    Yes.
      Q.    So an adjuster could look at the
5  policy itself and see that the coverage that
6  was selected was stacked coverage?
7    A.    Yes.
8    Q.    And the adjuster could follow up
9  and check the underwriting file and see that
10 there is no signed waiver of stacking?
11   A.    Yes.
12   Q.    So every indication is -- is that
13 there is stacked coverage?
14   A.    Yes.
15   Q.    Okay.  And my question is -- is --
16 do you know why the adjuster believed the
17 policy limit to be 50,000 as opposed to
18 100,000?
19         MR. BUTCHER:  I'm going to place an
20 objection.  I think that calls for his
21 interpretation of what Ms. Hericks knew at the
22 time.  I don't -- I don't know if he can
23 honestly answer what she knew and why she knew
     it.  But to the extent that you can answer it,

138

1  go ahead, answer it.
2    A.    Okay.  I'm -- I -- this is not
3  something that I haven't seen many times
4  before.  It's not uncommon when an adjuster
5  doesn't recognize an exposure that may exceed
6  the available coverage that they don't go
7  looking for more coverage.
8         In this case, I think it was pretty
9  clear that Mrs. Winewsky's (sic) injuries were
10 not sufficient that they may exhaust the
11 policy limit.  There were many questions as to
12 whether or not her injuries were related to
13 the accident, and it wasn't until such time
14 that someone raised the question as to whether
15 it was a stackable policy that that threshold
16 was crossed and she looked into it and very
17 quickly determined that it was a stackable
18 policy and increased the coverage.
19   Q.    On March 30, 2004, she had -- Diane
20 Herick had set the limit at $50,000 --
21   A.    Right.
22   Q.    -- assuming the worst-case
23 scenario.
24   A.    Right.

139

1    Q.    So in setting the coverage at
2  $50,000, Ms. Hericks acknowledged that there
3  was the possibility that the case could have a
4  limit -- or have a value of the limit of what
5  she believed to be the limit?
6    A.    Yes.
7    Q.    Now, there -- in her notes she
8  indicates that there are unpaid medicals --
9  I'm sorry -- that there was a wage loss claim
10 and that there were medicals at over
11 $14,000 --
12   A.    Yes.
13   Q.    -- is that correct?
14   A.    Yes.
15   Q.    Now, again, assuming worst-case
16 scenario, the wage loss of 40,000 and the
17 medicals of 14, that would be more than 50,000
18 right there, right?
19   A.    14,000.  And was there -- was there
   a numeric value there as to the alleged lost
21 wages?  I missed that.
22   Q.    If you look at page 1664 --
23   A.    It says that she's -- meds are
24 running over 14,000 and she's claiming that

140

1  she's not been able to work -- was earning
2  $40,000 a year.  Yeah, I think you could draw
3  the conclusion that the claim, in its
4  worst-case scenario, could be worth more than
5  50,000, yes.
6    Q.    Right.  Now, if the adjuster had
7  properly identified the policy limit as being
8  100,000 as opposed to 50,000, that might have
9  led to a reserve in excess of 50,000 --
10   A.    Yes.
11   Q.    -- because you can see that there
12 were specials above 50,000?
13   A.    Yes.
14   Q.    And then at that point, that would
15 have triggered home office involvement by, if
16 not you, someone like you?
17   A.    Yes.
18   Q.    And, of course, you have greater
19 technical expertise?  The examiners have
20 greater technical expertise?
21   A.    You'd like to think so, sure.
22 Diane is a very, very capable adjuster.
23   Q.    And -- but because it wasn't
24 reserved above 50,000, there was no home

141

1 office involvement?

2    A.   That's correct.

3    Q.   Okay.  I'd like you to look at 1664 and 1665 together.

5    A.   Okay.

6       MR. BUTCHER:  And when doing so, Mr. Shiner, just make sure on 1665 you're looking at the unredacted portion.

9       THE WITNESS:  Yes, I am.  Any particular section in 1664?

11   Q.   Well, I just wanted to get you on the right pages because there -- at the bottom of 1664, there's an entry by Ms. Dorger approving the reserve increase to $50,000. Do you see that?  It's toward --

16   A.   Yeah.

17   Q.   It's line 46.

18   A.   I sure do.  I do.

19   Q.   That's March -- that's the end of March 2004.

21   A.   I must be looking at the wrong note.  Okay.  I need to look at the unredacted version of 1665.

       MR. BUTCHER:  It's actually on

142

1 1664.

2       MR. SCIARRINO:  1664.

3    A.   Okay.  Yes.  I do see that.

4    Q.   Okay.  And above that is the note we've been talking about earlier from March 30, 2004 by Diane Hericks.

7    A.   Yes.

8    Q.   Okay.  And then there's a note on May 14 of 2004 by Diane Hericks.

10   A.   I see that.

11   Q.   That's middle of May, May 14, 2004.

12   A.   Yes.

13   Q.   The next entry by the adjuster who's handling the claim is November 9 of 2004 and that's on page 1665.

16   A.   By the adjuster.

17   Q.   Right.

18      MR. BUTCHER:  What do you mean by "adjuster"?  You mean by Ms. Hericks?

20      MR. SCIARRINO:  By Ms. Hericks.

21   A.   Because there are several entries that precede that.

23   Q.   Right.

24   A.   Okay.  I do.

143

1    Q.   That is about, by my count, almost exactly six months from May 14, 2004 to November 9, 2004.

4    A.   Yes, it is, give or take.

5    Q.   It's like five -- five months and 25 days.  Do you know why there is -- we had talked earlier about there being about 60 days or so.  Do you know why there was about a six-month gap in entries by Ms. Herick?

10   A.   Well, it appeared to me that there was a -- a good deal of dialogue between the then defense -- the then plaintiff's attorney and the adjusters involved in this case, asking for and waiting for various documentation, and it appears that Diane had had an active dialogue with counsel about prior MRI reports.

18      He had represented that he was going to get her prior MRI reports, then explained that there was a miscommunication and there were no prior MRI reports, but he was going to produce some additional medical documentation and would be forwarding that.

24      So that's the May entry.  And it

144

1 appears that she was still waiting for that throughout that period.  There's a -- there's a note here from a AXT Hill who seems to be perhaps working on the file in Diane's absence where there's some conversation with the attorney about, again, getting medical records and documentation together.

8       So my assumption is that we're, again, waiting for the plaintiff's attorney to send us information that he had offered to furnish.

12   Q.   So -- and, again, I'm not trying to put words in your mouth -- your understanding is that Ms. Hericks was waiting for Attorney Hartman's office to send her materials?

16   A.   Yes.

17   Q.   Okay.  Now, ultimately, there was involvement by Attorney George who was the new attorney for Ms. Wisinski.

20   A.   Okay.

21   Q.   And Attorney George requested arbitration.

23   A.   Okay.

24   Q.   Do you know why ACIC refused to

145

1 arbitrate Ms. Wisinski's claim initially?

2   A.   I believe the -- the position of

3 the company was that arbitration would not be

4 a favorable forum, given the fact there was

5 still owed a great deal of information that

6 had not been furnished to us.

7         There were questions as to whether

8 or not Mrs. Wininski (sic) had been disabled

9 for a considerable period before the accident

10 occurred, and there were questions as to

11 whether or not Ms. Wisinski's knee injuries

12 were actually related to the accident.

13        I believe she had a long-standing

14 problem with osteoarthritis in both knees and

15 had, in fact -- we were under the impression,

16 may have been disabled from work for quite

17 some time as a result of those very injuries,

18 so we were looking for information to help us

19 make that determination which we were working

20 with plaintiff's counsel to gather and present

21 to us.

22        And arbitration, as -- as you

23 referenced in the materials, doesn't give you

as many discovery options:  Records, subpoena

146

1 capabilities, and things of that nature.  As

2 well, oftentimes the arbiters, the panel, tend

3 to be less willing to -- to look at those

4 types of things and we feel, in cases such as

5 that, juries tend to be a better venue to help

6 us decide damages.

7   Q.   Attorney Godshall testified that he

8 believed that arbitrators generally award more

9 in dollar damages than juries.

10        Was that a factor in ACIC's refusal

11 to arbitrate Margaret Wisinski's claim?

12   A.   Well, let me say that I wasn't

13 involved in the case at the time that those

14 decisions were made so I can't speak to

15 entirely what the -- I can't speak to what the

16 basis for their position was, but generally I

17 think it's very true that arbitrators tend to

18 be more willing to award more money and put

19 aside, you know, valid causation defenses.

20   Q.   So you believed it would be a more

21 favorable forum -- when I say "you" -- so

22 American Commerce Insurance Company believed

23 that arbitration would be a forum that was

24 more favorable to Margaret Wisinski and less

147

1 favorable to American Commerce?

2         MR. BUTCHER:  I'm going to place an

3 objection yet again.  Mr. Shiner is here for

4 -- as being a corporate designee on policies,

5 but Ms. Hericks has been deposed, who is

6 handling the claim who made certain decisions

7 along and in conjunction with advice of

8 defense counsel, as to what forum and venue

9 the dispute with Ms. Wisinski under her policy

10 would take place, and I'm not sure if

11 Mr. Shiner can speak to that exact decision

12 outside of already what was answered by

13 Ms. Hericks in her deposition.

14   A.   I think it's pretty clear.  I

15 cannot offer any factual basis, having not

16 been involved in the case and those

17 discussions at that time as to why the

18 decision was made.  I was trying to answer in

19 a more general sense.

20   Q.   Well, as the corporate designee,

21 understanding that there's already been

22 testimony by Ms. Hericks and Ms. Dorger, can

23 we then assume, seeing as you're indicating

24 that you can't answer that, that the testimony

148

1 given by Ms. Dorger and Ms. Hericks on it are

2 accurate and accurately reflect the position

3 of ACIC?

4   A.   I haven't read their deposition

5 testimony, but I would certainly expect that

6 whatever they testified to is certainly the

7 factual basis supporting the position that

8 they took.

9   Q.   And so that would be the position

10 of American Commerce?

11   A.   Yes.

12   Q.   Okay.  Does American Commerce

13 Insurance Company or the parent company, The

14 Commerce Group, track the age of un- or

15 uninsured motorist files?

16   A.   We don't -- we don't seek to track

17 the age.  We do have cycle time reports.

18 That's something that we look at very closely

19 on other types of coverage.

20        You know, from a customer service

21 standpoint, we seek to reduce to the lowest

22 number possible turnaround times on collision

23 and comprehensive claims, and we have tens of

24 thousands of those claims, so the numbers tend

149

1  to be very reliable.

2         When you -- when you start looking

3  at bodily injury and underinsured claims, the

   numbers are very small, and one could settle

4  in 30 days and another in six years so the

6  numbers get very skewed by those variances, so

7  the numbers aren't typically something that

8  are reliable and very meaningful to us.

9     Q.    My question is -- is -- are they

10 tracked?

11    A.    Well, there are reports that track

12 those.  Absolutely.

13    Q.    Okay.  And do those -- who -- who

14 generates those reports?  And I don't mean the

15 individual.  I mean, the department or the --

16    A.    Who generates the reports?  The

17 corporation.  They're home office management

18 reports.  They're not the sort of thing that's

19 shared with individuals throughout the

20 corporation.

21    Q.    Okay.  Have you seen such reports?

22    A.    Yes, I have.

23    Q.    And in your current capacity as --

   I think -- I hope I have this right -- as

150

1  assistant vice president --

2     A.    Yes.

3     Q.    -- that would be something that

4  might cross your desk?

5     A.    Absolutely.

6     Q.    Okay.  And so are also statistics

7  kept as to the average aging on uninsured and

8  underinsured motorist claims?

9     A.    Well, exactly the statistic that's

10 kept is the number of paid underinsured and

11 underinsured motorist claims, they're grouped

12 together, and the average number of days from

13 the date that the claim was initialized until

14 the date that it closed with a payment --

15    Q.    Okay.

16    A.    -- that number is an average of the

17 number of features that were closed during

18 that time frame.

19    Q.    Okay.  Now, the date that -- that

20 it's opened is the date that the coverage is

21 opened?

22    A.    Yes.

23    Q.    So the start date for an un- or

24 underinsured motorist would be the date that

151

1  the un- or underinsured motorist coverages is

2  opened electronically?

3     A.    Yes.

4     Q.    And then the end date would be the

5  date that the file's closed electronically?

6     A.    Yes.

7     Q.    And then the system generates

8  those?

9     A.    The system generates the data that

10 supports the reports if that's what you're

11 asking.

12    Q.    Yes.  And what I'm asking is, and I

13 know from other cases, not with your company,

14 but that the different coverages have

15 different coding, and then when that coding is

16 opened and then closed, then somehow

17 internally the computers understand that and

18 put it into the appropriate category for them,

19 you know, these are uninsured claims, these

   are underinsured claims so that when you do

21 the statistics on aging, you're just getting

22 the un- and underinsured in one category and

23 everything else in their -- in their

24 appropriate --

152

1     A.    Yes.

2     Q.    -- categories?

3     A.    Yes.

4     Q.    And is that a report that comes --

5  how often do those sorts of reports get

6  generated?

7     A.    Our cycle times severity report is

8  produced quarterly.

9     Q.    Okay.  And so -- and I mean, is

10 there -- like what's the first quarter report?

11 Is it the -- you get that in April?

12    A.    Yeah.  Yes.

13    Q.    And so it's a calendar year?

14    A.    Yeah.  These are calendar year

15 reports.  Sure.

16    Q.    Okay.  And so, in other words, this

17 -- this file would have been closed -- well,

18 let me -- let me ask you something.  From --

19 from the log, can you tell when this file was

20 closed?

21    A.    It would generally be closed with a

22 final payment.

23    Q.    Okay.

24    A.    That -- there are exceptions.  If

153

1  the final payment -- you know, if there was
2  work that needed to be done after the final
3  payment was made to resolve liens or get a
stipulation on dismissal, if it were a
٬  lawsuit, it would be kept open but, by and
6  large, it's the final settlement check that
7  closes the claim.
8      Q.   I see here on March 30, 2007 it
9  says "executed release received."
10     A.   Okay.
11     Q.   So March of 2007.  So in April of
12 2007, there would be a report that would tell
13 us the average un- and underinsured motorist
14 claim aging?
15     A.   For that quarter, yes.
16     Q.   For that quarter.
17     A.   Yes.
18     Q.   And because this file was closed in
19 that quarter, it would be included in those?
20     A.   Yes.
21     MR. SCIARRINO:  Okay.  This is not
22 a -- a question to you.  I believe we
23 requested that.
۰۰     MR. BUTCHER:  He can answer it,

154

1  sitting here, if you want to ask him.  He
2  knows the answer.
3      MR. SCIARRINO:  Oh.
4      MR. BUTCHER:  Now, I have the
5  answer to provide, but he knows the answer.
6      MR. SCIARRINO:  Okay.  Well, I want
7  the document -- it's not that I don't believe
8  the witness, but I would like a copy of the
9  report as well.
10     MR. BUTCHER:  Well, I'll -- I don't
11 know if you asked for the report.  You asked
12 for the information --
13     MR. SCIARRINO:  Okay.  Well,
14 whatever form.
15     MR. BUTCHER:  -- and that's why he
16 can provide that to you.
17     MR. SCIARRINO:  Okay.
18     MR. BUTCHER:  At least as of this
19 most recent quarter report, maybe not for the
20 quarter this was closed, but go ahead, you can
21 ask him a question.
22     Q.   My question was going to be, for
23 the un- and underinsured motorist files, what
24 is the average aging as of the last report

155

1  that you would have reviewed?
2      A.   That I looked at.  It -- it -- it
3  ranged, because it -- it compares to prior
4  years, and it ranged from 420 to, I think,
5  440-something days, depending upon the year
6  you were looking at.
7      Q.   Okay.  And when you say it depended
8  on the year you were looking at, do -- do the
9  reports you get reflect back on prior years?
10     A.   Yes, they do.
11     Q.   Okay.  And that 420-to-440 range,
12 what years?
13     A.   I think I was looking at year end
14 2007, which would give me a full year of data,
15 so, you know, I'm going to say we had, you
16 know, 250 to 300 UM and UIM claims during that
17 period.
18     Q.   I'm sorry.  How many claims?
19     A.   250 to 300.  So I looked at the end
of a year so I had a larger number to try and
20 get a more reliable average.
21     Q.   Okay.  And the -- you looked at --
22 at a larger number which was 250 -- between
23 250 and 300, and the average was between 420

156

1  and 440 days?
2      A.   That's my recollection.
3      Q.   Okay.
4      A.   Pretty close.
5      Q.   And I'm going to plumb my old
6  college classes, but I recall that the larger
7  the number, the more statistically accurate
8  things become, the more statistically
9  significant I believe is the word they used
10 back when I was a college student?
11     A.   Absolutely.
12     Q.   And so that's why you looked at --
13 at a full year, because you would get a bigger
14 sample size?
15     A.   That's right.
16     Q.   Okay.  You remember when I told you
17 we weren't going to look at Exhibit 3 anymore?
18 I forgot something.  I apologize.  There's a
19 part of the materials that address Medicare
20 liens --
21     A.   Okay.
22     Q.   -- and I'm trying to find that.
23 Please bear with me for just one moment.  It's
24 towards the front third.

158

1    MR. BUTCHER: It's Bates number --
2  you don't have it. I have it. It's Bates
3  number 3081. Procedure memorandum number 18;
   is that correct?
5        MR. SCIARRINO: Yes. Claim
6  department procedure memorandum 18, and it
7  deals with handling claims involving
8  Medicare/Medicaid, Military, or Veterans
9  Administration as provided.
10       Q.   Do you see that?
11       A.   I do see that, yes.
12       Q.   Now -- and I'm not sure that this
13 printed exactly right because it kind of runs
14 off --
15       MR. BUTCHER: I can state that it
16 didn't print correctly.
17       MR. SCIARRINO: Okay.
18       MR. BUTCHER: I mean --
19       MR. SCIARRINO: Because the
20 sentences don't --
21       THE WITNESS: Looks like something
22 was cut off.
23       MR. SCIARRINO: Correct.
24       Q.   So with regard to -- and I just

1  want to ask you about Medicare liens because
2  that is the only thing that's germane to this
3  particular file.
4        American Commerce Insurance Company
5  requires that Medicare be added as an
6  additional payee on a settlement check unless
7  what happens?
8        A.   Unless they receive a written
9  release of lien from -- from Medicare or the
10 lien has been deemed satisfied in writing.
11 I'm not sure if that answers your question.
12       In any situation where we are
13 placed on notice or believe that Medicare has
14 a lien, there's a federal statute that makes
15 the insurance company fully culpable for the
16 repayment of that amount if they satis -- if
17 they settled the claim without including
18 Medicare as a payee in the claim.
19       So we -- we watch that very closely
20 and make certain that the lien has either been
21 satisfied or we're going to include them on
22 the settlement check.
23       Q.   Now, when you say "the lien has
24 been satisfied," meaning it has already been

159

1  paid?
2        A.   Well, sometimes the plaintiff
3  attorney will negotiate an agreement with
4  Medicare, and they will produce a letter
5  indicating that such an agreement has been
6  released and/or has been reached and it's okay
7  to cut the settlement check.
8        There's a number of ways that I've
9  seen different law firms deal with that.
10 Sometimes they'll -- they'll work it out so
11 that they ask the insurer to cut two checks.
12       Q.   Do you -- if the release of the
13 case, the release that is executed at the
14 conclusion of the case, indicates that the
15 claimant and their counsel will pay the lien,
16 is that sufficient?
17       A.   No. No.
18       Q.   So you require that either -- in
19 the case of Medicare, you require that
   Medicare provide a release of lien or a letter
21 saying that they have accepted a compromised
22 amount?
23       A.   There may be other alternatives,
24 but we -- we would not accept a personal

160

1  guarantee, for example, that the lien would be
2  satisfied by the plaintiff attorney and their
3  client because we become culpable and we'll be
4  the one that is sued and have been.
5        Q.   That has happened?
6        A.   Absolutely. Even -- even after
7  we've paid the claim and they have every right
8  under the federal statute to ask us to pay it
9  a second time.
10       Q.   And that -- in the case -- how many
11 cases have you been sued on that you know of?
12       A.   I don't know. I've been involved
13 in at least a couple personally.
14       Q.   Was counsel involved in those
15 cases? And when I say "counsel," I mean
16 counsel for the plaintiff.
17       A.   I'm fairly sure that they were. I
18 can't recall. Federal statute's very clear.
19       Q.   Do you have an understanding of
20 whether it will take additional time to have a
21 check clear if Medicare is a payee on the
22 check?
23       A.   Yes, I believe that it does take
24 additional time.

161

Q.   Okay.  And if Medicare is added as a payee on a check, do you know where the check is to be sent so that Medicare can endorse it?

A.   I believe they have different processing centers, depending upon the location of the -- of the beneficiary, and I believe that they actually have administrators that generally, under health insurance plans, that administer those programs for them, but, you know, offhand, I don't know the location.

I think generally the plaintiff attorneys try to reach an agreement with Medicare and then ask us to cut the check has been my experience.

Q.   Under any circumstances, do you cut the entire check to the plaintiff's attorney if Medicare is -- if there's a Medicare lien?

A.   Without some evidence that the lien has been satisfied?

Q.   Well, you indicated that Medicare could agree to accept a compromised amount so, say, for example, there's a Medicare lien of $30,000 and counsel for plaintiff negotiates

162

and gets Medicare to write a letter and Medicare says, "We will accept $20,000" and let's say the total payment is $50,000.

In that situation do you cut the check for $50,000 made payable to the plaintiff and his counsel or do you send a check for $30,000 to plaintiff and his counsel and a check for 20,000 to Medicare?

A.   Well, it depends what they've asked us to do.  We're willing to do whatever, you know, is -- is most convenient for the -- for the parties involved.

Generally, the plaintiff attorney would either ask us to send the check payable to all the parties, including Medicare, or cut separate checks to satisfy the -- the agreement that they've reached with Medicare.

Q.   But you wouldn't just send the check for $50,000 made payable to the plaintiff and his counsel alone?

A.   Probably not unless Medicare had directed us to do that.

Q.   In the case of Margaret Wisinski, there was a bankruptcy order.  Did you review

163

that?

A.   I didn't review the bankruptcy order.  I -- I think I read in the -- in the claim file notes that she had filed bankruptcy.

Q.   Okay.  You -- you understood -- in fact, there's -- there's notes that go back as early as May of '03 indicating that American Commerce Insurance Company was aware that Ms. Wisinski was in bankruptcy?

A.   Okay.

Q.   My question is -- is -- there was a bankruptcy order approving the settlement of -- of this case and ACIC refused to -- initially refused to make payment.

My question is -- is -- why did ACIC not feel that the bankruptcy court's order was sufficient?

MR. BUTCHER:  Place an objection.  Again, Mr. Shiner's involvement, I think, with this claim, his own individual involvement, ceased after his involvement in July of 2006, and I'm not sure if he has any knowledge about exactly the reasons outside of what have

164

already been testified to as by Ms. Hericks, potentially Ms. Dorger -- because I don't recall whether she was questioned on that -- and Mr. Godshall who was ACIC's attorney on that matter.

MR. SCIARRINO:  Well, he's the corporate designee.  He speaks for the corporation --

MR. BUTCHER:  I understand.

MR. SCIARRINO:  -- if he wants to say he adopts -- the corporation adopts whatever they said, that's --

MR. BUTCHER:  Well, you're going to have to -- very similar question you asked before if he has anything outside of --

MR. SCIARRINO:  That's fine.

MR. BUTCHER:  Yeah.

A.   To answer your question, I -- I wasn't aware of the -- the order approving the -- the -- the settlement in -- in bankruptcy court.  That's an unusual set of circumstances.  I would -- I would defer to our defense counsel for -- for advice on that matter.

1    Q.    And I also do not agree -- or
2  recall exactly what defense counsel and
3  Ms. Dorger and Ms. Hericks said.
4         My question to you is -- is -- does
5  ACIC adopt the statements of Ms. Hericks,
6  Ms. Dorger, and Mr. Godshall as it would
7  relate to ACIC's position on the bankruptcy
8  court's order and the -- and the requirement
9  that the check be issued?
10        MR. BUTCHER:  I'm just going to
11 place an objection.  I'm not sure -- the
12 question asked Mr. Shiner to adopt statements
13 made by somebody he doesn't know what the
14 statements are.
15        However, for the purposes to -- I
16 will, as counsel for ACIC and The Commerce
17 Group, state that we have no other information
18 relative outside of what has been identified
19 in the claims log notes and in the deposition
20 testimony of Ms. Dorger and Ms. Hericks and
21 Mr. Godshall as to why that was ACIC's
22 position with regard to the Medicare lien and,
23 therefore, we cannot present anything outside
24 of what those individuals or the log notes

1  state with regard to that issue.
2         MR. SCIARRINO:  He can still answer
3  the question.
4         MR. BUTCHER:  Go ahead.
5    A.    Maybe you could repeat the question
6  for me?
7         MR. BUTCHER:  Maybe if you could
8  simplify it, too.
9    Q.    I knew that that would happen. Does
10 ACIC adopt the testimony of Ms. Dorger,
11 Ms. Hericks, and Mr. Godshall on the issue of
12 the bankruptcy court order and the requirement
13 that ACIC issue a check thereunder?
14   A.    Again, I don't know what their
15 testimony was, but I would say that yes, we
16 would -- we would support and adopt the
17 testimony that was given by the three
18 individuals you identified, knowing that they
19 were doing all things reasonable to resolve
20 the claim.
21        MR. SCIARRINO:  We're getting into
22 the home stretch here.
23   Q.    With regard to -- with regard to
24 un- and underinsured motorist claims that are

1  in the arbitration process, typically, the
2  insured picks an arbitrator and the defendant
3  picks an arbitrator, they -- then there's an
4  agreement as to the third arbitrator or the
5  Court appoints a third arbitrator; is that
6  your understanding of the --
7    A.    Yes, it is.
8    Q.    -- process?  With regard to the
9  defendant's arbitrator, is it ACIC's position
10 that the defendant's arbitrator should not be
11 advised of the policy limits on the un- or
12 underinsured motorist claim?
13   A.    I know of no policy.
14   Q.    So here's what I'm asking, your
15 counsel retains or indicates that another
16 lawyer is going to be the defense arbitrator,
17 the plaintiff says another person's going to
18 be the plaintiff's arbitrator, and then
19 there's the third attorney, who's sometimes
   called the neutral arbitrator --
20
21   A.    Yes.
22   Q.    -- is it okay for ACIC's attorney
23 to tell the defense attorney or the defense
24 arbitrator, "Hey, our policy limit's

1  $100,000"?
2         MR. BUTCHER:  I'm just going to
3  place an objection.  That calls into question
4  what -- the appropriateness of conduct by
5  defense counsel; but to the extent that you
6  can answer, go ahead.
7    A.    Well, I guess I would answer that
8  in two parts.  Number one, we would -- we
9  would rely on the advice of counsel in matters
10 such as those as to whether or not he or she
11 felt that the arbiters needed to have that
12 information, but I would say generally I don't
13 see any reason why they would need that
14 information.
15   Q.    Why they would or would not?
16   A.    Why they would.
17   Q.    Okay.  Would you agree that it is
18 not appropriate for ACIC's attorney to consult
19 with the defendant's arbitrator regarding
20 issues of Pennsylvania law?
21        MR. BUTCHER:  I'm going to, again,
22 place a similar objection that that calls into
23 question some legal obligation regarding what
24 is appropriate conduct by defense counsel, but

169

1  to the extent that you can answer, go ahead.

2      A.   I don't have legal training.  I
3  think that's probably beyond the purview of
4  what I -- I can offer competent testimony on.
5  I -- I don't know whether it would -- whether
6  it's appropriate for that or not.

7      Q.   Do you have an understanding of
8  what the arbitrators in an un- or underinsured
9  motorist arbitration do?

10     A.   Absolutely.

11     Q.   Okay.  And what is your
12  understanding as to what they do?

13     A.   Well, generally, they're going to
14  decide liability and damages.  Their
15  involvement is -- is -- is generally not to
16  make coverage decisions, and so they're going
17  to look at the accident facts, the materials
18  that are presented supporting the plaintiff's
19  special damages, economic, noneconomic
20  damages, anything else relevant to their
21  damages, and make a determination as to an
22  award.

23     Q.   Now -- so, essentially, they serve
24  like a -- a jury almost?

170

1      A.   Yes.

2      Q.   Okay.  Is it appropriate for
3  counsel for either the plaintiff or the
4  defendant in an arbitration to consult with
5  any arbitrator about issues of Pennsylvania
6  law as it would relate to the case that they
7  were arbitrating?

8      A.   I didn't catch the first part of
9  that question.

10     Q.   Okay.  Would it be appropriate for
11  either the plaintiff arb -- I'm sorry --
12  plaintiff counsel or defense counsel to
13  consult with anyone on the arbitration panel
14  about issues of Pennsylvania law as it would
15  relate to the case that the arbitrators are
16  deciding?

17         MR. BUTCHER:  Again, I would place
18  a similar objection.  Although this is more
19  broadly stated, because it goes to both the
20  duties of the plaintiff's counsel and defense
21  counsel, that calls into question a legal
22  conclusion and an understanding of and
23  application of Pennsylvania law, but to the
24  extent you can answer, go ahead.

171

1      A.   I've never considered this question
2  before.  I -- I don't know that it would --
3  would be inappropriate.  You know, as I
4  mentioned, the arbitrators are not typically,
5  although they can by agreement, but are not
6  typically consulted on -- on legal matters.

7         Their -- their determination is --
8  is simply, you know, liability and damages.
9  So if the question had something to do in gen
10  -- of a general nature with -- with
11  Pennsylvania law, I'm not sure that that would
12  be inappropriate.

13     Q.   Let me ask the question this way.
14  If I represented American Commerce Insurance
15  Company and Attorney Butcher was the person I
16  selected to be the arbitrator, the defense
17  arbitrator, could I call him up on a claim --
18  and let's say it was your claim.

19         Let's say you were the -- the --
20  the person who was making a claim.  Could I
21  call him up and say, "Hey, Joe, about the
22  Mr. Shiner claim, this -- this medical bill,
23  is that something that's admissible?  Can I
24  put that into evidence?"  Would it be

172

1  appropriate for me to ask the arbitrator a
2  question like that?

3         MR. BUTCHER:  Again, I place the
4  objection that I believe that as it calls for
5  -- to the extent it calls for a legal
6  conclusion and application of specific law or
7  legal principles that Mr. Shiner is not --
8  cannot answer it, but to the extent that he
9  can...

10     A.   I'm not sure that that would be
11  inappropriate.  I don't know that that
12  influences the outcome of the claim.

13     Q.   Do you have an understanding of
14  whether or not the arbitrations are governed
15  by any statute in Pennsylvania?

16     A.   I believe in -- in most states they
17  are governed by statute.

18     Q.   Okay.  Would you agree that that
19  statute in, say, in the Commonwealth of
20  Pennsylvania would be binding upon American
21  Commerce Insurance Company in handling
22  Pennsylvania claims?

23     A.   Yes.

24     Q.   Now, you indicated that in

174

1   preparation for your deposition here today,
2   you reviewed the log notes and the claim file?
3       A.   Yes.
4       Q.   Okay.  In your review -- or based
5   upon your review, was the Margaret Wisinski
6   uninsured motorist claim adjusted in a way
7   that complied with the American Commerce
8   Insurance Company claim handling guidelines?
9       A.   Well, first of all, I -- I didn't
10  review it with -- with that mission in mind so
11  I -- I'm not sure that I -- I could answer
12  that question without fully reviewing the
13  claim file and the -- and the procedures and
14  expectations that were in place at that time.
15          That being said, I think there were
16  a number of things that occurred throughout
17  the course of this claim that were largely
18  driven by the plaintiff's attorney that
19  handled this case initially that delayed our
20  ability to bring this claim to disposition.
21      Q.   I want you to look at the notice of
22  deposition which is Exhibit 43.
23      A.   I have a copy of it here if that's
        the same as the -- okay.  I do.  Yes.

1       Q.   I'd like you to look at the
2   subheadings G, H, and I -- I'm sorry -- F, G,
3   H, and I.
4       A.   Okay.
5       Q.   F reads, "ACIC's claim handling
6   standards and practices as it pertains to
7   uninsured motorist claims generally and
8   specifically to the uninsured motorist and
9   wage loss claims of Margaret Wisinski."
10      A.   Mm-hmm.
11      Q.   Did I read that properly?
12      A.   Yes, you did.
13      Q.   And my question was, understanding
14  the claims handling practices of ACIC, was
15  Margaret Wisinski's uninsured motorist claim
16  adjusted in compliance with those claims
17  handling practices?
18      A.   Yes.
19      Q.   Okay.  Independent of this lawsuit,
20  this lawsuit for breach of contract, bad
21  faith, wage loss, and the other elements that
22  make up this lawsuit, was any internal review
23  of this file performed?
24      A.   Maybe you could be more specific.

175

1   You mean in response to this litigation or --
2       Q.   No.  I mean other than in response
3   to this litigation.
4       A.   So, for example, was it part of a
5   general audit that was carried out?  I
6   wouldn't know that.  I'm not sure that there's
7   any way of knowing that.
8           Audits are generally conducted --
9   well, they're by our auditing department, and
10  we don't necessarily have access to the
11  specific files that they looked at.  There
12  wouldn't be any reflection in the file if it
13  was reviewed for that purpose.
14      Q.   Okay.  So you don't know whether
15  this was part of an audit or not?
16      A.   No.
17      Q.   Was there any other -- again,
18  outside of this litigation -- obviously, this
19  file's gone back and been reviewed as part of
    this case, but what I'm asking about is, was
21  there any internal investigation to the way
22  this file was handled, other than through this
23  lawsuit?
24      A.   No, there was not.

176

1       Q.   Was any individual or individuals
2   disciplined in any ways -- in any way relative
3   to their performance in -- in the handling of
4   this Margaret Wisinski uninsured motorist
5   claim or her wage loss claim?
6       A.   No.  Absolutely not.
7           MR. SCIARRINO:  Why don't we take a
8   quick break.  I need to use the men's room.  I
9   may be done.  If I'm not, then I just have a
10  couple more.
11          THE VIDEOGRAPHER:  The time is
12  1:53.  Off the record.
13          (Recess taken.)
14          THE VIDEOGRAPHER:  The time is
15  2:02.  Back on the record.
16      Q.   Mr. Shiner, we took a break here
17  and we're -- we're -- we're wrapping up, but
18  as I went back through my notes, I realized I
19  forgot to ask a couple of -- of questions.
20          We were talking about the basic
21  insurance principles earlier in your -- in
22  your deposition, and there was a couple of --
23  of just general i -- principles and ideas that
24  I wanted to -- to get to.

177

1    The -- when I looked through the
2  American Commerce Insurance Company log notes,
3  I noticed that the entries regarding the
4  payment of medical bills are interspersed with
5  the entries regarding other aspects of the
6  claim.
7    Does that mean that the adjuster
8  who's handling the un- and underinsured
9  motorist component of a claim is able to see
10  the entire log and see the entries made by the
11  first-party benefit medical adjuster?
12    A.   Yes.  Anyone handling that file can
13  see all of the log notes.
14    Q.   Okay.  And in some cases, is it the
15  same person handling both aspects of the
16  claim?
17    A.   We generally split out the -- the
18  PIP or the no fault from the -- from the
19  liability claim so there are two separate
20  adjusters handling those two elements of the
21  claim and I -- I believe that was the case in
22  this matter.
23    Q.   Well, the reason I ask is because
24  there are some entries early in this file, and

178

1  I think some of them are by Kelly Binh, and
2  there's some other ones by Terry West, and I
3  think they are on -- I'm just wondering if you
4  know whether they were handling both at the
5  time they were handling the file or not?
6    A.   They may have been been.  You know,
7  our -- our position has been the -- the -- you
8  know, first party no-fault coverage and
9  first party UM/UIM coverages are basically --
10  can be handled by the same adjuster.
11    Their -- their coverage under --
12  under the same policy with all the rights,
13  same rights and obligations, in terms of
14  medical examinations and EUOs and -- and other
15  policy provisions so, generally speaking, I
16  wouldn't see a problem with the same adjuster
17  handling both coverage parts.
18    Q.   And I'm not suggesting there is.
19  I'm just asking you --
20    A.   Yeah.
21    Q.   -- whether that is acceptable under
22  AC --
23    A.   Yes.
24    Q.   -- IC guidelines?

179

1    A.   We -- we generally split them out
2  now because it's more efficient, but at that
3  point in time I wouldn't be surprised to -- to
4  learn that the same adjuster handled both
5  features.
6    Q.   Okay.  And the -- and, again, the
7  reason for that is they're -- they're both
8  first-party benefits and there are a lot of
9  common issues associated?
10    A.   Yes.  If it was a third-party
11  liability claim and the individual happened to
12  have a no-fault claim at the same time, for
13  example, if it were a pedestrian, we would
14  split those out.
15    Q.   Okay.  And would that -- would
16  those principles regarding the -- the same
17  adjuster can handle both features apply to the
18  wage loss feature as well?
19    A.   Yes.
20    Q.   Okay.  And -- and if I've already
21  asked some of these and I've just forgotten or
22  forgot to mark them off, I apologize.
23    There was never an issue regarding
24  liability or comparative or contributory

180

1  negligence in this file?
2    A.   Not to my knowledge, no.  I think
3  it was clear liability.
4    Q.   Okay.  And when ACIC utilizes an IM
5  -- IME physician, that physician is to be
6  impartial and not an advocate for one side or
7  the other?
8    A.   Correct.  Absolutely.
9    MR. SCIARRINO:  I believe we are
10  done.  Thank you for your patience and your
11  time here today.  I don't know if Attorney
12  Butcher has any questions for you.
13    MR. BUTCHER:  We will read.
14  Thank you.
15    MR. SCIARRINO:  All right.  It's
16  been a pleasure meeting you.
17    MR. SHINER:  Likewise.
18    THE VIDEOGRAPHER:  The time is 2:07
19  and the deposition is concluded.  End of video
20  cassette three.  Off the record.
21    (The deposition concluded.)
22
23
24

181

ERRATA SHEET

        In accordance with the rules of procedure
governing depositions, you are entitled to
read and correct your deposition.
        Accordingly, please carefully read your
deposition and, on this errata sheet, make any
changes or corrections in form or substance to
your deposition that you feel should be made.
PLEASE DO NOT MARK THE TRANSCRIPT.  After
completing this procedure, sign at the
conclusion of such changes/corrections (if
any) and return it in accordance with your
instructions.

PAGE  LINE         CHANGE            REASON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24 DATE:            _____
                        STEVEN SHINER

---

182

Excerpt from Rule 30 (e):

        Submission to witness; Changes; Signing.
When the testimony is fully transcribed, the
deposition shall be submitted to the witness
for examination and shall be read to or by
him/her, unless such examination and reading
are waived by the witness and by the parties.
Any changes in form or substance which the
witness desires to make shall be entered upon
the deposition by the officer with a statement
of the reasons given by the witness for making
them.  This procedure must be accomplished
within 30 days of receipt of the transcript.

****************************************

        I have read the foregoing, and it is a true

transcript of the testimony given by me at the

taking of the subject deposition.


                    _____
                         STEVEN SHINER



_____
        DATE



CASE NAME:  Margaret M. Wisinski Vs. American
                Commerce Group, Inc., et al
DATE TAKEN: September 5, 2008

---

183

COMMONWEALTH OF MASSACHUSETTS
WORCESTER, SS.
        I, DEBBIE J. DIEMDOWICZ, a notary
public in and for the Commonwealth of
Massachusetts, do certify that pursuant to
appropriate notice of taking deposition, there
came before me the subject deponent, who was
by me duly sworn; that said witness was
thereupon examined under oath and said
examination reduced to writing by me; and that
the deposition is a true record of the
testimony given by the witness.
        I further certify that I am not a
relative or employee or counsel or attorney
for any of the parties, or a relative or
employee of such counsel or attorney, nor am I
financially or otherwise interested in the
outcome of the action.
        Witness my hand and official seal
at Leominster, Massachusetts this 12th day of
September, 2008.
My Commission Expires _____
    February 23, 2012         Notary Public


        The foregoing certification of this
transcript does not apply to any reproduction
of the same in any respect unless under the
direct control and/or direction of the
certifying reporter.

# EXHIBIT V

# In The Matter Of:

*Margaret Wisinski v.*
*American Commerce Group, Inc. and et al*

---

*Joanne Dorger*
*August 7, 2008*

---

*Morse Gantverg & Hodge Court Reporters, Inc.*
*Suite 719, One Bigelow Square*
*Pittsburgh, Pennsylvania  15219*
*1-800-966-4157*

Original File ECF5796.txt, Pages 1-133

**Word Index included with this Min-U-Script®**

This Page Intentionally Left Blank

Margaret Wisinski v.
American Commerce Group, Inc.and et al

Joanne Dorger
August 7, 2008

---

Page 1

[1]          IN THE UNITED STATES DISTRICT COURT
[2]           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
[3]                       - - -
[4]   MARGARET WISINSKI,                    )
                                           )
[5]              Plaintiff,                 )
                                           )
[6]        vs.                             )  No. 1:07-CV-346
                                           )
[7]   AMERICAN COMMERCE GROUP, INC. and    )
      AMERICAN COMMERCE INSURANCE          )
[8]   COMPANY,                             )
                                           )
[9]              Defendants.               )
[10]                      - - -
[11]           Deposition of JOANNE DORGER
[12]             Thursday, August 7, 2008
[13]                      - - -
[14]        The deposition of JOANNE DORGER, called as a
      witness by the plaintiff, pursuant to notice and the
[15]  Federal Rules of Civil Procedure pertaining to the
      taking of depositions, taken before me, the
[16]  undersigned, Eugene C. Forcier, Stenographer
      Commissioner in and for the Commonwealth of
[17]  Pennsylvania, at the Holiday Inn Express, 11160 Dowlin
      Drive, Sharonville, Ohio 45241, commencing at 8:40
[18]  o'clock a.m., the day and date above set forth.
[19]                      - - -
[20]           COMPUTER-AIDED TRANSCRIPTION BY
                 MORSE, GANTVERG & HODGE, INC.
[21]                 ERIE, PENNSYLVANIA
                       814-454-6655
[22]
[23]                      - - -
[24]
[25]

---

Page 2

[1]   APPEARANCES:
[2]        On behalf of the Plaintiff:
[3]             J. Timothy George, Esquire
                2525 West 26th Street, Suite 200
[4]             Erie, Pennsylvania 16506
[5]             Anthony J. Sciarrino, Esquire
                Renaissance Centre
[6]             1001 State Street, Suite 1220
                Erie, Pennsylvania 16501
[7]
[8]        On behalf of the Defendants:
[9]             Zimmer Kunz, PLLC;
                Joseph F. Butcher, Esquire
[10]            3300 U.S. Steel Tower
                600 Grant Street
[11]            Pittsburgh, Pennsylvania 15219
[12]                      - - -
[13]       ALSO PRESENT:
[14]            Dave Scherm, Videographer
[15]                      - - -
[16]           ALSO RECORDED VIA VIDEOTAPE
[17]
[18]                 I-N-D-E-X
[19]  EXAMINATION BY:  Mr. Sciarrino - Page 4
[20]                      - - -
[21]
[22]
[23]
[24]
[25]

---

Page 3

[1]        **MR. SCHERM:** We are on the record, the time
[2]   is 8:40 a.m.
[3]        My name is David Scherm, videographer for
[4]   the firm of Morse, Gantverg & Hodge, located at
[5]   Suite 719, One Bigelow Square, Pittsburgh,
[6]   Pennsylvania 15219.
[7]        The witness in today's deposition is
[8]   Miss Joanne Dorger, called as a witness in the
[9]   case captioned Margaret Wisinski versus American
[10]  Commerce Group, et al., in the United States
[11]  District Court for the Western District of
[12]  Pennsylvania.
[13]       Today's deposition is being held at
[14]  11160 Dowlin Drive, Cincinnati, Ohio 45241.
[15]       Today's date is Thursday, August 6, 2008.
[16]       Would counsel please introduce themselves.
[17]       **MR. SCIARRINO:**  Tony Sciarrino for the
[18]  plaintiff, Margaret Wisinski.
[19]       **MR. BUTCHER:**  Joseph Butcher, on behalf of
[20]  the Commerce Group, Inc., and America Commerce
[21]  Insurance Company.
[22]       **MR. SCHERM:** Would the court reporter
[23]  please introduce himself, and swear the witness.
[24]       **THE REPORTER:**  I'm Gene Forcier with
[25]  Morse, Gantverg & Hodge.

---

Page 4

[1]        Would you raise your right hand, please.
[2]                     - - -
[3]            JOANNE DORGER
[4]   called as a witness by the plaintiff, having been
[5]   first duly sworn, as hereinafter certified, was
[6]   deposed and said as follows:
[7]            **EXAMINATION**
[8]   **BY MR. SCIARRINO:**
[9]     **Q**    Good morning, ma'am.
[10]    **A**    Good morning.
[11]    **Q**    My name's Tony Sciarrino, and I represent
[12]  the plaintiff in this matter, and I am going to be
[13]  asking you some questions here today.  But before we
[14]  begin, I would like to set out some ground rules for
[15]  our deposition.
[16]       Okay?
[17]    **A**    Yes.
[18]    **Q**    First, please be sure to respond verbally
[19]  to my inquiries.  Nods of the head, and uh-huh, and
[20]  huh-uh, won't make a lot of sense when we go back and
[21]  review the transcript.
[22]       Okay?
[23]    **A**    Yes.
[24]    **Q**    Secondly, please let me get my question
[25]  out, and then respond.  It's very difficult for our

---

Page 5

[1] court reporter, Mr. Forcier, to take two people at the
[2] same time.
[3]      Okay?
[4]   **A**   Yes.
[5]   **Q**   I'm going to be asking you a series of
[6] questions. If you don't understand my questions,
[7] please let me know, and I will be happy to rephrase or
[8] restate my question, so that it makes sense to you.
[9]      Okay?
[10]  **A**   I understand.
[11]  **Q**   If you give a response, we are going to
[12] assume that you heard and understood the question.
[13]      Okay?
[14]  **A**   Yes.
[15]  **Q**   If, during the course of the deposition,
[16] you think of something that would modify a prior
[17] answer that you gave, please let us know, and you can
[18] state that on the record, to correct your answer.
[19]      Okay?
[20]  **A**   Yes.
[21]  **Q**   We want your most complete best answers.
[22]      Okay?
[23]  **A** .  Yes.
[24]  **Q**   Also, there are a lot of documents in this
[25] case. If referring to a document would be helpful to

Page 6

[1] your response, please let us know, and we will make
[2] sure that you get that document so that we get your
[3] most complete response.
[4]      Okay?
[5]   **A**   Okay.
[6]   **Q**   And finally, this is not an endurance test,
[7] so, should you need a break for any reasons, please
[8] let us know, and we will be happy to take an
[9] adjournment.
[10]      Okay?
[11]  **A**   Yes.
[12]  **Q**   Could you please identify yourself for the
[13] record?
[14]  **A**   My name is Joanne Dorger, D-o-r-g-e-r.
[15]  **Q**   And, Joanne, what is your business address?
[16]  **A**   You know what? I can't tell you.
[17]      It's Sharon Park Road, and it's in
[18] Cincinnati, I can't give you the street address
[19] number, or the Zip code, because I'm just not involved
[20] in mail.
[21]      And it's -- that's terrible to say, but I
[22] can't give that to you.
[23]  **Q**   Well, you know how to drive there, is what
[24] you are saying?
[25]  **A**   I know how to drive there.

Page 7

[1]   **Q**   Okay.
[2]      Miss Dorger, that is the American Commerce
[3] office, regional office, which is here in the
[4] Cincinnati area?
[5]   **A**   Yes.
[6]   **Q**   Okay.
[7]      And you are physically in the same office
[8] with Miss Bihn, and Miss Hericks?
[9]   **A**   Yes.
[10]  **Q**   And my understanding is that it's part of
[11] basically a large office suite, and your operations
[12] are in that suite?
[13]  **A**   Yes.
[14]  **Q**   Ma'am, have you ever been involved in a
[15] deposition prior to today?
[16]  **A**   Yes.
[17]  **Q**   Okay. Do you recall approximately how many
[18] occasions?
[19]  **A**   I think this will be my fourth.
[20]  **Q**   Okay. Let's talk about the prior
[21] depositions.
[22]      Do you recall when -- approximately when
[23] the first one took place?
[24]  **A**   No. Within the last eight years, that's
[25] all I could -- probably, approximately six years, but

Page 8

[1] I can't -- I -- I don't know.
[2]   **Q**   And, was it -- were you testifying in your
[3] capacity as an employee of American Commerce Insurance
[4] Company?
[5]   **A**   Yes.
[6]   **Q**   Okay. And what was the nature of the case,
[7] what was it about, to the extent that you know?
[8]   **A**   I don't -- I don't recall.
[9]   **Q**   Okay.
[10]      Do you recall where your deposition took
[11] place?
[12]  **A**   Downtown Cincinnati. I don't know -- I
[13] don't recall the name of the hotel.
[14]  **Q**   Okay. Do you recall the name of the case?
[15]  **A**   No.
[16]  **Q**   Okay. Was American Commerce Insurance
[17] Company a defendant?
[18]  **A**   Yes.
[19]  **Q**   All right. So it was a suit against
[20] American Commerce Insurance Company?
[21]  **A**   Yes.
[22]  **Q**   All right.
[23]      The second deposition that you were
[24] involved in, do you recall approximately when that
[25] happened?

Margaret Wisinski v.
American Commerce Group, Inc.and et al

Joanne Dorger
August 7, 2008

---

Page 9

[1]   **A**   No, but I will -- on this question, I will
[2]   say approximately three years ago.
[3]   **Q**   Okay.
[4]   **A**   I'm not sure.
[5]   **Q**   And do you recall where that deposition
[6]   took place?
[7]   **A**   Where?
[8]   **Q**   Yes.
[9]   **A**   Close by.
[10]        I'm from Kentucky, so I don't know this
[11]  area myself.
[12]        It was at a hotel somewhere within the few
[13]  blocks of where we are at right now.
[14]  **Q**   So it was in the greater Cincinnati area?
[15]  **A**   Yes.
[16]        It was in Sharonville.
[17]  **Q**   Okay.
[18]        And, was it also a case where you were
[19]  testifying as a representative of American Commerce
[20]  Insurance Company?
[21]  **A**   Yes.
[22]  **Q**   And, were you -- was American commerce a
[23]  defendant in the case?
[24]  **A**   Yes.
[25]  **Q**   Do you recall the type of case, or nature

Page 10

[1]   of the case?
[2]   **A**   Are you asking me the details of the case?
[3]   **A**   No. I am asking you whether it was a case
[4]   that was a contract claim, or a bad faith claim, or a
[5]   first party benefit claim?
[6]   **A**   It was a bad faith claim.
[7]   **Q**   Okay.  And the first time you testified,
[8]   what type of case was it?
[9]   **A**   Bad faith.
[10]  **Q**   Okay.
[11]       Were they Ohio cases, if you recall?
[12]  **A**   No.
[13]  **Q**   The first one, do you recall what state --
[14]  **A**   Oklahoma.
[15]  **Q**   Okay.  How about the second one?
[16]  **A**   West Virginia.
[17]  **Q**   Okay.
[18]       Now, you said that there were two more --
[19]  or did you say this was your fourth?
[20]  **A**   This would be my fourth.
[21]  **Q**   Okay.  So there is one more?
[22]  **A**   Yes.
[23]  **Q**   Prior to today?
[24]  **A**   Yes.
[25]  **Q**   And do you recall about when that other

Page 11

[1]   case took place?
[2]   **A**   That was approximately a month ago.
[3]   **Q**   Okay.  And did that take place in the
[4]   greater Cincinnati area?
[5]   **A**   Yes, it did.
[6]   **Q**   Okay.  And do you recall what the nature of
[7]   that action was?
[8]   **A**   Bad faith.
[9]   **Q**   And do you recall what state --
[10]  **A**   Oklahoma.
[11]  **Q**   Okay.  And again, you were testifying on
[12]  behalf of American Commerce, and American Commerce was
[13]  a defendant?
[14]  **A**   Yes.
[15]  **Q**   Okay.
[16]       In any of the three cases, prior to today,
[17]  where you testified, do you recall any of the names of
[18]  the plaintiffs?
[19]  **A**   No.
[20]  **Q**   Okay.
[21]       **MR. SCHERM:**   We are off the record, the
[22]  time is 8:48 a.m.
[23]       (Discussion off the record.)
[24]       **MR. SCHERM:**   We are back on the record, the
[25]  time is 8:53 a.m.

Page 12

[1]   **BY MR. SCIARRINO:**
[2]   **Q**   Miss Dorger, we had taken a short break,
[3]   and we are back on the record now, and we were talking
[4]   about your prior testimony in other -- in other cases,
[5]   and you had indicated that you did not recall the name
[6]   of any of the --
[7]   **A**   No, I really --
[8]   **Q**   -- the litigants?
[9]   **A**   No.
[10]  **Q**   But in each one, American Commerce was the
[11]  defendant, and each one was a -- a bad faith claim?
[12]  **A**   Alleged.
[13]  **Q**   Okay.  There was a bad faith component in
[14]  the lawsuit?
[15]  **A**   Yes.
[16]  **Q**   All right.
[17]       If you could, I would like you to outline
[18]  your educational background for us.
[19]  **A**   High school only.
[20]  **Q**   And where did you graduate from high
[21]  school?
[22]  **A**   Boone County High School in Florence,
[23]  Kentucky.
[24]  **Q**   And what year would that be?
[25]  **A**   You are getting personal here, but 1963.

---

Page 13

[1] Q And, did you -- did you enter the work
[2] force after high school?
[3] A Yes.
[4] Q Okay. And let's go through your employment
[5] history.
[6] A Okay.
[7] Q Why don't we to this, to shortcut it.
[8] Let's start with your employment history
[9] within the insurance industry, if that will make
[10] things easier?
[11] A Okay.
[12] Q When did you start in the insurance
[13] industry?
[14] A About July 1963 -- no -- yeah, about July
[15] 1963.
[16] Q Okay.
[17] And where did you start working?
[18] A Continental Insurance Company.
[19] Q And what did you do at Continental?
[20] A Back then, they called them secretaries,
[21] but a support.
[22] Q And how long did you work for Continental?
[23] A Somewhere in the summer of '65 I quit and
[24] went to Great American Insurance Company.
[25] Q Okay. And how long did you work for Great

Page 14

[1] American?
[2] A About a year and a half at that point, at
[3] which time I went back to Continental.
[4] Q Okay.
[5] Now, when you went back to Continental,
[6] were you a support staff, or were you -- or did you
[7] have a different position at that point?
[8] A I went back to handle desk claims.
[9] Q And what does that mean, desk claims?
[10] A Claims that could be handled by phone, and
[11] not personal contact.
[12] Q Okay.
[13] And how long were you at Continental, in
[14] the second stint?
[15] A I think I left in '72, when I had my
[16] daughter.
[17] Q And when you re-entered the work force,
[18] where did you --
[19] A I went back to Continental.
[20] Q Okay. In about what year was that?
[21] A '74.
[22] Q And what -- as of that time, when you
[23] re-entered the work force in 1974, what was your job?
[24] A When I first went back, it was work a
[25] tornado loss that had happened here in Ohio, and then

Page 15

[1] I was assigned, again, a desk job, when I first went
[2] back.
[3] Q And after you returned to the work force in
[4] 1974, how long did you work for Continental?
[5] A Somewhere in the early '80's.
[6] Q Okay. And in the early '80's, did you
[7] leave Continental?
[8] A Yes.
[9] Q When you left Continental in the early
[10] '80's, what was your last job?
[11] A I may have been a supervisor at that
[12] point. I was a supervisor in the later years.
[13] Q Okay.
[14] A But there was so much cutback, I may have
[15] just been a general liability senior adjuster at that
[16] point.
[17] Q All right. You left in the late -- in the
[18] early '80's?
[19] A '80's.
[20] Q And where did you go to?
[21] A After spending approximately five months at
[22] home, I took a job briefly with a company called
[23] Globe, located in Cleveland, Ohio.
[24] Q And are they an insurance company?
[25] A Yes.

Page 16

[1] Q And how long were you at Globe?
[2] A Very briefly, because I had interviewed
[3] with Firemen's Fund, who called and offered me a job,
[4] and I then went to Firemen's Fund.
[5] Q And how long were you with Firemen's Fund?
[6] A Five years.
[7] Q And when you left Firemen's Fund, what was
[8] your position?
[9] A Supervisor.
[10] Q And this is a claim supervisor?
[11] A Yes.
[12] Q And where were you located at Firemen's
[13] Fund?
[14] A Downtown Cincinnati.
[15] Q Okay.
[16] The positions at Continental, were they
[17] also in Cincinnati?
[18] A Yes.
[19] Q You left Firemen's Fund after about five
[20] years, and where did you go to?
[21] A Back to Continental.
[22] Q And that would have been about your third
[23] time working at Continental?
[24] A Yes.
[25] Q And did you come in as a claims supervisor?

Page 17

[1]   **A**   No.  I went back as a litigation
[2]  adjuster.
[3]         I went back, because of -- I got all of my
[4]  seniority and benefits back, and that was the reason I
[5]  went back.
[6]   **Q**   And you stayed at Continental for how long?
[7]   **A**   About two years.  They closed not long
[8]  after that.
[9]   **Q**   And when you left Continental, where did
[10]  you go to?
[11]   **A**   Cincinnati Equitable Insurance.
[12]   **Q**   And how long were you with Cincinnati
[13]  Equitable?
[14]   **A**   Two years.
[15]   **Q**   And what did you do at Cincinnati
[16]  Equitable?
[17]   **A**   Litigation and serious BI's.
[18]   **Q**   And after Cincinnati Equitable, where did
[19]  you go?
[20]   **A**   Great American Insurance.
[21]   **Q**   And how long were you there?
[22]   **A**   Five years.
[23]   **Q**   And what did you do there?
[24]   **A**   I was an adjuster there.  Senior.
[25]   **Q**   And what year did you leave -- or about --

Page 18

[1]  strike that.
[2]   **A**   I don't know.
[3]   **Q**   Where did you go after great American?
[4]   **A**   American Commerce.
[5]   **Q**   Okay.  What year did you start with
[6]  American Commerce?
[7]   **A**   January 3rd, 2000.
[8]   **Q**   And you have worked continuously for
[9]  American Commerce since January 3rd, 2000?
[10]   **A**   Yes.
[11]   **Q**   And when you started with American
[12]  Commerce, what was your job title?
[13]   **A**   I don't really recall.  It was like a
[14]  senior claims adjuster.
[15]   **Q**   Okay.
[16]         And then what's your present job?
[17]   **A**   Regional claims supervisor.
[18]   **Q**   We are here because of the claim of
[19]  Margaret Wisinski.  Margaret's loss occurred on
[20]  December 21st, 2001, and the claim was concluded in
[21]  2007.
[22]         What -- did you have the same position,
[23]  during that period, or did you change positions during
[24]  that period?
[25]   **A**   I would have been a supervisor at that

Page 19

[1]  time.  I became a supervisor approximately six months
[2]  after I started.
[3]   **Q**   As a claims supervisor, what are your
[4]  responsibilities?
[5]   **A**   It varies.  I supervise, my unit is
[6]  classified as CR III's, these are the adjusters with
[7]  the most experience in the office.
[8]         I now supervise Dianne Hericks, who is a
[9]  CR IV.
[10]         I give -- they are all experienced
[11]  adjusters.
[12]         I -- I, you know, give them authority when
[13]  it is above their authority.  They -- most of them
[14]  work pretty much on their own.
[15]         I just make sure that things are running
[16]  the way the company wants them run.
[17]         I do spot checks on files.
[18]         I -- with us being a satellite office, I
[19]  might have to deal with building issues, and
[20]  attendance, performance issues, assisting the manager,
[21]  holding meetings to discuss a new procedure.
[22]         It -- it's -- varies a lot.
[23]   **Q**   Explain for me the chain of command in your
[24]  office.
[25]         The adjusters respond to you, you are the

Page 20

[1]  supervisor?
[2]   **A**   Yes.
[3]   **Q**   Who do you report to?
[4]   **A**   Martin Baxter.
[5]   **Q**   Okay.  Now, back at the time of the
[6]  Wisinski claim, was Mr. Baxter your supervisor?
[7]   **A**   No.
[8]   **Q**   Okay.  Who was?
[9]   **A**   I'm going to say -- I'm going to have to
[10]  say I don't know.
[11]   **Q**   Okay.  I see some entries in the file from
[12]  a gentleman named Bob Seese.
[13]   **A**   He was a manager at one time.
[14]   **Q**   Okay.
[15]   **A**   During this time period of this file.  But
[16]  I don't know if he was manager when the file was
[17]  created.
[18]   **Q**   Okay.  Do you recall about when Mr. Seese
[19]  became the claims manager?
[20]   **A**   I'm not sure.  It would be a guess.
[21]   **Q**   Okay.  Is Mr. Seese still with the company?
[22]   **A**   No.
[23]   **Q**   Do you know where Mr. Seese is employed?
[24]   **A**   No.
[25]   **Q**   Okay.  Do you know approximately when

Page 21

[1] Mr. Seese left?

[2]    A    Two to three years ago.

[3]    Q    And that's when Mr. Baxter came in, or
[4] shortly thereafter?

[5]    A    Yes.

[6]    Q    Okay.

[7]    A    He was the supervisor prior.

[8]    Q    Okay.  So, you report to Mr. Baxter.  Do
[9] you know who Mr. Baxter reports to?

[10]    A    Steve Shiner.

[11]    Q    Okay.  And who is Steve Shiner?

[12]    A    He is the assistant VP of national claims.

[13]    Q    And where is Mr. Shiner located?

[14]    A    Webster, Mass.

[15]    Q    Webster, Massachusetts?

[16]    A    Yes.

[17]    Q    With regard to claims settlement authority,
[18] the adjusters have a certain dollar authority to
[19] settle claims.

[20]        What is your settlement authority?

[21]    A    The office authority of 50.

[22]    Q    Okay.  When you said the office authority
[23] of 50, could you explain what you mean by that?

[24]    A    Our office can only settle claims up to
[25] 50,000.

Page 22

[1]    Q    So does that mean that Mr. Baxter would
[2] also have 50,000 in authority?

[3]    A    Correct.

[4]    Q    Okay.  And that would have been the same
[5] for Mr. Seese?

[6]    A    Correct.

[7]    Q    All right.

[8]        Now, if a claim is valued above 50,000, who
[9] becomes involved at that point?

[10]    A    We report the claim to Webster, and then an
[11] examiner would be -- would handle it -- not handle it,
[12] but be the -- he would be the examiner of the file.

[13]        The examiner's the technical strength of --
[14] I would say of the roles, of the different roles in
[15] the claims line of personnel, and they would be
[16] involved.

[17]    Q    Now, do the examiners have a particular
[18] dollar limit on their --

[19]    A    Oh, I am sure they do, but I am not privy
[20] to that.

[21]    Q    In this particular file, I have noticed
[22] that there were entries made by Mr. Shiner.  Do you
[23] know whether he was a examiner, or the assistant vice
[24] president of claims at that time?

[25]    A    At that time, he would have been an

Page 23

[1] examiner.

[2]    Q    Okay.  Do you know approximately when he
[3] became the assistant vice president of national
[4] claims?

[5]    A    I can only guess.

[6]    Q    Is it within the past two years?

[7]    A    Within the last -- probably.

[8]    Q    Okay.

[9]        Now, I want to make sure I understand.
[10] Webster is the home office?

[11]    A    Correct.

[12]    Q    Is it your testimony that any claim
[13] evaluated above 50,000 is going to require home office
[14] involvement?

[15]    A    Yes.

[16]    Q    As a supervisor, is it part of your role to
[17] ensure that the file, the claim file is properly
[18] documented?

[19]    A    I do not supervise all files.  If it's
[20] within an adjuster's authority, I may not see the
[21] file.

[22]    Q    What triggers your involvement in a file?

[23]    A    There is various things.

[24]        It may -- it may be that it is something
[25] that I am concerned, and I want to follow.

Page 24

[1]        It may be a home office reporting, although
[2] at that point the technical part will go to the
[3] examiner, and I'm just sort of like the -- I just make
[4] sure that the adjuster responds to the examiner, and
[5] follow up, and makes sure the file is moving.

[6]        I -- I -- once it goes to home office, even
[7] though I'm in the file, I'm not heavily in the file,
[8] because their authority and expertise is greater than
[9] mine, and they can choose to direct and work with the
[10] adjuster.

[11]        And I really -- even if a file is, say,
[12] reserved at 50,000, I don't necessarily have to be on
[13] diary on the file, because if an adjuster would
[14] evaluate a claim over their authority, then they do
[15] have to come to me for review and sign off.

[16]        So, it -- it brings me in at that point.

[17]    Q    Are there any types of injuries that
[18] automatically trigger your involvement?

[19]        I'm not talking about dollar valuation, I
[20] am talking about --

[21]    A    Types.

[22]    Q    -- types of injuries, like if there is a
[23] head injury, do you automatically get involved?

[24]    A    Well, that would probably be triggered, a
[25] serious head injury could be triggered to be reported

Margaret Wisinski v.
American Commerce Group, Inc.and et al

Joanne Dorger
August 7, 2008

Page 25

[1] to home office.

[2] So, it would be reported to home office, I

[3] would be involved.

[4] An amputation would be reported to home

[5] office.

[6] A fatality, you know.

[7] There are certain things that goes above

[8] the adjusters, regardless of dollar values.

[9] Q Do you -- do you supervise claims in more

[10] than one state?

[11] A Yes.

[12] Q What states do you supervise claims for?

[13] A Tennessee, Kentucky, Ohio, Indiana,

[14] Oklahoma, which is our biggest state, we have a few

[15] claims left in Florida, Pennsylvania. I do not

[16] believe that we are writing in Pennsylvania any more,

[17] and that has been a very, very minor state. We have

[18] never received many claims from Pennsylvania.

[19] Q Any other states? Or is that it?

[20] A I think that's it.

[21] If I -- if I forgot one, I'm sorry, but I

[22] think that Kentucky and Oklahoma is probably our

[23] biggest states.

[24] Q Okay. I don't want to put words in your

[25] mouth, but it seems like you are indicating that

Page 26

[1] Oklahoma and Kentucky are the two states from which

[2] you see the most claims?

[3] A Yes.

[4] Q Handle the most claims.

[5] And then Tennessee, Ohio, Indiana have

[6] claims, and then there is relatively few from Florida

[7] and Pennsylvania; did I accurately summarize that?

[8] A Yeah. Yes. And I don't know if we have

[9] any from Pennsylvania any more, new ones.

[10] Q And if -- you may have answered this

[11] already, and if I am repeating myself, I apologize,

[12] but did you indicate that you do not believe that

[13] American Commerce is writing policies in the

[14] Commonwealth of Pennsylvania any more?

[15] A I don't think so, but I don't know.

[16] Q Okay.

[17] During the time that you have been with

[18] American Commerce, how many claims do you think you

[19] supervised that were Pennsylvania claims? And I'm not

[20] looking for an exact number, I am looking for a

[21] ballpark.

[22] A Very few.

[23] There -- Pennsylvania, as long as I have

[24] been there, I can't give you a number, I can't even

[25] give you an estimation, except very, very limited

Page 27

[1] numbers.

[2] Q Are we talking like less than 25, maybe?

[3] A I wouldn't think that would be a bad

[4] number, but I don't know if it would be that high, to

[5] be truthful.

[6] But I don't -- you know, very minimal,

[7] that's all I can say.

[8] Q In your history working in the insurance

[9] industry, and you worked in a variety of different

[10] carriers, did you ever adjust or supervise claims from

[11] Pennsylvania?

[12] A Continental would not have been, because we

[13] were strictly a local claims. That's the one I had

[14] the most time with.

[15] Firemen's Fund was regional, I -- there --

[16] as a supervisor, there may have been, I don't recall.

[17] If you are asking me, as my experience,

[18] exposure to Pennsylvania is almost nothing.

[19] Q Okay.

[20] When you started with American Commerce, do

[21] you recall whether American Commerce was writing in

[22] Pennsylvania at that time?

[23] A I don't know.

[24] Once again, they didn't have a large volume

[25] of claims, so --

Page 28

[1] Q Well, we know that Margaret Wisinski had a

[2] Pennsylvania policy issued by American Commerce, and

[3] her incident, her accident occurred in December of

[4] 2001. So we know at least during that time, American

[5] Commerce was writing claims in Pennsylvania.

[6] I am just wondering --

[7] A Well, we don't know that.

[8] Q Well, she had a policy.

[9] A Well, sometimes when you leave a company --

[10] a state, you may be required to renew a policy, even

[11] though you are not writing.

[12] Q Okay.

[13] A So I don't know.

[14] Q So -- and I am not -- I am trying to

[15] understand the distinction.

[16] You are saying it may have been that

[17] American Commerce had already pulled out of

[18] Pennsylvania, and was no longer actively writing

[19] policies, other than just renewals?

[20] A Correct. I don't know.

[21] Q Okay.

[22] A But that's correct, it is a possibility.

[23] Q So there is two different ways of looking

[24] at it. There is the writing, including renewals, and

[25] there is the distinguishing between renews and new

Page 29

[1] policies?

[2] **A** Correct.

[3] **Q** Okay. When you started with American

[4] Commerce, did you receive any training in Pennsylvania

[5] law?

[6] **A** No.

[7] **Q** And when I say "Pennsylvania law," I am

[8] going to break that down. Pennsylvania's Motor

[9] Vehicle Law, is called the MVFRL, which stands for

[10] Motor Vehicle Financial Responsibility Law?

[11] **A** No.

[12] **Q** Did you receive any training on that?

[13] **A** No.

[14] **Q** Okay.

[15] There is, as in most states, there is also

[16] common law, that impacts motor vehicle accidents, and

[17] injuries.

[18] Did you receive any training on

[19] Pennsylvania common law, as it pertained to motor

[20] vehicle accidents?

[21] **A** No.

[22] **Q** Pennsylvania has a law called the

[23] Pennsylvania Unfair Insurance Practices Act.

[24] Did you receive any training -- that's also

[25] called the UIPA. Did you receive any training on the

Page 30

[1] Pennsylvania Unfair Insurance Practices Act?

[2] **A** No.

[3] **Q** Pennsylvania also has a code section

[4] regarding unfair claims settlement practices.

[5] Did you receive any training on the

[6] Pennsylvania Insurance Code?

[7] **A** No.

[8] **Q** About how many adjusters did you supervise,

[9] and we are going to set the time frame from December

[10] of 2001 to about February of 2007?

[11] **A** That's an unfair question.

[12] I -- at any one time, it would have been

[13] five to seven.

[14] **Q** Okay. And I should have worded that more

[15] carefully, I meant at any one time, not the total

[16] number of people that may --

[17] **A** No, but it would vary at different

[18] times. You know, if someone left, I may have

[19] supervised even more, but generally it was between

[20] five, let's say, right now I supervisor two, four,

[21] five -- five and a half, like.

[22] **Q** Okay.

[23] Now, I assume that you share a person, that

[24] it is not just a very small person?

[25] **A** Right.

Page 31

[1] It's an adjuster who is housed in Webster,

[2] and she has taken some of the claims. We have had an

[3] adjuster on extended medical leave, and she has taken

[4] some of the claims.

[5] So I supervise her --

[6] **Q** Remotely?

[7] **A** -- remotely.

[8] **Q** Okay.

[9] About how many files, at any given time, on

[10] average, are you monitoring actively?

[11] **A** Again, I can't answer that.

[12] **Q** Is there -- I mean, I am not looking for a

[13] specific number, I am looking for a range, that you

[14] are involved in, you know, a hundred to 120, or

[15] something in that area?

[16] **A** Again, I am not trying to be evasive about

[17] it, I don't know how many that I am actively involved

[18] in.

[19] If you are asking me how many claims I have

[20] under my supervision code, I can give you an

[21] approximate amount, but that doesn't mean I am

[22] involved in them.

[23] **Q** Okay. Well, why don't we start with that,

[24] how many -- how many claims are under your supervision

[25] code?

Page 32

[1] **A** During this time period, it would have

[2] ranged anywhere from 12 to 15 hundred, minor to large.

[3] **Q** Now, do you supervise all types of claims;

[4] meaning, first party medical, first party wage,

[5] uninsured, underinsured, bodily injury liability?

[6] **A** At different times in this time period, it

[7] would have varied, but we are the injury unit of the

[8] serious claims.

[9] At one time we handled the property damage,

[10] that went with it. We no longer handle the property

[11] damage, another unit, the file's sort of split.

[12] At times, and probably during this time

[13] period, we had an adjuster who did med pay and PIP, to

[14] help the adjuster -- BI adjusters to get away from so

[15] much paperwork.

[16] And then at other times -- presently, we

[17] have it to where the CR III -- and the CR III's the

[18] adjusters in my unit -- can make a call on it. If

[19] they want to handle the med pay, they can go ahead,

[20] and if it's going to be an extended pay here, pay

[21] there, they may request it go to a med pay adjuster,

[22] or CR I.

[23] **Q** Now, we have taken a couple of depositions

[24] yesterday, and I have learned that there is a system

[25] at the American Commerce called the Gateway program.

**Margaret Wisinski v.**
**American Commerce Group, Inc.and et al**

Joanne Dorger
August 7, 2008

---

Page 33

[1] **A**   It's on our system -- it is on our
[2] computer, yes.
[3] **Q**   And that is an internal asset, that has
[4] policies and procedures for claim handling, and other
[5] things, as part of its content.
[6]   Are you familiar with the Gateway program?
[7] **A**   I'm familiar with the Gateway, I didn't
[8] realize it had policies on it, but --
[9] **Q**   When I say policies, I mean claims handling
[10] policies, not the actual --
[11] **A**   Oh, okay.  Okay.  Yes.
[12] **Q**   Let me be more clear, because I don't want
[13] to confuse you.  There is the actual policy contract.
[14] **A**   Okay.
[15] **Q**   Which is between the insurance company and
[16] the insured.
[17] **A**   Right.
[18] **Q**   And then there is procedures for claim
[19] handling.
[20] **A**   Okay.
[21] **Q**   And I am not trying to confuse you.
[22] **A**   No.
[23] **Q**   I want to make sure we make that
[24] distinction.
[25] **A**   Right.

---

Page 34

[1] **Q**   My understanding is that the procedures
[2] methodology, philosophy, regarding claims handling,
[3] along with some other information, is available on the
[4] Gateway program?
[5] **A**   That's correct.
[6] **Q**   Okay.  And that is available to you,
[7] through your computer?
[8] **A**   That's correct.
[9] **Q**   Now, when you started with American
[10] Commerce, were there actual physical manuals, or when
[11] you started, was it already computerized?
[12] **A**   Okay.
[13]   We are going to step back here.
[14]   When I started with the company, they -- I
[15] actually thought, when I started with the company,
[16] that I was going to work for the Automobile Club
[17] Insurance Company.
[18]   And when I first came in and started
[19] handling claims, the letterhead said Automobile, the
[20] Auto Club, you know, that you hear through AAA, that's
[21] who I thought I was working for.
[22]   Well, I eventually realized within a couple
[23] of months that they went from Auto Club letterhead to
[24] ACIC, which I still thought it meant Auto Club
[25] Insurance Company.  I didn't know.

---

Page 35

[1]   Well, they had been bought out by Commerce.
[2]   Now, prior to Commerce becoming actively
[3] involved in the operation, I don't know, there was
[4] nothing on the computers, and to my knowledge, there
[5] was no written manuals.
[6]   I was just given an office, and files,
[7] and --
[8] **Q**   And you handled them, because you were an
[9] experienced adjuster?
[10] **A**   Yeah.  Yeah.
[11] **Q**   Okay.  And so -- and I'm just trying to get
[12] an understanding.  You are telling us that when you
[13] started, the actual company was different, and it
[14] got --
[15] **A**   I don't say -- I am not saying that it is
[16] different.  I am just saying, that it prior -- I don't
[17] know when Commerce bought the Auto Club.
[18] **Q**   Yes.
[19] **A**   They have may -- they may have already
[20] owned the Auto Club, but you know how companies, when
[21] they buy out, there is a time period of change, you
[22] know.
[23]   I believe I probably was hired during that
[24] time period.
[25] **Q**   Okay.

---

Page 36

[1] **A**   Commerce probably owned the company, but
[2] had not made its presence, as far as how they wanted
[3] things to be done yet.
[4] **Q**   Okay.
[5]   So when you started, it was still, for lack
[6] of a better term, the old way of doing things?
[7] **A**   Yes.
[8] **Q**   And then when American Commerce, or when
[9] the Commerce Group got more actively involved in the
[10] management, things began to change?
[11] **A**   Yes.
[12] **Q**   Okay.
[13]   So the Gateway program was then made
[14] available at some point?
[15] **A**   Yes.
[16] **Q**   Okay.  Do you recall approximately when
[17] that was instituted?
[18] **A**   I can't, because they sort of came into the
[19] claims department on a gradual basis.
[20]   They came in and, you know, sort of
[21] introduced themselves.
[22]   I think the biggest thing they sort of
[23] wanted to get on, was how they wanted us -- their
[24] evaluation process, just on a claim.
[25]   And then as we -- as we worked, they

---

**Page 37**

[1] exposed us to more and more, you know.

[2]     They didn't come in one day, and just dump

[3] it on us.

[4]     So I am not sure exactly when we were

[5] exposed to the Gateway, but I would say within a year

[6] of them taking things over, we were, you know, given

[7] that, the Gateway.

[8]     Q    Did -- did anyone come from home office,

[9] and give any special training?

[10]    A    We had a -- a lady come, and gave special

[11] training on the evaluation process that they used, it

[12] was a two-day seminar.

[13]    I think various people may have come in and

[14] just given us information, and making themselves known

[15] to, you know, look at the faces, and giving us an idea

[16] of "we are part of the group, and we are going to work

[17] with you," and -- you know, and a lot, most of it was

[18] done on phone, with the examiners.

[19]    Q    Presently, in your -- in your office, other

[20] than the Gateway program, are there any manuals,

[21] documents, or other written information, regarding

[22] claims handling practices and procedures?

[23]    A    I don't know what -- what is in the

[24] manager's office, so I can't speak to that, but I'm

[25] sure if it was something that for claims, you know, we

**Page 38**

[1] would be using it, so -- and other than maybe the

[2] adjusters have their own written notes, something they

[3] have learned on the claim in the past, and they have

[4] written it down, so they -- you know, so I have passed

[5] out sheets, as far as statutes of limitations, what

[6] kind of comparative we have.

[7]     Nothing structured, and actually not

[8] company, it is just adjusters swapping information, to

[9] help, you know.

[10]    Q    In your capacity as a supervisor, if you

[11] would come across something that you would feel is

[12] important, whether it be a matter of law, or claim

[13] handling procedure, and you want to get that out to

[14] your adjusters, do you prepare a memo?

[15]    A    You mean if I learn something?

[16]    Q    Correct.

[17]    A    If I am notified of something, it usually

[18] would come from Webster, then I would send it to the

[19] unit.

[20]    Sometimes an adjuster will call one of our

[21] defense counsels, to ask us how to -- you know, what

[22] is the proper way of doing something, or what is the

[23] position, you know, and they may either get a letter,

[24] and they may make a copy and give it to one of the

[25] adjusters for future reference.

**Page 39**

[1]    Q    So, some information -- oh, look at that.

[2]    A    What is it?  You are leaking.

[3]    Q    Yeah, the coffee has been leaking on me.

[4]    MR. BUTCHER:  That's okay, Tony, you are

[5] not on camera.  But, for the record, Tony has

[6] coffee on his shirt.

[7]    THE WITNESS:  Look.

[8]    MR. SCIARRINO:  Now I am mad at whoever

[9] noticed that and didn't say anything.

[10]    THE WITNESS:  No one noticed it, if you

[11] just kept your mouth shut, no one would know.

[12]    Oh, you got a bad stain.

[13]    MR. SCIARRINO:  Okay.

[14] BY MR. SCIARRINO:

[15]    Q    All right.  We were talking about how

[16] information is disseminated within the office.

[17]    Are there -- are you aware of any training

[18] manuals, other than the Gateway program?

[19]    A    No.

[20]    Q    Are you -- are you aware of American

[21] Commerce sending out a newsletter to its employees?

[22]    A    Oh, they send out a newsletter, but it's --

[23]    Q    Does anything in the newsletter have to do

[24] with claims handling, or claims handling practices and

[25] procedures?

**Page 40**

[1]    A    No.

[2]    Q    In anticipation of your deposition here

[3] today, did you review any documents?

[4]    A    I read the log notes, is the only thing I

[5] had available.

[6]    Q    Did you review anything else?

[7]    A    No.

[8]    Q    Did you meet with anybody, other than

[9] Attorney Butcher?

[10]    A    No.

[11]    Q    Did you have any phone conferences with

[12] anyone, other than Attorney Butcher?

[13]    A    No.

[14]    This came out of the blue for me.

[15]    Now, I did talk to Diane and Kelly about

[16] dates, in response to Mr. Butcher's trying to get this

[17] all together.

[18]    Q    Okay.

[19]    I'm asking just about the actual substance

[20] of claim handling, and the documents associated with

[21] the Wisinski file.

[22]    The only documents that you reviewed, are

[23] the log notes then?

[24]    A    That was all that was available, yes.

[25]    Q    Okay.

Margaret Wisinski v.
American Commerce Group, Inc.and et al

Joanne Dorger
August 7, 2008

---

**Page 41**

[1]     Now, we have some documents, and we are
[2] going to go through some of them.
[3]     One of which, which is Exhibit 3, is part
[4] of the Gateway materials which was produced in
[5] response to the subpoena duces tecum, which was part
[6] of your notice of deposition, as well as the other
[7] witnesses' notices of deposition.
[8]     Okay?
[9]     A   Okay.
[10]    Q   And Attorney Butcher has a copy of it.
[11]    MR. SCIARRINO: And, why don't we take a
[12] break now, and then we are going to get into that
[13] document --
[14]    MR. BUTCHER: No problem. No problem.
[15]    MR. SCIARRINO: -- a bit.
[16]    Okay?
[17]    MR. SCHERM: We are off the record, the
[18] time is 9:35 a.m.
[19]    (Recess taken.)
[20]    MR. SCHERM: We are back on the record, the
[21] time is 9:53 a.m.
[22] BY MR. SCIARRINO:
[23]    Q   Miss Dorger, we took a break off the record
[24] for a moment, we are now back, and I want to ask you
[25] some questions about the Gateway claims procedure

---

**Page 42**

[1] materials that were provided in response to the
[2] subpoena duces tecum, and this is part of what is
[3] Exhibit 3.
[4]     Okay?
[5]     A   Okay.
[6]     Q   The specific part I am going to be asking
[7] you questions about, initially, is the "Claims File
[8] Analysis Directions," and then underneath it says,
[9] "Claims Training, Casualty."
[10]    And it's about a four-page document.
[11]    A   Uh-huh.
[12]    Q   And I wanted to bring your attention to
[13] what is the last page, page 4 of 4.
[14]    And, this document is talking about the
[15] preparation of the claim file analysis?
[16]    A   Yes.
[17]    Q   Okay.
[18]    And on the last page, it talks -- it breaks
[19] down the various responsibilities.
[20]    A   Yes.
[21]    Q   Okay.
[22]    And you are a supervisor, so the supervisor
[23] responsibility would be germane to you?
[24]    A   On a file.
[25]    Q   Correct.

---

**Page 43**

[1]     Now, the supervisor responsibilities, could
[2] you read them for us?
[3]     A   "Review the file, claim notes, and the
[4] CFA.
[5]     "Document Notepad with specific" --
[6] Woo-hoo -- "comments relating to claim," I guess
[7] that's "reserve.
[8]     "If the CA" --"CFA is approved, sign and
[9] date the CFA.
[10]    "Document Notepad: 'Forwarding CFA to
[11] management.'"
[12]    Q   Okay.  And the CFA is a form?
[13]    A   It's a -- it's a report form, yeah.
[14]    Q   Okay.
[15]    A   Yes.
[16]    Q   That is prepared, and it -- it deals with
[17] basically analysis of a particular claim?
[18]    A   Yes.
[19]    Q   And it sets forth -- is that the document
[20] that then sets forth sort of the settlement
[21] parameters, the high and low range?
[22]    A   Well, it sets forth various things, but
[23] that -- yes.
[24]    Q   Okay.
[25]    A   Among other things.

---

**Page 44**

[1]     Q   Now, so part of your duty, when a CFA is
[2] prepared, is to review the log notes, and to review
[3] the CFA?
[4]     A   Yes.
[5]     Q   Okay.
[6]     Now, when a file comes to your attention,
[7] and it is a file that is -- that you are brought in
[8] on, what is the first thing you do?
[9]     A   Well, it's -- has changed, and I do want to
[10] go on record, since you are talking about the CFA, I
[11] do not think I was the supervisor at the time the CFA
[12] was submitted on this case, but it depends.
[13]    A file is reassigned, and it may say,
[14] "Requesting a reassignment" -- to my unit, because
[15] there is a UM claim.
[16]    Now what I do is I look at the file, and
[17] make some notes in the log notes, and give it to the
[18] adjuster.
[19]    There was a time that we just went ahead
[20] and reassigned it, you know, who is up next, they get
[21] it, and I didn't actually review it.
[22]    Q   When a -- when a file -- when you are
[23] adding into a file -- well, strike that.  Let's back
[24] up
[25]    A   Okay.

---

Page 45

[1]    Q    How does a file come to you; how do you get
[2] involved in a file?
[3]    A    An adjuster can bring me in on the file, I
[4] can spot check the file, and become involved.
[5]        I can -- it used to be -- not now, it used
[6] to be that I saw all legal documentation mail, and if
[7] there was something in the -- in the mail that I
[8] questioned, or didn't -- you know, what's going on
[9] here, I would pull the file.
[10]        The adjuster may request me to be in the
[11] file.
[12]        If it was reported to Webster, I would be
[13] in the file.
[14]        I'm not automatically in the file.
[15]        Excuse me.
[16]    Q    Once -- how is -- what is the mechanism by
[17] which you are brought in?
[18]        Is there an electronic prompt, is there a
[19] memo, is there an e-mail; how do you get brought into
[20] a file mechanically?  How are you made aware, "This is
[21] a file that I am going to need to be reviewing, and
[22] participating in"?
[23]    A    Well, it could be the adjuster brings it to
[24] me and says, you know, "Here's what's going on."
[25]        They will leave the file with me, when the

Page 46

[1] adjuster realizes I need to be involved.
[2]        It could be when the file comes into the
[3] unit -- and again things are different now, than what
[4] they were probably back then.
[5]        I review the files now, and put a note in,
[6] and make a decision whether I want to go on diary.
[7]        Back then, I -- the file would be assigned,
[8] and basically it would be left up to the adjuster, or
[9] if the adjuster came for authority, if the adjuster
[10] submitted a -- requested a reserve increase, and if
[11] it -- it used to be if an adjuster requested a reserve
[12] increase over their authority, I would go on diary.
[13]        I no longer do that, because they can't
[14] settle the claim, so I had too many files on diary, so
[15] I don't do that any more.
[16]        I can do a 15 month review on a file that
[17] is still open, and determine I need to be on diary.
[18] But I don't think we did 15 month reviews on -- at the
[19] time of that file.
[20]    Q    When you say "that file," you mean the
[21] Margaret Wisinski?
[22]    A    The file in question.  The file in
[23] question.
[24]        It can be by e-mail, it can be by report,
[25] it could be by the adjuster, it could be see papers

Page 47

[1] come in, and I -- you know, they are given to me if
[2] the adjuster is in my unit, and I may or may not go on
[3] diary.
[4]    Q    When a file is brought to you, either
[5] electronically, or physically, for you to become
[6] involved, and for you to participate in, what -- what
[7] do you do; do you review the file?
[8]    A    It depends.
[9]        It depends on why it's being brought to me.
[10]    Q    Okay.
[11]        Why would you not review the file?
[12]    A    An adjuster may come and ask me a -- just a
[13] question that is a yes or a no, or you had permission
[14] to run an assets check, you -- you know, they give me
[15] a summary, "This is what's going on."
[16]        "Yeah, go ahead and do an assets check."
[17]        I would trust their summary, as we
[18] discussed it.
[19]    Q    But would you be on the diary for those
[20] files?
[21]    A    Not necessarily.
[22]    Q    Okay.  On a file, where you are going to be
[23] on the diary -- excuse me -- what do you do?
[24]    A    I have a diary date, obviously, and I
[25] review the file when it comes up on diary, and once

Page 48

[1] again, depending if examining's involved, I just make
[2] sure the housekeeping of the file is current, and the
[3] adjuster has responded, you know.
[4]        On files that I am offering the direction,
[5] I'll put, "You need to do this, you need to follow up
[6] on this, why don't you see if you can do this," you
[7] know, I give some form of direction or comment.
[8]    Q    Do you review the log notes?
[9]    A    Yes.
[10]    Q    Okay.  Do you review the log notes -- when
[11] you first get added to a diary, on a file, do you
[12] review the log notes from the beginning?
[13]    A    From -- sometimes I do, and sometimes I
[14] don't.
[15]        If I can get a good -- if there is a good
[16] summary from someone, then I will just take that
[17] summary, and read it.
[18]    Q    Do you -- when you review the log notes, do
[19] you review for questions of coverage to determine what
[20] coverages are available to an insured?
[21]    A    Usually not, unless it is a coverage issue
[22] to begin with.
[23]    Q    Is that something you rely upon the
[24] adjuster to have done?
[25]    A    Well, that's part of their job

Margaret Wisinski v.
American Commerce Group, Inc.and et al

Joanne Dorger
August 7, 2008

Page 49

[1] responsibility.

[2]        I may review something, and see that, you
[3] know, they haven't caught something, and of course
[4] then I bring it out.

[5]        But I don't double check their -- their
[6] confirmation of coverage.

[7]   Q    And the reason you don't double check, is
[8] because the expectation is that that is something that
[9] they can do, and that they are trained to do?

[10]   A    That's within their -- yes, and that's
[11] within their responsibilities and accountability.

[12]   Q    Now, when you are on the diary for a
[13] particular file, is there a minimum time under which
[14] you have -- by which you have to review the file;
[15] meaning, every certain number of days, you have to
[16] look at --

[17]   A    I don't think that a supervisor -- I think
[18] somewhere it says no more than 90 days, unless
[19] there -- you have a good reason to put it on a six
[20] month.

[21]        But, I usually have a 60 day diary, unless
[22] there is something going on that needs to be done, and
[23] then I will put a shorter diary on.

[24]   Q    And when you say you put a diary on it,
[25] what does that mean; is there -- how does that work?

Page 50

[1]   A    Well, it's an electronic function.

[2]        I mean, it is on the computer.  And when
[3] you go into log notes, the first sheet on this would
[4] be the diary sheet.

[5]   Q    Okay.

[6]   A    And that's where you maintain everybody's
[7] diaries, on this sheet.

[8]   Q    Now, does that automatically prompt you?
[9] In other words, if today you were looking at a file,
[10] and you said, "I want to review this file in 45 days,"
[11] is there something in the computer that you do, so
[12] that 45 days from today, when you turn -- when you go
[13] into the office, it will come up and remind you, "Hey,
[14] look at this file"?

[15]   A    Okay.

[16]        The sheet that I am talking about, that --
[17] the sheet that goes on top of -- or the page right
[18] before this (indicating) will have your diary date.

[19]        And if you want to see it in 45 days, you
[20] go to the diary page, and you put in a new diary.

[21]        And then our diary is printed out, it is
[22] not prompted.

[23]        There is a diary sheet for everyone printed
[24] out daily.

[25]        So in 45 days I would get a printout, and

Page 51

[11] that claim number should be on there.

[2]   Q    Is there a historic diary for every file;
[3] meaning, is there a way of seeing -- going back and
[4] looking, and seeing when things were diaried?

[5]   A    Yes and no.

[6]        If someone does their diary, and uses a
[7] certain code, you would see it.

[8]        If you do a change diary, which is what I
[9] usually do, I put a 2 in, and just change the date, it
[10] is not going to show you the different dates.

[11]   Q    You -- when we were talking about the log
[12] notes, you said there is a cover page, meaning, when
[13] you electronically, on the screen, the first screen
[14] you see is the diary page, not page 1 of the log
[15] notes?

[16]   A    Okay.

[17]        When you look at our computer --

[18]   Q    Okay.

[19]   A    -- the first thing is, you are going to
[20] come to a screen, and this is the screen where you put
[21] in your claim number, you put your claim number in,
[22] and hit enter, and then it will come down here, and
[23] then the first number, claim number, will be the
[24] number you just put in, even though there is other
[25] claim numbers underneath, but the first one will be

Page 52

[1] the one.

[2]        Then you have a little space in front of
[3] that, that allows you to do different things to the
[4] file.

[5]        You may go into the section to issue a
[6] check.

[7]        You may go in to increase the reserve.
[8] Well, that would be the same thing.

[9]        But -- I forget what else you can do.

[10]        But there, you put in a 7, say, you hit
[11] enter.

[12]        The first thing that you see after that is
[13] this diary, and on here you keep your diary, or you
[14] can put a sticky note, what we call a sticky note,
[15] like if we void a check on a file, we are supposed to
[16] put a sticky note saying, "Check No. something
[17] voided," which people then don't have to go through
[18] the whole file searching to see if the check has been
[19] voided.

[20]        You know, that is not always done, but --
[21] and then after that screen, you would put a 5 or a 2
[22] code.

[23]   A 5 would bring you to this screen, to this
[24] entry.

[25]   Q    Which is the log notes?

Page 53

[1]   A   Yes.  But the beginning.

[2]   Q   Okay.

[3]   A   Or you put a 2, and it would take you to

[4] the last entry, where you can make an entry.

[5]   Q   Okay.

[6]   So, under each claim number, there is a way

[7] of getting to the diary --

[8]   A   That's the first page.

[9]   Q   Okay.  All right.

[10]   MR. SCIARRINO:  On the record, and I can

[11] see Joe has anticipated this, I would like to

[12] make -- I would like to get a copy of the diary

[13] for this file, because I don't believe that's

[14] been provided.

[15]   MR. BUTCHER:  Okay.  I just need my task

[16] list.

[17]   MR. SCIARRINO:  Okay.

[18]   MR. BUTCHER:  Just since I didn't have my

[19] microphone on, we will produce that, if it's

[20] available.

[21]   MR. SCIARRINO:  Okay.

[22] BY MR. SCIARRINO:

[23]   Q   Now, you also said there is another

[24] feature, where you can go to where the checks are.

[25]   A   It's where you --

Page 54

[1]   Q   Print checks?

[2]   A   It's where you enter a check to be issued.

[3]   Q   Okay.

[4]   A   It --

[5]   Q   And does that have an historic register; in

[6] other words, all of the checks that have been issued

[7] on a file, will be stored in there?

[8]   A   On each feature, yes.

[9]   Q   Okay.

[10]   MR. SCIARRINO:  I would also like the check

[11] register.

[12]   MR. BUTCHER:  Just so I understand, the

[13] check register, does that include checks for

[14] expenses, or is that just checks for the ultimate

[15] settlement of the claim?

[16]   THE WITNESS:  Both.

[17]   MR. BUTCHER:  Well, to the extent that I

[18] have not objected to this point, I will produce

[19] the check for this case, but I have continued to

[20] object to the dollar amounts expended.  If you

[21] want to see the checks with the dollar amounts

[22] redacted, I can do that.

[23]   But I have objected in this case,

[24] throughout, and made the objection, I don't think

[25] it is relevant.

Page 55

[1]   MR. SCIARRINO:  At this point, we want all

[2] of the checks.

[3]   MR. BUTCHER:  All right.

[4]   MR. SCIARRINO:  You can redact, as you

[5] see -- as you wish, and give us a redaction log.

[6]   MR. BUTCHER:  Okay.

[7]   MR. SCIARRINO:  We will make a judgment as

[8] to whether or not we feel we need to --

[9]   MR. BUTCHER:  I agree, I am just noting the

[10] objection I made throughout.

[11]   MR. SCIARRINO:  Okay.

[12]   MR. BUTCHER:  Regarding the actual expenses

[13] for the file.

[14]   MR. SCIARRINO:  Well --

[15]   MR. BUTCHER:  And so noted, I am just

[16] saying, I am noting that was the previous

[17] response.

[18]   MR. SCIARRINO:  But we are also interested

[19] just in knowing what all checks have been issued,

[20] even -- not just the settlement check for the

[21] uninsured motorist coverage, but also if there

[22] have been any medical checks, checks for wage

[23] loss of any type, things of that nature.

[24]   MR. BUTCHER:  I understand.

[25]   MR. SCIARRINO:  Okay.

Page 56

[1] BY MR. SCIARRINO:

[2]   Q   The -- the daily diary sheet that you get,

[3] does that, then -- you use that as your prompt for the

[4] day, to go through that, and go into those log notes

[5] for the files that you have been diaried on?

[6]   A   Hopefully, yes, that day.

[7]   Q   That's your goal for the day?

[8]   A   Yeah, that's one of my goals.

[9]   Q   Okay.  When you go into a -- into the log

[10] notes, do you always enter, always make an entry?

[11]   A   Oh, yes.

[12]   Q   Okay.

[13]   So any time you review, you always make an

[14] entry --

[15]   A   Yes.

[16]   Q   -- even if it would be something just to

[17] say that you reviewed?

[18]   A   We are not allowed to say "reviewed."

[19]   Q   Okay.  What would you -- if you go in and

[20] go through the log notes, what do you put in, so

[21] that --

[22]   A   Well, for an example, say I'm looking at

[23] one of Diane's files, and she mainly handles

[24] litigation files, I will go into the last entries, I

[25] will go into the back end of the file, and I will look

Page 57

[1] at the last few entries, and if I see that she has
[2] talked to our defense counsel in Louisville, Kentucky,
[3] and this is what they are going to do, this is their
[4] plan, well, the file is active, they have got their
[5] plan, and so I will just say, "Reviewed, adjuster and
[6] defense counsel has a active ongoing plan of action,"
[7] and that's all I need to do.
[8]    Q    Okay.
[9]         But you don't go in, review a file, and
[10] then make no notation?
[11]   A    No.
[12]   Q    So any time that -- for example, with
[13] regards to the Margaret Wisinski file, if we look
[14] through these log notes, every time you reviewed this
[15] file, there would be a log note entry by you?
[16]   A    Yes.
[17]   Q    With regard to the -- to the log notes,
[18] what are the logging requirements for an adjuster; in
[19] other words, what do you expect the adjuster to enter
[20] into their log notes?
[21]   A    Well, it changes, obviously, with the age
[22] of the file.
[23]   Q    Do you expect --
[24]   A    They will -- they should list all pertinent
[25] information to that file.

Page 58

[1]         They should list what they have done on the
[2] file, i.e., if they indexed an injury, or that, if
[3] they have talked with someone, they need to document
[4] that, and give a brief summary of perhaps what they
[5] talked about.  It doesn't have to be he said, she
[6] said, you know.
[7]    Q    If research was done --
[8]    A    Yes.
[9]    Q    -- by the adjuster, should they log the
[10] research?
[11]   A    Yeah.
[12]   Q    If a document review was performed by the
[13] adjuster, should they log that?  In other words, if
[14] they --
[15]   A    I am not sure what you mean by "document
[16] review."
[17]   Q    For example, they received correspondence
[18] from counsel, should they read that correspondence,
[19] and then log that they reviewed the correspondence?
[20]   A    They might not log a bill letter, you know,
[21] until they pay the bill, and then they will say,
[22] "Reviewed and approved," you know, but they might not
[23] do that for -- until the end of the month.
[24]   Q    If they receive correspondence from
[25] counsel, either plaintiff counsel or defendant

Page 59

[1] counsel, that is not a bill?
[2]    A    That's correct, yeah.
[3]    Q    Should that be logged?
[4]    A    Yes.
[5]    Q    If they received medical records, and they
[6] review them, should that be logged?
[7]    A    Yes.
[8]    Q    If they receive wage loss records, should
[9] that be logged?
[10]   A    Yes.
[11]   Q    Would it be fair for me to say that the log
[12] is the diary of the file?
[13]   A    Not in my mind, because I don't think -- I
[14] don't think it's one and the same.  It is the activity
[15] of the file, it is not the diary of the file, but you
[16] might mean it in a different way.
[17]   Q    Well, let's use your term, it is the
[18] activity in the file.
[19]   A    Uh-huh.
[20]   Q    So after --
[21]   A    It could be -- it could be abbreviated, it
[22] might not be in summary, you know, or -- you know, in
[23] a novel form, but, yes.
[24]   Q    So the actions that are taken, should be in
[25] the log?

Page 60

[1]    A    Yes.
[2]    Q    Okay.
[3]         And is it important that those actions be
[4] logged clearly, so that the supervisor, or manager,
[5] can review them, and understand what has gone on?
[6]    A    Yes.  Uh-huh.
[7]    Q    Is it important that the log notes be made
[8] roughly contemporaneous with the activity, so that it
[9] is fresh in the person's mind, and more accurate?
[10]   A    Yes.
[11]   Q    Is it important that the log notes be -- be
[12] written in a way that is clear and understandable, so
[13] that the supervisor and the manager can ascertain what
[14] the actions were?
[15]   A    Yes.
[16]   Q    And those logging requirements, which we
[17] have discussed, those were the responsibility of the
[18] primary claim handler, who is the adjuster?
[19]   A    Yes.
[20]   Q    Okay.
[21]         Now, in dealing with a uninsured motorist
[22] claim, are the logging requirements any different
[23] from, say, a bodily injury claim?
[24]   A    The logging entry?
[25]   Q    Logging requirements.  In other words --

Page 61

[1]   A   Requirements.

[2]   Q   -- what you expect in the log.

[3]   A   No, they should be the same, I mean,
[4] regardless if it's -- it doesn't matter which type of
[5] coverage, the requirements are basically the same.

[6]   Q   Okay.  So -- so, the idea that all of the
[7] actions be in the log, transcends different coverage
[8] types?

[9]   A   Say that again, please.

[10]   Q   The idea that the actions taken on a file
[11] be entered into the log is global, meaning it applies
[12] to the various types of coverages and claims that can
[13] be made?

[14]   A   I'm going to say generally, yes.

[15]   Q   When you review the log on a -- on a file,
[16] you are able to, as part of that review, see both the
[17] first party medical benefit payments, as well as the
[18] wage payments, if any?

[19]   A   You mean the actual payments?

[20]   Q   The notes, regarding what was -- what came
[21] in, what was done, and if payment was made?

[22]   A   Should, yes.

[23]   Q   Okay.

[24]       If a claim is an un or underinsured
[25] motorist claim, those entries are all intermixed,

Page 62

[1] meaning there are entries in the log notes regarding
[2] first party medical benefit, there might be log
[3] entries regarding first party wage payments, and there
[4] are entries regarding the un or underinsured motorist
[5] claim?

[6]   A   Yes.

[7]   Q   And anyone who has access to the log, would
[8] be able to see all of that?

[9]   A   Yes.

[10]   Q   Does everyone have access to the log, or is
[11] there a special way so that only certain people can
[12] see a given log?

[13]   A   Anyone who has access to the system, can
[14] pull up the file and read the log notes.

[15]   Q   Okay.  So any employee of American
[16] Commerce, who has access -- I assume that they need a
[17] password?

[18]   A   Right.

[19]   Q   -- can, if they know the claim number, read
[20] any log note?

[21]   A   Yes.

[22]   Q   Okay.  And it doesn't have to be
[23] specifically assigned to you?

[24]   A   Correct.

[25]   Q   So --

Page 63

[1]   A   The president could look at it.

[2]   Q   I'm trying to understand, because it seems
[3] like what you are telling me is, if you saw the claim
[4] number for Joe Smith's claim, and it is not one you
[5] are supervising, and you just were curious, because
[6] you know Joe Smith, you could go in and read the log
[7] notes.

[8]   A   Well, I guess I could.

[9]   Q   I'm not suggesting you would.

[10]   A   Well, no.  No.  No.

[11]   Q   I am just saying --

[12]   A   No, you are right, yes, anyone could look
[13] at it, because, I mean, that's -- yeah, I mean,
[14] anybody could look at it.

[15]   Q   And as you said, from a supervisory
[16] standpoint, anyone in upper management, if they wanted
[17] to review a particular file, once they know the claim
[18] number, they could go in and review that log?

[19]   A   Yes.

[20]   Q   Okay.  So as you said, if the president
[21] decided he had an interest in Margaret Wisinski's
[22] claim, once he gets Margaret's claim number, he can
[23] see everything that's been done?

[24]   A   Yes.

[25]   Q   That's in the log?

Page 64

[1]   A   Yes.

[2]       MR. BUTCHER:  Tony, are we done with that
[3] first document?

[4]       MR. SCIARRINO:  We are done with that --

[5]       MR. BUTCHER:  Okay.

[6]       MR. SCIARRINO:  -- that first document.

[7]       We are going to be talking about some other
[8] documents next.  But I think they are also in
[9] Exhibit 2, which is easier, because it's Bates
[10] stamped.

[11]       MR. BUTCHER:  Okay.

[12]       MR. SCIARRINO:  If we need to get back in
[13] Exhibit 3, I will let you know, so we can pull
[14] them out.

[15]       MR. BUTCHER:  No problem.  That's fine.  I
[16] just wanted to keep it together.

[17] BY MR. SCIARRINO:

[18]   Q   Ma'am, you had indicated that you handle
[19] claims in multiple states?

[20]   A   Yes.

[21]   Q   Would you agree with me that American
[22] Commerce Insurance Company has an obligation to adhere
[23] to the laws and regulations of the various states in
[24] which it handles claims?

[25]   A   Repeat that.

Margaret Wisinski v.
American Commerce Group, Inc.and et al

Joanne Dorger
August 7, 2008

---

**Page 65**

[1]     Q    Okay.

[2]         You would agree with me, that American

[3] Commerce Insurance Company has an obligation to follow

[4] the laws of the various states that it does business

[5] in, when handling claims from those states?

[6]     A    You are using the word "obligation," which

[7] I feel is a legal term. I'm not an attorney. So I'm

[8] going to say, I don't know.

[9]     Q    How about if we use the word

[10] "should"? American Commerce Insurance Company should

[11] follow the laws of the states -- of the various states

[12] it handles claims in?

[13]    A    Yes.

[14]    Q    Okay.

[15]        So, if you are handling claims in the

[16] Commonwealth of Pennsylvania, American Commerce

[17] Insurance Company should follow the laws of

[18] Pennsylvania?

[19]    A    They should. Again, they should handle the

[20] claim to the best of their ability, as a good

[21] adjuster. They don't always know the law, they are

[22] not attorneys. But they need to strive to provide the

[23] coverage on the policy.

[24]    Q    When we -- we were provided with some

[25] materials, that have been marked as Exhibit 2, and

---

**Page 66**

[1] they are also part of the Gateway program.

[2]         I would like to bring your attention to

[3] page 1675.

[4]     A    Uh-huh.

[5]     Q    And page 1675, at the very top heading,

[6] talks about -- it's called the "Unfair Claims

[7] Settlement Practice - Regulations continued."

[8]     A    Yes.

[9]     Q    And it lists a couple of states, and one of

[10] which is the Commonwealth of Pennsylvania?

[11]    A    Yes.

[12]    Q    And, it list, right at the very top of that

[13] entry, under "Pennsylvania," the Pennsylvania Code

[14] section for Pennsylvania's Unfair Claims Settlement

[15] Practices Act."

[16]    A    Yes.

[17]    Q    So that's a resource available to an

[18] adjuster, or supervisor, or anyone at American

[19] Commerce; should they have any questions about

[20] Pennsylvania law, that's there for them?

[21]    A    I would not read it.

[22]    Q    Why would you not read it?

[23]    A    Because I might interpret it wrong. I am

[24] not an attorney. I am not going to read a statute,

[25] and say, "Oh, now I know what they are talking about."

---

**Page 67**

[1]         I am not going to -- you know, I will call

[2] a defense counsel, and say, "Here is the issue, what

[3] do we do?" And let them tell me as an attorney.

[4]     Q    So, are you saying that you don't feel that

[5] you are able to interpret and understand insurance

[6] regulations?

[7]     A    I am not an attorney.

[8]     Q    The Pennsylvania Code has a section that

[9] regard -- that is referenced here, and I am going to

[10] show you a copy of it. It's been marked as Exhibit 5.

[11]        I would like you to turn to -- the code

[12] sections are numbered, I would like you to turn to the

[13] code section that is -- and it's about the middle of

[14] the page, where you can see the various code numbers.

[15]    A    Uh-huh.

[16]    Q    I would like you to turn to the code

[17] section that is 31 PA Code Section 1 --

[18]    A    What page are we on? At the top.

[19]        MR. BUTCHER: Tony, go ahead and read where

[20] you are going, I will flip the page.

[21]        MR. SCIARRINO: 146.4.

[22] BY MR. SCIARRINO:

[23]    Q    Now, Section 146.4 is titled

[24] "Misrepresentation of policy provisions."

[25]        Do you see that?

---

**Page 68**

[1]     A    Yes.

[2]     Q    And I would like you to read out loud,

[3] subsection (a).

[4]     A    "An insurer or agent may not fail to fully

[5] disclose first party claimants pertinent benefits,

[6] coverages or other provisions of an insurance policy

[7] or insurance contract under which a claim is

[8] presented."

[9]     Q    Okay.

[10]        Do you understand that?

[11]    A    I understand that, but it doesn't

[12] necessarily mean I would understand the next sentence,

[13] or a sentence prior.

[14]    Q    Let me ask --

[15]    A    I think the company, you know, gives us

[16] claims standards to go by, that the higher up

[17] management puts into place, to fit these.

[18]        But I'm not going to sit here and talk

[19] about what these things mean, because I am not an

[20] attorney.

[21]    Q    I would like you --

[22]        MR. BUTCHER: Tony, before -- can I take a

[23] quick break, please? Thank you. I just want to

[24] take like a minute break.

[25]        MR. SCIARRINO: Okay.

---

---

Page 69

[1]     **MR. BUTCHER:** Is that okay?

[2]     **MR. SCHERM:** We are off the record, the

[3] time is 10:29 a.m.

[4]     (Recess taken.)

[5]     **MR. SCHERM:** We are back on the record, the

[6] time is 10:37 a.m.

[7] **BY MR. SCIARRINO:**

[8]     **Q**   Okay. Ma'am, we were talking about the

[9] section of the Pennsylvania Code 31 PA Section 146.4,

[10] and we had just talked about subsection (a)?

[11]    **A**   Yes.

[12]    **Q**   Do you recall that?

[13]    **A**   Yes.

[14]    **Q**   Now, going down the page, could you read

[15] subsection (e) for me?

[16]    **A**   "An insurer may not request a first party

[17] claimant to sign a release that extends beyond the

[18] subject matter that gave rise to the claim payment."

[19]    **Q**   Now, did you understand that, that

[20] sentence?

[21]    **A**   Yes.

[22]    **Q**   Okay.

[23]    And those are parts of the Pennsylvania

[24] Code, and the Gateway system refers you to them;

[25] correct?

---

Page 70

[1]     **A**   Yes.

[2]     **Q**   And the Gateway system, I believe you said

[3] came into effect about six months after you started?

[4]     **A**   I think it was longer than that.

[5]     **Q**   Okay.

[6]     **A**   But -- no, six months I became a

[7] supervisor.

[8]     **Q**   Okay.

[9]     **A**   That was that date.

[10]    Maybe it was a couple of years -- I mean --

[11] well, let's just say I don't know.

[12]    **Q**   Let me ask you this.

[13]    **A**   Yes, uh-huh.

[14]    **Q**   Margaret Wisinski's claim started because

[15] her motor vehicle collision occurred on December 20th,

[16] 2001.

[17]    **A**   Uh-huh.

[18]    **Q**   Is it your recollection that Gateway was in

[19] place by that time?

[20]    **A**   I don't think it was for ACIC. I could be

[21] wrong, I don't know.

[22]    I will also tell you this, that when it

[23] first came on board -- you know, when we first had a

[24] home page, that they set up and got going, it did not

[25] include these things.

---

Page 71

[1]     They had just revamped the home page in the

[2] past year, and added things.

[3]     **Q**   Do you know what was added or not?

[4]     **A**   I believe this is all new.

[5]     **Q**   Well, the section I just gave, that you are

[6] pointing to, is actually a part of the Pennsylvania

[7] Code that I presented you with.

[8]     **A**   Oh, I thought you said it was in --

[9]     **Q**   Well, it is referenced.

[10]    **A**   Well, this is -- this is new.

[11]    **Q**   Okay.

[12]    **A**   This would not have been on the home page,

[13] if we had a home page, because I know -- I can say,

[14] three or four years ago, this was not in there.

[15]    **Q**   Why don't we do this, to save ourselves

[16] some effort:

[17]    **MR. SCIARRINO:** Attorney Butcher, could you

[18] find out when Gateway was made available --

[19]    **MR. BUTCHER:** Sure.

[20]    **MR. SCIARRINO:** -- to the Cincinnati

[21] office?

[22]    **MR. BUTCHER:** No problem.

[23]    **MR. SCIARRINO:** And give us a formal

[24] response on behalf of the company?

[25]    **MR. BUTCHER:** Yeah, that's fine.

---

Page 72

[1]     I think, Tony --

[2]     **THE WITNESS:** And if I my, and changes.

[3]     **MR. BUTCHER:** Tony, as I was saying, I

[4] think if you look at the larger document; and I

[5] may be incorrect on that, if you look where that

[6] page is listed actually in the larger document,

[7] it does say like 2007, either addition, or

[8] updated.

[9]     So, I'm just noting that if you look in the

[10] larger document, it says 2007.

[11]    But, that, I will find out that information

[12] for you as well.

[13]    **MR. SCIARRINO:** Okay.

[14]    And the reason I'm asking that, is because

[15] if it were -- we want to know what was available

[16] throughout the life of this particular claim,

[17] number one and, number two, if it were updated,

[18] or additions, we would want to see what the prior

[19] material included.

[20]    **MR. BUTCHER:** I understand.

[21]    **MR. SCIARRINO:** Okay.

[22]    **MR. BUTCHER:** I have added it to my list.

[23]    **MR. SCIARRINO:** Okay.

[24]    **MR. BUTCHER:** Mr. George and I, I am sure,

[25] before the end will confirm, and make sure we

---

**Page 73**

[1] have it.

[2]   **MR. SCIARRINO:** Okay.

[3]   Now, I'm going to go back to what was

[4] marked as Exhibit 3, and I am going to -- I have

[5] to find the page for you.

[6]   **MR. BUTCHER:** What is the topic heading

[7] there, Tony?

[8]   **MR. SCIARRINO:** Hold on just one moment.

[9] It's in the bad faith section.

[10]   **MR. BUTCHER:** Near the top of the document;

[11] right -- or the top of the exhibit? But near the

[12] top part of the --

[13]   **MR. SCIARRINO:** At the very top, in the

[14] upper left-hand corner, it says "Bad Faith."

[15]   **MR. BUTCHER:** Is it the "Claims Training

[16] Causalty/Physical Damage Bad Faith," and --

[17]   **MR. SCIARRINO:** Yes.

[18]   **MR. BUTCHER:** Okay. Page what?

[19]   **MR. SCIARRINO:** Well, let's start at

[20] page 1.

[21]   **MR. BUTCHER:** Okay. Let me make sure I

[22] have got the right document.

[23]   **THE WITNESS:** May I take it?

[24]   **MR. BUTCHER:** Yes, that's fine.

[25]   **Q**   All right. Ma'am, I am going to ask you

**Page 74**

[1] some questions about this aspect of the Gateway

[2] materials. And we can start with page 1 of 10.

[3]   The first paragraph, the first section is

[4] titled "Bad faith overview." And the first paragraph

[5] concludes by stating, "We have this duty to deal

[6] fairly with both policyholders and claimants."

[7]   Did I read that properly?

[8]   **A**   Yes.

[9]   **Q**   And that is a duty to exercise good faith

[10] claims handling; is that correct?

[11]   **A**   Oh, it -- it says we have a duty to deal

[12] fairly with both policyholders and claimants.

[13]   **Q**   Let me read the last few sentences in

[14] combination, to make sure that we are clear. "In

[15] doing so, it is our duty" -- "it is also our duty to

[16] process the claim while exercising good faith and fair

[17] dealing. We have this duty to deal fairly with both

[18] policyholders and claimants."

[19]   Did I read that properly?

[20]   **A**   Yes.

[21]   **Q**   So do you understand that to mean, that

[22] American Commerce Insurance Company has a duty to

[23] exercise good faith and fair dealing when dealing with

[24] its policyholders?

[25]   **A**   Correct.

**Page 75**

[1]   **Q**   Okay.

[2]   As part of the duty to exercise good faith,

[3] does the insurance carrier have an obligation to place

[4] its insured's interests on equal footing with its own

[5] interest?

[6]   **MR. BUTCHER:** I place an objection. I

[7] believe that calls for a legal conclusion.

[8]   But notwithstanding my objection, go ahead

[9] and answer.

[10]   **A**   Yes.

[11]   **Q**   Now, on page 7 of 10, at the bottom portion

[12] of page 7 of 10, there is a heading that says, "Unfair

[13] Claim Practices Act."

[14]   Do you see that?

[15]   **A**   Yes.

[16]   **Q**   All right.

[17]   Now, I'm going to read the first couple of

[18] sentences of the second paragraph.

[19]   "Along with the right to bring an action

[20] for bad faith, insureds may bring an action for an

[21] insurer's violation of the state's Unfair Claims

[22] Practices Act. The National Association of Insurance

[23] Commissioners, along with the states, drafted a model

[24] act to address unfair trade practices by insurance

[25] companies."

**Page 76**

[1]   Did I read that accurately?

[2]   **A**   Yes.

[3]   **Q**   Okay.

[4]   In your time with American Commerce

[5] Insurance Company, did you ever receive any training

[6] on the National Association of Insurance

[7] Commissioners, it is also called the NAIC, model

[8] Unfair Trade Practices Act?

[9]   **A**   No.

[10]   **Q**   And if you answered this already, I

[11] apologize, but did you receive any training on the

[12] Pennsylvania Unfair Insurance Practices Act?

[13]   **A**   No.

[14]   **Q**   Okay.

[15]   Now, on the next page, that goes over, and

[16] the second full paragraph on page 8 of 10, concludes

[17] by saying, "Unfair Insurance Claim Settlement

[18] Practices are generally similar to the following:" --

[19] and then it has a list that goes on to the next page,

[20] page 9, of 15 things.

[21]   **A**   Yes.

[22]   **Q**   Okay.

[23]   **A**   Oh, I'm --

[24]   **Q**   Is that right?

[25]   **A**   15, yeah.

Page 77

[1]    Q    Now, the very first one, could you read the
[2] very first one?
[3]    A    "Misrepresenting pertinent facts of
[4] insurance policy provisions relating to coverages at
[5] issue."
[6]    Q    Okay.
[7]    So, in the Gateway program, American
[8] Commerce Insurance Company is alerting people to these
[9] unfair insurance claim settlement practices; correct?
[10]   A    That's correct.
[11]   This has been added within the last year.
[12]   Q    Okay.
[13]   Now, the insurer, who does business in a
[14] given state or commonwealth, you indicated has --
[15] should comply with the laws of that state?
[16]   A    Yes.
[17]   Q    And, it's the insurer's responsibility to
[18] learn about those laws?
[19]   A    Well, I'm not -- yes, to what your question
[20] is, insurers, I don't know exactly who you are talking
[21] about, but --
[22]   Q    Any insurance company.  Let's talk about
[23] the Commonwealth of Pennsylvania.
[24]   A    Okay.
[25]   Q    The Commonwealth of Pennsylvania has

Page 78

[1] insurance regulations.
[2]    And, if an insurance company wants to enter
[3] our Commonwealth and sell insurance policies, the
[4] state doesn't have to go over to them and hand them a
[5] form, and say, "Hey, here is our laws," it is the
[6] obligation of the insurance company, who is coming in
[7] to do business, to make themselves aware?
[8]    A    Okay.  Yes.
[9]    Q    That's true?
[10]   A    But you know, like this No. 1, that's
[11] claims handling.
[12]   If an adjuster -- misrepresenting to me is
[13] intentionally, it is an intentional act, and an
[14] adjuster would be fired for that misrepresentation.
[15]   Q    So that's something that -- misrepresenting
[16] a pertinent fact, or insurance policy provisions
[17] relating to coverages at issue, that's something an
[18] adjuster should not do?
[19]   A    Absolutely.
[20]   Q    Okay.
[21]   A    Now, they can make a mistake.  They can
[22] make a mistake, which is different.
[23]   Q    You understand misrepresenting to be --
[24]   A    Intentional.
[25]   Q    It has to be intentional?

Page 79

[1]    A    That's the way I read it.
[2]    Q    Now, with regard to No. 2, it reads --
[3] well, why don't you read No. 2.
[4]    A    "Failing to acknowledge and act with
[5] reasonable promptness upon communications with respect
[6] to claims arising under insurance policies."
[7]    Q    Okay.
[8]    And do you understand that?
[9]    A    Yes.
[10]   Q    And let's talk about No. 4.  Would you read
[11] that?
[12]   A    "Refusing to pay claims without conducting
[13] a reasonable investigation based upon all available
[14] information."
[15]   Q    Do you understand that?
[16]   A    "Refusing to pay claims without conducting
[17] a reasonable" -- "based upon all available
[18] information."
[19]   Yeah.  Yes.  I'm sorry.
[20]   Q    Could you read No. 6?
[21]   A    "Not attempting in good faith to effectuate
[22] prompt, fair and equitable settlements of claims in
[23] which liability has become reasonably" -- "reasonably
[24] clear."
[25]   Q    Do you understand that?

Page 80

[1]    A    Yes.
[2]    Q    Could you read No. 7.
[3]    A    "Compelling insureds to institute
[4] litigation to recover amounts due under an insurance
[5] policy by offering substantially less than the amounts
[6] ultimately recovered in actions brought by such
[7] insureds."
[8]    Q    Did you understand that?
[9]    A    Yes.
[10]   Q    All right.
[11]   Could you read No. 11 for us?
[12]   A    "Making known to insureds or claimants a
[13] policy of appealing from arbitration awards in favor
[14] of insureds or claimants" -- "claimants for the
[15] purpose of compelling them to accept settlements or
[16] compromises less than the amount awarded in
[17] arbitration."
[18]   "Making known to" -- "making known to
[19] insured or claimants a policy of appealing" -- oh,
[20] yes.
[21]   Q    Okay.  Do you understand that?
[22]   A    Uh-huh.  Yes.
[23]   Q    And finally, could you read No. 13?
[24]   A    "Failing to promptly settle claims where
[25] the liability has become reasonably clear under one

**Page 81**

[1] portion of the insurance policy coverage in order to
[2] influence settlements under other portions of the
[3] insurance policy coverage."
[4]     Q    Do you --
[5]     A    Yes.
[6]     Q    -- understand that?
[7]         And these are all essentially basic
[8] adjusting principles; aren't they?
[9]     A    Yes, they are.
[10]    Q    Would you agree with me that an insurance
[11] company should be truthful in dealing with the
[12] insured?
[13]    A    Absolutely.
[14]    Q    Would you agree with me that an insurance
[15] company has a -- should place their interests and the
[16] insured's interests on equal footing?
[17]    A    Absolutely.
[18]    Q    Would you agree with me that the insurance
[19] company should advise the insured of any coverages
[20] that are applicable to a particular loss, and the
[21] amount of those coverages?
[22]    A    Yes. Uh-huh.
[23]        Are you finished with this one?
[24]    Q    Yes. We are done with the ten pages of
[25] that.

**Page 82**

[1]    A    Is it okay if I take an aspirin --
[2]    Q    Oh, sure.
[3]    **MR. BUTCHER:** Certainly.
[4]    A    -- while you are getting the next one?
[5]    Q    We were talking about the Gateway system,
[6] and you had indicated that there had been some changes
[7] made and materials added?
[8]    A    Uh-huh.
[9]    Q    Do you know whose responsibility it is to
[10] update and maintain that system?
[11]    A    No, I can't. I -- I don't know.
[12]    Q    Is it done by home office, to your
[13] knowledge?
[14]    A    Yes. Yes, it is.
[15]    Q    So you don't know the individual, but you
[16] know it is done from home office?
[17]    A    That's correct.
[18]    Q    Okay. Do you know whether or not they
[19] maintain, like a historic register, so that one would
[20] know what was on in the past?
[21]    A    I don't know, no.
[22]    Q    And would it be an accurate statement that
[23] all adjusters, supervisors, claims managers and claims
[24] examiners, would have access to the Gateway system?
[25]    A    Yes.

**Page 83**

[1]    Q    The actual American Commerce Insurance
[2] Company auto policies, auto insurance policies, are
[3] those available electronically, or do you need to
[4] have -- or do you have physical hard copies onsite?
[5]    A    They are on the computer.
[6]    Q    Okay. During the all time of the
[7] Margaret Wisinski claim, do you know whether those
[8] were on the computer, or whether they were -- whether
[9] they were hard copies?
[10]    A    I really -- I don't remember.
[11]        There has been so much change in these, in
[12] the years, I -- it would either have been a paper
[13] copy, or a hard copy.
[14]        You know, now we use it on the computer,
[15] but I don't know at the time that this loss came in.
[16]    Q    Okay. But one way or the other, adjusters,
[17] and supervisors, managers, would have copies of the
[18] various policies available to them?
[19]    A    Yes. Uh-huh.
[20]    Q    Okay. And there are state specific
[21] endorsements for each state in which American Commerce
[22] does business?
[23]    A    Yes.
[24]    Q    So, you would have a policy for Oklahoma,
[25] and you would have one for Pennsylvania, and Ohio, and

**Page 84**

[1] so forth?
[2]    A    Uh-huh. Yes.
[3]    Q    And is it your understanding that those
[4] endorsements, and state specific policies, exist to
[5] comply with the various rules and regulations of those
[6] states?
[7]    A    I suppose the answer is yes.
[8]        My -- my answer would be, they are there
[9] for us to read, if we need to look at something but,
[10] yes, I --
[11]    Q    What I'm asking you is: The policy from,
[12] say, Oklahoma, is a little different than the policy
[13] from Pennsylvania, say, and one of the reasons for the
[14] difference is that Oklahoma and Pennsylvania may have
[15] some different laws and regulations?
[16]    A    Correct.
[17]    Q    And so there is an individual version --
[18]    A    Oh, yes.
[19]    Q    -- for each state --
[20]    A    Yes.
[21]    Q    -- for that reason?
[22]    A    Yes.
[23]    Q    Okay.
[24]        It wasn't like they just decided, "We are
[25] going to create different ones just for fun," for

Page 85

[1] every state?

[2] **A** No, right.

[3] **Q** Do you know whether you ever reviewed the

[4] Pennsylvania policy for Margaret Wisinski, on this

[5] file?

[6] **A** I did not.

[7] **Q** Okay.

[8] Do you recall that specifically, or is that

[9] based upon your review of the log?

[10] **A** For most of the file, I really was not the

[11] supervisor, so I looked at my part of it, and I did

[12] not.

[13] **Q** I want to make sure I am understanding you.

[14] You said for most of the file, you were not the

[15] supervisor.

[16] Why -- explain that comment, that statement

[17] to me.

[18] **A** Well, it depends on who the adjuster is.

[19] **Q** Okay. Initially there was an individual

[20] named Terri West?

[21] **A** Yes.

[22] **Q** Okay. Were you her supervisor?

[23] **A** No.

[24] **Q** Then, in about -- do you know who

[25] Terri West's supervisor was?

Page 86

[1] **A** I believe it was Martin Baxter.

[2] **Q** Okay.

[3] And was Mr. Baxter -- that's the same

[4] Mr. Baxter, who is the claims manager now?

[5] **A** Yes.

[6] **Q** Okay. And was he located at the Cincinnati

[7] regional office?

[8] **A** Yes.

[9] **Q** Okay. So he was in the same location you

[10] were?

[11] **A** Yes.

[12] **Q** According to the review of the log notes,

[13] it looks like an individual by the name of Kelly Bihn

[14] took over handling of the file in about May of 2003?

[15] **A** I would have been her supervisor.

[16] **Q** Okay.

[17] So, starting in May of 2003, you would have

[18] been Kelly Bihn's supervisor?

[19] **A** Kelly's, yes, uh-huh.

[20] **Q** Okay. And then -- pardon me -- you were

[21] the supervisor of -- of Diane Hericks; correct?

[22] **A** Not the whole time.

[23] **Q** Could you explain when you either started,

[24] or stopped being her supervisor?

[25] **A** Okay. I don't remember the dates.

Page 87

[1] There was a point in time, due to changes

[2] in personnel, and things, that it was felt that I had

[3] too many people reporting to me, so the manager at the

[4] time, Bob Seese, him and I discussed it, and since

[5] Dianne needed very little supervision, he took over

[6] her supervision, and you will note that when she did

[7] the reporting to home office, he was -- he was the

[8] supervisor at that point.

[9] She sent the claims evaluation sheet to

[10] him -- or claim evalu -- claim file analysis, I mean,

[11] to him, to be sent to home office.

[12] I was not the supervisor at the time.

[13] Then, when he left the company, I again

[14] became her supervisor.

[15] **Q** Okay.

[16] Do you know about when Mr. Seese left?

[17] **A** Approximately two years, maybe, a year and

[18] a half, two years, something like that.

[19] I should know, but I -- just time gets

[20] screwy on you.

[21] **Q** Okay.

[22] I'm --

[23] **A** And once it went to examining, there was

[24] very little that a supervisor here would have done.

[25] **Q** Let me -- I want to follow up on something

Page 88

[1] you said earlier in the deposition.

[2] You indicated that once claims examining

[3] gets involved, because of their greater technical

[4] knowledge, at that point your technical input into the

[5] claim is reduced, and sort of substituted by the

[6] claims examiner?

[7] **A** It's reduced.

[8] I would say it never goes away, because if

[9] I obviously -- or I should say, any supervisor here

[10] locally, saw something that, "No, that's not right,"

[11] they would put their -- give their input, or they may

[12] even give their input on value of something, you know,

[13] maybe there might be a round -- a telephone

[14] conference, a roundtable, this kind of work, but

[15] technically, they sort of fade into the background.

[16] **Q** And when we use the term, we are talking

[17] about technical, are we talking about the procedures

[18] and practices of claims handling?

[19] **A** We are talking about how -- how we are --

[20] how they are going to resolve that file in particular,

[21] what the plan of action should be.

[22] They have the last word on value.

[23] They basically have the last word on

[24] anything, on the file.

[25] **Q** So -- and again, I am not trying to put

Page 89

[1] words in your mouth, but once -- once a claims

[2] examiner gets involved, they are, for lack of a better

[3] term, a team leader?

[4]   A   Yes, uh-huh.

[5]   Q   And -- and they have the ultimate say on

[6] things like evaluation, offers, and ultimate

[7] resolution?

[8]   A   Yes.

[9]       I mean -- I mean, our authority is only

[10] 50,000, so anything over 50 they have to approve, they

[11] would approve how to approach, how to handle, how to

[12] resolve, yeah.

[13]       Yes, they would be involved.

[14]   Q   Okay.

[15]       I want to back up a little bit, because we

[16] were talking about the Gateway program, and I realized

[17] I forgot to ask you some questions about it, and I

[18] apologize --

[19]   A   That's okay.

[20]   Q   -- for being out of order.

[21]       When we talked about that -- that model

[22] act, that was part of the Gateway program, where I had

[23] you read those sections about claims handling -- do

[24] you recall that?

[25]   A   Where I read like the 15 one?

Page 90

[1]   Q   Right.

[2]   A   Yes.  Okay.

[3]   Q   And you had indicated that those were

[4] fairly standard --

[5]   A   Duties.

[6]   Q   -- basic, you know, claims adjusting duties

[7] and practices.

[8]   A   Yes.

[9]   Q   You indicated that you thought that that was a

[10] newer addition to the Gateway software.

[11]       But those general principles, those aren't

[12] new?

[13]   A   Correct.

[14]   Q   Those have been around for quite sometime?

[15]   A   For years.

[16]   Q   In fact, I think it might have been even

[17] said, the material, we can go back, that the model act

[18] came out in the '70's.

[19]   A   Oh, you are talking about the actual act.

[20]       I don't know how long that act has been

[21] involved, but it -- are you talking about the duties

[22] of an adjuster, or --

[23]   Q   Right.  But those duties about -- that it

[24] talked about in the act about, you know, not

[25] misrepresenting the policy procedures --

Page 91

[1]   A   Yes, uh-huh.

[2]   Q   -- and so forth, those are principles that

[3] go back a long time?

[4]   A   At least 43 years.

[5]   Q   Okay.

[6]   A   No comment on that one.

[7]   Q   In the materials that are provided as

[8] Exhibit -- Exhibit 3, I want to bring your attention

[9] to a couple of other sections.

[10]       MR. SCIARRINO:  And for convenience, Joe,

[11] this is in the -- excuse me -- this is in the

[12] part regarding evaluation philosophy.

[13]       MR. BUTCHER:  Okay.

[14]       MR. SCIARRINO:  I have to find it.

[15]       MR. BUTCHER:  I will get it.

[16]       MR. SCIARRINO:  Attorney Butcher, it might

[17] be a little easier if I could just show you, this

[18] is part of that PowerPoint --

[19]       MR. BUTCHER:  Oh, okay.

[20]       MR. SCIARRINO:  -- presentation, that's

[21] part of the materials.

[22]       MR. BUTCHER:  Let me see if I can --

[23]       THE WITNESS:  Oh, is that off the training

[24] program?

[25]       MR. BUTCHER:  Yes.

Page 92

[1]       THE WITNESS:  I have seen that.

[2]       MR. BUTCHER:  Bear with me, Tony.

[3]       MR. SCIARRINO:  Its about a third of the

[4] way in.

[5]       MR. BUTCHER:  Thank you.  You are farther

[6] in than I am.  Maybe.

[7]       THE WITNESS:  There you go.

[8]       MR. BUTCHER:  Some of these materials are

[9] in different places, but I think linked to the

[10] same location, so you may see some replication.

[11]       Okay.

[12]       MR. SCIARRINO:  Did you find that?

[13]       MR. BUTCHER:  Yes.

[14]       MR. SCIARRINO:  Okay.

[15] BY MR. SCIARRINO:

[16]   Q   Miss Dorger, I am going to ask you a couple

[17] of questions that come from what appear to be a slide

[18] presentation that at the top, it's titled "ACIC

[19] Evaluation Philosophy."

[20]   A   Okay.

[21]   Q   Okay?

[22]       On the very first page, could you -- it's

[23] titled "ACIC Evaluation Philosophy".

[24]       Could you read that to us?

[25]   A   "To determine the impact the injury had on

Page 93

[1] quality of life of the injured individual."

[2] **Q** And is that your understanding of ACIC's

[3] claim evaluation philosophy?

[4] **A** Yes, it is.

[5] **Q** Okay.

[6] **A** It is -- we have an impact statement.

[7] **Q** And has that been consistent throughout the

[8] time that you have been with ACIC?

[9] **A** Since we were -- came under Commerce, and

[10] they taught us their evaluation process, the first

[11] several years we would not have had it.

[12] **Q** It was a different philosophy?

[13] **A** Well, yeah -- well, I don't know I want to

[14] say that, but it was -- evaluations were done

[15] differently.

[16] **Q** Okay.

[17] **A** This is a very important part of our

[18] evaluation process, so --

[19] **Q** Now, the next page in this material, it has

[20] that slide that's headed "Take Into Consideration All

[21] of the Following Factors."

[22] And could you read that for us?

[23] **A** "Age.

[24] "Prior physical health," I would assume.

[25] "Employment.

Page 94

[1] "Family status.

[2] "Medical expense.

[3] "Verified lost wage.

[4] "Activity level.

[5] "Pain associated with trauma, and healing,"

[6] I guess.

[7] "Permanent disability.

[8] "Loss of" --

[9] **Q** "Function," perhaps?

[10] **A** Yeah, that's probably what it is, yeah.

[11] **MR. BUTCHER:** Just so the record -- I

[12] recognize we will have the exhibit, but that the

[13] slides don't print out fully all of the words on

[14] some of the PowerPoint presentations that were

[15] produced in Exhibit 3.

[16] **BY MR. SCIARRINO:**

[17] **Q** Now, is that your understanding of -- of

[18] some of the key factors that are to be considered in

[19] evaluating an injury claim?

[20] **A** Definitely.

[21] **Q** Now, going back to two more pages --

[22] **Q** Going forward, or --

[23] **Q** I'm sorry.

[24] You are at the right page.

[25] **A** Right here.

Page 95

[1] **Q** It says "Total and Partial Disability"?

[2] **A** Yes. Uh-huh.

[3] **Q** Now, that -- that document talks about,

[4] "Total and Partial Disability" is the heading, and the

[5] first sentence reads, "The evaluation is determined by

[6] allotting a dollar value per week of disability."

[7] Did I read that accurately?

[8] **A** Yes, you did.

[9] **Q** Now, you had talked about there was a

[10] change in the way that claims were evaluated.

[11] Was -- evaluating, on a weekly basis, was

[12] that part of the change?

[13] **A** Okay.

[14] Prior to Commerce our -- well, it is not

[15] our parent company any more, but it was at the time.

[16] Prior to Commerce coming in, I think there was leeway

[17] as to how people evaluated claims.

[18] You know, I had come back -- I had been in

[19] claims since 1963. So, I have done various ways of

[20] evaluating claims, but someone else may have had

[21] another way of doing it.

[22] And, as long as, I guess, the bottom line

[23] was agreeable to whoever may have seen the file, that

[24] was okay.

[25] But, Commerce doesn't do it that way,

Page 96

[1] obviously. We all have a uniform way of doing things.

[2] So, whenever -- and you would have to get a

[3] date from someone else -- whenever Commerce came in,

[4] they taught us this way to do it.

[5] **Q** And, when you say "this way," this way

[6] involves the allocating of a dollar value per week, of

[7] either partial or total disability, and then --

[8] **A** If the injury calls for it, yes.

[9] **Q** If the injury merits it.

[10] **A** Uh-huh.

[11] **Q** And then multiply that by the number of

[12] weeks that it's applicable?

[13] **A** That's correct.

[14] **Q** And including that as part of the general

[15] damages on the claim?

[16] **A** That's correct.

[17] **Q** Okay.

[18] And the distinction between general damages

[19] and special damages, sometimes general damages are

[20] called noneconomic damages?

[21] **A** Yes.

[22] **Q** And a lot of people will refer to that

[23] sometimes as like pain and suffering, or loss of

[24] life's pleasures?

[25] **A** Yes, uh-huh.

Page 97

[1]   Q   Am I accurate in that?

[2]   A   Yes, you are.

[3]   Q   And on the next slide, the next slide is

[4] the pain and suffering value slide.

[5]   A   Uh-huh.

[6]   Q   And could you read that for us?

[7]   A   "A per week dollar allowance is allotted in

[8] order to calculate the value of pain and suffering."

[9]      Do you want me to go on?

[10]   Q   Yes, please.

[11]   A   Okay.

[12]      "The amount allowed per week should be

[13] proportionate to the amount of discomfort the injury

[14] caused and the type of treatment received.

[15]      "Review the daily office notes to check

[16] pain levels and the activity levels.  As pain

[17] decreases and activities increase the value per week

[18] should decrease.

[19]      "Age, prior physical health, employment,

[20] family status, activity level, medical expenses,

[21] verified lost wages, permanent disability, and loss of

[22] function should also be considered."

[23]   Q   Okay.  Thank you.

[24]      Now, in understanding and applying this

[25] principle, or these principles, particularly the

Page 98

[1] second bullet section, does that mean that if it is

[2] understood that for a particular time frame a person

[3] would have had more pain, say, for a month they had

[4] more pain than, say, the following month, you would

[5] have a different dollar amount for that, that first

[6] period, than for the second period?

[7]   A   Correct.

[8]   Q   Okay.

[9]      And, would the nature of the injury be

[10] considered?

[11]      For example, something that was a very

[12] painful injury, versus an injury that was, say, less

[13] painful, would those be accounted for?

[14]   A   Yes.

[15]      Like a soft tissue versus a herniation, or

[16] a -- with other things going on, or -- yeah.

[17]   Q   Now, if somebody had -- if a claimant had a

[18] surgery during a particular period of time, and it was

[19] believed that that surgery was related to the motor

[20] vehicle accident, would there be any increase in the

[21] weekly -- the weekly pain and suffering allocation, to

[22] account for the occurrence of the surgery?

[23]   A   Yes.

[24]      I don't know if you have a copy of our

[25] actual evaluation sheet, where we do all of that but,

Page 99

[1] you know, you could go -- you could go, say, for

[2] instance, right at the time of the accident, they go

[3] into the hospital, and may be treated and released

[4] and, you know, sometimes it gets worse, rather than

[5] better, and then like two months after the accident,

[6] and I'm just throwing things out, they have to have

[7] surgery, well, then you take those dates, and those

[8] amounts, and put them back into the total disability.

[9]      Your weeks can be --

[10]   Q   You can move them around?

[11]   A   Yes, uh-huh.

[12]   Q   Okay.

[13]      Do you recall, there was a -- a form

[14] prepared on this case, there were actually two forms

[15] prepared on this case, do your recall whether you

[16] reviewed either of them?

[17]   A   No.

[18]      When I reviewed the file, I can remember

[19] that both originals was reviewed very low.

[20]      I can't remember what Kelly's evaluation

[21] was, but it was under her authority -- I mean, it

[22] was -- yeah, it was within her authority, I should

[23] say, and I think when Diane did her evaluation, she

[24] had a wide range, which went over her office limits,

[25] and that's when the CFA -- which I didn't see.

Page 100

[1]   Q   Okay.  The evaluations on this case, did

[2] you see them at the time they were performed, or right

[3] around that time?

[4]   A   I didn't see them.

[5]   Q   Okay.  You never saw them?

[6]   A   No.

[7]   Q   Okay.  The reason I am asking, is in your

[8] response to my prior question, you said you remembered

[9] that one was low, and one had a bigger range?

[10]   A   Well, I read the log notes, that someone

[11] had made an offer around seven to nine thousand

[12] dollars, and I think Diane made something like nine,

[13] or something.

[14]      I read it in the logbooks.

[15]   Q   Okay.

[16]   A   It is in there.

[17]   Q   But the evaluation forms, either the one

[18] that was performed by Kelly Bihn, or the one that was

[19] performed by Diane Hericks, you never reviewed those?

[20]   A   I did not, no.

[21]   Q   Okay.  And when you say you didn't review

[22] them, you mean you didn't review them either at the

[23] time, or in preparation for your deposition here

[24] today?

[25]   A   No.  No, I haven't seen them.  The only

---

Page 101

[1] thing I -- the only thing I seen was this.

[2]    Q    Okay.  And when you say "this" we are

[3] talking about the log notes?

[4]    A    Yes, uh-huh.

[5]         Should I give this back to him?

[6]    Q    Sure.

[7]         THE WITNESS:  He has got the log notes now.

[8]         MR. BUTCHER:  I know.  That's fine.

[9] BY MR. SCIARRINO:

[10]    Q    I would like you to look at what is

[11] Exhibit 4, which is the log notes.

[12]         And, in reviewing the log notes, I'm

[13] looking at page 16 --

[14]         THE WITNESS:  Oh, my gosh, I'm sorry.  Of

[15] course, I can't find it, I apologize.

[16]    A    Now, what was the --

[17]    Q    Okay.  Page 1663.

[18]    A    1663?

[19]    Q    Yes.  It's at the bottom right, those are

[20] called Bates pages, Bates marks.

[21]         MR. BUTCHER:  I will --

[22]    A    Oh, you are doing the line numbers.

[23]         MR. BUTCHER:  No, no, no.  Okay.  That's

[24] the page.

[25]    Q    In the bottom right-hand corner, there is a

---

Page 102

[1] number which we call the Bates page, or the Bates

[2] stamp.

[3]    A    Oh, you are looking down here, I am --

[4] Okay.  I'm sorry.

[5]    Q    Okay.  And most all of the documents in

[6] this case are stamped with those at the bottom, which

[7] is how we refer to them, so that we are all looking at

[8] the same thing.

[9]    A    Okay.

[10]    Q    Okay?

[11]         I see an entry, at line -- at line 368 --

[12]    A    Uh-huh.

[13]    Q    -- and that is February 3rd, 204?

[14]    A    Uh-huh.  Yes.

[15]    Q    Is that your first entry?

[16]    A    Yes.

[17]    Q    Now, do you know how it was that this file

[18] was triggered, to come to your attention?

[19]    A    Well, if you look right above, Kelly Bihn

[20] had apparently talked with the attorney, and made an

[21] offer, and he indicated that he wouldn't take -- he

[22] would not move off the limits, and they had some kind

[23] of discussion here, and she brought the file to me

[24] because she felt that it was above her ability at the

[25] time; that it should be reassigned.

---

Page 103

[1]    Q    So, the file was brought to you by

[2] Kelly Bihn, for reassignment?

[3]    A    Yes.

[4]    Q    Now, why was it reassigned, as opposed to

[5] just you supervising Miss Bihn?

[6]    A    Well, as I told you, I have got 12 to 15

[7] hundred files, and I can't review -- I mean, I can't

[8] supervise all of the files.

[9]    Q    And so it was referred to Miss Hericks,

[10] because she was more experienced?

[11]    A    Yes, she is.

[12]    Q    Okay.

[13]         And at that point, were you on the diary?

[14]    A    I don't know.  I would have to look at the

[15] diary.

[16]    Q    Okay.  And that, I am going to represent to

[17] you, that's something we don't -- we don't have a copy

[18] of.

[19]    A    Yeah.

[20]    Q    So I unfortunately cannot provide you with

[21] a copy that would aid you in responding.

[22]         There is another entry by you on page 1664?

[23]    A    Yes.

[24]    Q    Which is dated March 31st, 2004.

[25]    A    Yes.

---

Page 104

[1]    Q    And it is at line 406.

[2]    A    Yes.

[3]    Q    Now, at that point, you were responding to

[4] a request to increase the reserve to the policy limit

[5] of 50,000?

[6]    A    Yes.

[7]    Q    Okay.  Now, you -- can you tell whether or

[8] not that was a scheduled review, or whether that was a

[9] triggered review?

[10]    A    Oh, that was a triggered review.  Reviewed

[11] at adjuster's request, that means, she -- if you note

[12] on 3-30, Dianne indicates she is recommending a

[13] reserve increase, and on the following day I reviewed

[14] her request, and raised it.

[15]    Q    Okay.

[16]         Now, in the entry made above -- when I say

[17] made above, I mean made on page 1664 on March 30th,

[18] 2004, by Dianne Hericks, the line 398, Miss Hericks

[19] writes, "But, considering the worst case scenario I

[20] recommend we increase the reserve to the full 50,000

[21] UM limit."

[22]    A    Uh-huh.

[23]    Q    Did I read that --

[24]    A    Yes.

[25]    Q    -- correctly?

---

**Page 105**

[1]      Now, UM is shorthand for uninsured
[2] motorist?

[3]      A   Yes.

[4]      Q   Miss Hericks is indicating that the
[5] uninsured motorist limit is $50,000, and that was not
[6] accurate?

[7]      A   That's correct.

[8]      Q   Okay.  And you earlier testified that you
[9] generally don't review the policy coverages and
[10] limits, because that's something you expect the
[11] adjuster to do?

[12]      A   Yes.

[13]      Q   And in this case, did you review, to
[14] confirm the policy limit?

[15]      A   No.

[16]      Q   Okay.

[17]      Now, on page 1665, there are a couple of
[18] entries I want to ask you about.

[19]      First, there is an entry by -- on line 417,
[20] on August 30th, 2004, by Bob Seese.

[21]      A   Yes.  Uh-huh.

[22]      Q   Do you know why Mr. Seese would be involved
[23] in the file at this point?

[24]      A   Actually, I don't.  I don't -- I don't know
[25] if, since we increased the reserve to 50, I don't know

**Page 106**

[1] if the manager was required to be on diary or not.

[2]      Q   There is also at line 422, an entry by
[3] AXTHILL.

[4]      A   Yes.

[5]      Q   And it says Tom -- underneath it, it says
[6] Tom Hill?

[7]      A   Yeah.

[8]      Q   Do you know who Mr. Hill is?

[9]      A   Who he is?

[10]      Q   Yes.

[11]      A   Oh, yes.  He was an adjuster we had, and if
[12] he took anybody -- he would work any file, when he got
[13] a phone call on.  I mean -- he apparently -- I don't
[14] know -- I don't know why he has got that entry in
[15] there.  But, he was known for that.

[16]      I can't explain it.

[17]      Q   Okay.  He was not technically assigned to
[18] the file?

[19]      A   No.  No.  No.

[20]      Q   Now, there is an entry on -- at line 412,
[21] by you, for June 10th, 2004.

[22]      A   Uh-huh.  Yes.

[23]      Q   Okay.

[24]      And, it indicate that you reviewed the
[25] file, and it indicates that the adjuster, which is

**Page 107**

[1] Miss Hericks, is working to get additional
[2] information -- I'm sorry, additional medical
[3] documentation to evaluate and resolve the claim?

[4]      A   Yes.

[5]      Q   Okay.  Did I read that, or summarize it
[6] accurately?

[7]      A   Correct.

[8]      Q   Okay.

[9]      Now, the next entry is August 24th, 2004,
[10] which is about two and a half months later.

[11]      A   Yes.

[12]      Q   And, so there was no activity from
[13] June 10th, 2004 to August 24th, 2004?

[14]      A   Is that a question?  Yes.

[15]      Q   Okay.

[16]      And then there is another entry on
[17] November 18th, 2004, again by you, on line 419, it
[18] says "reviewed on file - sending email to adjuster to
[19] bring file up to date - if we have not received the
[20] documentation, let's push attorney."

[21]      A   Yes.

[22]      Q   Did I summarize --

[23]      A   Yes.

[24]      Q   -- that properly?

[25]      A   Uh-huh.

**Page 108**

[1]      Q   So, that would have us about four months
[2] after your June 10th, 2004 entry?

[3]      A   Yes.

[4]      Q   And there was no -- no actions taken by the
[5] adjuster, during that four-month period, that were
[6] logged?

[7]      A   Correct.

[8]      Q   The -- on page 1664 --

[9]      A   Yes.

[10]      Q   -- there is a log entry by Dianne Hericks,
[11] who was the adjuster.

[12]      A   Yes.

[13]      Q   And that was on May 14th, 2004.

[14]      A   Wait a minute, I'm sorry, where are we?

[15]      Q   Page 1664.

[16]      A   Oh, yeah.  Oh, down at the bottom, yes.

[17]      Q   That's at line 408?

[18]      A   Right.

[19]      Q   And let me restate the question, so that we
[20] are clear.

[21]      A   Okay.

[22]      Q   On page 1664, there is an entry by
[23] Dianne Hericks, on May 14, 2004.  And she is noting
[24] communication with plaintiff's counsel.

[25]      MR. BUTCHER:  Joanne, you sometimes have to

Joanne Dorger
August 7, 2008

Margaret Wisinski v.
American Commerce Group, Inc.and et al

---

Page 109

[1] skip a page, because there are pages where things
[2] were redacted, and ultimately produced, and then
[3] they are attached together.
[4]    **THE WITNESS:** Oh, okay.  I am reading --
[5]    **MR. BUTCHER:** Yes, you just --
[6]    **THE WITNESS:** Okay.
[7] **A**   Okay.
[8]    And now what was your question?
[9] **Q**   Okay.
[10]   Well, that was part of my question.
[11]   You see where the entry is, and it's
[12] May 14, 2004?
[13] **A**   Yes.
[14] **Q**   All right.
[15]   And then there are three entries by you in
[16] June, August and October.
[17]   And then the next entry by Miss Hericks is
[18] on November 9th, 2004, where she indicates that she
[19] was sending a letter to claimant's counsel; is that
[20] correct?
[21] **A**   On November 9th?
[22] **Q**   Yes.  November 9th, 2004?
[23] **A**   She indicated she sent a letter.
[24] **Q**   Okay.
[25] **A**   Yes.

---

Page 110

[1] **Q**   So, from May 14th, 2004, till November 9th,
[2] 2004, the adjuster didn't log any activity on her
[3] behalf?
[4] **A**   That's correct.
[5] **Q**   And that would be about a six-month period?
[6] **A**   Yes.
[7] **Q**   Now, you had indicated earlier that there
[8] came a time when Miss Hericks wasn't being actively
[9] supervised by you, but was being in fact supervised by
[10] Mr. Seese?
[11] **A**   That's correct.
[12] **Q**   I'm looking at page 1666, and there is an
[13] entry at the very bottom dated November 21st, 2005; do
[14] you see that?
[15] **A**   I don't know -- okay.
[16]   Yes.
[17] **Q**   And you made an entry on that date?
[18] **A**   Yes.
[19] **Q**   And it indicates that the reserve on this
[20] claim was set at the policy limit of $50,000?
[21]   If you look, that carries over onto
[22] page 1667.
[23] **A**   Okay.  "Reviewed on diary - did we obtain
[24] response from insured regarding her UM" -- oh, okay.
[25] Yes.

---

Page 111

[1] **Q**   Now, we have already talked about this, but
[2] the policy limit of $50,000 was in fact an error?
[3] **A**   That's correct.
[4] **Q**   Okay.
[5]   Now, from page 1667 it appears that
[6] Miss Hericks' entries -- it appears that you don't
[7] have another entry until on page 1669, February of
[8] 2006.
[9] **A**   Yes.
[10] **Q**   Now, is that about the time that Mr. Seese
[11] took over supervising Miss Hericks?
[12] **A**   Somewhere in that area, but I can't -- I --
[13] I can't pinpoint to when.
[14]   It looks like -- it likes like I approved a
[15] legal bill on 2-9.
[16] **Q**   2-9 of 05?
[17] **A**   Is that 2-9-05?
[18]   **MR. BUTCHER:**  2-9-2006.
[19]   **MR. SCIARRINO:**  Oh, I'm sorry, 2000 --
[20] February 9th, 2006.
[21] **A**   Yeah.  And I can't -- I can't even say that
[22] I was still supervising, I may have just reviewed a
[23] bill, a legal bill.
[24]   But I don't know, I just don't remember
[25] when Bob took the file over.

---

Page 112

[1]   All I can tell you is by July 25th of '06,
[2] he was obviously -- let's see -- yeah, he was -- he
[3] was the supervisor, because the CFA went direct to
[4] him.
[5] **Q**   Well, the reason I'm asking, is because --
[6] and certainly I would ask that you review this on your
[7] own -- after the entry of February 9th, 2006, which
[8] appears at Bates page 1669, I don't see another entry
[9] by you.
[10] **A**   No, I don't think so, until later.
[11]   Did I get back involved in it?
[12] **Q**   I -- I don't recall seeing any other
[13] entries, by you, but if I am wrong, I'm happy to be
[14] corrected.
[15] **A**   No, I think -- see, Steve got into it,
[16] Dianne, Bob Seese, Dianne, Dianne, Dianne,
[17] Theresa Ellis, Dianne, Dianne, Bob Lucas.
[18]   What probably happened then, is -- and
[19] Theresa.
[20]   Okay.  Somewhere along the line, Bob left.
[21] And it could well be that I had a diary on it again,
[22] except by that time examining was doing everything.  I
[23] was not actively involved in the file then, so to
[24] speak.
[25]   The CFA went -- the CFA went up in July of

---

Margaret Wisinski v.
American Commerce Group, Inc.and et al

Joanne Dorger
August 7, 2008

---

Page 113

[1] '06, Steve Shiner and Theresa Ellis were the
[2] examiners, and I may have had -- you know, when Bob --
[3] then when Bob Seese left the employment of the
[4] company, I may have had another diary date put on
[5] there, and I may not have.
[6]     I don't know.
[7]     Q   Without reviewing the diary, you wouldn't
[8] be able to tell?
[9]     A   No.  Huh-uh.
[10]    Q   Okay.
[11]    Referring to page 1667.
[12]    A   1667?
[13]    Q   '67.
[14]    A   '67.  Okay.  Yes, uh-huh.
[15]    Q   There is an entry on December 28th, 2005,
[16] by Miss Hericks, and at line 517 it's noted that the
[17] claimant was demanding arbitration.
[18]    A   Uh-huh.  Yes.
[19]    Q   And then on the next page, 1667, there is
[20] reference to whether or not -- I'm sorry, 1668, there
[21] is reference to whether or not American Commerce will
[22] agree to arbitration, and ultimately a decision was
[23] made to object to arbitration.
[24]    Did you play any role in deciding to object
[25] to arbitration, and in directing Attorney Godshall to

---

Page 114

[1] object to plaintiffs's request for arbitration?
[2]     A   No.
[3]     Q   Do you recall whether that was after you
[4] were no longer supervising Miss Hericks -- strike
[5] that.
[6]     Do you know why you didn't play a role in
[7] that decision?
[8]     A   I doubt that I was involved in the file.
[9]     I wasn't.  I don't know why I wasn't,
[10] but --
[11]    Q   Okay.
[12]    MR. SCIARRINO:  Why don't we take a little
[13] break.  We are getting into the home stretch, so
[14] I think this would be a good point to take a
[15] break.
[16]    MR. SCHERM:  We are off the record, the
[17] time is 1:46 a.m. -- I'm sorry --
[18]    THE WITNESS:  What time?
[19]    MR. SCHERM:  -- 11:46 a.m.
[20]    (Recess taken.)
[21]    MR. SCHERM:  We are back on the record, the
[22] time is 12:04 p.m.
[23] BY MR. SCIARRINO:
[24]    Q   Ma'am, we have taken a short break, and we
[25] are back on the record.  I have a few more questions

---

Page 115

[1] for you.
[2]     Q   Do you recall whether or not you reviewed
[3] any of the medical records on this file on
[4] Margaret Wisinski?
[5]     A   I do not.
[6]     Q   Would it be fair for me to say that the
[7] only thing you reviewed on this file, during the time
[8] that you supervised the file, was the log notes?
[9]     A   That's correct.
[10]    Q   Okay.
[11]    You never reviewed any of the primary
[12] documentation, meaning the correspondence, or the
[13] medical records?
[14]    A   I never pulled the paper file, to review.
[15]    Q   Okay.
[16]    And I think you also earlier testified that
[17] you never reviewed the actual insurance policy, or
[18] declarations page?
[19]    A   No.  Or the coverage on the system.
[20]    Q   Okay.  And the coverage on the system, is a
[21] computer screen?
[22]    A   Uh-huh.  Yes.
[23]    Q   Did you ever have any conversations,
[24] meetings, phone calls, with Attorney Godshall?
[25]    A   No.

---

Page 116

[1]     Q   I know we talked about you authorized
[2] payment of a bill, but --
[3]     A   Yes.  Oh.
[4]     Q   -- do you recall reviewing any of
[5] Attorney Godshall's correspondence?
[6]     A   No.  The way the procedure works, is the
[7] bill comes in, and it's approved by the adjuster for
[8] the accuracy, and then it is put in a basket, and I
[9] sign off on it.
[10]    Q   Earlier we had talked about your -- strike
[11] that.
[12]    During the time that you were actively
[13] supervising Miss Hericks on the file -- and I
[14] understand you don't recall exactly when that started,
[15] and exactly when it ended.
[16]    A   Yes.
[17]    Q   But during that time, you indicated that
[18] you only reviewed the log notes?
[19]    A   Yes.
[20]    Q   Based upon your review of the log notes,
[21] was the file being handled in compliance with American
[22] Commerce Insurance Company's policies and procedures
[23] during that time?
[24]    A   Well, obviously during that time period,
[25] where there was no activity, I was, you know, sending

---

Page 117

[1] her e-mails, that we reviewed here earlier, I would
[2] have liked to have seen better follow up on the case.
[3] **Q** Can you -- based upon what we have talked
[4] about today, and based upon your review, and
[5] anticipation of this deposition, do you recall
[6] anything else that you would feel would be not in
[7] compliance with ACIC's guidelines and procedures?
[8] **A** I reviewed the log notes. I am
[9] uncomfortable in making a comment, because while I --
[10] I reviewed the log notes, I didn't study them, and
[11] look at them, and look at date and times, and what
[12] people did.
[13] I did it -- I didn't think that it was a
[14] bad file, so, you know, could the follow up have been
[15] better? Yes.
[16] Were there areas needed improvement or --
[17] you know, yes, but I can't really talk, you know, in
[18] details, like on page 616, whatever, I can't do
[19] that.
[20] I read the file, and I have memory of the
[21] general facts of the file.
[22] I didn't find anything in the file that
[23] made me say, "Oh, wow, oh, my gosh," I can't say that.
[24] I am not going to say it is a perfect file,
[25] and I am not going to say it is a file that I would

Page 118

[1] take into a training thing, and say, "Look, this is
[2] how we want you to do things."
[3] But, it's -- a mistake was made, it's been
[4] admitted, and we corrected it immediately.
[5] **Q** You had indicated early in your deposition,
[6] and we had talked about other cases where you had
[7] testified, and my recollection was that the three
[8] prior depositions were all -- there was all in each
[9] one a allegation of bad faith conduct, two of them
[10] were Oklahoma cases, and one was a West Virginia case?
[11] **A** That's correct.
[12] **Q** Do you know whether any of those cases are
[13] still active?
[14] **A** I don't know.
[15] **Q** Okay.
[16] Do you know whether any of them have been
[17] resolved?
[18] **A** I believe the first one was, but -- but
[19] that's only like -- I don't want to say hearsay, but I
[20] think that one was resolved.
[21] **Q** Okay.
[22] **A** But I really don't know.
[23] **Q** Do you know, I think you testified in each
[24] case American Commerce Insurance Company was the
[25] defendant, or a defendant, you didn't recall the names

Page 119

[1] of the plaintiffs, do you recall the names of any of
[2] the lawyers involved? And when I say when I say the
[3] lawyers, I mean either the plaintiff lawyer, or
[4] American Commerce's lawyer?
[5] **A** Well, I know my defense firms, yes.
[6] **Q** Okay. Could you tell me who they were?
[7] **A** On both --
[8] **Q** On the Oklahoma ones?
[9] **A** My mind's going blank, I'm sorry. On the
[10] Oklahoma claims, the law firm was Connors & Richards,
[11] and --
[12] **Q** Let me interrupt you, and I am not trying
[13] to be rude.
[14] **A** No, I know that.
[15] **Q** Connors & Richards, are they -- do you know
[16] where they are located?
[17] **A** Tulsa, I think.
[18] **Q** Okay.
[19] **A** And Bill Richards was the attorney, that --
[20] the first one.
[21] **Q** Okay.
[22] **A** And then the second one was the same law
[23] firm, and it was Rich Hathcoat, who he just left the
[24] firm, unfortunately.
[25] **Q** You wouldn't happen to know how to spell

Page 120

[1] that gentleman's last name, would you?
[2] **A** I will take a guess. I think it is
[3] H-a-t-h-c-o-a-t. I could be wrong. Just spell it the
[4] best you can, because I don't know, either.
[5] **Q** Okay.
[6] And the West Virginia file?
[7] **A** Okay. In West Virginia -- in West
[8] Virginia, a individual person can be held responsible.
[9] **Q** Okay.
[10] **A** The adjuster, personally, can be held
[11] responsible.
[12] So the company gave the people involved in
[13] the claim, Doug Godshall, to represent us. And
[14] Steptoe & Johnson, and I can't tell you who the
[15] adjuster would have been -- or not adjuster, attorney,
[16] but it was the Steptoe & Johnson firm in West
[17] Virginia.
[18] **Q** Okay. And did you say, were you named as
[19] an individual defendant in that file?
[20] **A** I -- you know, I can't remember. I think
[21] so, because something came up, and it was determined
[22] that each individual could personally be responsible,
[23] i.e., a judgment against them on a personal level, and
[24] of course, that was very upsetting, and the attorney
[25] agreed to get -- give us an attorney, to represent us.

Margaret Wisinski v.
American Commerce Group, Inc.and et al

Joanne Dorger
August 7, 2008

---

**Page 121**

[1]     Q   So, do you recall who the other named
[2] defendants were, other than yourself and American
[3] Commerce Insurance Company?
[4]     A   I guess you are asking on who the adjusters
[5] were.
[6]     Q   Well, if that would be the other people
[7] named?
[8]     A   Yeah.  I think -- I think the adjuster was
[9] Angela Tanner.
[10]     Q   T-a-n-n-e-r?
[11]     A   Uh-huh.  Yes.
[12]     Q   Okay.
[13]         Is that an individual who you supervise?
[14]     A   Yes.
[15]     Q   And, you recall that Steptoe & Johnson
[16] represented, or represents American Commerce Insurance
[17] Company, and that Attorney Godshall represented the
[18] individuals who were named, and you believe yourself
[19] and Miss Tanner were named?
[20]     A   I think so, now.
[21]     Q   Okay.
[22]     A   I -- but -- I think so, but I don't know
[23] for sure.
[24]     Q   Okay.
[25]     MR. SCIARRINO:  That's all we have.  Thank

---

**Page 122**

[1] you, for your patience here today, ma'am.
[2]     MR. BUTCHER:  We will read.
[3]     MR. SCHERM:  There being no further
[4] questions, this deposition is concluded, we are
[5] off the record, the time is 12:16 p.m.
[6]         - - -
[7]     (Thereupon, at 12:16 o'clock p.m., the
[8] deposition was concluded.)
[9]         - - -
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 123**

[1]
[2]                 SIGNATURE PAGE
[3]
[4]     _____
[5]     Joanne Dorger

     Subscribed and sworn to before me this
[6]
     _____ day of _____, 2008
[7]
[8]
     _____
[9]     Notary Public
[10]
                - - -
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 124**

[1]                 CERTIFICATE
[2] COMMONWEALTH OF PENNSYLVANIA, )
                                 )  SS:
[3] COUNTY OF ALLEGHENY.          )
[4]     I, Eugene C. Forcier, do hereby certify that
     before me, a Stenographer-Commissioner in and for the
[5] Commonwealth aforesaid, personally appeared
     JOANNE DORGER, who then was by me first duly cautioned
[6] and sworn to testify the truth, the whole truth, and
     nothing but the truth in the taking of her oral
[7] deposition in the cause aforesaid; that the testimony
     then given by her as above set forth was by me reduced
[8] to stenotypy in the presence of said witness, and
     afterwards transcribed by means of computer-aided
[9] transcription.
[10]     I do further certify that this deposition was
     taken at the time and place in the foregoing caption
[11] specified, and was completed without adjournment.
[12]     I do further certify that I am not a relative,
     counsel or attorney of either party, or otherwise
[13] interested in the event of this action.
[14]     IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Pittsburgh,
[15] Pennsylvania, on this _____ day of _____,
     2008.
[16]
[17]
[18]     _____
     Eugene C. Forcier
[19]     Stenographer-Commissioner
[20]
[21]                 - - -
[22]
[23]
[24]
[25]

---

# EXHIBIT X

# In The Matter Of:

*Margaret Wisinski v.*
*American Commerce, Inc. and et al*

---

*Kelly Ann Bihn*
*August 6, 2008*

---

*Morse Gantverg & Hodge Court Reporters, Inc.*
*Suite 719, One Bigelow Square*
*Pittsburgh, Pennsylvania  15219*
*1-800-966-4157*

Original File ECF5794.txt, Pages 1-149

**Word Index included with this Min-U-Script®**

This Page Intentionally Left Blank

Margaret Wisinski v.
American Commerce, Inc. and et al

Page 1

```
[1]  f              IN THE UNITED STATES DISTRICT COURT
[2]             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
[3]                             - - -
[4]  MARGARET WISINSKI,                )
                                       )
[5]            Plaintiff,              )
                                       )
[6]     vs.                            )  No. 1:07-CV-346
                                       )
[7]  AMERICAN COMMERCE GROUP, INC. and )
     AMERICAN COMMERCE INSURANCE       )
[8]  COMPANY,                          )
                                       )
[9]            Defendants.             )
[10]                            - - -
[11]           Deposition of KELLY ANN BIHN
[12]            Wednesday, August 6, 2008
[13]                            - - -
[14]        The deposition of KELLY ANN BIHN, called as a
     witness by the plaintiff, pursuant to notice and the
[15] Federal Rules of Civil Procedure pertaining to the
     taking of depositions, taken before me, the
[16] undersigned, Eugene C. Forcier, Stenographer
     Commissioner in and for the Commonwealth of
[17] Pennsylvania, at the Holiday Inn Express, 11160 Dowlin
     Drive, Sharonville, Ohio  45241, commencing at 8:32
[18] o'clock a.m., the day and date above set forth.
[19]                            - - -
[20]         COMPUTER-AIDED TRANSCRIPTION BY
              MORSE, GANTVERG & HODGE, INC.
[21]              ERIE, PENNSYLVANIA
                   814-454-6655
[22]
                                - - -
[23]
[24]
[25]
```

Page 2

```
[1]  APPEARANCES:
[2]    On behalf of the Plaintiff:
[3]       J. Timothy George, Esquire
          2525 West 26th Street, Suite 200
[4]       Erie, Pennsylvania 16506
[5]       Anthony J. Sciarrino, Esquire
          Renaissance Centre
[6]       1001 State Street, Suite 1220
          Erie, Pennsylvania 16501
[7]
       On behalf of the Defendants:
[8]
          Zimmer Kunz, PLLC:
[9]       Joseph F. Butcher, Esquire
          3300 U.S. Steel Tower
[10]      600 Grant Street
          Pittsburgh, Pennsylvania 15219
[11]
[12]                         - - -

     ALSO PRESENT:
[13]
          Dave Scherm, Videographer
[14]
[15]                         - - -

          ALSO RECORDED VIA VIDEOTAPE
[16]
[17]                         - - -
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

Page 3

[1] **MR. SCHERM:** We are on the record, the time
[2] is 8:32 a.m.
[3]     My name is David Scherm, videographer for
[4] the firm of Morse, Gantverg & Hodge, located at
[5] Suite 719, one Bigelow Square, Pittsburgh,
[6] Pennsylvania 15219.
[7]     The witness in today's deposition is
[8] Miss Kelly Bihn, called as a witness in the case
[9] captioned Margaret Wisinski versus American
[10] Commerce Group, et al., in the United States
[11] District Court for the Western District of
[12] Pennsylvania.
[13]     Today's deposition is being held at
[14] 11160 Dowlin Drive, Cincinnati, Ohio 45241.
[15]     Today's date is Wednesday, August 6th,
[16] 2008.
[17]     Would counsel please introduce themselves.
[18] **MR. SCIARRINO:** My name is Tony Sciarrino,
[19] and I am here for the plaintiff,
[20] Margaret Wisinski.
[21] **MR. BUTCHER:** I am Joseph Butcher, I am
[22] here on behalf of the defendants, the Commerce
[23] Group, Inc. and American Commerce Insurance
[24] Company.
[25] **MR. SCHERM:** Would the court reporter

Page 4

[1] please introduce himself, and swear the witness.
[2] **THE COURT REPORTER:** I am Gene Forcier with
[3] Morse, Gantverg & Hodge.
[4]     Miss Bihn, would you raise your right hand,
[5] please.
[6]
[7]         KELLY ANN BIHN
[8] called as a witness by the plaintiff, having been
[9] first duly sworn, as hereinafter certified, was
[10] deposed and said as follows:
[11]         **EXAMINATION**
[12] **BY MR. SCIARRINO:**
[13] **Q**    Good morning, Miss Bihn.
[14] **A**    Hi.
[15] **Q**    My name is Tony Sciarrino, and I represent
[16] Margaret Wisinski in this matter, and we are here for
[17] your deposition this morning.
[18]     Okay?
[19]     I am going to be asking you a series
[20] of questions, but before we go through the
[21] questioning, I would like to set forth some ground
[22] rules.
[23] **A**    Okay.
[24] **Q**    Is that okay with you?
[25] **A**    Uh-huh.

Page 5

[1]    **Q**    Okay. The first ground rule is I am going
[2] to ask that you let me finish my question, and then
[3] you give your response because, as you can see,
[4] Mr. Forcier here is taking down everything that we
[5] say, and it is very difficult if we are both talking
[6] at the same time.
[7]        Okay?
[8]    **A**    Right. Okay.
[9]    **Q**    Also, please be sure to respond
[10] verbally. Things like a uh-huh and huh-uh won't
[11] necessarily make much sense when we go back and review
[12] the transcript.
[13]        Okay?
[14]    **A**    Okay.
[15]    **Q**    I'm going to be asking you a series of
[16] questions. If I ask you a question that you don't
[17] understand, please let me know, and I will be happy to
[18] restate it, or rephrase it for you.
[19]        Okay?
[20]    **A**    Okay.
[21]    **Q**    Also, if you don't hear me clearly, please
[22] let me know, and I will be happy to restate the
[23] question, or Mr. Forcier can read it back.
[24]        Okay?
[25]    **A**    Okay.

Page 6

[1]    **Q**    If you give a response to one of my
[2] questions, we will assume that you heard and
[3] understood the question.
[4]        Is that okay?
[5]    **A**    Yes.
[6]    **Q**    Finally, this is not supposed to be a form
[7] of punishment.
[8]    **A**    Uh-huh.
[9]    **Q**    Should you need to take a break for any
[10] reason, please let us know, and we will have a brief
[11] adjournment, and then we will then continue the
[12] deposition after the adjournment.
[13]        Okay?
[14]    **A**    Okay.
[15]    **Q**    Have you ever been deposed before?
[16]    **A**    Once.
[17]    **Q**    Okay.
[18]        So those rules are not being particularly
[19] new to you?
[20]    **A**    Right.
[21]    **Q**    Okay. Let's begin.
[22]        could you please identify yourself by your
[23] full name?
[24]    **A**    Kelly Ann Bihn, B-i-h-n.
[25]    **Q**    Okay. And what is your professional

Page 7

[1] address, Miss Bihn?
[2]    **A**    3801 Sharon Park Lane, Sharonville, Ohio
[3] 45241.
[4]    **Q**    And is that your present office?
[5]    **A**    Yes.
[6]    **Q**    And who is your current employer?
[7]    **A**    American Commerce Insurance.
[8]    **Q**    Now, you had indicated earlier that you had
[9] been deposed before.
[10]    **A**    Yes.
[11]    **Q**    Do you recall the caption or title of the
[12] case in which you were deposed?
[13]    **A**    I believe it was Thurman Sorrell versus
[14] Ohio Casualty Group.
[15]    **Q**    Okay.
[16]        Were you an employee of Ohio Casualty Group
[17] at the time of that deposition?
[18]    **A**    Yes.
[19]    **Q**    And was that relative to your duties as an
[20] employee of Ohio Casualty Group?
[21]    **A**    Yes.
[22]    **Q**    Do you recall the approximate date of that
[23] deposition?
[24]    **A**    No.
[25]    **Q**    How about the year, like, you know, was it

Page 8

[1] in 2002, or 2003, something like that?
[2]    **A**    Probably between 2000 and 2003.
[3]    **Q**    Do you recall what the nature of the
[4] complaint was?
[5]        In other words, was it a bad faith claim,
[6] was it first party benefits suit; do you know what it
[7] was about?
[8]    **A**    Not exactly. I know that there was
[9] indication of spoilization of evidence.
[10]    **Q**    Did you testify at trial in that matter?
[11]    **A**    No.
[12]    **Q**    Do you know what the conclusion of that
[13] matter was?
[14]    **A**    No.
[15]    **Q**    What county did that take place in?
[16]    **A**    The deposition?
[17]    **Q**    Yes.
[18]    **A**    Hamilton County.
[19]    **Q**    Okay.
[20]    **A**    Ohio.
[21]    **Q**    And do you know whether the case was filed
[22] in that county?
[23]    **A**    I don't know.
[24]    **Q**    Okay. Miss Bihn, could you trace your
[25] educational background for us, beginning with high

Margaret Wisinski v.
American Commerce, Inc. and et al

Page 9

[1]  school?
[2]      A    Graduated high school in 1987, and that's
[3]  the extent of my formal education.
[4]      Q    Okay.
[5]          And, which high school did you attend?
[6]      A    Oak Hills High School, Cincinnati, Ohio.
[7]      Q    Okay.  So are you a life long
[8]  Cincinnatiite?
[9]      A    Yes.
[10]     Q    Is that the proper way to say it?
[11]     A    Cincinnatian.
[12]     Q    Cincinnatian?
[13]     A    Yes.
[14]     Q    You graduated in 1987.
[15]          Let's track your employment history.
[16]          Okay?
[17]          Where did you start working first?
[18]     A    Equifax.
[19]     Q    And how long did you work for Equifax?
[20]     A    Eight years -- or, I'm sorry, let me back
[21]  up.
[22]          Four years.  Sorry.
[23]     Q    Your response there raises a good point, it
[24]  was something I forgot to mention to you.
[25]          If, during the course of the deposition,

Page 10

[1]  you recall something relative to another question that
[2]  was earlier, that would make you want to either change
[3]  or modify your answer, please let us know, and you can
[4]  do that, because we want to get your most accurate
[5]  understanding and response.
[6]          Okay?
[7]      A    Okay.
[8]      Q    All right.
[9]          You worked for Equifax for about four
[10]  years.
[11]          Where did you work after that?
[12]     A    The Hartford Insurance.
[13]     Q    Okay.  And what did you do at Hartford?
[14]     A    My first two years I was clerical, and then
[15]  the next six years claims adjuster.
[16]     Q    Okay.  And do you recall the year you
[17]  started at Hartford, approximately?
[18]     A    It would have been right after Equifax, so
[19]  '91, approximately.
[20]     Q    And where was your office located for the
[21]  Hartford?
[22]     A    Downtown Cincinnati.
[23]     Q    As an adjuster for Hartford, did you have
[24]  any special training in claims adjusting?
[25]     A    I'm sure I did.  I don't remember what.

Page 11

[1]      Q    Okay.  I know some insurance companies will
[2]  send new adjusters to like a school, where they go
[3]  away and they spend a couple of weeks being trained in
[4]  claims adjusting.
[5]          Did that happen while you were at Hartford?
[6]      A    No.
[7]      Q    Was your training primarily on-the-job
[8]  training at Hartford?
[9]      A    Primarily.  And then I do remember taking
[10]  the pictorial test, and a lot of book study.
[11]     Q    Okay.  That would bring us to about 1988 or
[12]  1999, approximately?
[13]     A    Correct.
[14]     Q    Okay.  And you left Hartford.  When you
[15]  left Hartford, what was your job title?
[16]     A    Claims adjuster.
[17]     Q    Okay.
[18]          And, what types of claims did you adjust?
[19]     A    Automobile, personal auto, commercial auto,
[20]  personal homeowner's.
[21]          I am sure I probably had commercial -- or,
[22]  some commercial general liability, but I don't
[23]  remember for sure.
[24]     Q    Did you -- as part of your job in adjusting
[25]  auto claims, did you adjust first party benefit,

Page 12

[1]  medical benefit claims?
[2]      A    Yes.
[3]      Q    How about uninsured or underinsured
[4]  motorist claims?
[5]      A    Yes.
[6]      Q    How about bodily injury claims?
[7]      A    Yes.
[8]      Q    Okay.  How about wage loss claims?
[9]      A    Yes.
[10]     Q    Now, you left the Hartford in '88 or '89 --
[11]  or, I'm sorry, '98 or '99, and where did you go to
[12]  work from there?
[13]     A    Ohio Casualty Insurance.
[14]     Q    Okay.  And how long were you at Ohio
[15]  Casualty?
[16]     A    Until 2001, so --
[17]     Q    And what did you do at Ohio Casualty?
[18]     A    Actually, 2003.  Gosh, sorry.
[19]     Q    Okay.
[20]     A    Claims adjuster.
[21]     Q    And what types of claims did you adjust
[22]  there?
[23]     A    Commercial, auto, general liability,
[24]  personal auto, commercial auto, I believe that's it.
[25]     Q    Okay.  Did you also adjust -- as in your

Page 13

[1] capacity as personal auto, adjust uninsured and
[2] underinsured motorist claims?
[3]    A    Yes.
[4]    Q    How about first party benefit medical?
[5]    A    Yes.
[6]    Q    And how about wage loss claims?
[7]    A    Yes.
[8]    Q    When you left Ohio Casualty in 2003, what
[9] was your title?
[10]    A    Claims adjuster.
[11]    Q    Okay.  And where did you go to work from
[12] there, in 2003?
[13]    A    American Commerce Insurance.
[14]    Q    And that's where you currently are
[15] employed?
[16]    A    Yes.
[17]    Q    And when you started in 2003, what was your
[18] title at American Commerce?
[19]    A    Claims adjuster.
[20]    Q    Okay.  What is your current title?
[21]    A    Claims supervisor.
[22]    Q    Okay.
[23]        So is that a -- how many levels of
[24] promotion is that from claims adjuster to claims
[25] supervisor?

Page 14

[1]    A    The claims adjusters have levels of
[2] difficulty, I would say claim rep II, there is a claim
[3] rep III, claim rep IV, and then supervisor, so --
[4]    Q    You started at claim rep II?
[5]    A    And then to supervisor, so that I was not a
[6] claim rep III or IV, if that's what you are asking me.
[7]    Q    That was my question.
[8]    A    The level, yeah.
[9]    Q    So you just sort of jumped those other
[10] levels?
[11]    A    Uh-huh.  Yes.
[12]    Q    Okay.
[13]        In your capacity as a claims adjuster II,
[14] what types of claims did you adjust?
[15]    A    All personal lines auto.  That would have
[16] been all that I did, personal lines auto.
[17]    Q    Okay.  Did you adjust first party medical
[18] benefits claims?
[19]    A    Yes.
[20]    Q    How about uninsured and underinsured
[21] motorist claims?
[22]    A    Yes.
[23]    Q    Was there any dollar limit on the types of
[24] claims that you adjusted, while you were a claims
[25] adjuster II?

Page 15

[1]    A    No.
[2]        Now, I had a authority.
[3]    Q    Okay.
[4]    A    But I would handle the larger claims, and
[5] just have to get authority from my supervisor.
[6]    Q    When you started with American Commerce,
[7] did you have any training; did they give you any
[8] training in that claims adjusting?
[9]    A    No.
[10]    Q    Did you essentially just come in from
[11] another company, and start adjusting claims right
[12] away?
[13]    A    Correct.
[14]    Q    When you started with American Commerce,
[15] were you provided any claims manuals?
[16]    A    Not that I recall.
[17]    Q    Were you given any educational material,
[18] when you started with American commerce?  And by that
[19] I mean pamphlets, brochures, manuals, computer
[20] programs to review?
[21]    A    When I started, I don't remember for sure.
[22]    Q    When you started with American Commerce,
[23] were you given any specific training relative to the
[24] terms and conditions of the American Commerce
[25] Insurance policy?

Page 16

[1]    A    Do you mean the insurance policy, or our
[2] policy of how we do our business?
[3]    Q    Let me be clear.
[4]    A    Okay.
[5]    Q    Because those are synonyms.
[6]        What I was referring to was the actual
[7] insurance policy contract itself.  Okay?  The document
[8] that the insureds receive, that has the declaration
[9] page, and the terms and conditions of their
[10] coverages.
[11]        All right?
[12]    A    Not that I recall.
[13]        Besides given a copy of the policy for each
[14] state that we handled to review and learn, but I don't
[15] recall any formal training.
[16]    Q    Okay.
[17]        You indicated that you received a copy of
[18] the insurance policy for each state that you handled.
[19]        When you started with American Commerce,
[20] what states did you handle?
[21]    A    From the best of my recollection, Ohio,
[22] Kentucky, Indiana, Tennessee, West Virginia, Oklahoma,
[23] and I don't remember if Pennsylvania would have been
[24] an active state at that time.
[25]    Q    Okay.

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

Page 17

[1]     And you said you started in 2003?
[2]   **A**   Correct.
[3]   **Q**   Okay.
[4]     I'm going to represent to you that I have
[5]  reviewed the log, and it looks like the first log
[6]  entry on this file, from you, was in May of 2003.
[7]     Did you review the log prior to your
[8]  deposition here today?
[9]   **A**   I did.
[10]   **Q**   Okay.  Is that consistent with your
[11]  recollection?
[12]   **A**   Yes.
[13]   **Q**   Do you recall about when you started in
[14]  2003?
[15]   **A**   March 31st.
[16]   **Q**   Okay.  So this claim would have been within
[17]  the first couple of months?
[18]   **A**   Correct.
[19]   **Q**   So, if Pennsylvania wasn't right when you
[20]  started, it would have been shortly after you started,
[21]  as a state that the -- that American Commerce handled?
[22]   **A**   That we actually quit writing in.  I
[23]  believe -- and I might be wrong, but I believe we
[24]  wrote Pennsylvania, and stopped shortly after I
[25]  started, or shortly before I started.

Page 18

[1]   **Q**   And this may not be something you know, but
[2]  to the extent that you have a recollection, do you
[3]  know about the time frame that American Commerce wrote
[4]  policies in Pennsylvania?
[5]   **A**   No, I do not.
[6]   **Q**   Okay.
[7]     Is it your recollection that by the time
[8]  you started, American Commerce was essentially no
[9]  longer actively writing policies in Pennsylvania?
[10]   **A**   I'm not sure.
[11]   **Q**   Okay.  When you were employed -- well,
[12]  strike that.
[13]     During your time working for American
[14]  Commerce, were you ever given any specific training on
[15]  the Pennsylvania Motor Vehicle Financial
[16]  Responsibility Law?
[17]   **A**   No.
[18]   **Q**   During the time that you have been working
[19]  for American Commerce Insurance Company, were you ever
[20]  given any training on the Pennsylvania Unfair
[21]  Insurance Practices Act?
[22]   **A**   No.
[23]   **Q**   Were you given any training on the
[24]  Pennsylvania insurance regulations?
[25]   **A**   No.

Page 19

[1]   **Q**   During the time that you worked for
[2]  American Commerce, were you given any general training
[3]  on what is called the model Unfair Insurance Practices
[4]  Act?
[5]   **A**   I don't know what that means, sir.
[6]   **Q**   There is -- many states have unfair
[7]  insurance practices acts.
[8]   **A**   Right.
[9]   **Q**   They were, many of them were based upon a
[10]  model that was promulgated throughout the insurance
[11]  industry, and they have a lot of similarities from
[12]  state to state.
[13]     I'm wondering if you were given any
[14]  generalized training, in what was called the model
[15]  Unfair Insurance Practices Act?
[16]   **A**   No.
[17]   **Q**   Okay.
[18]     Does American Commerce utilize a
[19]  computerized case evaluation system, such as Colossus,
[20]  or a similar type computer program?
[21]   **A**   Our evaluation form is on the computer, but
[22]  it's not like Colossus, where Colossus pulls its own
[23]  numbers and figures.
[24]     You actually input the figures yourself.
[25]     It's basically just a typed form, instead

Page 20

[1]  of handwritten, but you are punching in all of the
[2]  numbers and figures.
[3]   **Q**   So for lack of a better term, it is a
[4]  computerized template, but it does not calculate any
[5]  of the -- any of the damages, or other figures for
[6]  you?
[7]   **A**   Correct.
[8]     Besides the fact that it will add them up
[9]  for you, for the figures you have put in; correct.
[10]   **Q**   Okay.
[11]     Do you know whether the template that
[12]  American Commerce uses, is that proprietary, meaning,
[13]  created by American Commerce, or whether it is an
[14]  outside program that they purchased?
[15]   **A**   I don't know for sure.
[16]   **Q**   Do you have any certifications, such as
[17]  CPCU?
[18]   **A**   No.
[19]   **Q**   Okay.
[20]     Do you have -- I have also seen some
[21]  adjusters who have the initials AIC.
[22]   **A**   No.  Half way through it.
[23]   **Q**   Okay.  So you are in the process --
[24]   **A**   Halfway there.
[25]   **Q**   -- of obtaining that certification?

**Page 21**

[1]  **A**    Correct.

[2]  **Q**    All right.

[3]       During your time as a claims adjuster with

[4]  American Commerce, was there any separation of duties

[5]  regarding the handling of first party benefit medical

[6]  versus uninsured or underinsured motorist claims, on a

[7]  particular claim?

[8]  **A**    Only if the attorney requested it.

[9]  **Q**    Okay.

[10]  **A**    Many attorneys do not care if the same

[11]  adjuster handles both, some attorneys will request a

[12]  separate adjuster.

[13]       Only if they request a separate.

[14]  **Q**    Okay.

[15]       And let me -- I want to make sure

[16]  I am understanding your response.

[17]       Okay.

[18]  **Q**    When a -- when a claim is opened, and there

[19]  is both first party medical benefit claims and un or

[20]  underinsured motorist claims made, American Commerce

[21]  would assign one adjuster to handle all of those

[22]  components?

[23]  **A**    Correct.

[24]  **Q**    If an attorney requested a separation, that

[25]  would be performed at their request, but otherwise one

**Page 22**

[1]  person would handle the whole thing, as it were?

[2]  **A**    Correct.

[3]  **Q**    Did I accurately describe that?

[4]  **A**    Yes.

[5]  **Q**    Okay.

[6]       Would that be the same if there was a wage

[7]  loss claim as well?

[8]  **A**    Yes.

[9]  **Q**    Now, we had earlier spoken about the time

[10]  that you were involved in the Margaret Wisinski claim.

[11]       And the record indicates that your first

[12]  entries were in May of 2003, and it appears that your

[13]  last entries were in February of 2004.

[14]       Is that consistent with your recollection?

[15]  **A**    Yes.

[16]  **Q**    And your review of the file?

[17]  **A**    Yes.

[18]  **Q**    During that approximately seven to eight

[19]  month time frame, what was your job title?

[20]  **A**    Claims adjuster.

[21]  **Q**    And that was claim rep --

[22]  **A**    Claim rep II.

[23]  **Q**    Okay.

[24]       Now, as a claim rep II, would you be

[25]  essentially the front line adjuster; meaning, that you

**Page 23**

[1]  are getting the material directly sent to you, and you

[2]  are performing the analysis and evaluation?

[3]  **A**    Yes.

[4]  **Q**    Okay.

[5]       As a claims rep II, is part of your duty to

[6]  properly document the file?

[7]  **A**    Yes.

[8]  **Q**    Is it part of your duties to properly log

[9]  the file?

[10]  **A**    Do you mean the log notes, or --

[11]  **A**    Yes.

[12]  **A**    Yes.

[13]  **Q**    Okay.  Are there -- within American

[14]  Commerce, are there log notes requirements?  In other

[15]  words, what's supposed to be put in the log, and what

[16]  is not appropriate for the log?

[17]  **A**    Basically, anything -- anything done on the

[18]  file, should be noted in the log notes.

[19]  **Q**    Okay.  So any action taken by the adjuster,

[20]  should be logged?

[21]  **A**    Correct.

[22]  **Q**    Okay.  Does that include correspondence?

[23]  **A**    Do you mean summarize what you have

[24]  received, sort of thing?

[25]  **Q**    Both.

**Page 24**

[1]       Let me be more precise with my question.

[2]       Would that include summarizing

[3]  correspondence that was received?

[4]  **A**    Yes.

[5]  **Q**    Would it also mean noting correspondence

[6]  that was sent out?

[7]  **A**    Yes.

[8]  **Q**    Okay.  Would contact with the claimant be

[9]  logged?

[10]  **A**    Yes.

[11]  **Q**    Would contact with claimant's counsel, if

[12]  one existed, be logged?

[13]  **A**    Yes.

[14]  **Q**    Would review of documents be logged?

[15]  **A**    Yes.

[16]  **Q**    By that I mean, like for example, medical

[17]  records, or medical bills?

[18]  **A**    Right.

[19]  **Q**    Okay.

[20]  **A**    It may not -- you may not summarize what

[21]  you have read, you may put in there, "Reviewed Dr. So

[22]  and So's records," but you have your hard copy in the

[23]  file, where you may have more information than you are

[24]  going to summarize in the notes.

[25]  **Q**    If an e-mail is sent, either -- well,

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

Page 25

[1] strike that.

[2]     If an e-mail is sent to another American
[3] Commerce employee, is that something that should
[4] appear in the log?

[5]     A   I guess it would assume what the content of
[6] it was.

[7]     Q   For example, if you made an inquiry of
[8] underwriting to request information, would that be
[9] something that should be logged?

[10]    A   Yes.

[11]    Q   If you were to ask a question of your
[12] supervisor, seeking direction on a claim, would that
[13] be something that would be logged?

[14]    A   I would say you would generally put in
[15] there, "Here's the information," but you may not
[16] necessarily say where it came from, or just if it's
[17] something that you have learned, you note your file,
[18] "This is how this is," but you may not -- not really
[19] necessary to say where you obtained the information,
[20] maybe.

[21]    Q   Okay.

[22]     Is there a logging -- American Commerce
[23] logging requirement, that the log be made
[24] contemporaneous with the action?

[25]    A   I don't know for sure.

Page 26

[1]     Q   Okay. Do you personally have a practice
[2] with regard to logging activities contemporaneous with
[3] the action taken?

[4]     A   Yes, I do.

[5]     Q   And is that something you do?

[6]     A   Yes.

[7]     Q   Now, as part of your duties as a claim
[8] representative II, is it your responsibility to
[9] understand the liability facts of a particular claim?

[10]    A   Yes.

[11]    Q   Is it your responsibility to learn the
[12] medical facts, or medical information on the claim?

[13]    A   Yes.

[14]    Q   Is it your obligation to gather the
[15] information necessary to evaluate the claim?

[16]    A   Yes.

[17]    Q   Is it your obligation to be knowledgeable
[18] and current on the appropriate and applicable
[19] statutes?

[20]    A   Yes.

[21]    Q   Being like motor vehicle, the rules of the
[22] road type things?

[23]    A   Yes.

[24]    Q   Is it also part of your job to be
[25] knowledgeable on the appropriate insurance

Page 27

[1] regulations?

[2]     A   I'm not sure what you mean by the
[3] regulations.

[4]     Q   Meaning rules and regulations promulgated
[5] by the various states relative to, say, how long it
[6] takes for claims to be paid, what the various states
[7] have for rules regarding correspondence to insureds,
[8] things of that nature?

[9]     A   Yes, you should be familiar with them, yes.

[10]    Q   Okay. Do you also have any -- have to be
[11] knowledgeable in the status of the common law;
[12] meaning, say, the tort law of a particular state?

[13]    A   Yes.

[14]     And again, you may just have reference
[15] material. Of course, I don't have most of this to
[16] memory, but I do have a lot of reference material.

[17]    Q   I was going to ask you about that in just a
[18] moment.

[19]    A   Okay.

[20]    Q   Is it part of your -- excuse me. Is it
[21] part of your duties to be knowledgeable and understand
[22] lien issues, such as Social Security and Medicare
[23] liens?

[24]    A   Yes.

[25]    Q   Is it part of your job to determine the

Page 28

[1] applicable policy coverages for a particular claim?

[2]     A   Yes.

[3]     Q   Is it part of your job to identify any
[4] applicable exclusions to coverage on a particular
[5] claim?

[6]     A   Yes.

[7]     Q   Is it also part of your job to identify the
[8] amount of coverage on the claim?

[9]     A   Yes.

[10]    Q   Is it a part of your job to identify all of
[11] the applicable coverages, and the amount of coverages
[12] available to an individual insured?

[13]    A   Yes.

[14]    Q   Is it also part of your job to advise the
[15] insured of those coverages, and their amounts?

[16]    A   Yes.

[17]     Excuse me.

[18]    Q   Okay.

[19]     Now, you indicated that you have some
[20] reference material. And I want to go through that.

[21]     Where do you physically keep your reference
[22] material?

[23]    A   At my desk.

[24]    Q   Okay. is the majority of it hard copy
[25] documents, or is the majority of it computerized, or

---

**Page 29**

[1] is it a combination of both?

[2]  **A**   Combination of both.

[3]  **Q**   Okay. Well, let's talk about first the

[4] actual physical hard copy documents.

[5]  Okay?

[6]  What do you recall having available to you?

[7]  **A**   Any reference material that I have, you

[8] mean?

[9]  **Q**   Well, let's start with things that would be

[10] germane to Pennsylvania.

[11]  Do you have a copy available of the

[12] Pennsylvania Motor Vehicle Financial Responsibility

[13] Law?

[14]  **A**   No.

[15]  **Q**   Do you have a copy of the Pennsylvania

[16] Unfair Insurance Practices Act?

[17]  **A**   No.

[18]  **Q**   Do you have a copy of the Pennsylvania

[19] Insurance Code to the -- the parts of the code that

[20] apply to claims handled?

[21]  **A**   No.

[22]  **Q**   Do you have any binders, or documents, or

[23] treatises, on Pennsylvania accident law?

[24]  **A**   I don't know for sure.

[25]  **Q**   Okay. Now, let's talk about things that

---

**Page 30**

[1] aren't Pennsylvania specific.

[2]  Do you have any documents that deal

[3] generally with, say, orthopedic medicine?

[4]  **A**   No.

[5]  **Q**   Okay.

[6]  Do you have any multistate summaries of

[7] tort law?

[8]  **A**   I know I have some states, I don't know

[9] what all I have.

[10]  **Q**   Okay.

[11]  Do you have any -- do you have any

[12] documents that are, for lack of a better term, copies

[13] of case law?

[14]  **A**   Yes.

[15]  **Q**   Okay. Do you know if any of those are

[16] Pennsylvania specific?

[17]  **A**   I don't know.

[18]  **Q**   Okay.

[19]  While we are talking about the materials

[20] that you have available to you, how does American

[21] Commerce communicate to its adjusters, such as

[22] yourself, when there are changes in the law, whether

[23] it be by statute, or by case law?

[24]  **A**   We have a computerized system, called the

[25] Gateway, and it -- it basically has everything on

---

**Page 31**

[1] there, as far as our procedures, et cetera, and it

[2] does have specifics to states that you can look up.

[3]  I am not sure how to -- I think I have

[4] forgotten your question. I'm sorry.

[5]  **Q**   That's okay. I was asking how they can --

[6] how -- how American --

[7]  **A**   How they can communicate.

[8]  **Q**   -- how American Commerce communicates to

[9] you.

[10]  Do they -- if there is a change, do they

[11] send -- would you get an e-mail, or a physical

[12] document, or would there just be a change in the -- in

[13] the computer somehow?

[14]  **A**   In the computer.

[15]  However, the home page, when you first pull

[16] it up, if there is something new, generally a

[17] procedure change or something like that, it will be on

[18] the home page, it will tell you, "Hey, check this

[19] out."

[20]  Now, if they have -- I don't recall seeing

[21] any law changes on the home page, but it could be

[22] there, and I have not seen it.

[23]  **Q**   The Gateway, as you described it, is that

[24] the program that you would go in to enter to then go

[25] into the various claim logs, or is that a separate

---

**Page 32**

[1] program?

[2]  **A**   Separate.

[3]  You mean our log notes?

[4]  **Q**   Yes.

[5]  **A**   Separate.

[6]  **Q**   Help me to understand how the computer

[7] system is set up.

[8]  At your desk, you have a computer; right?

[9]  **A**   Uh-huh.

[10]  **Q**   You turn it on. What comes up first?

[11]  **A**   Just your basic, your black screen with the

[12] icons, different programs you can go into, I guess.

[13]  I am not a computer person, but --

[14]  **Q**   Okay.

[15]  Now, this Gateway, is that one of the

[16] icons?

[17]  **A**   Yes.

[18]  **Q**   And when you click on that, what is in

[19] Gateway; what can you access by going into that

[20] particular icon and program?

[21]  **A**   You can access our templates, you can

[22] access your list of appraisers, you can access claim

[23] procedures.

[24]  You can access specific -- I guess it

[25] would -- I guess it would be specific laws, or

---

Page 33

[1] specific claim handling procedures.

[2]      I'm in it a hundred times a day, it's

[3] funny.

[4]      Just, they have a search, which they call

[5] it a Google search, so any time you want to know

[6] anything, you can punch it in, if they have anything

[7] in the system, it will pull it up.

[8]      So, it's --

[9]   **Q**   If you were going to do a ISO search on a

[10] claimant, would you go through Gateway for that, or

[11] would you go to a different program?

[12]   **A**   Different program.

[13]      Gateway is strictly American Commerce

[14] material, or templates, and you can't go outside of

[15] that.

[16]   **Q**   Okay.

[17]   **A**   Through that.

[18]   **Q**   That's strictly internal?

[19]   **A**   Correct.

[20]   **Q**   Internal to the company.

[21]      The log material that was provided to us,

[22] did you review that?

[23]   **A**   Log notes?

[24]   **Q**   I'm sorry.  The manual material that was

[25] provided by defense counsel, that was a printout of

Page 34

[1] the computer screens, did you review that prior to

[2] your deposition here today?

[3]   **A**   Would that have been Gateway?  Is that what

[4] you mean by -- sorry.

[5]   **Q**   I am trying to figure that out.

[6]   **A**   The only thing I reviewed prior, was log

[7] notes.

[8]   **Q**   Okay.

[9]   **A**   So, no.

[10]   **Q**   Okay.  Well, we will get to the

[11] documents --

[12]   **A**   Okay.

[13]   **Q**   -- and I will show them to you in a few

[14] minutes.

[15]      Now, the log notes, is that a separate

[16] program?

[17]   **A**   Yes.

[18]   **Q**   And what's that program called?

[19]   **A**   JWALK.  And it has -- the name has changed.

[20]   **Q**   Okay.

[21]   **A**   I don't -- I sort of -- JWALK.

[22]   **Q**   And is that the -- where you would go to

[23] make log entries in the various claims that you would

[24] handle?

[25]   **A**   Yes.

Page 35

[1]   **Q**   And is that the only thing that is in

[2] JWALK, or are there other things in that?

[3]   **A**   That's where, basically, the entire claim

[4] file is.  That's where you would issue checks, change

[5] reserves.

[6]   **Q**   Are documents scanned into that?

[7]   **A**   They are now.

[8]      Well, no, I'm sorry, not into the JWALK

[9] system.

[10]   **Q**   Okay.

[11]   **A**   We have another system that we have now

[12] gone to the paperless scanning our mail.

[13]   **Q**   The -- I am going to represent to you that

[14] the length and breadth of the Margaret Wisinski file

[15] starts in December of 2001 and concludes in and around

[16] February or March of 2007.

[17]   **A**   Okay.

[18]   **Q**   Was the document scanning system in force

[19] during that time?

[20]   **A**   No.

[21]      I'm sorry, what month of '07?

[22]   **Q**   It would be about February or March.

[23]   **A**   February or March.

[24]      I don't believe so.  I think it started

[25] later '07.  I'm not positive.

Page 36

[1]   **Q**   Okay.

[2]      So, all of the documents in this case,

[3] there should have been hard copies of, that should

[4] have been in the file?

[5]   **A**   If I am remembering my dates correctly,

[6] yes.

[7]   **Q**   Okay.

[8]      Now, we were talking, we got off on the

[9] tangent, we were talking about the computer system, we

[10] were talking about the documents that you have

[11] available to you, your reference material, and we

[12] talked about treatises, we talked about Pennsylvania

[13] specific material, we talked about orthopedic

[14] medicine, or other medicine documents.

[15]      Do you have a copy of the various American

[16] Commerce policies?  And by that I mean, the insurance

[17] policy document?

[18]   **A**   Yes.  Hard copies of the actual policies,

[19] yes.

[20]   **Q**   How -- do those include the state specific

[21] endorsements?

[22]   **A**   It would include any endorsements that were

[23] on that policy.

[24]   **Q**   Did you, at the time that you were handling

[25] the Margaret Wisinski file, have a copy of the

Page 37

[1] American Commerce Insurance policy for the State of
[2] Pennsylvania?
[3]    A    Yes.
[4]    Q    Does American Commerce send out newsletters
[5] to its employees?
[6]    A    Yes.
[7]    Q    Are any of those newsletters relative to
[8] claims handling?
[9]    A    No.
[10]    Q    Do you receive any periodicals, or
[11] professional journals, relative to claims handling?
[12]    A    No.
[13]    Q    Either through the computer system, or
[14] through physical documents, do you have any sources
[15] for, or lists of -- of examination doctors, defense
[16] medical examination doctors?
[17]    A    No.  And as far as I know, they are not on
[18] the Gateway.
[19]    Q    Are there any -- with regard to medical
[20] information, are there any materials available, on
[21] line, to you, such as, say, diagrams of various
[22] anatomical structures, or things of that nature?
[23]    A    If I am looking up something medical, to me
[24] it's just quicker to Google it, go to the -- I just
[25] use the Internet for that, so I don't -- I honestly

Page 38

[1] don't know if we have reference material.
[2]    Q    So you would use something like WebMD,
[3] or --
[4]    A    Correct.
[5]    Q    -- you would Google it.
[6]        Do you have any access to any in-house
[7] medical experts, either nurses, or doctors, who are
[8] employees of American Commerce?
[9]    A    No.
[10]    Q    Do you know whether American Commerce has
[11] any in-house medical experts?
[12]    A    I don't know.
[13]    Q    Do you have access to in-house counsel, for
[14] American Commerce?
[15]    A    We do not have in-house counsel, at least
[16] for our office.
[17]    Q    Okay.  Now, your physical location is here
[18] in the Cincinnati area?
[19]    A    Correct.
[20]    Q    This is not the headquarters for American
[21] Commerce, though?
[22]    A    No.
[23]    Q    Where is the headquarters for American
[24] Commerce?
[25]    A    Boston, Massachusetts.

Page 39

[1]    Q    Okay.
[2]    A    Actually, the Commerce Group is.
[3]    Q    And that's like the parent company?
[4]    A    Correct.
[5]    Q    Okay.
[6]        Do you have contact with any of the legal
[7] people in Boston at all?
[8]    A    Legal people?
[9]    Q    In-house counsel?
[10]    A    No.
[11]    Q    If you have a question on the law of a
[12] particular state, who do you contact to answer your
[13] question?
[14]    A    The majority of time, I may -- I would
[15] request from an independent appraiser -- independent
[16] adjuster, I'm sorry, perhaps call Crawford Insurance,
[17] ask to speak to an experienced whatever it is,
[18] experienced PIP adjuster, experienced -- you know, and
[19] just get information from them.
[20]    Q    Do you know whether there is a list of
[21] counsel for each state that American Commerce uses?
[22]    A    Yes, there is.
[23]    Q    Okay.  And where is that kept?
[24]    A    Gateway.
[25]    Q    Are you able to, on your own, contact

Page 40

[1] outside counsel, to ask questions?
[2]    A    Yes.
[3]    Q    Okay.
[4]        Now, you don't need to seek approval from
[5] anyone to do that?
[6]    A    Correct.
[7]    Q    Are there any dollar limits associated
[8] with, you know, if you ask a question, and the counsel
[9] says, "Well, I have to do research, and it will cost
[10] X," do you have to get approval to spend money for
[11] something like that?
[12]    A    Yes, if it's over your expense authority.
[13]    Q    Okay.  At the time of this claim, what was
[14] your expense authority?
[15]    A    I don't remember.
[16]    Q    Okay.  You said there was also authority
[17] for settlement.
[18]        At the time of this claim, at the time of
[19] your involvement in this claim, which was essentially
[20] May of '03 to February of '04, what was your
[21] settlement authority?
[22]    A    I believe it was 15,000.
[23]    Q    What was the maximum expense authority that
[24] you had as an adjuster?
[25]    A    I don't remember.

Margaret Wisinski v.
American Commerce, Inc. and et al

Page 41

[1]   **Q**   And I wanted to make sure I am
[2]  understanding this correctly.
[3]        Say, for example, your expense authority
[4]  was $2,000, if you contacted counsel and said, "I need
[5]  to have a question answered," and they said, "Well, it
[6]  will require research, and it will cost a thousand
[7]  dollars," you could go ahead and authorize it on your
[8]  own?
[9]   **A**   Correct.
[10]  **Q**   On the other hand, if it were, say,
[11]  $4,000, you would have to get approval from someone
[12]  else?
[13]  **A**   Correct.
[14]  **Q**   Okay.
[15]        At the time of the Margaret Wisinski claim,
[16]  I want you to explain to me the chain of command.
[17]  **A**   Oh, boy.
[18]  **Q**   Okay?
[19]  **A**   Okay.
[20]  **Q**   At the time that you were handling that
[21]  claim, who was your immediate supervisor?
[22]  **A**   Joanne Dorger.
[23]  **Q**   Okay.  And what was Miss Dorger's title?
[24]  **A**   Claims supervisor.
[25]  **Q**   And as a claims supervisor, was she

Page 42

[1]  involved in any way in evaluating claims?
[2]   **A**   From the get go, no.
[3]        I mean, she would review yours for
[4]  accuracy, and potentially evaluate it.  From the
[5]  beginning, no.
[6]   **Q**   She would have to review the adjuster's
[7]  evaluation?
[8]   **A**   Correct.
[9]   **Q**   Would she have to approve reserves?
[10]  **A**   Again, if it's over your authority, yes.
[11]  **Q**   Would -- who would Miss Dorger respond to;
[12]  who would be her supervisor?
[13]  **A**   At that time, Bob Seese.
[14]  **Q**   Okay.  Now, let's back up for a second.
[15]  Where was Miss Dorger's office?
[16]  **A**   Same office, Cincinnati.  Is that what you
[17]  mean?
[18]  **Q**   Yes.
[19]  **A**   Yep.
[20]  **Q**   Now, Miss Dorger's supervisor would have
[21]  been Mr. Seese?
[22]  **A**   Correct.
[23]  **Q**   And, what was Mr. Seese's title?
[24]  **A**   Claim manager.
[25]  **Q**   Okay.  Where was Mr. Seese's office?

Page 43

[1]   **A**   Cincinnati, same office.
[2]   **Q**   Okay.
[3]        Now, my understanding is that Mr. Seese is
[4]  no longer with American Commerce?
[5]   **A**   Correct.
[6]   **Q**   Do you know where Mr. Seese is employed at
[7]  this time?
[8]   **A**   No.
[9]   **Q**   Do you know approximately when he left the
[10]  employment of American Commerce?
[11]  **A**   Two, maybe three years ago.
[12]  **Q**   Who would Mr. Seese's supervisor be?
[13]  **A**   At that time?
[14]  **Q**   Yes.
[15]  **A**   I don't know for sure.
[16]  **Q**   What position would the claims manager
[17]  respond to?
[18]  **A**   I don't understand.
[19]  **Q**   If you don't remember the individual --
[20]  **A**   Oh, okay.
[21]  **Q**   -- who would have been Mr. Seese's
[22]  supervisor, what would be that person's title?
[23]  **A**   I don't know for sure.
[24]  **Q**   You indicated that you had a maximum
[25]  authority for both settlement and expenses.

Page 44

[1]        Do you know if Mrs. Dorger had a maximum
[2]  authority for settlement and expenses?
[3]   **A**   Yes, both.
[4]   **Q**   Do you know what those amounts were, in or
[5]  around the time of the Wisinski claim?
[6]   **A**   No.
[7]   **Q**   How about Mr. Seese, did he have a maximum
[8]  authority for expenses and settlement?
[9]   **A**   I know settlement for sure.
[10]  **Q**   Okay.
[11]  **A**   Expenses, I'm not positive.
[12]  **Q**   Do you what know Mr. Seese's authority was?
[13]  **A**   No.
[14]  **Q**   Okay.
[15]        Was there any maximum authority associated
[16]  with particular positions; meaning, adjusters, the
[17]  highest level of adjuster had authority up to a
[18]  certain dollar amount, claims supervisors generally
[19]  had authority up to a certain amount, managers, and so
[20]  on up the chain?
[21]  **A**   I don't know if it's broken down that way,
[22]  or individually.
[23]  **Q**   Now, I had earlier asked you what you had
[24]  reviewed in preparation for your deposition here
[25]  today, and you had indicated you reviewed the log

**Page 45**

[1] notes.

[2] **A** Correct.

[3] **Q** Was there anything else you reviewed, in

[4] preparation for today's deposition?

[5] **A** I don't believe so.

[6] I don't believe so.

[7] **Q** Okay.

[8] And I am not asking for --

[9] **A** Well, let me correct that, yes, because --

[10] **MR. BUTCHER:** Tony, I want to correct that,

[11] because we did review a few things, so I am

[12] sure --

[13] **A** -- I did review some letters, I'm sorry.

[14] Some -- a copy of the file, there is hard copy of the

[15] file, and there is just a few letters that were, "Do

[16] you remember this," and -- from what was -- occurred

[17] during the time I was handling it. I did forget about

[18] the letters.

[19] **MR. BUTCHER:** Thank you.

[20] **MR. SCIARRINO:** Okay.

[21] **BY MR. SCIARRINO:**

[22] **Q** Did you review any of the claims manuals

[23] material?

[24] **A** Such as our Gateway procedures, those --

[25] **Q** Yes.

**Page 46**

[1] **A** No.

[2] And I also did review the BI evaluation

[3] that I completed, and I think that's everything.

[4] **Q** Okay.

[5] That's a multi-page form that you filled

[6] out?

[7] **A** Correct.

[8] **Q** Now, obviously you met with counsel, and

[9] I'm not asking what was discussed between you and

[10] counsel.

[11] Did you meet with any other individuals,

[12] ever, in connection with this lawsuit?

[13] **A** No.

[14] **Q** No one other than counsel; you never talked

[15] to any of your supervisors, bosses --

[16] **A** Just direction -- I'm sorry, go ahead.

[17] **Q** No supervisors, no bosses, no in-house

[18] counsel, no one, other than outside counsel?

[19] **A** Correct.

[20] We discussed where it is, and

[21] directions. That was it.

[22] **Q** Okay.

[23] During the time that you have been employed

[24] by American Commerce, have the manuals and the

[25] practices and policies been computerized and on the

**Page 47**

[1] Gateway, or has there ever been a hard copy?

[2] **A** I don't recall if there was a hard copy.

[3] **Q** When you started, were you trained on the

[4] Gateway system?

[5] **A** No.

[6] My gosh, I don't believe I was, but I'm not

[7] positive.

[8] **Q** Okay. I want to start with a few

[9] documents, if we could.

[10] **MR. BUTCHER:** Tony, before you go, I was

[11] trying to find, I think this would be a good

[12] place for just a two minute break, to let her get

[13] up.

[14] **MR. SCIARRINO:** Oh, certainly.

[15] **MR. BUTCHER:** It has been about an hour,

[16] and that way instead of you getting into,

[17] starting that and then stopping in 15 minutes,

[18] why don't we take a quick break.

[19] **MR. SCIARRINO:** Actually, that's a good

[20] point, because I need to grab some of the

[21] documents, so --

[22] **MR. BUTCHER:** That's fine. We will take a

[23] quick break.

[24] **MR. SCHERM:** We are off the record, the

[25] time is 9:27 a.m.

**Page 48**

[1] (Recess taken.)

[2] **MR. SCHERM:** We are back on the record, the

[3] time is 9:43 a.m.

[4] **BY MR. SCIARRINO:**

[5] **Q** Miss Bihn, we have just taken a short

[6] break, and I do have just one follow up question on a

[7] subject we had talked about before, before we move on

[8] to some new subject matter.

[9] Okay?

[10] **A** Okay.

[11] **Q** We had talked about your supervisor,

[12] Miss Dorger, and her supervisor, Mr. Seese, being at

[13] the same office.

[14] Now, is that the physical same location,

[15] here in -- outside of Cincinnati?

[16] **A** Yes.

[17] **Q** Now, is this an American Commerce building,

[18] or do you guys occupy a floor in an office building;

[19] how is that set up?

[20] **A** We occupy a suite in a building, office

[21] building.

[22] **Q** Okay. So should you have questions of

[23] Mr. Seese, or Miss Dorger, they would be essentially

[24] in the same office suite as you?

[25] **A** It is a very small office, yes.

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

Page 49

[1] **Q** Okay. So it would not be a problem for you
[2] to --
[3] **A** Right.
[4] **Q** -- ask them a question, or make inquiries
[5] of them?
[6] **A** Correct.
[7] **Q** Okay. Thank you.
[8] We had talked earlier about the
[9] insurance -- the American Commerce policy, and I'm
[10] going to provide you with a copy of that policy, that
[11] has been provided through the discovery process.
[12] Now -- and that is Bates paged 0036 through
[13] 0103.
[14] Did I accurately describe that, ma'am?
[15] **A** Yes.
[16] **Q** Okay.
[17] And that purports to be a certified copy of
[18] the American Commerce Insurance policy for
[19] Margaret Wisinski, with a -- I'm trying to find the
[20] policy number here -- with a policy number
[21] 11001052172?
[22] **A** Correct.
[23] **Q** Did I -- is that accurate?
[24] **A** Yes.
[25] **Q** Okay.

Page 50

[1] So this is the actual physical Pennsylvania
[2] policy for Margaret Wisinski?
[3] **A** Yes.
[4] **Q** And, you would have a copy of that in your
[5] office, available to you, not -- just not necessarily
[6] specific for Miss Wisinski?
[7] **A** Correct.
[8] Do you mean, do I have access to all of the
[9] endorsements, the general policy? Correct.
[10] **Q** So you would have all of those forms?
[11] **A** Yes.
[12] **Q** And, could you order a copy of
[13] Miss Wisinski's declarations page?
[14] **A** Yes.
[15] **Q** Who would you order that from?
[16] **A** I assume it goes to underwriting. I don't
[17] know, it is this request sheet here that we fax.
[18] **Q** And, so at any time you can obtain the
[19] declarations page for any American Commerce insured?
[20] **A** Correct.
[21] And actually now underwriting's part of the
[22] electronic mail system, I can actually pull it off of
[23] my computer now.
[24] **Q** Okay.
[25] At the time of Margaret Wisinski's claim,

Page 51

[1] at that time when you were handling it, from May of
[2] '03 to February of '04, was it part of the electronic
[3] system then?
[4] **A** No.
[5] **Q** You would then have had to request it?
[6] **A** Correct.
[7] **Q** And about how long does it take to get that
[8] turned around and sent back to you?
[9] **A** Probably three days at the most, from the
[10] day requested.
[11] **Q** All right.
[12] And that would provide you, then, with a
[13] copy of all of the relevant material, and her policy
[14] limits?
[15] **A** A certified copy of a policy, or just the
[16] dec page, I am not sure which --
[17] **Q** The combination of the documents that you
[18] had, the Pennsylvania policy you had available to you,
[19] and the dec page, would provide you with that
[20] information?
[21] **A** Correct.
[22] **Q** Now, if we look at Miss Wisinski's policy
[23] itself, if I would bring -- could bring your attention
[24] to what is page 0040.
[25] **A** Okay.

Page 52

[1] **Q** That is the declarations page; correct?
[2] **A** Correct.
[3] **Q** And it actually goes on for a couple of
[4] pages?
[5] **A** Correct.
[6] **Q** It looks like the declarations go on to
[7] about page 44?
[8] **A** Correct.
[9] **Q** Okay.
[10] Now, the policy sets forth the terms and
[11] conditions of American Commerce's coverage for
[12] Mrs. Wisinski?
[13] **A** Correct.
[14] **Q** And the declarations page sets forth the
[15] coverages which she purchased, and the amount of
[16] coverage she purchased?
[17] **A** Yes.
[18] **Q** Okay. Now, we had also talked about --
[19] when we were in the first portion of your deposition,
[20] we talked about the materials through the Gateway
[21] system, which I am going to collectively call -- oh,
[22] we are going to break them out into two groups, but
[23] they we going to call them claims handling materials.
[24] Okay?
[25] **A** Okay.

---

**Page 53**

[1]    **Q**   Is that a fair description?

[2]    **A**   Yes.

[3]    **Q**   All right.

[4]    And if I misdescribe something, or use a

[5] term that is inaccurate, I would ask that you correct

[6] me, because I will continue to use it under the

[7] assumption its correct.

[8]    Okay?

[9]    **A**   Okay.

[10]    **Q**   Now, the first document --

[11]    **MR. SCIARRINO:** Pardon me, did I forget the

[12] mark the policy as 1?

[13]    Okay. Let's call the policy, the certified

[14] copy of the policy, with the declarations page,

[15] as Exhibit 1. Okay?

[16]    (Thereupon, Deposition Exhibit No. 1 was

[17] marked for identification.)

[18]    **MR. SCIARRINO:** Gene is going to make sure

[19] we mark it ahead of time, so I don't mess up.

[20]    **THE WITNESS:** Thank you.

[21]    (Thereupon, Deposition Exhibit No. 2 was

[22] marked for identification.)

[23] **BY MR. SCIARRINO:**

[24]    **Q**   Now, ma'am, that document was provided by

[25] counsel for the defendant as in response to our

---

**Page 54**

[1] request for production of documents, and it purports

[2] to be claims handling materials.

[3]    Now, from your review of that, does that

[4] appear to be materials from the Gateway system?

[5]    **A**   Yes.

[6]    **Q**   And that is all material that is available

[7] to you, through the computer system?

[8]    **A**   Yes.

[9]    **Q**   So should you want to find information that

[10] would be contained therein, you would be essentially a

[11] few clicks away from it?

[12]    **A**   Correct.

[13]    **Q**   Okay.

[14]    **MR. SCIARRINO:** Now, let's mark the

[15] remaining documents, which were also claims

[16] handling documents that were responsive to our

[17] subpoena duces tecum, let's mark that as

[18] Exhibit 3.

[19]    And, Mr. Butcher, you have the copy there.

[20]    **MR. BUTCHER:** Yes.

[21]    Do you want to put an exhibit sticker on

[22] it. And I will just take it with me.

[23]    (Thereupon, Deposition Exhibit No. 3 was

[24] marked for identification.)

[25]    **MR. SCIARRINO:** Thank you, Joe.

---

**Page 55**

[1]    **MR. BUTCHER:** Sure. We will kill a lot of

[2] trees with that.

[3]    **MR. SCIARRINO:** Now, hold on just one

[4] moment.

[5] **BY MR. SCIARRINO:**

[6]    **Q**   Ma'am, are you familiar with those

[7] materials, that are Exhibit 3?

[8]    **MR. BUTCHER:** Go ahead and take a quick

[9] look at them.

[10]    **A**   Looks like from the Gateway.

[11]    **Q**   Okay.

[12]    **A**   Yes.

[13]    **Q**   And again, I am not trying to put words in

[14] your mouth, but does that appear to be, again, all

[15] materials that are available through the Gateway

[16] program, that would be a resource to you, through your

[17] computer system?

[18]    **A**   I don't know if that's all of them. I

[19] wouldn't have any idea.

[20]    **Q**   I am not asking if that's all of the

[21] documents.

[22]    **A**   Oh, okay.

[23]    **Q**   I am asking if those documents that are

[24] included in there all appear to be part of the Gateway

[25] program?

---

**Page 56**

[1]    **A**   What I looked at, yes.

[2]    **Q**   Okay. And again, those would be available

[3] to you through the computer system, should you need

[4] information that might be contained in there?

[5]    **A**   Correct.

[6]    **Q**   Okay.

[7]    And the Gateway system, is it searchable?

[8]    **A**   Do you mean, you know, if I am not sure

[9] which topic to go into, yes, there is a Google

[10] search.

[11]    They call it Google, but it is actually on

[12] the Gateway in there.

[13]    **Q**   So if you, let's say, had a question about

[14] Pennsylvania regulations, or something like that, you

[15] could put into the Gateway system, you know,

[16] "Pennsylvania Regulations," and then if there was any

[17] reference to Pennsylvania regulations in the Gateway

[18] system, it would bring that up?

[19]    **A**   Correct.

[20]    **MR. BUTCHER:** Tony, not that I want to put

[21] words in anyone's mouth, just so you understand,

[22] the Gateway is a web-based program that has a

[23] search engine generated by Google. Just so, when

[24] she refers it to, that's exactly what the system

[25] is.

---

Page 57

[1] MR. SCIARRINO: Okay.

[2] MR. BUTCHER: So that clears -- is that
[3] your understanding of what it is, Kelly?

[4] THE WITNESS: I don't know.

[5] MR. BUTCHER: Okay. I tried to make it
[6] easier.

[7] THE WITNESS: I know how it works.

[8] MR. BUTCHER: I didn't make it any --

[9] THE WITNESS: Don't make me understand it,
[10] just let me know how it works.

[11] MR. BUTCHER: Sorry.

[12] BY MR. SCIARRINO:

[13] Q Okay. Well, let me go back, because I am
[14] just trying to understand --

[15] A Okay.

[16] Q -- how you use it to obtain information,
[17] because that's what's important to us.

[18] The actual mechanics of how the computer
[19] stuff works isn't really critical to us, and I don't
[20] think, it appears not to be critical to you, either.

[21] A Nope.

[22] Q You can go in and type in, like I said,
[23] "Pennsylvania Regulations," and then if there is
[24] reference to Pennsylvania regulations within Gateway,
[25] then it would come up and then you could then go

Page 58

[1] through that?

[2] A Correct.

[3] Q So you don't have to go through all of that
[4] material, to find a particular thing, you can -- the
[5] computer will help you search it?

[6] A Correct.

[7] Q Okay.

[8] You know what, let's take the log next.

[9] (Thereupon, Deposition Exhibit No. 4 was
[10] marked for identification.)

[11] Q All right.

[12] I am going to show you another document,
[13] which is Bates stamped 1654 through 1683,

[14] And at the top it is titled "American
[15] Commerce Insurance Company Log Notes."

[16] Have I accurately described that?

[17] A Yes.

[18] Q And is that, to the best of your knowledge,
[19] the complete log notes for the Margaret Wisinski file?

[20] A As long as the numbers run in order,
[21] yes. I could page through them all, but I assume it's
[22] all there.

[23] Q And is this the -- one of the documents
[24] that you reviewed, in anticipation of your deposition
[25] here today?

Page 59

[1] A Yes.

[2] Q And is this the log that you would have
[3] made entries in, regarding your activities in the
[4] handling of Margaret Wisinski's claims?

[5] A Yes.

[6] Q Okay. Now, I want to bring your attention
[7] back to the -- the Exhibit 2, which is the Gateway
[8] materials.

[9] And I particularly would like to bring your
[10] attention to some other materials referenced in there.
[11] Just bear with me for one moment, and I will find it.

[12] Okeydoke.

[13] If you would look at Bates page 1675.

[14] And that page appears to have materials
[15] regarding unfair claims practices.

[16] Am I correct, in my description?

[17] A Yes.

[18] Q And the bottom half of that page, there is
[19] a heading for the State of Pennsylvania.

[20] A Yes.

[21] Q And then it talks about the regulations,
[22] and right at the very first one, it gives a citation
[23] to the Pennsylvania Code.

[24] A Correct.

[25] Q Okay. Now, is that material accessible to

Page 60

[1] you; in other words, are you able to obtain access to
[2] the code?

[3] A I don't know through Gateway for sure.

[4] If I do, I have to look up a specific code,
[5] I would go to the Internet and Google it, you can
[6] usually just pull it up if you input the numbers
[7] correctly, but I don't know if it's on Gateway.

[8] Q Okay. So normally what your practice would
[9] be, is -- and again, I don't want to be putting words
[10] in your mouth, so correct me if I am wrong -- if you
[11] reviewed this and saw that you thought a particular
[12] code section might be important to you, you would just
[13] Google that, and as most states have their codes
[14] available on line, you would expect to be able to get
[15] it that way?

[16] A Correct.

[17] (Thereupon, Deposition Exhibit No. 5 was
[18] marked for identification.)

[19] Q And I'm going to provide you with a copy of
[20] the Pennsylvania Code, that is -- that is referenced
[21] on page 1675.

[22] A Okay.

[23] Q And do you recall ever having reviewed a
[24] that Pennsylvania Code?

[25] A No.

Page 61

[1]    Q    As it would pertain to unfair claims
[2] handling practices?
[3]    A    No.
[4]    Q    Would you agree with me that American
[5] Commerce Insurance Company, when it does business in
[6] the Commonwealth of Pennsylvania, is obligated to
[7] follow the rules and regulations of the Commonwealth
[8] of Pennsylvania?
[9]    MR. BUTCHER:  I want to place an objection,
[10]   I think that calls somewhat for a legal
[11]   conclusion, but go ahead and answer it, to the
[12]   extent that you know.
[13]   A    Yes.  Of course, all of the claims should
[14] be handled fairly, and just because I may not have
[15] read this, I understand a broad fair claim handling.
[16]   Q    You understand the general principles of
[17] fair claim handling?
[18]   A    Correct.
[19]   Q    Okay.  And, with any state that American
[20] Commerce does business in, whether it be the
[21] Commonwealth of Pennsylvania, or the State of
[22] Kentucky, or one of those other states that you
[23] mentioned, American Commerce is obligated to follow
[24] the laws of those particular states, when they do
[25] business in that state?

Page 62

[1]    A    I would have to say yes.
[2]    Q    Okay.  That's your understanding?
[3]    A    Right.
[4]    Q    Okay.
[5]        I'm also going to provide you with a copy
[6] of a part of the Pennsylvania statute --
[7]    MR. SCIARRINO:  And just for the record, we
[8]    had marked the Pennsylvania Code as 5, and we can
[9]    mark the statute as 6, then.
[10]       (Thereupon, Deposition Exhibit No. 6 was
[11]   marked for identification.)
[12] BY MR. SCIARRINO:
[13]   Q    And that is a part of the Pennsylvania
[14] Statute 40 PS 1171.5, and it deals with the unfair
[15] methods of competition or deceptive acts or practices.
[16]       And have you ever reviewed that prior to
[17] today?
[18]   A    No.
[19]   Q    Okay.
[20]       With regard to fair claims handling
[21] practices generally, is it your understanding that
[22] American Commerce has an obligation to be honest and
[23] candid with its insureds?
[24]   A    Yes.
[25]   Q    Is it your understanding that American

Page 63

[1] Commerce has an obligation to identify all applicable
[2] coverages, and the amount of those coverages, and so
[3] advise the insured?
[4]    A    Yes.
[5]    Q    Is it your understanding that American
[6] Commerce has an obligation to treat its insureds'
[7] interests equally with the interests of American
[8] Commerce?
[9]    A    Say that again, I'm sorry.
[10]   Q    Is it your understanding that American
[11] Commerce Insurance Company has an obligation to treat
[12] its insureds, and their interests, equally to the
[13] interests of American Commerce Insurance Company?
[14]   A    Yes.
[15]   MR. SCIARRINO:  I mislaid one of my
[16]   documents.
[17]   Thank you.
[18] BY MR. SCIARRINO:
[19]   Q    Is it your understanding, that as part of
[20] fair claims handling, that American Commerce Insurance
[21] Company's adjusters have an obligation to help the
[22] insureds gather evidence in support of their claim?
[23]   A    I'm not sure what you mean by "gather
[24] evidence to support their claim."
[25]   Q    Gather information, such as records,

Page 64

[1] documents, photographs, things of that nature?
[2]    A    Yes.
[3]        Many times the person may want to obtain
[4] them theirself, but, you know, 99 percent of the time
[5] we gather the information.
[6]    Q    For them?
[7]    A    For them; correct.
[8]    Q    Okay.
[9]    A    For our file.
[10]   Q    As an adjuster for American Commerce
[11] Insurance Company, is it part of your obligation to
[12] essentially aid the insured in presenting their claim?
[13]   A    It's our obligation to advise them of their
[14] right to pursue the claim.
[15]       We do gather all of the information
[16] necessary to evaluate the claim, to advise them of
[17] what they are entitled to.
[18]       But I don't know if -- repeat the question.
[19]   Q    Do you have an obligation to aid the
[20] insured in presenting their claim?
[21]   A    I'm not sure what you mean.  I'm sorry.
[22]       Again, it is our obligation to let them
[23] know what's available, and to assist them with
[24] gathering information, or to gather everything
[25] ourselves, but --

Margaret Wisinski v.
American Commerce, Inc. and et al

Page 65

[1]    Q    Let's --
[2]    A    I mean, I'm thinking yes, but I am not sure
[3] I am understanding your question correctly.
[4]    Q    Okay. And I am not trying to confuse you.
[5]    A    No, it just hits me.
[6]    Q    Let me -- let's break down presenting a
[7] claim --
[8]    A    Okay.
[9]    Q    -- into its various components.
[10]    Okay?
[11]    The first component of presenting a claim
[12] would be understanding what coverages are available,
[13] and the amount of coverage available to an insured?
[14]    A    Yes, we are obligated to do that.
[15]    Q    Okay. So you are obligated to tell the
[16] insured, "These are your coverages, this is the amount
[17] of overage, and those are the coverages applicable to
[18] this loss"?
[19]    A    Correct.
[20]    Q    Okay.
[21]    And then there is the marshaling of the
[22] information, so that the claim can be evaluated?
[23]    A    Correct.
[24]    Q    And that's the gathering of records, and
[25] documents, and photographs, and police records, or

Page 66

[1] whatever would be applicable to that particular loss?
[2]    A    Right.
[3]    Q    Okay. And that is also something you have
[4] an obligation to aid the insured in doing?
[5]    A    Correct.
[6]    Q    And then finally, that material is all
[7] brought together to be presented, and then evaluated
[8] by the carrier; correct?
[9]    A    Correct.
[10]    Q    So, there is the learning about the policy
[11] provisions, and the available coverages, and there is
[12] gathering information.
[13]    Those are the two components of presenting
[14] the claim; is that correct?
[15]    A    Correct.
[16]    Q    And you have an obligation to aid the
[17] insured in both of those components?
[18]    A    I really don't know if it is an obligation
[19] to obtain all of the information.
[20]    Of course, the insurance company will do
[21] it. I don't know if it's our -- I honestly don't know
[22] if it's our obligation to obtain everything, versus
[23] having the party do it themselves.
[24]    I don't know.
[25]    Q    Is it something that American commerce

Page 67

[1] does?
[2]    A    Yes.
[3]    Q    When a first party benefits medical claim
[4] is presented, do you know whether, as part of the
[5] application for benefits, there is a authorization to
[6] obtain medical records component to that document?
[7]    A    I don't know about Kentucky's -- or
[8] Pennsylvania's positively, I don't remember, but I
[9] know other states I have handled, they do.
[10]    Q    Okay. And that enables the insurance
[11] carrier to get the medical records, so that it can
[12] evaluate them to determine whether or not payment is
[13] owed for certain medical charges?
[14]    A    At that time, yes.
[15]    Now it's a -- new HIPAA regulations, even
[16] the medical authorization on the PIP forms, they don't
[17] fly anymore, you have to have another whole other
[18] authorization, HIPAA requirements, but at that time,
[19] yes.
[20]    Q    Okay. So at the time of your handling of
[21] Margaret Wisinski's file, the standard authorization
[22] was sufficient?
[23]    A    Correct.
[24]    Q    Okay.
[25]    And is there a state specific application

Page 68

[1] for benefits, for every state, or is it a general form
[2] that American Commerce uses in multiple states?
[3]    A    State specific for each PIP state.
[4]    Q    Okay.
[5]    Did you ever review that, in your handling
[6] of Margaret Wisinski's file?
[7]    A    Yes.
[8]    Q    Do you recall whether there was an
[9] authorization?
[10]    A    I don't recall it.
[11]    Q    Okay. Were you able to obtain medical
[12] records?
[13]    A    I don't recall if I requested them myself,
[14] or her attorney.
[15]    Q    With regard -- let me back up for a moment.
[16]    During the time that you handled
[17] Margaret Wisinski's claim, had the -- had the first
[18] party benefits already been exhausted as of that date?
[19]    A    Can I look?
[20]    Q    Certainly.
[21]    Oh, that's another good point.
[22]    If, in response to any of my questions, it
[23] would aid you to review a document, please do not
[24] hesitate to do so, and if you need to take a moment,
[25] please let us know, so that you -- bless you.

Page 69

[1]   A   Excuse me.
[2]   Q   -- so that we can get your best response.
[3]   Okay?
[4]   A   We had exhausted the limits prior to --
[5]   they -- we had exhausted the medical benefits by the
[6]   time I received the file.
[7]   Q   Okay.
[8]        With re -- you indicated that you handle
[9]   first party benefits medical claims, as part of your
[10]  job as an adjuster?
[11]  A   Yes.
[12]  Q   With regard to the payment of first party
[13]  medical benefits, what are the rules regarding whether
[14]  or not a bill is payable?
[15]  A   Obviously, if you have limits remaining to
[16]  pay it, if the treatment is related to the auto
[17]  accident, if the treatment fell within the time frame
[18]  that's allowed, you know.
[19]       Some policies, or statutes, it is for
[20]  treatment only three years past the date of accident.
[21]       As long as it falls within the required
[22]  time frame.
[23]       Reasonable and necessary, according to the
[24]  policy.
[25]  Q   So that's essentially it.

Page 70

[1]        So let's break that out.
[2]   A   Okay.
[3]   Q   First, we have to know whether there are
[4]   medical benefits available under the policy.
[5]   A   Correct.
[6]   Q   So, in the case of Margaret Wisinski, she
[7]   had medical benefit coverage under her policy?
[8]   A   Yes.
[9]   Q   Then next, we have to know whether or not a
[10]  particular bill falls within the appropriate time
[11]  frame?
[12]  A   Correct.
[13]  Q   Okay.  And then, after that, the issue
[14]  becomes:  Is the medical care and treatment related to
[15]  the accident?
[16]  A   Correct.
[17]  Q   And then, is the medical care and treatment
[18]  reasonable and necessary?
[19]  A   Yes.
[20]  Q   So someone couldn't go to a witch doctor
[21]  and get treatment, and expect it to be paid?
[22]  A   I have paid for some crazy things.  I
[23]  haven't paid for that yet, but I have paid some
[24]  interesting things.
[25]  Q   Okay.

Page 71

[1]        But those are essentially the two prongs?
[2]   A   Correct.
[3]   Q   Is it related to the accident, and is the
[4]   care reasonable and necessary?
[5]   A   Not as strong on the reasonable and
[6]   necessary, because generally, you don't -- you don't
[7]   argue with the doctor, you know.
[8]   Q   Now -- and that's what triggers payment,
[9]   assuming that there is coverage still available?
[10]  A   Correct.
[11]  Q   All right.
[12]       And that is a standard that you would apply
[13]  to first party benefits claims in the State of
[14]  Pennsylvania?
[15]  A   Correct.
[16]  Q   And it might be the same standard in other
[17]  states as well, but it would be -- that would be the
[18]  standard for Pennsylvania?
[19]  A   Yes.
[20]  Q   Now, when you were brought into this
[21]  case -- well, strike that.  Let me back up.
[22]       How is it that you came to be involved in
[23]  this case?
[24]  A   I don't know for sure.
[25]       I know that one of the prior adjusters, the

Page 72

[1]   T. West, was no longer with the company when I
[2]   started.
[3]        I see some other names in here.
[4]        N. Brother, who was a temp at the time.  So
[5]   I assume they just -- I don't know for sure.
[6]   Q   Okay.
[7]   A   If they took it away from a temp to give it
[8]   to a full time adjuster, I don't know.
[9]   Q   Okay.  But it ultimately came to be a file
[10]  assigned to you?
[11]  A   Correct.
[12]  Q   And I do want to go through some of the
[13]  acronyms, to determine who various people are.
[14]  A   Okay.
[15]  Q   And I am going to reference Bates pages, to
[16]  sort of keep us on track.
[17]  A   Okay.
[18]  Q   You said NBROTHE, B-r-o-t-h-e.  Do you know
[19]  who that is?
[20]  A   I did work with him briefly, he was a temp,
[21]  but I don't remember his name.
[22]  Q   Okay.
[23]       On page 1658, there is an SRIDGWA.
[24]  A   Susan Ridgeway.
[25]  Q   Okay.  And who is Susan Ridgeway?

---

Page 73

[1]     A     She was a, I believe claim rep I, with our
[2] company at the time.
[3]     Q     Okay.  Do you know if Miss Ridgeway is
[4] still employed by American commerce?
[5]     A     No, she is not.
[6]     Q     On that same page, there is a
[7] K-E-S-M-I-T-H.  KESMITH?
[8]     A     I don't know who that is.
[9]     Q     Okay.
[10]           On page 1660, there is an MBURDEN.
[11]     A     Madeline Burden.
[12]     Q     Do you know who Miss Burden is?
[13]     A     I know she is employed in our subrogation
[14] department.
[15]     Q     Okay.  Does she work at the same office you
[16] work at?
[17]     A     No.
[18]     Q     Okay.  Do you know where Miss Burden is
[19] located?
[20]     A     I think Massachusetts, but I am not
[21] positive where the subrogation office is.
[22]     Q     Okay.
[23]     q     Now, JDORGER, D-O-R-G-E-R, that is
[24] Joanne Dorger?
[25]     A     Correct.

---

Page 74

[1]     Q     And that's your supervisor?
[2]     A     Yes.
[3]     Q     There is, on page 1664, a LSNODGR.  Do you
[4] know who that is?
[5]     A     Her current name, she is remarried,
[6] Linda Bird, at that time I think it was
[7] Linda Snodgrass, I believe was her name.
[8]     Q     And what would -- Miss Bird, or Snodgrass,
[9] what would her title be?
[10]     A     She was clerical.
[11]     Q     Okay.
[12]           On page 1665, there is a entry by a BSEESE,
[13] S-E-E-S-E, is that Bob Seese?
[14]     A     Yes.
[15]     Q     And that would be the claims manager?
[16]     A     Yes.
[17]     Q     On that same page, there is an AXTHILL.
[18]     A     I would not have shown, except he put his
[19] name under it, "Tom Hill, telephone call to attorney."
[20]     I do recall that there was a Tom Hill that
[21] worked there for a period of time, I don't remember
[22] who he was.
[23]     Q     Okay.  And you don't remember what his job
[24] title was?
[25]     A     No.

---

Page 75

[1]     Q     Okay.
[2]           There is just a couple of more.
[3]           There is on page 1676, an SSHINER,
[4] S-S-H-I-N-E-R.
[5]     A     Steve Shiner.
[6]     Q     Do you know who Mr. Shiner is?
[7]     A     He is in our home office, he is an
[8] examiner.
[9]     Q     And what does an examiner do?
[10]     A     I'm not sure of the full extent.  I know
[11] that they will follow, on diary, larger claims, large
[12] reserves, I don't remember if it's over 50,000, or
[13] over a hundred thousand reserve.
[14]           I don't know if they actually kind of
[15] supervise the file, but they are -- they monitor the
[16] file, they -- they are --
[17]     Q     Do you know what triggers a examiner to be
[18] involved in the file?
[19]     A     No.
[20]     Q     Is this considered part of a home office
[21] review?
[22]     A     Yes.
[23]     Q     Okay.  Do you know what triggers a home
[24] office review?
[25]     A     No.  Besides once a file is reserved at, I

---

Page 76

[1] think it is a hundred thousand, it could be 50, but
[2] I'm thinking a hundred thousand, they are notified and
[3] reviewed at that time.
[4]     Q     The criteria for home office review, would
[5] that be written somewhere, either in Gateway, or
[6] something like that?
[7]     A     Yes.
[8]     Q     Okay.
[9]     A     That's why it is not to memory.  I just
[10] look it up, when I need to know.
[11]     Q     Okay.  So somewhere in the Gateway
[12] materials is the criteria for what triggers a home
[13] office review?
[14]     A     Correct.
[15]     Q     All right.  And there might be a myriad of
[16] things, it might be reserving amounts, it might be
[17] particular types of injuries, there are a number of
[18] things that could trigger that?
[19]     A     What it will indicate is when a CFA, claim
[20] file analysis, is required, a report, that report goes
[21] to home office, so it may not specifically say, "Home
[22] office review required," but it's "CFA required," and
[23] that goes to home office for review.
[24]     Q     Okay.
[25]           And CFA stands for claim file analysis?

---

Page 77

[1]   **A**   I believe that's correct.

[2]   **Q**   And who is responsible for preparing that?

[3]   **A**   The adjuster handling it at the time.

[4]   **Q**   Okay.

[5]   There is also, on the last page of the log,

[6] 1683, there is a entry by RLUCAS, L-U-C-A-S.  Do you

[7] know who that individual is?

[8]   **A**   Bob Lucas, and I believe at that time he

[9] was also an examiner; same level as Steve Shiner at

[10] that time, I don't know.

[11]   **Q**   Do you know if Mr. Shiner is still with the

[12] company?

[13]   **A**   Yes, he is.

[14]   **Q**   Do you know what his current position is?

[15]   **A**   No.

[16]   **Q**   Okay.

[17]   How about Mr. Lucas?

[18]   **A**   I believe he is.

[19]   **Q**   Do you know what his current position is?

[20]   **A**   No.

[21]   **Q**   Okay.

[22]   I think we have identified everybody.

[23]   **A**   I think I need to learn my co-workers a

[24] little better.

[25]   **Q**   Do you know, are all of the examiners in

Page 78

[1] the -- well, strike that.

[2]   The two examiners that appear to be

[3] involved in this case, Mr. Lucas and Mr. Shiner, are

[4] they in Massachusetts?

[5]   **A**   Yes.

[6]   **Q**   Okay.  Thank you.

[7]   **MR. SCIARRINO:**  Why don't we take a break

[8] now, because I think this is sort of a natural

[9] pausing point.

[10]   **MR. BUTCHER:**  Okay.

[11]   **MR. SCIARRINO:**  Give her a break.

[12]   **MR. BUTCHER:**  Oh, yeah.  I guess it's been

[13] an hour, almost.

[14]   **MR. SCIARRINO:**  Time flies, doesn't it?

[15]   **MR. BUTCHER:**  When you are having fun.

[16]   **MR. SCHERM:**  We are off the record, the

[17] time is 10:23 a.m.

[18]   (Recess taken.)

[19]   **MR. SCHERM:**  We are back on the record, the

[20] time is 10:38 a.m.

[21]   **BY MR. SCIARRINO:**

[22]   **Q**   Miss Bihn, we are back from a brief

[23] adjournment, and I am going to ask you some questions

[24] about the claim log notes on this file.

[25]   The file -- the first file note that we see

Page 79

[1] your name associated with, is on May 15th, 2003, and

[2] it appears at page 1569 in the Bates page.

[3]   Is that accurate?

[4]   **A**   It's 1659, I'm not sure what you said, but

[5] correct, yes.

[6]   **Q**   Oh, okay.

[7]   **A**   I think, yeah.  I think you said it

[8] backwards.

[9]   **Q**   And that was your first entry?

[10]   **A**   Yes.

[11]   **Q**   And when you are assigned a file that is

[12] already in midstream, as it were, what to you do?

[13]   **A**   First thing you do, just as if it were a

[14] new claim, you verify coverage.  You don't assume the

[15] prior adjuster was correct, so you review the

[16] coverage.

[17]   I also review liability.

[18]   Of course, you review the whole file, but I

[19] look at liability again with an open mind.

[20]   Review the hard copy of the file, the log

[21] notes, liability coverage, and what needs to be done

[22] to move the file forward.

[23]   **Q**   So, at -- and each one of these entries has

[24] line numbers, so, to aid us, I may refer to a line

[25] number as well.

Page 80

[1]   **A**   Okay.

[2]   **Q**   It indicates at line -- on page 1659, at

[3] line 197, that you reviewed the file.

[4]   **A**   Correct.

[5]   **Q**   And, that would have included your review

[6] of the available and applicable coverages?

[7]   **A**   Correct.

[8]   **Q**   Okay.  And then you discussed what the

[9] injuries were?

[10]   Is that correct?

[11]   **A**   Yes.  Sorry.  Yes.

[12]   **Q**   Now, at line 205, there is an indication,

[13] "Insured filed bankruptcy."

[14]   Do you see that entry?

[15]   **A**   Yes.

[16]   **Q**   As of May 15th, 2003, was it your

[17] understanding that Margaret Wisinski had filed

[18] bankruptcy?

[19]   **A**   I don't know.  I would have to read the

[20] prior log notes.

[21]   Looking at the file, it looks like it's

[22] from conversation with her attorney from that day, but

[23] there may be indication in here prior, that I don't

[24] remember.

[25]   **Q**   Okay.

Page 81

[1]     But at least as of that day, you knew it,
[2] because the counsel had advised you?
[3]     **A**   Correct.
[4]     **Q**   Okay.  And, did you take any steps -- well,
[5] strike that.
[6]     Did you -- did you believe that to be
[7] accurate?
[8]     **A**   I took his word for it.  I didn't question
[9] it.
[10]    **Q**   Okay.  You didn't, say, go to the computer
[11] system to access the bankruptcy documents, to
[12] determine whether or not she was in fact in
[13] bankruptcy?
[14]    **A**   No, I did not.
[15]    **Q**   Did you -- I am going to represent to you
[16] that Miss Wisinski was in bankruptcy, and that was
[17] consistent with your understanding at that time?
[18]    **A**   Yes.
[19]    **Q**   Okay.
[20]    So, as of your first log, you had reviewed
[21] the coverages, talked to plaintiff's counsel, and --
[22] and reviewed the first party payments?
[23]    **A**   The coverages at that time, that I knew
[24] applied, yes.
[25]    **Q**   Okay.

Page 82

[1]     **A**   I mean, I do -- I have not -- I don't have
[2] them all documented, but at what was pertained at that
[3] time, yes.
[4]     **Q**   Okay.  Now, on the next page, 1660, there
[5] is an entry at line 245 from M. Burden.
[6]     **A**   Okay.
[7]     **Q**   It says, "Received letter from TTC stating
[8] policy was canceled prior to DOL.  Sending TT S70
[9] diary 30 days."
[10]    Did I read that properly?
[11]    **A**   Yes.
[12]    **Q**   Okay.  And is that essentially an
[13] indication that the tort feasor was uninsured at the
[14] time of the accident?
[15]    **A**   It's an indication that he possibly is
[16] uninsured.  He is not insured with the carrier we
[17] thought he was.
[18]    **Q**   Okay.
[19]    (Thereupon, Deposition Exhibit No. 7 was
[20] marked for identification.)
[21] **BY MR. SCIARRINO:**
[22]    **Q**   I am going to show you a copy of a letter
[23] from State Farm Insurance Company that's dated
[24] June 29th, 2003.
[25]    Do you see that letter?

Page 83

[1]     **A**   Yes.
[2]     **Q**   And that was a letter from State Farm
[3] indicating that the tort feasor was not insured with
[4] State Farm at that time?
[5]     **A**   Correct.
[6]     **Q**   Okay.
[7]     As of -- well, strike that.
[8]     Can you tell me on what date an uninsured
[9] motorist claim was opened for Margaret Wisinski?
[10]    **A**   I don't know if I can tell from what I
[11] have.
[12]    It's not noted when it was opened.
[13]    **Q**   Other than the log, would there be any
[14] other source, to determine when that was opened?
[15]    **A**   When you open a feature, so in the
[16] computer, when the UM was opened, it's going to -- the
[17] computer will show the dates, and the reserves, how
[18] much you opened it for.
[19]    **Q**   Okay.
[20]    **A**   It's the same screen that you would issue
[21] checks off of, it's the reserves screen.
[22]    **Q**   Okay.
[23]    And, is that historic; in other words, when
[24] you went into that screen for this file, it would show
[25] when that coverage was opened?

Page 84

[1]     **A**   You can get into it, yes.
[2]     I mean, it's different than going into log
[3] notes, but it is in the same claim number, you go
[4] through it differently, and it will show you the date
[5] it was opened, and the reserve that was opened for it.
[6]     **Q**   Okay.
[7]     Let me hold on just one moment, because I
[8] don't know if we have been provided with that, but I
[9] want to check my responses to discovery.
[10]    **MR. SCIARRINO:**  Can we just go off the
[11] record for just one second.
[12]    **MR. BUTCHER:**  Sure.
[13]    **MR. SCHERM:**  We are off the record, the
[14] time is 10:47 a.m.
[15]    (Recess taken.)
[16]    **MR. SCHERM:**  We are back on the record, the
[17] time is 10:49 a.m.
[18] **BY MR. SCIARRINO:**
[19]    **Q**   Miss Bihn, we are back on the record, we
[20] have taken a short break, and to obtain some
[21] documents.
[22]    I am going to show you a document that is
[23] titled "Defendants' Objections and Answers to
[24] Plaintiff's Interrogatories," and I am going to bring
[25] your attention to interrogatory 8, and its response,

**Kelly Ann Bihn**
**August 6, 2008**

Margaret Wisinski v.
American Commerce, Inc. and et al

---

Page 85

[1] to see if this helps you.

[2]   **A**   Okay.

[3]   **Q**   And to see if you can help me understand
[4] that response.

[5]   **MR. BUTCHER:** Okay. No. 8.

[6]   **THE WITNESS:** Okay.

[7]   **MR. BUTCHER:** Sorry.

[8]   **A**   Okay. It looks like they have indicated
[9] the amount and the date that it was set up.

[10]   **Q**   In looking at the response to interrogatory
[11] No. 8, it indicates that the initial -- the initial
[12] reserves for plaintiff's uninsured motorist claim were
[13] $12,000 on February 2nd, 2004.

[14]   **A**   Correct.

[15]   **Q**   Okay. Is it correct that when a coverage
[16] is opened, a reserve must be set?

[17]   **A**   No. You can open a coverage without a
[18] reserve.

[19]   **Q**   Okay.

[20]   **A**   It's not done, it is done in error. You
[21] just go back in and put the money in. But it is not a
[22] requirement.

[23]   **Q**   All right.

[24]       If we look at the log for February 2nd,
[25] 2004.

---

Page 86

[1]   **A**   Okay.

[2]   **Q**   There is -- is there anything on that date,
[3] or the dates around there, that would indicate when
[4] the coverage was opened?

[5]   **A**   No. I did not indicate it in the notes.

[6]   **Q**   Based upon your review of the answers to
[7] interrogatories, and the log notes, can you tell me
[8] when you believe the underinsured -- I'm sorry,
[9] uninsured motorist coverage was opened?

[10]   **A**   I believe February 2nd, '04.

[11]   **Q**   Okay.

[12]       Now, let's go back in time, just a little
[13] bit. I skipped something accidentally, and I
[14] apologize.

[15]       I'm going to show you what purports to be
[16] an e-mail from Kelly Bihn to Jolene Murphy, dated
[17] May 5th, 2003, and it's also got some handwriting on
[18] it.

[19]       (Thereupon, Deposition Exhibit No. 8 was
[20] marked for identification.)

[21]   **A**   Okay.

[22]   **Q**   All right.

[23]       Have you seen this prior to today?

[24]   **A**   Yes.

[25]   **Q**   Is this a e-mail that you prepared?

---

Page 87

[1]   **A**   Yes.

[2]   **Q**   Okay. First of all, who is Jolene Murphy?

[3]   **A**   She is in underwriting, I don't know her
[4] job title.

[5]   **Q**   Okay. And it has, under the subject line
[6] of the e-mail, it says "PA coverage question."

[7]   **A**   Pennsylvania coverage question.

[8] Okay. Yes.

[9]   **Q**   What was your question?

[10]   **A**   On the policy -- oh, I shouldn't say the
[11] policy -- on our computer screen, on our coverages on
[12] the computer screen, it had listed P34, which I did
[13] not know what that was.

[14]   **Q**   Okay. I'm going to show you, to aid you
[15] with that --

[16]   **A**   Okay.

[17]   **Q**   -- we also have a copy of what looks to be
[18] a screen print, and it's Bates page 451 and 452.

[19]       By the way, the prior document was Bates
[20] page --

[21]   **Q**   450.

[22]   **Q**   -- 450.

[23]       (Thereupon, Deposition Exhibit No. 9 was
[24] marked for identification.)

[25]   **A**   Okay.

---

Page 88

[1]   **Q**   Now, in reviewing that, does that aid you
[2] in understanding your e-mail, that is, at Bates page
[3] 450?

[4]   **A**   Yes.

[5]   **Q**   Having looked at that, what was your
[6] question?

[7]   **A**   My question was, I understand it's 5,000
[8] first party medical bills, what is the coverage that
[9] P34 indicates.

[10]   **Q**   And that indicated that there was $5,000 in
[11] first party medical benefit?

[12]   **A**   Correct.

[13]   **Q**   Okay. Also, there is some handwritten
[14] notes on here.

[15]       Do you -- are those your handwritten notes?

[16]   **A**   I know that this "Work loss monthly limit
[17] 1,500/25,000" is mine.

[18]   **Q**   Okay.

[19]   **A**   "Claim pending with State Farm" is mine.

[20]       "Filed bankruptcy - wages" is me.

[21]       The affidavit about Social Security

[22] disability looks like me.

[23]       "Injuries - knee surgery," everything down
[24] to "neck/back" is me, "both knees."

[25]   **Q**   So is there anything on here --

---

Min-U-Script®

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

---

Page 89

[1]   A   Yeah, it looks like all of it, yeah.

[2]       I'm sorry --

[3]   Q   Is there anything on here, that isn't

[4] yours?

[5]   A   I didn't recognize some of the handwriting,

[6] that's why I was going one by one, but, yes, now, it

[7] is all me.

[8]   Q   Now, were these notes from conversations,

[9] were these notes from research; can you tell?

[10]   A   Conversation, both with, I would say

[11] Jolene Murphy, regarding the coverage, and I don't

[12] know for sure who the other one would have been with.

[13]   Q   Okay.

[14]       And the next exhibit, which is the screen

[15] prints of the coverage, which is Bates page 451 and

[16] 452, that indicates the coverages, and on page 452 it

[17] indicates uninsured motorist and underinsured motorist

[18] of 50/100?

[19]   A   Yes.

[20]   Q   Okay.  And so when you had reviewed the

[21] coverage, when you initially looked at this claim, you

[22] would have been aware that there was un and

[23] underinsured motorist coverage?

[24]   A   Yes, I would have been.

[25]   Q   Okay.  And you would have then, after your

---

Page 90

[1] discussion with Jolene Murphy, you would have

[2] understood the first party benefit medical coverage,

[3] and the first party benefit wage loss coverage?

[4]   A   Correct.

[5]   Q   Okay.  And that was all done on or around

[6] May 5th, 2003, which would have been a little bit

[7] before your first log entry?

[8]   A   Oh, yeah.

[9]   Q   Is that correct?

[10]   A   Yes.

[11]   Q   Okay.  Now, is the entirety of the log,

[12] that we see here, something that would have been --

[13] strike that.

[14]       The log entries that were made by other

[15] individuals, would they be visible to you?

[16]   A   Yes.

[17]   Q   Okay.

[18]       So, as you were reviewing the file, when

[19] you first took over, and you would have gone through

[20] the log, you would have been able to review what was

[21] written by Miss Ridgeway, or Miss West?

[22]   A   Correct.

[23]   Q   Similarly, once you started handling the

[24] file, and there were entries made by Miss Burden, you

[25] would have had access to those entries?

---

Page 91

[1]   A   Correct.

[2]   Q   Okay.  so when you looked at the file, you

[3] would have known, State -- back in July of 2003, "Hey,

[4] State Farm is saying that they don't have coverage"?

[5]   A   State Farm, correct.

[6]   Q   And you would have known that, because you

[7] would have been able to review Miss Burden's log note?

[8]   A   Right.

[9]   Q   Okay.  now, when you reviewed the file,

[10] back in May of '03, at that time you knew that

[11] Miss Wisinski was claiming that she had personal

[12] injuries from this accident?

[13]   A   Correct.

[14]   Q   Okay.

[15]       And you also would have reviewed the

[16] liability discussion?

[17]   A   Yes.

[18]   Q   And, can we agree that during the time that

[19] you reviewed -- that you handled this file, liability

[20] was never an issue in this case?

[21]   A   Correct.  It wasn't.

[22]   Q   Meaning, the tort feasor was assumed to be

[23] 100 percent at fault for the Wisinski accident?

[24]   A   Correct.

[25]   Q   Okay.

---

Page 92

[1]       I believe the tort feasor's name was

[2] Mr. Kowalski.

[3]   A   Jeffrey Michael Kowalski.

[4]   Q   Is that correct?

[5]   A   Correct.

[6]   Q   Now, from your review of the log notes,

[7] when was it clear to you that Mr. Kowalski was an

[8] uninsured motorist?

[9]   A   To me it's never clear that he is

[10] uninsured.

[11]       We assumed he was with State Farm at one

[12] time; discovered he was not at the day of the

[13] accident; continued to try to contact him to obtain

[14] insurance information.

[15]       We learned that he had passed away, and we

[16] discontinued our efforts to find insurance through

[17] family members, or otherwise.

[18]       We -- at that time we assumed he was

[19] uninsured, and that was -- looks like October of '03.

[20]   Q   And is that -- are you looking at Bates

[21] page 1662?

[22]   A   Yes.

[23]   Q   Okay.

[24]       And are those the entries that are made by

[25] Miss Burden?

---

Page 93

[1]  A   Which, are what, the entries made by her?

[2]  Q   There is a series of entries on October 1st

[3]  through October 15th, I think there is four of them;

[4]  is that what you are relying on, or are you relying on

[5]  something else?

[6]  A   And also the insured's attorney himself, is

[7]  one that indicated that he had passed away, I thought.

[8]      Wait a minute.

[9]      Hold on.

[10]     Okay. I may not have put it in log notes,

[11] I would have to look back through it, but I had

[12] apparently contacted Madeline Burden to say our

[13] insured's attorney indicated tort feasor is deceased,

[14] so, yes, I would say the notes from Madeline Burden,

[15] from October 1st through the 15th, '03.

[16]  Q   So as of October of 2003, American Commerce

[17] was no longer pursuing Mr. Kowalski, or his estate, to

[18] determine if there was any coverage?

[19]  A   According to the log notes, correct, it

[20] looks like severed, discontinued their efforts then.

[21]  Q   Okay.

[22]     And so as of that date, you had the

[23] information that led you to believe that Mr. Kowalski

[24] was in fact an uninsured motorist?

[25]  A   At that time I understood that was the

Page 94

[1]  position our company was taking.

[2]  Q   Okay.

[3]  A   But we never verified he was uninsured.

[4]  Q   At any point after October of 2003, during

[5]  the time you handled the claim, was there any other

[6]  investigation to determine if there was any coverage

[7]  available for Mr. Kowalski?

[8]  A   I don't know. I would have to read through

[9]  them, the rest of the log notes.

[10]     I don't recall any, but I don't remember.

[11]  Q   Okay.

[12]     Now, we were talking about the log notes

[13] themselves.

[14]     You can review everything that had been

[15] previously performed, by other adjusters, so you would

[16] have had access to the first party medical notes, to

[17] indicate what bills were paid, and what weren't paid?

[18]  A   Correct.

[19]  Q   And you would have access to any of the

[20] notes relative to the wage loss claim?

[21]  A   Correct.

[22]  Q   So, all of that material would be

[23] accessible to you?

[24]  A   Yes.

[25]  Q   Okay. How about the actual bills

Page 95

[1]  themselves; would you be able to gain access to the

[2]  medical bills and the records that go with them?

[3]  A   Yes.

[4]  Q   Now, would that be by physical review, or

[5]  would that be by something on line, or through the

[6]  computer system?

[7]  A   At that time it would have been hard copy

[8]  of the file.

[9]  Q   Okay.

[10]  A   Physical file.

[11]  Q   Now, would that have been physically in

[12] that same claim office you were working in?

[13]  A   Yes. It would have been in my filing

[14] cabinet, at my desk.

[15]  Q   Oh, okay.

[16]     So that would have been -- when you took

[17] over the claim, those first party medical records

[18] would have been right there with it.

[19]  A   The -- if we had any records in the file

[20] but, yes, the first party medical bills that we paid,

[21] in addition to any records, or other documents that we

[22] had.

[23]  Q   Okay.

[24]     And, we talked about the guidelines for

[25] paying first party medical benefits, and the

Page 96

[1]  requirements that the bill be related, that the

[2]  treatment be related to the accident, and that the

[3]  treatment be reasonable and necessary, and to make

[4]  those determinations you don't rely simply on the

[5]  bill, usually there is some records or notes that come

[6]  with that?

[7]  A   Usually.

[8]  Q   And again, that would have been, as you

[9]  said, in your file cabinet in your office?

[10]  A   Yes.

[11]  Q   Now, in September of 2003, you were

[12] provided with some materials, some medical records,

[13] from plaintiff's counsel at the time, which was the

[14] law offices of Dallas Hartman?

[15]  A   I don't know that as fact, but --

[16]  Q   Well, I would direct your attention to

[17] pages 1661 and 1662.

[18]  A   Okay.

[19]     I see where the attorney has sent some

[20] documentation from a doctor.

[21]     Is that what you were asking? I'm sorry.

[22]  Q   Right. You received some materials?

[23]  A   Yes.

[24]  Q   And I'm going to show you a document that

[25] is a report from Dr. David German, G-e-r-m-a-n, which

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

Page 97

[1] is dated March 26th, 2003.

[2]     (Thereupon, Deposition Exhibit No. 10 was

[3] marked for identification.)

[4]   A   Okay.

[5]   Q   And, in reviewing that report, which is

[6] Bates paged -- hold on. Thank you -- 833 through

[7] 835 --

[8]   A   Yes.

[9]   Q   -- does that appear to be the report that

[10] you received, that led to your log entry of

[11] September 10th, 2003?

[12]   A   It does seem to follow the report, yes.

[13]   Q   And, as of September 10th, 2003, did you

[14] understand that the material that was being provided

[15] to you by Attorney Hartman's office, was related to

[16] both Ms. Wisinski's wage loss claim, and her uninsured

[17] motorist claim?

[18]   A   Yes.

[19]   Q   Okay.

[20]     (Thereupon, Deposition Exhibit No. 11 was

[21] marked for identification.)

[22]   Q   And then subsequently on September 23rd,

[23] 2003, Attorney Hartman's office provided a demand

[24] letter, which is Bates paged 158 through 167.

[25]   A   Correct.

Page 98

[1]   Q   So, at that time, as of September 23rd,

[2] 2003, the plaintiff, through her counsel, was

[3] delineating a wage loss claim and an uninsured

[4] motorist claim?

[5]   A   If that date is correct.

[6]     Our date stamp on when we received it did

[7] not come through, but I assume that's a correct date.

[8]   Q   I'm reading the date on the letter.

[9]   A   Right, that's what I mean.

[10]     I -- there has been numerous times where

[11] you will receive, especially demand packages, because

[12] I don't know if they prepare their covering letter

[13] ahead of time, but the date of the letter might be a

[14] month prior to when you actually got it, but I will

[15] say he -- he was preparing it September of '03.

[16]   Q   Okay.

[17]     Do you -- can you tell from the log, when

[18] you received it?

[19]   A   No.

[20]     I think I did look for that yesterday. The

[21] only thing -- the first indication that we received

[22] it, if I remember correctly, is where I had evaluated

[23] it.

[24]     I believe 2-2-04 is the first indication in

[25] the log notes.

Page 99

[1]     Yes, that's correct.

[2]   Q   So you don't know when you received that?

[3]   A   Correct.

[4]   Q   There is a stamp at the bottom, and it

[5] doesn't appear very clear.

[6]   A   No. It's the hole punch kind.

[7]   Q   Would the original document be one that we

[8] could determine the date it was received?

[9]   A   Yes. It would actually have the holes

[10] punched in it.

[11]   Q   Okay. Do you know where the original

[12] document resides?

[13]   A   No.

[14]     MR. SCIARRINO:  Can counsel shed any light

[15] on that?

[16]     MR. BUTCHER:  I have a copy, which kind of

[17] looks like an original, but I am not sure if it's

[18] the original. Do you understand what I am

[19] saying? It has tabs on it, so it makes me think

[20] that either somebody copied it exclusively the

[21] same way the original was, or we have the

[22] original file.

[23]     MR. SCIARRINO:  Okay.

[24]     Can we ask you to review that to determine

[25] whether or not --

Page 100

[1]     MR. BUTCHER:  Yes.

[2]     MR. SCIARRINO:  -- what the date received

[3] was.

[4]     MR. BUTCHER:  I will do that.

[5] BY MR. SCIARRINO:

[6]   Q   While we are talking about this, is it your

[7] understanding that the practice is, when documents are

[8] received, that they are stamped?

[9]     Bless you.

[10]   A   Excuse me.

[11]     Date stamped, yes.

[12]   Q   And are they usually date stamped within

[13] the date, the day or two of their receipt?

[14]   A   Yes.

[15]   Q   Okay. And would you expect that to be

[16] accurate?

[17]   A   Yes.

[18]   Q   Now, after you received the -- strike that.

[19]     On page 1663 of the log, there is an

[20] indication that you evaluated the claim.

[21]   A   Yes.

[22]   Q   Okay.

[23]     And, I'm going to show you a document that

[24] is entitled "American Commerce Insurance Company

[25] Claims Department BI/Litigation/OTA Evaluation Form,"

Page 101

[1] and it is Bates page 437 through 439.

[2]     (Thereupon, Deposition Exhibit No. 12 was

[3] marked for identification.)

[4]     **Q**     Are we all set?  Do you need a moment to

[5] review that document, ma'am?

[6]     **A**     No.

[7]     **Q**     Did you review that document in preparation

[8] for your deposition here today?

[9]     **A**     Briefly looked at it yesterday.

[10]     **Q**     Okay.

[11]     This document, was this prepared by you?

[12]     **A**     Yes.

[13]     **Q**     Is it your handwriting?

[14]     **A**     Yes.

[15]     **Q**     Okay.  I want to go through this document.

[16]     At the very top, it has on the first line,

[17] it indicates the file number, and the policy limits,

[18] and it indicates that the policy limit is

[19] 50,000/100,000.

[20]     Is that for uninsured motorist coverage?

[21]     **A**     Correct.

[22]     **Q**     Next to that it says "UMB."  What does that

[23] mean?

[24]     **A**     That's our UM abbreviation, uninsured

[25] motorist bodily injury.

Page 102

[1]     **Q**     And the 50/100 stands for 50,000 per

[2] person, 100,000 per accident?

[3]     **A**     That's what's on -- that's what's indicated

[4] on the policy, like on the dec sheets.

[5]     **Q**     And so that at that time it was your

[6] understanding that Miss Wisinski had $50,000 in

[7] underinsured motorist coverage, available under her

[8] policy?

[9]     **A**     At least 50.

[10]     I mean, I did not look into it further to

[11] see if there was any stacking, anything like that,

[12] because the evaluation was less than 50.

[13]     **Q**     You had indicated earlier that the first

[14] thing you did, when you reviewed the file, was confirm

[15] coverage; is that correct?

[16]     **A**     Correct.

[17]     **Q**     And when you confirmed the coverage, you

[18] confirmed the coverages that are available, and you

[19] confirmed their amounts; is that correct?

[20]     **A**     Correct.

[21]     **Q**     And, whether a claim is worth $5,000 or

[22] $5 million, doesn't affect the policy limits; does it?

[23]     **A**     If it's -- no, it does not.

[24]     **Q**     Okay.

[25]     You can't reserve above the policy limit,

Page 103

[1] but the evaluation is not dependent upon the policy

[2] limit?

[3]     **A**     Correct.

[4]     **Q**     All right.  And this is an evaluation form;

[5] correct?

[6]     **A**     Right.

[7]     **Q**     So the amount of policy limit would be

[8] irrelevant to your evaluation?

[9]     **A**     Correct.

[10]     **Q**     On the next category, it has "Loss

[11] Description."

[12]     **A**     Yes.

[13]     **Q**     And then it has the time and the location,

[14] and then it has the notation, "Aggravation of

[15] preexisting to right knee and left knee, soft tissue

[16] neck and back."

[17]     Did I read that --

[18]     **A**     Before the left knee, it looks like a

[19] little arrow, and I have no idea what that is, but I

[20] don't think that is an "and."

[21]     **Q**     Oh, okay.

[22]     **A**     But I don't know what it is.

[23]     **Q**     Is that referring, perhaps, to the

[24] aggravation component?

[25]     **A**     I don't know.

Page 104

[1]     **Q**     Or can't you tell?

[2]     **A**     I don't know what it is.

[3]     **Q**     Okay.

[4]     Then under "Injury" it says, "Other party

[5] ran red light, struck insured uninsured."

[6]     **A**     Yes.

[7]     **Q**     Okay.

[8]     Now, the next category says, "Special

[9] Damages."

[10]     **A**     Uh-huh.  Yes.

[11]     **Q**     Then there is a category that says,

[12] "Medical."  What -- there is a series of numbers in

[13] there.  Tell me what those entries mean.

[14]     **A**     Okay.

[15]     The two categories, the one on the left is

[16] what you would consider your low range, on the right

[17] is the high range.

[18]     Basically, the right is everything they are

[19] claiming, their argument, their -- what they have

[20] presented as being related.

[21]     The low end is what you believe to be

[22] related, or -- I don't want to say that, but it's

[23] what's shown to be related.  It has the medical

[24] records to support it, to support that figure.

[25]     But, it's broken down by hospital bill.

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

---

Page 105

[1] Even the hospital bill will generally break down if
[2] they took x-rays at the ER, you are going to pull out
[3] that figure for diagnostic.
[4]      So it is just -- it is all of the medical
[5] bills, low and high range.
[6]    Q    Okay.
[7]      And then at the far right of that same
[8] form, it has a category that says "Range"?
[9]    A    Yes.
[10]   Q    And then it has 11355 to 13300?
[11]   A    Yes.
[12]   Q    And that's the total amount of medicals?
[13]   A    Correct.
[14]   Q    So that would be, if you added up the
[15] categories in the column at the extreme left --
[16]   A    Yes.
[17]   Q    -- that's what they would total?
[18]   A    Yes.  And then the extreme right is the
[19] 13300.
[20]   Q    Okay.
[21]   A    Correct.
[22]   Q    And then there is a PIP offset?
[23]   A    Yes.
[24]   Q    Does that mean that you subtract from that
[25] amount the amount paid by the first party benefits?

---

Page 106

[1]    A    Correct.
[2]    Q    And then that leaves a total?
[3]    A    Yes.
[4]    Q    A remainder?
[5]    A    Yes.
[6]    Q    Okay.
[7]      And, then the next category is "Special
[8] Damages."
[9]      Well, let me back up.  There is also a
[10] category that says "Income" -- "Loss of Income/Wages
[11] Range."
[12]   A    Okay.
[13]   Q    Okay.  That is left blank?
[14]   A    Yes.
[15]   Q    So are we to assume from that, that you did
[16] not attribute any income or wage loss to the motor
[17] vehicle accident of December 20th, 2001?
[18]   A    I did not on the evaluation form, I never
[19] received the supporting documentation.
[20]   Q    Okay.
[21]      So you essentially said there was no income
[22] or wage loss?
[23]   A    On this evaluation, yes.  Yeah.
[24]   Q    Okay.
[25]      Now, the next category is "General

---

Page 107

[1] Damages."
[2]    A    Yes.
[3]    Q    And then there is a category that says,
[4] "Total Disability" and "Partial Disability."
[5]    A    Yes.
[6]    Q    Okay.
[7]      There is an entry under "Partial
[8] Disability."  What does that -- what does that mean?
[9]    A    It's the -- the period of time that you are
[10] allowing in your evaluation for the pain and suffering
[11] side of it.
[12]   Q    Okay.
[13]   A    I don't want to say it's her treatment
[14] period, because a lot of times people are still in
[15] pain at the end of their treatment, so you may extend
[16] the date out farther, but it is the period of time we
[17] are allowing in our evaluation.
[18]   Q    So from this evaluation, we can conclude
[19] that you determined that as of December 20th, 2003,
[20] Ms. Wisinski had no further pain or discomfort
[21] associated with the motor vehicle accident of
[22] December 20th, 2001?
[23]   A    I would have to assume 12-20-03 she was
[24] back to the preaccident condition.
[25]   Q    Okay.

---

Page 108

[1]      And, you assumed a dollar amount of $50 per
[2] week?
[3]    A    On the low end of the range, correct.
[4]    Q    And on the high end of the range, a hundred
[5] dollars per week?
[6]    A    Correct.
[7]    Q    And that was -- and that would be $50 --
[8] between $50 and a hundred dollars a week to compensate
[9] her for her pain and discomfort, and the other
[10] noneconomic losses associated with a personal injury?
[11]   A    Yes.
[12]   Q    Okay.  And so then it was just a simple
[13] multiplication, $50 times 104 weeks to a total, and
[14] then 104 weeks times a hundred dollars?
[15]   A    Correct.
[16]   Q    And how did you come up with $50 a
[17] week as the low range?
[18]   A    Based on the medical records, her
[19] complaints.
[20]      Again, you are looking at her condition as
[21] a result of the auto accident, and what that has done
[22] with her pain level, and her lifestyle, her -- the
[23] inconvenience due to the pain, due to the auto
[24] accident.
[25]   Q    Is there any formula to this?  I mean, by

---

**Page 109**

[1] that I mean, how do you determine whether one person's

[2] pain is worth $50 a week, versus another person's pain

[3] being worth $150 a week?

[4]     A   It's -- there is no formula, and again,

[5] it's case-by-case basis.

[6]     It's, you have to look at each person

[7] individually, and their circumstances.

[8]     They have small children to take care of.

[9]     If some people are prescribed pain

[10] medication, and then they are fine, but then you have

[11] the pregnant woman that can't take it, so you have to

[12] compensate her for that, for the fact that she is in

[13] more pain than this guy.

[14]     And it is a case by case, and no formula at

[15] all.

[16]     Q   Okay.

[17]     Did -- you had a total then, on the

[18] right-hand side, that said $7,798 to $14,943.

[19]     A   Yes.

[20]     Q   Okay.  And that was the range?

[21]     A   Settlement range, yes.

[22]     Q   Okay.

[23]     And then there is a signature at that point

[24] by you?

[25]     A   Yes.

**Page 110**

[1]     Q   Now, then there is another entry under

[2] "Instruction/comments."  Was that an entry that you

[3] made, or was that an entry that someone else made?

[4]     A   I made.

[5]     Q   Okay.  And it says, "Hi-Low on the bills is

[6] not considering all Novacare physical therapy bills on

[7] low end, because records not sent for the additional

[8] visits."

[9]     A   Correct.

[10]     Q   And then there is a signature below that

[11] appears to be Joanne Dorger?

[12]     A   Yes.

[13]     Q   Does that mean Miss Dorger reviewed this?

[14]     A   Yes.

[15]     Q   And then there is also a notation sort of

[16] in an area to the left, that says, "Goal $12,000"?

[17]     A   Correct.

[18]     Q   What does that mean?

[19]     A   That is your settlement goal, which you

[20] actually believe the file, what your settlement goal

[21] is.

[22]     You may not agree with the high end, the

[23] low end is if we win, basically, any arguments that we

[24] may have against the file, but the goal is based upon

[25] three things, which is causality, liability and

**Page 111**

[1] damages.

[2]     If the causality is very much against the

[3] individual, then -- then your goals might be lower

[4] than -- you just look at the whole thing, liability,

[5] causality and damages, to come up with your goal.

[6]     If that makes sense.

[7]     If everything is going to be in the favor

[8] of the injured party, then obviously your goal is

[9] going to be the high, you know, close to the 14-9.

[10]     Q   In this particular case, there was no

[11] question as to liability; correct?

[12]     A   Correct.  My understanding.

[13]     Q   So the only issue were damages, and the

[14] causal relationship between the accident and the

[15] damages?

[16]     A   Correct.

[17]     Q   Okay.

[18]     The -- the date that you used for the

[19] conclusion for the general damages, 12-20-03, appears

[20] to be exactly two years after the date of the loss.

[21]     Is that accurate?

[22]     A   Yes, it is.

[23]     Q   Okay.  To your knowledge, as of 12-20-2003,

[24] had Miss -- Miss Wisinski concluded her medical

[25] treatment?

**Page 112**

[1]     A   I don't remember, offhand.

[2]     Q   Do you recall whether or not Miss Wisinski

[3] had any surgeries during the time from the date of

[4] loss, December 20th, 2001 to December 20th, 2003?

[5]     A   I don't recall specifically.

[6]     Q   It may help you to review the --

[7]     A   Right.

[8]     Q   -- either your notes, or the report of

[9] Dr. German?

[10]     A   If I am understanding my note correctly, it

[11] looks like she had two orthoscopic surgeries.

[12] Orthoscopic surgeries.

[13]     Q   What is your understanding of an

[14] orthoscopic surgery?

[15]     A   Basically, my understanding is, generally,

[16] small incision, basically to look around, or if you

[17] can do a minor repair.

[18]     Q   Do you know whether that's a procedure that

[19] requires general anesthesia?

[20]     A   I don't remember. I'm thinking no, not

[21] necessary.

[22]     I don't remember.

[23]     Q   Do you know whether that's a painful

[24] procedure?

[25]     A   I'm sure with the medication, no.  But,

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

---

Page 113

[1] during the surgery, I would say no, you are not going
[2] to feel it, but, yes, afterwards.
[3]    Q    Okay.
[4]         Do you know whether or not Miss Wisinski
[5] also had injections into her knee?
[6]    A    I don't remember.
[7]         According to my notes, no. I don't know if
[8] that's correct, offhand.
[9]         Do you want me to review this?
[10]   Q    If you would review the report of
[11] Dr. German from, I believe it is March of 2003, that
[12] may aid you in responding to my question.
[13]   A    It does mention a steroid injection,
[14] December '01. I don't know if that was before or
[15] after the accident, by reading this quickly.
[16]        Do you want me to see if there is more,
[17] read further?
[18]   Q    Why don't you review the entire report,
[19] that may aid you in responding to --
[20]   A    Okay.
[21]        She had had a few other injections after
[22] that, April 15, 25th, May 2nd.
[23]   Q    And do you know what type of injections
[24] those are?
[25]   A    The Synvise. No, I do not know those

---

Page 114

[1] specifically.
[2]    Q    Why don't we spell that for the court
[3] reporter.
[4]    A    S-y-n-v-i-s-e.
[5]    Q    Okay.
[6]         Did you do any research to find out what
[7] the nature of that procedure was?
[8]    A    I don't remember specifically.
[9]    Q    If you had done research, would it be noted
[10] in the log?
[11]   A    Probably not in the log notes, no,
[12] unless -- 50/50, depending on what I have learned. I
[13] can't say for sure.
[14]   Q    Okay.
[15]        So during the period that you listed for
[16] the general damages, it appears that Miss Wisinski had
[17] two surgeries, and three sets of injections into her
[18] knees?
[19]   A    Correct.
[20]   Q    Okay.
[21]        Did you attribute any general damages to
[22] any of those five procedures?
[23]   A    Not outside the range of 50 to a hundred
[24] dollars per week, no.
[25]   Q    I want to bring your attention to page 439,

---

Page 115

[1] the last paragraph.
[2]         I'm sorry, the last two paragraphs.
[3]         To the left there is an entry that says,
[4] "LCD Statement."
[5]    A    Yes.
[6]    Q    What does LCD stand for?
[7]    A    Liability, causality, damages.
[8]    Q    Okay.
[9]         The first paragraph reads, "Clear liability
[10] against uninsured motorist for running red light,
[11] causing aggravation injury to preexisting condition,
[12] resulting in treatment that may have been necessary -
[13] even without the accident LCD is strong to mid."
[14]   A    Correct.
[15]   Q    What does that -- what does "LCD is strong
[16] to mid" mean?
[17]   A    That is, we are evaluating it, and again,
[18] that is a little different with an uninsured motorist,
[19] but if -- it's our -- our -- the insurance company's
[20] view on the case.
[21]        We -- we have a strong case, strong to mid
[22] case, or arguments, to what's presented.
[23]        Of course, weak is going to be everything
[24] submitted is related to this auto accident, you know,
[25] we are paying top of our range most likely on this.

---

Page 116

[1]    Q    So when you say strong to mid, what that
[2] means, what that translates to, is that there are
[3] strong arguments against payment of the insured's
[4] claim?
[5]    A    Strong arguments against their arguments of
[6] what they have presented to be accident related.
[7]    Q    And the insured is seeking payment?
[8]    A    Correct.
[9]    Q    So, it would be strong arguments against
[10] payment?
[11]   A    Well, not -- not as much payment, as what
[12] they were looking for, if that's what you mean, yes.
[13]   Q    Okay.
[14]        Now, the next paragraph is, reads,
[15] "Treatment period/General Damages. Insured's
[16] complaints stayed about the same for entire treatment
[17] period. Last date of treatment still complaints.
[18] Gave period of two years. Did not allow a lot of
[19] money per week since this was an aggravation injury."
[20]   A    Correct.
[21]   Q    Okay. Did I read that accurately?
[22]   A    Yes.
[23]   Q    It says, "Gave period of two years."
[24]   A    On my range, which you indicated --
[25]   Q    General damage?

---

Morse Gantverg & Hodge Court Reporters, Inc.       Min-U-Script®

---

Page 117

[1]  A   Right. -- was two years exactly.

[2]  Q   And you also note that as of the last date

[3] of treatment that you had, Ms. Wisinski still had

[4] complaints?

[5]  A   Correct.

[6]  Q   Okay. My question is, is how did you pick

[7] two years?

[8]  A   I probably have to see my treatment

[9] calendar, if you --

[10]  Q   You are referencing a series of pages. I

[11] don't have copies of them --

[12]  A   Right.

[13]  Q   -- but I can show it to you --

[14]  A   Right.

[15]  Q   -- and I can give them to you.

[16]      They are Bates paged 440, 441 and 442?

[17]  A   Correct.

[18]      Okay.

[19]  MR. BUTCHER:   Let me see those.

[20]  A   Okay. Now, what was your question? I'm

[21] sorry.

[22]  Q   My question was, how you selected two years

[23] as the conclusion for the general damages time frame.

[24]  A   Well, the last treatment that we had

[25] records for, again this is not a color copy, so I am

---

Page 118

[1] not positive, but it looks like it might have been

[2] May 5th of '03, there was still indication of pain,

[3] according to my notes, so I extended it out a few

[4] months, and I may have just made it a generic two

[5] years. No. But extended it out from the last

[6] treatment, due to the more pain.

[7]  MR. BUTCHER:   Give those back to him.

[8]  THE WITNESS:   To him?

[9]  MR. BUTCHER:   Yes, give those back.

[10] BY MR. SCIARRINO:

[11]  Q   When you -- when you determined your amount

[12] of dollars per week, for the general damages, did you

[13] assume that the three sets of injections, that we

[14] discussed, were related to the motor vehicle accident?

[15]  A   There was a question on whether it was or

[16] not. And I don't want to say I assumed either way.

[17]  Q   So, you assumed there was -- well, strike

[18] that.

[19]      You did not conclude that it either was or

[20] was not related?

[21]  A   Correct.

[22]  Q   Okay. With regard to your assessment of

[23] dollar damages, did you assume that the left knee

[24] arthroscopy and the right knee arthroscopy were

[25] related to the motor vehicle accident of

---

Page 119

[1] December 20th, 2001?

[2]  A   I would have had a question on right knee,

[3] and I would have assumed left knee was related.

[4]  Q   Okay.

[5]      And when you say you have a question,

[6] meaning you did not assume it either was or was not,

[7] but you assumed the left knee was --

[8]  A   Correct.

[9]  Q   -- related.

[10]      Okay.

[11]      Now, your evaluation was in follow up to

[12] the demand that was made by Attorney Hartman's office?

[13]  A   Yes.

[14]  Q   And what do you recall the dollar demand

[15] being from Hartman's office? And if it would help you

[16] to review the document --

[17]  A   Coverage limits.

[18]  Q   Okay. And what did you understand the

[19] underinsured motorist coverage limit to be?

[20]  A   I'm not sure at that time --

[21]  Q   Let me --

[22]  A   -- if I assumed it was 50 or not.

[23]  Q   Let me direct you to Bates page 444, I am

[24] just going to hand it to you, because it is not

[25] something that has been copied.

---

Page 120

[1]  MR. BUTCHER:   Here.

[2]  Q   There is a highlighted portion, in the

[3] upper right-hand corner.

[4]  A   Okay. All right.

[5]  Q   Does that refresh your recollection, at

[6] all?

[7]  A   It's not my handwriting. And I don't know

[8] what's -- the last sentence is, no -- I don't know

[9] what that is.

[10]  Q   So that does not aid your recollection at

[11] all?

[12]  A   No, that's not mine.

[13]  Q   Okay. Going back to the policy itself --

[14]  A   Yes.

[15]  Q   -- are you able to determine the amount of

[16] coverage of underinsured -- uninsured motorist

[17] coverage, excuse me -- the amount of uninsured

[18] motorist coverage, from reviewing the policy?

[19]  A   I am going to have to say yes, just because

[20] that's the logical answer, but I would have to sit

[21] here and read -- read through the whole thing, to see

[22] if it explains stacking or anything like that, but it

[23] gives you the base coverage of course, and then I can

[24] read through here.

[25]      But, I'm going to have to assume, yes, it

---

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

---

Page 121

[1] does give the full coverages.

[2] **Q**   Okay. Now, on the declarations page -- the
[3] declarations pages start at page 40; correct?

[4] **A**   Yes.

[5] **Q**   Okay.

[6] And, it lists un and underinsured motorist
[7] coverage on the declarations page?

[8] **A**   Yes.

[9] **Q**   And then on page 43 it indicates
[10] endorsements which are applicable?

[11] **A**   Yes.

[12] **Q**   And under the second -- the second
[13] endorsement reads, "Uninsured motorist coverage
[14] (stacked)," and then it gives a form number.

[15] **A**   Correct.

[16] **Q**   Did I read that properly?

[17] **A**   Yes.

[18] **Q**   Now, that would indicate that the coverage
[19] is stacked?

[20] **A**   To me, what's written here would indicate
[21] that it's stacked, but I would have to read through
[22] this again to refresh my memory, but that's what it
[23] looks like.

[24] **Q**   At the time that you determined the
[25] coverage, and made your notations in the log, and in

---

Page 122

[1] the -- on the evaluation form, did you review the
[2] policy?

[3] **A**   I don't remember.

[4] Oh, when I did -- by the time I did the
[5] evaluation form also?

[6] **Q**   Yes.

[7] **A**   Yes, I would have.

[8] **Q**   So at the time you prepared this evaluation
[9] form, your notation that the policy limit was 50/100,
[10] that would be incorrect?

[11] **A**   Not by the way that I -- I -- I wouldn't
[12] say -- it may not be correct, but that's -- I
[13] understand what it means, just as in Kentucky PIP
[14] coverage, I might say PIP coverage is 30, but I also
[15] know that I have to look at how many cars were on the
[16] policy, to see if they actually get more.

[17] So, the fact that I did not write it all
[18] out, I either didn't know, or didn't write it all out.

[19] **Q**   As of today, can you tell me whether or not
[20] you understood there to be stacking on the -- on the
[21] Wisinski policy, at the time you filled out the
[22] evaluation form?

[23] **A**   I can't say for sure that I did, no.

[24] **Q**   Okay. So you don't know what you thought
[25] the limit was at that time?

---

Page 123

[1] **A**   Right.

[2] At -- as I said, it wasn't evaluated close
[3] to it, to where I would have put notations in, and I
[4] understand you say limits doesn't affect your
[5] evaluation, but unless my evaluation is close to the
[6] limits, I am not going to go back up and look at the
[7] limits again, if that makes sense.

[8] **Q**   The demand letter requested the policy
[9] limit.

[10] **A**   Correct.

[11] **Q**   Okay. In order to understand the demand,
[12] would you have to understand what the policy limit
[13] was?

[14] **A**   No. I believe I'd understand it is the
[15] policy limits.

[16] **Q**   So you would have to know what the policy
[17] limit was?

[18] **A**   If I wanted to know a dollar amount, yes.

[19] **Q**   Okay.

[20] And, that was the notation you made, which
[21] is at the top of the litigation evaluation form?

[22] **A**   What is the notation? You said "that is
[23] the notation."

[24] **Q**   The notation of 50/100?

[25] **A**   That's the policy limits shown on the

---

Page 124

[1] policy, when I did the evaluation, correct.

[2] **Q**   Okay.

[3] And that was also what was on the screen;
[4] the screen print that you did for the policy?

[5] **A**   I can't remember what the -- we have gone
[6] to a new system. But the P34.

[7] **Q**   It is actually in the materials?

[8] **A**   I think you gave me that, didn't you?

[9] **Q**   Yes.

[10] **MR. BUTCHER:** Here.

[11] **A**   Yes.

[12] It would have 50/100 on the screen.

[13] **Q**   And when you see 50/100, that's a split
[14] limit?

[15] **A**   Correct.

[16] **Q**   Meaning 50,000 per person, 100,000 per
[17] accident?

[18] **A**   Right.

[19] **Q**   Okay.

[20] And so that we are understanding each
[21] other, what that generally means is, is if there is an
[22] accident, the most any single individual could receive
[23] is 50,000, but if there was more than one individual,
[24] the limit would be a hundred thousand, but again, no
[25] individual could receive more than 50?

---

---

Page 125

[1]   **A**   Correct.

[2]   **Q**   Okay. Have I accurately described that

[3]   coverage?

[4]   **A**   The general, yes.

[5]   **Q**   Okay. So when you see on an insurance

[6]   policy the notation 50/100, that's what it's

[7]   indicating, the split limits?

[8]   **A**   Correct.

[9]   **Q**   Okay.

[10]   Now, I want to bring your attention to a

[11]   document which appears to be an ISO search, which is

[12]   Bates page 323 through 330 -- I'm sorry, 327.

[13]   **MR. SCHERM:** Mr. Sciarrino, I need to

[14]   change the tapes.

[15]   **MR. SCIARRINO:** Okay. Why don't we, this

[16]   is a good point to just pause for a moment.

[17]   **MR. SCHERM:** This concludes tape 1 of the

[18]   deposition of Miss Kelly Bihn, we are off the

[19]   record, the time is 11:55 a.m.

[20]   (Recess taken.)

[21]   **MR. SCHERM:** This begins tape 2 of the

[22]   deposition of Miss Kelly Bihn, we are back on the

[23]   record, the time is 12:21 p.m.

[24]   (Thereupon, Deposition Exhibit No. 13 was

[25]   marked for identification.)

---

Page 126

[1]   **BY MR. SCIARRINO:**

[2]   **Q**   Ma'am, we have taken a break, and we were

[3]   previously talking about a document which appears to

[4]   be an ISO search.

[5]   **A**   Yes.

[6]   **Q**   And that is Bates pages 323 through 327?

[7]   **A**   Yes.

[8]   **Q**   Did you have a chance to review that?

[9]   **A**   Yes.

[10]   **Q**   And is that in fact an ISO search?

[11]   **A**   Yes.

[12]   **Q**   And was that a document that was ordered by

[13]   you?

[14]   **A**   Yes.

[15]   **Q**   And what is an ISO search?

[16]   **A**   It is a system for insurance companies

[17]   to -- they will provide information on an injured

[18]   party into the system, to where you can search to see

[19]   if you have the -- a claim of a same injured party

[20]   from a previous claim.

[21]   **Q**   To see if there were other claims?

[22]   **A**   Right.

[23]   **Q**   Okay. And did you -- when you reviewed

[24]   this, did you notice any other claims by

[25]   Margaret Wisinski, that indicated injuries to her

---

Page 127

[1]   neck, back or knees?

[2]   **A**   What was the date of accident on this one?

[3]   12-01. Yes.

[4]   **Q**   And what was that?

[5]   **A**   There was an accident June 8th of '99,

[6]   Margaret Wisinski sustained a neck injury, neck pain.

[7]   **Q**   And what Bates page is that on, ma'am?

[8]   **A**   324.

[9]   **Q**   Okay.

[10]   And what was the date of that loss?

[11]   **A**   If they have entered it correctly, it looks

[12]   like June 8, '99.

[13]   And then it looks like that's the only

[14]   one. Then they are all for the same accident.

[15]   **Q**   Okay. And then there are references to

[16]   neck, back and knee injuries, but those are relative

[17]   to the accident which you were adjusting, and that

[18]   entry is -- is on page 325?

[19]   **A**   Yes.

[20]   **Q**   Okay. So based upon the ISO search which

[21]   you performed, there was one other reported loss that

[22]   involved a claim of a neck injury?

[23]   **A**   Neck, yes. Yeah.

[24]   **Q**   And that was about a year and a half

[25]   before?

---

Page 128

[1]   **A**   Yes.

[2]   **Q**   Okay.

[3]   Now -- and you had that ISO search

[4]   performed prior to your evaluation of Margaret's

[5]   uninsured motorist claim?

[6]   **A**   Generally, I do, yes. But let me double

[7]   check the date.

[8]   **MR. BUTCHER:** Just -- just, the date's at

[9]   the bottom right of the document, I believe.

[10]   **THE WITNESS:** I am looking at the ISO

[11]   received.

[12]   **MR. BUTCHER:** Oh, okay. Excuse me.

[13]   **THE WITNESS:** It looks like I made the

[14]   entry 10-16-03, if I am reading it correctly,

[15]   that's on page 325.

[16]   **Q**   Okay.

[17]   So that was then back in October, which was

[18]   before you evaluated the claim, which --

[19]   **A**   Yes.

[20]   **Q**   Did you order the ISO search relative to

[21]   your duties in adjusting the wage loss claim, or in

[22]   your duties relative to adjusting the uninsured

[23]   motorist claim, or both?

[24]   **A**   Every injury claim, med pay, PIP, bodily

[25]   injury, UM, every injury claimant is supposed to be

---

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

---

**Page 129**

[1] indexed --

[2]  Q   Okay.

[3]  A   -- by our company standards.

[4]  Q   Well, as of that date, the first party

[5] medical had already been exhausted; correct?

[6]  A   Yes. Because it was exhausted before I got

[7] it in May, yes.

[8]  Q   So, it would have been -- that ISO form

[9] would have been generated relative to either the wage

[10] loss, the uninsured, or both?

[11]  A   It would have been generated, because it

[12] was an injury claim. I'm not sure -- it doesn't have

[13] to be specific to a UM, or wage loss.

[14]  Q   Do you know whether another ISO search was

[15] done, when the first party benefit medical claim was

[16] first presented?

[17]  A   I do see a -- one that was entered, and

[18] this is on page 325, was entered July 17th of '02,

[19] that was entered by American Commerce. It appears

[20] that's the only other one.

[21]  Q   Okay.

[22]      Now, earlier you had -- we had asked you

[23] some questions about the wage loss claim, which was on

[24] the evaluation form. And that's the evaluation form

[25] which is, I believe, 437 through I think 439?

---

**Page 131**

[1] application. That doesn't mean that there isn't one

[2] in there, it just means I don't recall.

[3]      Do you recall in your review seeing one?

[4]  A   I don't recall, but I didn't review the

[5] file, prior to today.

[6]  Q   Okay.

[7]      MR. SCIARRINO:  While we are on the record,

[8] I just would like to ask Mr. Butcher, Joe, I

[9] certainly acknowledge that there is a possibility

[10] that I may have overlooked it, but if you could

[11] check and see if that's been produced, or if that

[12] is someplace else, because I do not recall seeing

[13] it.

[14]      And I will re -- re-review, and if it turns

[15] out I have missed it, I apologize, but if not, I

[16] would like you to check into that.

[17]      MR. BUTCHER:  That's fine, I have added it

[18] to my list.

[19]      MR. SCIARRINO:  Okay.

[20] BY MR. SCIARRINO:

[21]  Q   Other than requesting it from counsel, do

[22] you recall taking any other steps, relative to the

[23] wage loss claim?

[24]  A   No.

[25]  Q   The -- on Bates page 1663 of the log, it

---

**Page 130**

[1]  A   Yes.

[2]  Q   And you had indicated that you did not

[3] assign any sums for wage loss, as you did not feel

[4] that that had been properly documented.

[5]  A   Correct.

[6]  Q   Okay. Did I accurately summarize what you

[7] said?

[8]  A   Yes.

[9]  Q   Okay. What steps did you take to obtain

[10] documentation relative to Miss Wisinski's wage loss?

[11]  A   Requested it several times from her

[12] attorney.

[13]  Q   Did you request an authorization?

[14]  A   A wage authorization from the attorney?

[15]  Q   Either a wage, or a medical authorization,

[16] from the attorney?

[17]  A   I don't believe I did, no.

[18]  Q   Did you -- there would have been an

[19] authorization as part of the first party benefits

[20] file; correct?

[21]  A   Again, I'm not familiar with the

[22] Pennsylvania PIP application, to know for sure. So I

[23] don't know.

[24]  Q   I will confess, in my review of the file, I

[25] do not recall seeing a first party benefits

---

**Page 132**

[1] indicates that the day after your evaluation, the file

[2] was reassigned.

[3]  A   Yes.

[4]  Q   Why -- why was it reassigned; do you know?

[5]  A   It went to a more experienced adjuster, and

[6] that could have been due to the preexisting injury,

[7] somebody with more experience on preexisting, and also

[8] requesting the prior medical records, just somebody

[9] more experienced to review prior records, in relation

[10] to how this accident affected them.

[11]  Q   Did the amount of the demand play any role

[12] in the reassignment, if you know?

[13]  A   I would say no, because generally,

[14] 50 percent of the demand packages we receive have a

[15] policy limit demand, whether the claim is worth 3,000

[16] or actually policy limits.

[17]  Q   The -- you extended an offer, on this file?

[18]  A   Yes.

[19]  Q   And the amount offered was $7,798?

[20]  A   Yes.

[21]  Q   Which was the low end of your range?

[22]  A   Yes.

[23]  Q   And did the plaintiff, through their

[24] counsel, accept that offer?

[25]  A   No.

---

---

**Page 133**

[1] **Q**    And did they advise that they would only
[2] accept the policy limit?

[3] **A**    Yes.

[4] **Q**    Okay.

[5] **A**    In reading that now, that would have been
[6] another reason that it went to a claim rep III, if he
[7] did not negotiate.

[8] **Q**    I'm going to ask about your authority, and
[9] if you have already told me, and I am repeating the
[10] question, I apologize, but was your authority $15,000
[11] at that time?

[12] **A**    I think it was.

[13] **Q**    So, the plaintiff's counsel indicating that
[14] they would not accept anything less than the policy
[15] limit, would have placed that demand above your
[16] authority?

[17] **A**    Yes.

[18] **Q**    Okay.

[19]    Do you know if that was any -- that played
[20] any part in the reassignment?

[21] **A**    The fact that he would not move off of
[22] policy limits, on his demand?

[23]    Yes. It would have.

[24] **Q**    Okay. When you spoke with plaintiff's
[25] counsel, when you extended the offer on, I believe it

---

**Page 134**

[1] was February 2nd, 2004, did you advise counsel what
[2] the policy limits were?

[3] **A**    I don't believe so. It's not noted that I
[4] did.

[5] **Q**    Okay. At that time, did you understand the
[6] policy limit to be $50,000?

[7] **A**    I don't know. I don't remember.

[8] **Q**    Did you note, in the log, what the limit
[9] was?

[10] **A**    When it was first assigned to me?

[11] **Q**    Yes.

[12] **A**    Just what the -- no. Not on the uninsured
[13] motorist, no, I did not.

[14]    **MR. SCIARRINO:** I think we are just about
[15]    done, let me take a moment break just to see if
[16]    Attorney George has anything for me.

[17]    **MR. SCHERM:** We are off the record, the
[18]    time is 12:34 p.m.

[19]    (Discussion off the record.)

[20]    **MR. SCHERM:** We are back on the record, the
[21]    time is 12:35 p.m.

[22] **BY MR. SCIARRINO:**

[23] **Q**    Ma'am, relative to the -- either the wage
[24] loss, or uninsured motorist claim of
[25] Margaret Wisinski, did you at any point request that a

---

**Page 135**

[1] statement under oath be conducted?

[2] **A**    I don't believe I did.

[3] **Q**    Okay. Did you at any point request a
[4] recorded statement?

[5] **A**    I don't believe I did, no.

[6] **Q**    Did you request that a IME be performed?

[7] **A**    No.

[8] **Q**    Is that something you can request?

[9] **A**    My position now, yes.

[10]    Then, it probably would have been over my
[11] authority. I mean, I could have presented it to my
[12] supervisor.

[13] **Q**    So you could have requested it, but you
[14] would have had to request permission through your
[15] supervisor?

[16] **A**    Through the chain, correct.

[17] **Q**    Okay. And did you request that a medical
[18] records review be performed?

[19] **A**    I don't believe I did.

[20] **Q**    Okay.

[21]    **MR. SCIARRINO:** I think that's everything.
[22] Thank you, for your time.

[23]    I don't know, Attorney Butcher may have a
[24] question.

[25]    **MR. BUTCHER:** We will read.

---

**Page 136**

[1]    I have no questions. We will read.

[2]    **MR. SCHERM:** There being no further questions,
[3] this deposition is concluded, we are off the record,
[4] the time is 12:37 p.m.

[5]    - - -

[6]    (Thereupon, at 12:37 o'clock p.m., the
[7] deposition was concluded.)

[8]    - - -

[9]

[10]

[11]

[12]

---

Margaret Wisinski v.
American Commerce, Inc. and et al

Kelly Ann Bihn
August 6, 2008

---

Page 137

[1]
[2]                         SIGNATURE PAGE
[3]
[4]        _____
           Kelly Ann Bihn
[5]
               Subscribed and sworn to before me this
[6]        _____ day of _____, 2008
[7]
[8]        _____
[9]        Notary Public
[10]
                          - - -
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 138

[1]                         CERTIFICATE
[2]  COMMONWEALTH OF PENNSYLVANIA, )
                                   ) SS:
[3]  COUNTY OF ALLEGHENY.          )
[4]        I, Eugene C. Forcier, do hereby certify that
     before me, a Stenographer-Commissioner in and for the
[5]  Commonwealth aforesaid, personally appeared
     KELLY ANN BIHN, who then was by me first duly
[6]  cautioned and sworn to testify the truth, the whole
     truth, and nothing but the truth in the taking of her
[7]  oral deposition in the cause aforesaid; that the
     testimony then given by her as above set forth was by
[8]  me reduced to stenotypy in the presence of said
     witness, and afterwards transcribed by means of
[9]  computer-aided transcription.
[10]       I do further certify that this deposition was
     taken at the time and place in the foregoing caption
[11] specified, and was completed without adjournment.
[12]       I do further certify that I am not a relative,
     counsel or attorney of either party, or otherwise
[13] interested in the event of this action.
[14]       IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Pittsburgh,
[15] Pennsylvania, on this _____ day of _____,
     2008.
[16]
[17]
[18]      _____
          Eugene C. Forcier
          Stenographer-Commissioner
[19]
[20]                      - - -
[21]
[22]
[23]
[24]
[25]

---

Page 139

[1]                    I-N-D-E-X
[2]  EXAMINATION BY:  Mr. Sciarrino - Page 4
[3]  DEPOSITON EXHIBITS:
                                                        PAGE
     1 - Certified Policy                                53
[4]
     2 - Gateway claims handling materials               53
[5]
     3 - Gateway claims handling materials               54
[6]
     4 - Log Notes                                       58
[7]
     5 - Pennsylvania Code 31 PA 146.1                    60
[8]
     6 - Pennsylvania Statute 40 PS 1171.5               62
[9]
     7 - Letter, Andrews to Burden, 6-27-03              82
[10]
     8 - E-mail, Bihn to Murphy, 5-5-03                  86
[11]
     9 - Screen print, Coverage Master Maintenance       87
[12]
     10 - Dr. German report, 3-26-03                     97
[13]
     11 - Letter, Welton to Bihn, 9-23-03                97
[14]
     12 - BI/Litigation/OTA Evaluation Form, 1-30-04    101
[15]
     13 - ISO search                                    125
[16]
[17]
[18]
                          - - -
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

# EXHIBIT W

# In The Matter Of:

*Margaret Wisinski v.*
*American Commerce, Inc. and et al.*

---

*Diane L. Hericks*
*August 6, 2008*

---

*Morse Gantverg & Hodge Court Reporters, Inc.*
*Suite 719, One Bigelow Square*
*Pittsburgh, Pennsylvania  15219*
*1-800-966-4157*

Original File ECF5795.txt, Pages 1-195

**Word Index included with this Min-U-Script®**

This Page Intentionally Left Blank

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008



Page 1

[1]    IN THE UNITED STATES DISTRICT COURT
[2]    FOR THE WESTERN DISTRICT OF PENNSYLVANIA
[3]                      - - -
[4]  MARGARET WISINSKI,              )
                                     )
[5]            Plaintiff,            )
                                     )
[6]       vs.                       )  No. 1:07-CV-346
                                     )
[7]  AMERICAN COMMERCE GROUP, INC. and )
     AMERICAN COMMERCE INSURANCE     )
[8]  COMPANY,                        )
                                     )
[9]            Defendants.           )
[10]                     - - -
[11]       Deposition of DIANE L. HERICKS
[12]         Wednesday, August 6, 2008
[13]                     - - -
[14]     The deposition of DIANE L. HERICKS, called as a
     witness by the plaintiff, pursuant to notice and the
[15]  Federal Rules of Civil Procedure pertaining to the
     taking of depositions, taken before me, the
[16]  undersigned, Eugene C. Forcier, Stenographer
     Commissioner in and for the Commonwealth of
[17]  Pennsylvania, at the Holiday Inn Express, 11160 Dowlin
     Drive, Sharonville, Ohio 45241, commencing at 1:46
[18]  o'clock p.m., the day and date above set forth.
[19]
[20]        COMPUTER-AIDED TRANSCRIPTION BY
              MORSE, GANTVERG & HODGE, INC.
[21]                ERIE, PENNSYLVANIA
                    814-454-6655
[22]
[23]                     - - -
[24]
[25]

Page 2

[1]  APPEARANCES:
[2]    On behalf of the Plaintiff:
[3]         J. Timothy George, Esquire
           2525 West 26th Street, Suite 200
[4]        Erie, Pennsylvania 16506
[5]        Anthony J. Sciarrino, Esquire
           Renaissance Centre
[6]        1001 State Street, Suite 1220
           Erie, Pennsylvania  16501
[7]
     On behalf of the Defendants:
[8]
           Zimmer Kunz, PLLC;
[9]        Joseph F. Butcher, Esquire
           3300 U.S. Steel Tower
[10]       600 Grant Street
           Pittsburgh, Pennsylvania  15219
[11]
[12]                     - - -
     ALSO PRESENT:
[13]
           Dave Scherm, Videographer
[14]
[15]                     - - -
         ALSO RECORDED VIA VIDEOTAPE
[16]
[17]                     - - -
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]    **MR. SCHERM:**  We are on the record, the time
[2]  is 1:46 p.m.
[3]    My name is David Scherm, videographer for
[4]  the firm of Morse, Gantverg & Hodge, located at
[5]  Suite 719, One Bigelow Square, Pittsburgh,
[6]  Pennsylvania 15219.
[7]    The witness at today's deposition is
[8]  Miss Diane Hericks, called as a witness in the
[9]  case captioned Margaret Wisinski versus American
[10]  Commerce Group, et al., in the United States
[11]  District Court for the Western District of
[12]  Pennsylvania.
[13]    Today's deposition is being held at
[14]  11160 Dowlin Drive, Cincinnati, Ohio 45241.
[15]    Today's deposition -- today's date is
[16]  Wednesday, August 6th, 2008.
[17]    Would counsel please introduce themselves.
[18]    **MR. SCIARRINO:**  Tony Sciarrino for the
[19]  plaintiff, Margaret Wisinski.
[20]    **MR. BUTCHER:**  Joseph Butcher on behalf of
[21]  the defendants, the Commerce Group, Inc. and
[22]  American Commerce Insurance Company.
[23]    **MR. SCHERM:**  Would the court reporter
[24]  please introduce himself, and swear the witness.
[25]    **THE REPORTER:**  I am Gene Forcier with

Page 4

[1]  Morse, Gantverg & Hodge, Inc.
[2]    Would you raise your right hand, please.
[3]                     - - -
[4]    DIANE L. HERICKS
[5]  called as a witness by the plaintiff, having been
[6]  first duly sworn, as hereinafter certified, was
[7]  deposed and said as follows:
[8]    **EXAMINATION**
[9]  **BY MR. SCIARRINO:**
[10]    Q    Ma'am, my name is Tony Sciarrino, and I
[11]  represent Margaret Wisinski in this matter, and I am
[12]  going to be asking you some questions here today.
[13]    Before we begin, I would like to set out
[14]  some ground rules, if that's okay with you.
[15]    A    Yes.
[16]    Q    First of all, please be sure to respond
[17]  verbally to all of my questions, because later on,
[18]  when we review the transcript, responses like uh-huh
[19]  and huh-uh, and nods and shakes of the head, will not
[20]  make much sense.
[21]    Okay?
[22]    A    Yes. Okay.
[23]    Q    Also, I'm going to be asking a series of
[24]  questions.  If you don't understand my question,
[25]  please let me know, and I will be happy to restate it,

Page 5

[1] or rephrase it for you.

[2] Okay?

[3] **A** Okay.

[4] **Q** If you don't hear me, let me know, and we

[5] can either repeat it, or have the court reporter read

[6] it back for you.

[7] Okay?

[8] **A** All right.

[9] **Q** If you give a response, we are going to

[10] assume that you heard and understood my question, and

[11] responded to the best of your ability.

[12] Okay?

[13] **A** All right.

[14] **Q** If, during the course of the deposition, in

[15] responding to one of my questions, you are aware of a

[16] document, or series of documents that might aid you in

[17] responding, please let it know -- let me know, and we

[18] will make that available for you.

[19] Okay?

[20] **A** All right.

[21] **Q** If you think -- if you think of an answer

[22] later on in the deposition, if you think of something

[23] that modifies one of your other answers, or you just

[24] recall something else, let us know, and you can -- and

[25] you can respond so that we can have a complete answer.

Page 6

[1] **A** Okay.

[2] **Q** Finally -- pardon me -- this is not

[3] supposed to an endurance test. If you need to take a

[4] break for any reason, or if you need to confer with

[5] counsel, please let me know, and we will take a

[6] break.

[7] Okay?

[8] **A** All right.

[9] **Q** All right.

[10] Can you please state your full name for the

[11] record?

[12] **A** Dianne Leslie Hericks.

[13] **Q** And, ma'am, what is your professional

[14] address?

[15] **A** My professional is 3801 Sharon Park Lane,

[16] Cincinnati, Ohio 45241. That is the American Commerce

[17] Insurance Company.

[18] **Q** And you are employed with American Commerce

[19] Insurance Company?

[20] **A** Yes, I am.

[21] **Q** Okay. And have you ever been deposed

[22] before today?

[23] **A** No, I have not.

[24] **Q** So this is your very first deposition?

[25] **A** Yes, it is.

Page 7

[1] **Q** Okay.

[2] If you could, could you review your

[3] educational background for us?

[4] **A** Well -- well, high school is the last that

[5] I attended as far as school.

[6] I did, when I went to -- out of high

[7] school, I went to Cincinnati -- or, CNA Insurance

[8] Company, and they did send me to a couple of classes,

[9] when I was employed with them.

[10] **Q** What year did you graduate from high

[11] school, ma'am?

[12] **A** 1973.

[13] **Q** Okay. And where did you go to high school?

[14] **A** Mercy High School.

[15] **Q** Is that in the Cincinnati area?

[16] **A** Yes, it is.

[17] **Q** And right out of high school, did you start

[18] working for CNA Insurance?

[19] **A** Yes, I did.

[20] **Q** And where was the CNA office located at;

[21] what city?

[22] **A** That was also Cincinnati.

[23] **Q** And what was your first job with CNA?

[24] **A** I started as a secretary.

[25] **Q** And how long did you work at CNA as a

Page 8

[1] secretary?

[2] **A** Approximately 23 years.

[3] **Q** And so that would take us to about 1996,

[4] give or take?

[5] **A** Yes. Around there.

[6] **Q** Now, while you were at CNA, were you a

[7] secretary for that 23-year period, or did you have

[8] different titles?

[9] **A** I had different titles. I didn't remain a

[10] secretary that long.

[11] **Q** Okay.

[12] **A** Maybe about a year, and then I started to

[13] get into claims handling.

[14] **Q** Okay. Why don't you take me through the

[15] various job positions that you had with CNA, to the

[16] extent that you recall them.

[17] **A** Well, it was starting out as a secretary,

[18] and then I started with, I think what they referred to

[19] as claims processor, where you are beginning with the

[20] smaller claims.

[21] And, from there was claims representative,

[22] I just started handling more and more difficult

[23] claims, as the years went on.

[24] **Q** Okay.

[25] And, were there like various levels of

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

Page 9

[1] claim representative?

[2]　A　I think there was, to be honest with you.

[3] I don't remember what those titles were, but it was

[4] primarily, as I said, I started with the claims

[5] processing position, that was probably a year or two,

[6] and then from there went to a claims rep, and that

[7] again pretty much handling anything, other than

[8] possibly the real serious losses.

[9]　I didn't handle litigation, that was one

[10] thing I did not handle when I was there.

[11]　Q　Now, you left CNA in 1996?

[12]　A　Roughly around there.

[13]　Q　Okay. And where did you go from there?

[14]　A　I went to -- well, it's Indiana Insurance

[15] is what the title of the company was when I left, it

[16] was Commercial Union when I first started.

[17]　Q　When you left CNA, what was your job title

[18] at CNA?

[19]　A　Well, that's what I am saying, I am not

[20] sure.

[21]　I think it was claims representative,

[22] before I went.

[23]　Q　And then you went to Commercial Union, and

[24] what was your position there?

[25]　A　I also started as a claims

Page 10

[1] representative -- a senior -- actually, a senior

[2] adjuster, resident senior adjuster.

[3]　Q　And how long were you employed with

[4] Commercial Union, and its successor company?

[5]　A　Roughly about seven years.

[6]　Q　And when you left, what was your job title?

[7]　A　It was senior resident adjuster.

[8]　Q　And from -- I think you said it was then

[9] called Indiana Insurance?

[10]　A　Yes.

[11]　Q　Okay.

[12]　And when you left there, where did you go

[13] to?

[14]　A　I went to where I am at now, American

[15] Commerce.

[16]　I do want to correct something, now that I

[17] am thinking about it, when you asked me when I left

[18] CNA, I actually was a resident adjuster at that point,

[19] so that could have been my title.

[20]　Q　When you -- with any of the positions that

[21] you took as an adjuster, whether at CNA, Commercial

[22] Union or American Commerce, did you have any

[23] specialized training in adjusting?

[24]　A　Well, I did, what I mentioned before, is

[25] they sent me to a number of classes.

Page 11

[1]　I had undergone a number of correspondence

[2] courses, attended seminars.

[3]　I also took courses in -- I don't know if

[4] you are familiar with IIA, it is an International

[5] Institute of America courses, that they offer through

[6] that, that I completed.

[7]　Q　I know that certain adjusters, you will see

[8] a designation like CCPU, or --

[9]　A　That's what I went for.

[10]　Q　Do you have any such designations?

[11]　A　I was working on the IIA, and I had

[12] completed three of the four, didn't finish the fourth

[13] one, which was property.

[14]　Q　Now, when you went to work for American

[15] Commerce, did they have any specialized training for

[16] you?

[17]　A　I -- no, not really.

[18]　I already pretty much knew how to handle a

[19] claim, and that, so I was very familiar, you know,

[20] with the claims handling process, and the only type of

[21] training that I underwent, when I first came to

[22] American Commerce, was they sat me down and had me

[23] look at a couple of procedure manuals, reviewed a

[24] couple of files.

[25]　The other thing is, the supervisor that I

Page 12

[1] currently have now, is the same supervisor that I had

[2] when I came there, who was Joanne Dorger, and I had

[3] worked with Joanne before, when I was an employee of

[4] CNA, so she was familiar with my work.

[5]　Q　Now, you said that when you started, they

[6] had you review some policy manuals?

[7]　A　Not policy. Procedure manuals.

[8]　Q　Okay. And those would have been just

[9] essentially manuals explaining the way American

[10] Commerce did business, for lack of a better term?

[11]　A　I guess for lack of a better term.

[12]　I -- basically, it is just procedures that

[13] they like you to follow, when you are handling a

[14] claim.

[15]　Q　Now, were those hard copies, or were those

[16] like on line?

[17]　A　No, they were hard copies.

[18]　I don't believe they exist any longer, as

[19] when they went over to the Gateway, they did away with

[20] those manuals.

[21]　Q　Do you know when the Gateway system came

[22] into effect?

[23]　A　I don't, to be honest with you, I can't

[24] recall.

[25]　Q　Were you given any training on the

Page 13

[1] particular American Commerce Insurance Company auto
[2] policy?
[3]   A   No.  It's very similar to the policies I
[4] was working with in the past.
[5]        I -- you know, I definitely pull it out and
[6] review it and read it.
[7]   Q   In your capacity as a -- an adjuster --
[8] strike that.
[9]        What is your current title, at American
[10] Commerce Insurance Company?
[11]   A   Claims representative IV.
[12]   Q   Okay.  During the time that you were
[13] handling the uninsured motorist claim of
[14] Margaret Wisinski, what was your title?
[15]   A   I'm not certain.  It could have been a
[16] claims rep III, or a claims rep IV.
[17]   Q   How many states do you handle claims for?
[18]   A   I guess there is five of them.
[19]   Q   Okay.  And what are those states?
[20]   A   Ohio -- Ohio, Indiana, Kentucky,
[21] West Virginia, Oklahoma.
[22]        There is a few that we used to handle, but
[23] those are the primary ones --
[24]   Q   Okay.
[25]   A   -- we did.

Page 14

[1]   Q   What other ones did you -- did you used to
[2] handle?
[3]   A   Pennsylvania and Tennessee.
[4]   Q   Now, did you --
[5]   A   Wait.  Can I correct myself on that?
[6]   Q   Sure.
[7]   A   I don't know if there is some current
[8] claims out there, but we could possibly, as far as the
[9] office, still be handling, but I, myself, I am not
[10] aware that we have any currently.
[11]   Q   Is it your understanding that American
[12] Commerce no longer actively writes policies in the
[13] State of Pennsylvania?
[14]   A   I'm not certain of that.  I don't
[15] know.  I'm assume -- I think so, but I am not certain
[16] of that.
[17]   Q   Okay.  When you started with American
[18] Commerce, were they writing policies in the
[19] Commonwealth of Pennsylvania?
[20]   A   I don't know for certain.
[21]   Q   Do you recall approximately how many
[22] Pennsylvania claims you handled?
[23]   MR. BUTCHER:  When?  Just when, while she
[24] has been with ACIC --
[25]   THE WITNESS:  I was going to say, I

Page 15

[1] don't --
[2]   Q   Since the time you have been with American
[3] Commerce.
[4]   A   America Commerce?
[5]   MR. BUTCHER:  Thank you.
[6]   A   It would be a very rough guess, if you want
[7] me to guess.
[8]   Q   I mean, are we talking less than ten, less
[9] than --
[10]   A   Possibly less than ten, but I can't say for
[11] certain that that's correct.
[12]   Q   When you were employed with Commercial
[13] Union, did you handle Pennsylvania claims?
[14]   A   I -- I don't -- I can't -- I don't know.  I
[15] am not certain.
[16]   Q   Okay.
[17]   A   I would say possibly I did, but I cannot
[18] say for certain.
[19]   Q   How about CNA?
[20]   A   Same thing.
[21]   Q   Okay.
[22]        In your -- in any of the positions that you
[23] have held with -- with CNA, Commercial Union, or
[24] American Commerce, were you ever given any specific
[25] training on the Pennsylvania Motor Vehicle Financial

Page 16

[1] Responsibility Law?
[2]   A   No.
[3]   Q   Were you ever given any specific training
[4] on the Pennsylvania Unfair Insurance Practices Act?
[5]   A   No.
[6]   Q   There -- the Pennsylvania Unfair Insurance
[7] Practices Act, like many states, is based upon a model
[8] that was from the, I believe the NAIC, the National --
[9] the National Insurance Commissioners Association, I
[10] think I have that right, which prepared a model act,
[11] which a number of states adopted.
[12]        Do you recall whether you were ever trained
[13] on any of the model acts, regarding the unfair
[14] insurance practices?
[15]   A   Not that I can recall.
[16]   Q   Okay.
[17]        Now, in your capacity as a claims
[18] representative III, and claims representative IV, did
[19] you handle first party benefit medical claims?
[20]   A   Yes.
[21]   Q   How about wage loss claims?
[22]   A   Yes.
[23]   Q   How about uninsured and underinsured
[24] motorist claims?
[25]   A   Yes.

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

Page 17

[1] **Q**   Did you handle any property damage claims?

[2] **A**   Yes.

[3] **Q**   Did you handle commercial and personal
[4] lines, or only personal lines?

[5] **A**   Only personal, with American Commerce.

[6] **Q**   Okay.  In your -- with your other
[7] employers, had you handled commercial lines?

[8] **A**   Yes, I have.

[9] **Q**   Okay.  Now, with regards to the position of
[10] claim representative III, and claim representative IV,
[11] what is the distinction between those designations?

[12] **A**   There is not a real large distinction.

[13]      Claim rep IV would be inclined to get more
[14] of the litigation files, though.

[15]      So I was handling litigation cases when I
[16] was a claims rep III, which is that I handled a larger
[17] portion of it.

[18]      Also, if there happened to be -- possibly a
[19] more serious loss, they might be inclined to give it
[20] to me.

[21] **Q**   Was there a difference in the amount of
[22] dollar authority between a claims representative III
[23] and a claims representative IV?

[24] **A**   I don't believe so.

[25]      Well, I shouldn't say.  I don't know.

Page 18

[1]      They -- they were giving me more authority,
[2] I believe, when I was a claims rep III, but to say if
[3] that's something normal they do, I don't know.

[4] **Q**   At present, do you have a authority level
[5] beyond which you have to seek approval to spend the
[6] company's money, as it were?

[7] **A**   Yes, I do.

[8] **Q**   And is there a distension between the
[9] authority to incur expenses, versus settlement
[10] authority?

[11] **A**   Well, there is two different figures that I
[12] am looking at there, yes.

[13] **Q**   Okay.  Let's start with your authority to
[14] incur expenses.

[15]      What is your authority?

[16] **A**   When you -- just file expenses, itself,
[17] correct?

[18] **Q**   Yes.

[19] **A**   That would be 7,500.

[20] **Q**   Did that include cost of counsel?

[21] **A**   Yes, it does.

[22] **Q**   And do you have a dollar limit for
[23] settlement authority?

[24] **A**   Yes.  It is 30,000.

[25] **Q**   Now, the records seem to indicate that you

Page 19

[1] were involved in the Wisinski file from approximately
[2] February of '04 until its conclusion in 2007.

[3] **A**   Yes, I believe so.

[4] **Q**   Were your --

[5] **A**   Going from memory, and looking at that,
[6] yes.

[7] **Q**   Were your authority levels the same at that
[8] time?

[9] **A**   I -- that's what -- I think so.  I am not
[10] certain.

[11]      Again, if it was between me being a claims
[12] rep III, and claims rep IV, I'm not certain.  I would
[13] think it would be.  It wouldn't be much, you know,
[14] difference.

[15] **Q**   Now, as a claims rep III, would -- would
[16] you get litigation claims routinely?

[17] **A**   Yes.

[18] **Q**   Okay.  As a claims rep III, is it part of
[19] your job to properly document the file?

[20] **A**   Yes.

[21] **Q**   With regard to logging, what activities, by
[22] the claims representative, are to be logged?

[23] **A**   Whenever we have conversation on the phone,
[24] or we receive or send correspondence.  Possibly, if we
[25] reviewed a material, we might put that in there.

Page 20

[1] **Q**   What about research?

[2] **A**   Yes.

[3] **Q**   Are -- how about correspondence within the
[4] company; in other words, with other representatives?

[5] **A**   You mean such as like e-mail, or something
[6] like that?

[7] **Q**   Yes.

[8] **A**   Yes, uh-huh.

[9] **Q**   Is it part of your responsibility to be
[10] aware of the liability facts on a particular file?

[11] **A**   Yes.

[12] **Q**   Is it your responsibility to be cognizant
[13] of the medical, or injury facts?

[14] **A**   Yes.

[15] **Q**   Are you -- is it your obligation to
[16] investigate the claim, including obtaining
[17] photographs, documents, reports, police records,
[18] things of that nature?

[19] **A**   Yes.

[20] **Q**   Is it also part of your duties to obtain
[21] medical records, narrative reports, x-rays, operative
[22] reports, things of that nature?

[23] **A**   Yes.

[24] **Q**   Is it part of your job to be conversant
[25] with the rules regarding Social Security and Medicare

Diane L. Hericks
August 6, 2008

Margaret Wisinski v.
American Commerce, Inc. and et al.

Page 21

[1] liens?

[2]   **A**   General knowledge, yes.

[3]   **Q**   Okay. Is there a specialist, if you have

[4] questions, within the company, that you can ask

[5] Medicare lien or Social Security lien questions?

[6]   **A**   Not that I am aware of.

[7]   **Q**   Is it part of your job to supervise defense

[8] counsel?

[9]   **A**   No.

[10]   When you refer to supervising, I don't --

[11]   **Q**   Well, to review their -- to review their

[12] work?

[13]   **A**   Okay.

[14]   Yes, I review it, yes.

[15]   **Q**   Do you have to approve defense counsel

[16] taking actions, such as scheduling depositions?

[17]   **A**   Not necessarily all the time.

[18]   I -- we do have numerous discussions and

[19] conversations in regards to it, but I don't know if I

[20] have to say that he has to get permission from me.

[21]   **Q**   Do you have to approve the litigation

[22] budget?

[23]   **A**   If there is a certain amount, yes.

[24]   **Q**   Okay. And what's that amount?

[25]   **A**   Well, for the office, it's 10,000. If

Page 22

[1] that's what you are asking me.

[2]   Mine is over 75, I go to my manager.

[3]   **Q**   Is it part of your responsibility, as a

[4] claims representative, to make determinations

[5] regarding which policy coverages apply, and the amount

[6] of those coverages available to an insured?

[7]   **A**   Yes.

[8]   **Q**   Is it your obligation to advise the

[9] insureds as to the coverages available to them, and

[10] the amount of coverages available --

[11]   **A**   No.

[12]   **Q**   -- the amount of coverage limit?

[13]   **A**   To -- I'm not quite certain how to answer

[14] that question.

[15]   If they inquire about the information, I

[16] would say yes, you would.

[17]   You don't necessarily feel this obligation

[18] to discuss that with them in extensive -- now, I

[19] should say, when a claim is first made, you do kind of

[20] cover some of the things that are available, yes.

[21]   **Q**   If an insured presents a first party

[22] benefit, a medical claim --

[23]   **A**   Uh-huh.

[24]   **Q**   -- do you have an obligation to tell them

[25] that yes, they have first party benefit --

Page 23

[1]   **A**   Sure, yeah.

[2]   **Q**   -- medical coverage, and "You have a limit

[3] of X amount of dollars"?

[4]   **A**   Yes.

[5]   **Q**   Okay. Would that apply also to wage loss?

[6]   **A**   Yes.

[7]   **Q**   And would that also apply --

[8]   **A**   Usually if they inquire, yes, uh-huh.

[9]   **Q**   Does that also apply to un and underinsured

[10] motorist coverage?

[11]   **A**   Yes.

[12]   **Q**   You indicated that when you started, you

[13] were given some binders with policy -- with procedure

[14] manuals?

[15]   **A**   Yes.

[16]   **Q**   Okay.

[17]   Do you still maintain those?

[18]   **A**   No.

[19]   **Q**   You indicated that there is a Gateway

[20] program, I believe?

[21]   **A**   Yes, uh-huh.

[22]   **Q**   Is that where the procedure manuals are

[23] currently housed?

[24]   **A**   I don't know what material they used for

[25] the manuals on the Gateway, I don't know what

Page 24

[1] information they took from there.

[2]   I am not involved with that, I don't know.

[3]   **Q**   Okay.

[4]   My question is, is when you have a question

[5] regarding American Commerce's procedures, do you go to

[6] the Gateway system --

[7]   **A**   Oh, okay.

[8]   **Q**   -- to answer those questions?

[9]   **A**   Sometimes yes, uh-huh.

[10]   I mean, that is a reference guide, you

[11] know.

[12]   **Q**   Okay. Where else would you go, other than

[13] to Gateway?

[14]   **A**   If I had questions?

[15]   **Q**   Yes.

[16]   **A**   Depending on the type of question I had, I

[17] might consult counsel, or the manager, or something of

[18] that nature.

[19]   **Q**   Okay. I am talking about specifically

[20] about claim handling procedures.

[21]   **A**   Oh, procedures. Yes. I would say that.

[22]   **Q**   How many people work in your office?

[23]   **A**   Oh, gosh.

[24]   This is going to be a guess. I am going to

[25] say around 20, 25.

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

Page 25

[1]  **Q**   Now, your immediate supervisor is
[2]  Joanne Dorger?
[3]  **A**   Correct.
[4]  **Q**   And who does Miss Dorger respond to, who is
[5]  her supervisor?
[6]  **A**   The regional manager, who is Marty Baxter,
[7]  or Martin Baxter.
[8]  **MR. BUTCHER:** And just to clarify, for
[9]  currently; correct?
[10]  **MR. SCIARRINO:** Yes.
[11]  **MR. BUTCHER:** Okay.
[12]  **A**   Uh-huh.
[13]  **Q**   At the time of the Margaret Wisinski file,
[14]  who would have been the supervisor of Miss Dorger?
[15]  **A**   Martin Baxter. The manager.
[16]  **Q**   Okay.
[17]  During the whole of that time?
[18]  **A**   No. We do have examining, that we report
[19]  to. I don't --
[20]  **Q**   Well, I saw references to a Mr. Seese in
[21]  your file.
[22]  **A**   Oh, okay. I'm -- that's -- okay. That --
[23]  I was incorrect, that it isn't Martin -- it wasn't
[24]  Martin Baxter, at that time, it was Bob Seese, he was
[25]  the manager.

Page 26

[1]  **Q**   Okay. Do you know when Mr. Seese left?
[2]  **A**   No, I don't.
[3]  **Q**   Okay. Do you know whether Mr. Seese
[4]  continues to be an employee of American Commerce?
[5]  **A**   I don't believe he is, no.
[6]  **Q**   Okay. Do you know whether he is still in
[7]  the Cincinnati area?
[8]  **A**   That, I don't.
[9]  **Q**   Do you know where he is employed?
[10]  **A**   No, I don't.
[11]  **Q**   Is Mr. Baxter -- his office at the
[12]  same -- in the same location as yours?
[13]  **A**   Yes.
[14]  **Q**   Who would be Mr. Baxter's supervisor; who
[15]  would he respond to?
[16]  **A**   I don't know that.
[17]  It would be someone from our main office,
[18]  which is in Webster, Massachusetts.
[19]  **Q**   Okay.
[20]  So, would it then be fair for me to say
[21]  that whether it was Mr. Seese at the time, or
[22]  Mr. Baxter currently, the highest level of
[23]  management -- they were the highest level of
[24]  management for American Commerce in your office here
[25]  in Cincinnati?

Page 27

[1]  **A**   Correct.
[2]  Probably. I -- I -- I don't know if
[3]  Mr. Baxter would have been involved in that case. If
[4]  Mr. Seese was the manager, he would not have been.
[5]  **Q**   And I apologize, you may have told me this,
[6]  what would be the title of Mr. Seese or Mr. Baxter?
[7]  **A**   Regional claims manager.
[8]  **Q**   Do you know how big the region is?
[9]  **A**   I don't.
[10]  **Q**   You have indicated that you have handled
[11]  claims, and you gave me a list of states, Ohio,
[12]  Indiana, Kentucky, West Virginia, Oklahoma, those are
[13]  the ones active at this time.
[14]  Is that your region?
[15]  **A**   Yes. Pretty much.
[16]  **Q**   Okay.
[17]  Do you know whether American Commerce
[18]  Insurance Company has any other offices that handle
[19]  claims in Ohio, Indiana, Kentucky, West Virginia and
[20]  Oklahoma?
[21]  **A**   I don't believe so.
[22]  But I am not certain, I can't say for
[23]  certain now it is.
[24]  We had some other offices, but they are in
[25]  different regions, so I don't know if they would be

Page 28

[1]  handling a case in these states.
[2]  **Q**   Are you aware of there being any other
[3]  American Commerce Insurance Company offices in the
[4]  State of Ohio?
[5]  **A**   Not in Ohio, no.
[6]  **Q**   Okay. Do you know where the next closest
[7]  office is?
[8]  **A**   No, I don't. I don't know that.
[9]  **Q**   You know the headquarters is in
[10]  Massachusetts?
[11]  **A**   Yes, right, uh-huh.
[12]  **Q**   Okay. Is -- and if you don't know, I'm
[13]  just trying to get an understanding of the company, do
[14]  you know whether American Commerce, or its parent,
[15]  does business nationwide?
[16]  **A**   I don't.
[17]  **Q**   At your office in -- here in Cincinnati, do
[18]  you receive any periodicals that would be related to
[19]  the insurance industry; you know, like trade
[20]  magazines?
[21]  **A**   Not that I am aware of.
[22]  **Q**   Does American Commerce send out a
[23]  newsletter of any type, to its employees?
[24]  **A**   They do.
[25]  **Q**   Okay. Do you know what it's titled?

Diane L. Hericks
August 6, 2008

Margaret Wisinski v.
American Commerce, Inc. and et al.

---

**Page 29**

[1] **A**   No, I don't.

[2] **Q**   Do you read it?

[3] **A**   No.  No, not necessarily.

[4]   I don't -- I mean, I have, I might have,

[5] but I don't know, it is not one of those things that

[6] we see often.

[7] **Q**   Do you know whether the newsletter contains

[8] any materials regarding claims handling?

[9] **A**   I can look up.

[10] **Q**   Other than the procedures set forth in the

[11] Gateway program, are you aware of there being any

[12] other set of written procedures, or claim handling

[13] guidelines?

[14] **A**   Not that I am aware of, no.

[15] **Q**   If you have questions regarding claims

[16] handling practices and procedures, and you can't

[17] answer it by reviewing the Gateway program, who do you

[18] go to?

[19] **A**   Normally my superiors, or if I am working

[20] on a case involving litigation, I might sometimes

[21] consult with the attorney that is working the file.

[22] **Q**   When you say your superiors, you are

[23] identifying essentially Miss Dorger and Mr. Baxter?

[24] **A**   Whoever is available.

[25]   Well, then, also examining.

---

**Page 30**

[1] **Q**   Okay.

[2] **A**   If they get involved, the main office.

[3] **Q**   Do you know what triggers a main office

[4] examination?

[5] **A**   Usually, if the reserve is set over 50,000.

[6] **Q**   Okay.  And what's the role of the examiner,

[7] when the reserve is set over 50,000?

[8] **A**   Basically, review the case, and give their

[9] insight on it, and also somewhat supervise -- you

[10] know, supervise the file.

[11] **Q**   From a management chart, you know,

[12] organizational chart, is the examiner considered to be

[13] a higher level of management, than the regional claims

[14] manager?

[15] **A**   Yes.

[16] **Q**   Okay.

[17]   Does the regional claims manager have to

[18] review every claim that's reserved above $50,000?

[19] **A**   Yes.

[20] **Q**   So, now, was that above 50, or 50 and up?

[21] **A**   Above 50.

[22] **Q**   So if it's --

[23] **A**   50, they don't have to.

[24] **Q**   They don't have to?

[25] **A**   Yeah.

---

**Page 31**

[1] **Q**   But if it's $50,001, then they have to?

[2] **A**   Yes.

[3] **Q**   Okay.

[4]   Now -- pardon me.  So when a claim gets

[5] reserved, say, at a hundred thousand dollars --

[6] **A**   Uh-huh.

[7] **Q**   -- that means the adjuster is involved in

[8] the claim, their manager is involved in the claim --

[9] **A**   To a degree.

[10] **Q**   Okay.

[11] **A**   Usually, when it gets to examining, they

[12] are pretty much following the case.

[13] **Q**   Okay.  -- the regional claims manager, is

[14] reviewing the claim, and the examiner is reviewing the

[15] claim?

[16] **A**   I -- no, I'm not certain of that.  I can't

[17] really say for certain.

[18]   I -- I believe the primary party that is

[19] following the case, would be the examiner at that

[20] point.

[21]   But I -- I --

[22] **Q**   Other people are supposed to be at least

[23] involved?

[24] **A**   That's what I say, I don't know when you

[25] say supposed.

---

**Page 32**

[1]   I know the supervisor is usually on diary,

[2] to kind of monitoring the case, and -- but I don't

[3] know about the manager.  I don't think he is

[4] necessarily on diary.  I think that would be by

[5] choice.

[6] **Q**   So there is at least three individuals,

[7] potentially four, who are involved in handling the

[8] claim?

[9] **A**   Right.  Or watching it, possibly.

[10] **Q**   Okay.

[11] **A**   I am not saying that's an absolute thing,

[12] I am just saying, it's possible some of those may be

[13] by choice.

[14] **Q**   Are you aware of American Commerce having

[15] any in-house medical resources, and by that I mean

[16] individuals such as nurses, or doctors, to whom you

[17] can bring medical questions, or issues to?

[18] **A**   Not that I am aware of.  Not at our office

[19] in Cincinnati.

[20] **Q**   Okay.

[21]   And, because you are handling claims for a

[22] certain region, you have to go outside of your region

[23] if there is going to be something like that; correct?

[24] **A**   If there is someone, yes.

[25] **Q**   Okay.

---

Min-U-Script®

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

**Page 33**

[1]     Are there any house counsel available to
[2] answer legal questions?
[3]     **A**   No.
[4]     **Q**   So if you have a question regarding a
[5] medical issue, someone has an injury, and you are not
[6] familiar with that particular injury --
[7]     **A**   Uh-huh.
[8]     **Q**   -- how would you -- how would you go about
[9] learning; would you have to do your own research,
[10] would you be able to contact someone; how would you
[11] educate yourself?
[12]     **A**   I have done my own research, or will get
[13] information from a doctor, such as like an independent
[14] medical exam.
[15]     They also have had medical reviews done
[16] before, without the exams.
[17]     **Q**   By that you mean, like a document review?
[18]     **A**   Yes, correct.
[19]     **Q**   What about if you have legal questions, if
[20] you have a question of -- question regarding the law
[21] in a particular state, how do you find out the answer?
[22]     **A**   Contact one of our counsel.
[23]     **Q**   Now, you said you had expense authority up
[24] to $7,500.
[25]     Does that mean you can contact counsel, and

---

**Page 34**

[1] have counsel do research, or answer questions, as long
[2] as the expense is not going to be above $7,500?
[3]     **A**   Yes.
[4]     **Q**   If there is going to be expenses above
[5] $7,500, you have to get approval?
[6]     **A**   Yes.
[7]     **Q**   And who do you have to get approval from?
[8]     **A**   Well, that again depends.  I go to the
[9] manager, up to 10,000.
[10]     **Q**   If there is going to be expenses above
[11] 10,000, who has to approve it?
[12]     **A**   That would be the examining office.
[13]     **Q**   Pardon me.
[14]     So, I want to make sure I am understanding
[15] this.
[16]     Okay.
[17]     **Q**   If there is going to be a reserve above
[18] $50,000, home office examiners are going to be
[19] supervising the file?
[20]     **A**   I don't know if supervising is the word.
[21] They do follow the file, yes.  And we do report to
[22] them, and they give us authority on certain things,
[23] yes.
[24]     **Q**   Okay.
[25]     And if there is going to be expenses above

---

**Page 35**

[1] $10,000, then home office examiners are going to be
[2] involved in the file, authorizing those expenses?
[3]     **A**   Correct.
[4]     **Q**   So there is -- those are two separate and
[5] distinct ways that home office can become involved in
[6] the file?
[7]     **A**   Yes.
[8]     **Q**   Are there any types of injuries that home
[9] office always wants to be involved in?
[10]     **A**   Yes, there is.
[11]     **Q**   What are those?
[12]     **A**   Very serious injuries, like brain injuries.
[13] A lot of times, if you have a fairly serious injury,
[14] it is going to go over 50 anyway, so they are going to
[15] be pretty much involved in it.
[16]     **Q**   Are there any types of claims, by that I
[17] mean, does home office always want to be involved in
[18] underinsured or uninsured motorist claims, or other
[19] types of, and specific coverage claims?
[20]     **A**   Not that I am aware of.
[21]     **Q**   Okay.
[22]     Is it part of your job as a claims
[23] representative, to be -- to have an understanding of
[24] the tort law for the various states in which you
[25] handle claims?

---

**Page 36**

[1]     **A**   Yes.  To a certain degree.
[2]     **Q**   Okay.
[3]     Is it also part of your job to be
[4] knowledgeable regarding the statutes of a particular
[5] state that you are doing, handling claims, such as,
[6] say, the Motor Vehicle Code?
[7]     **A**   Well, again, to a certain -- to a certain
[8] degree, you have to be aware of them, yes.
[9]     **Q**   From time to time, laws in states change,
[10] insurance regulations change, case law evolves, and
[11] changes the way tort law is seen.
[12]     How does American Commerce get that
[13] information to claims representatives, like yourself?
[14]     **A**   I -- I don't know how they provide that
[15] information.
[16]     I -- I sometimes will have attorneys come
[17] in on occasion, and they will have seminars, that
[18] provide up-to-date information.  And a lot of times
[19] attorneys will be provided to us, too, for counsel.
[20] Now, how they exactly go about it, I don't know.
[21]     **Q**   In your experience in handling claims, have
[22] you ever been to -- ever had counsel come in to talk
[23] to you about Pennsylvania law?
[24]     **A**   No.
[25]     **Q**   Have you ever had like a memo, from either

---

Page 37

[1] an attorney, or from American Commerce, advising you
[2] about changes in the law?
[3]     A    I don't recall that.
[4]     Q    If you received something like that, would
[5] that be something you would want to keep?
[6]     A    Yes.
[7]     Q    Do you receive --
[8]     A    Well, possibly, yes.
[9]     Q    Do you keep any -- do you have like a
[10] binder, or a folder or something where you keep memos
[11] from the company, that you might want to refer back
[12] to?
[13]     A    Some.  I -- it depends on what kind of
[14] memo, or information it is.
[15]     Q    If there is a memo regarding claims
[16] handling, would that be something you would keep?
[17]     A    No.
[18]     Q    If there were memos, or information
[19] regarding changes in the law, would that be something
[20] you would keep?
[21]     A    Possibly.
[22]     Q    In anticipation of your deposition here
[23] today, what documents did you review?
[24]     A    The file material, and the adjuster notes.
[25]     Q    When you say "the file material," do you

Page 38

[1] mean all of the correspondence?
[2]     A    I kind of glanced through it, yes, I
[3] reviewed some of it.
[4]     Q    Did you read the medical records?
[5]     A    Not in detail, no.
[6]     Q    Did you review the log notes?
[7]     A    Yes.
[8]     Q    Okay.
[9]           Is there anything else that you reviewed,
[10] that I failed to mention?
[11]     A    Whatever was in the file.
[12]           I was given the binders, and went through
[13] it, and reviewed it.
[14]     Q    How many binders did you look through?
[15]     A    Two.  I think.  I think the medicals are
[16] split up between that and the -- some of the
[17] correspondence.
[18]     Q    Did you review any claims manuals, or
[19] on-line material?
[20]     A    No.
[21]     Q    Did you review any -- any legal materials,
[22] meaning any statutes, regulations, things of that
[23] nature?
[24]     A    No.
[25]           You are talking about the preparation for

Page 39

[1] this deposition?
[2]     No.
[3]     Q    Obviously you met with Attorney Butcher.
[4]           Other than Attorney Butcher, did you meet
[5] with any other individuals?
[6]     A    No.
[7]     Q    Did you have phone conferences, or exchange
[8] e-mails with any other individuals, relative to this
[9] lawsuit?
[10]     A    No.
[11]     Q    Pardon me.
[12]           We have already marked certain documents as
[13] exhibits in the previous deposition, and so most of
[14] those documents are there in front of you.
[15]     A    There.  Okay.
[16]     Q    I am going to be asking you some questions
[17] about some of those, and then some additional
[18] documents, and it might not necessarily be in order.
[19]     A    Okay.
[20]     Q    And if you notice, on the bottom right of
[21] most of the documents, there is a little Bates stamp,
[22] so I will try to make it as easy as possible by
[23] referring to either exhibits numbers, or Bates
[24] stamps.
[25]           Okay?

Page 40

[1]     A    Okay.
[2]     Q    The first exhibit is the -- is a certified
[3] copy of the American Commerce Insurance policy for
[4] Margaret Wisinski?
[5]     A    Uh-huh.
[6]     Q    Are you familiar with that document?
[7]     A    Yes, I am.
[8]     Q    Okay.
[9]           Now, do you have a form policy for
[10] Pennsylvania available to you?
[11]     A    Do you mean, if we don't -- if we don't
[12] actually request the policy itself, you mean?
[13]     Q    Right.
[14]     A    The only way that we would, is if we
[15] happened to keep a copy of one that we printed off.
[16]     Q    Do you request the copy of the policy, on
[17] most claims?
[18]     A    Now I don't, because I -- most of the time,
[19] when I get a file, I am -- I am already -- somebody
[20] has already previously done it, so I don't all the
[21] time.
[22]           Well, I should say, again, it depends.  It
[23] depends.
[24]     Q    Okay.
[25]     A    Sometimes we will go ahead and provide one

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

**Page 41**

[1] to counsel, too, when it goes into litigation.

[2]  Q    Okay.  When you order a copy, certified

[3] copy of the policy, why are you doing that; what's the

[4] purpose of ordering the certified copy of the policy?

[5]  A    To provide to an attorney, if they request

[6] it, and also to our counsel.

[7]        That's the only two primary things that I

[8] can think of, why we would request a certified copy,

[9] unless there was a question of coverage, then you

[10] would request one, too.

[11]  Q    How do you determine what coverages are

[12] available to an insured, under a particular policy?

[13]  A    There is information in our system.

[14]        Look.

[15]  Q    Yes, there is a little bug flying around.

[16]        Is that available electronically?

[17]  A    Yes, sir.

[18]  Q    And you can access that, and see what

[19] coverages are available?

[20]  A    Correct.  Now -- yes.  I was going to say

[21] no.  Again it depends on the coverage, but you can.

[22]  Q    And various states have different

[23] endorsements on their policies.

[24]        Do you keep copies of the various state

[25] endorsements?

**Page 42**

[1]  A    A lot of them I do.

[2]  Q    Okay.  At the time that you were handling

[3] the case of Margaret Wisinski, do you know whether you

[4] maintained a copy of the endorsements for the

[5] Pennsylvania policy?

[6]  A    I don't recall.

[7]        I -- I believe at one point in the file,

[8] and this is from me reviewing it, I did have to

[9] request some information.  I don't know what I had.

[10]  Q    Okay.

[11]        And I may have asked you this previously,

[12] and if I did, I apologize, you can handle a variety of

[13] different claims on a particular policy, meaning, you

[14] can handle the medical, the wage, the un and

[15] underinsured, other things, all under the same policy?

[16]  A    I am not quite certain what you mean by

[17] "can".

[18]        The office does have certain departments,

[19] currently, set up to where one unit would handle the

[20] property damage, so I don't handle property damage any

[21] longer.

[22]        Med pay, I do on occasion.

[23]        Wage.

[24]  Q    Is there --

[25]  A    Liability.

**Page 43**

[1]  Q    Is there any requirement, that you --

[2] within American Commerce, that the same person who

[3] handles the first party medical, not handle the un or

[4] underinsured motorist coverage?

[5]  A    I don't know.  I am not certain.

[6]        You are saying that, do they split up the

[7] med pay and the UM and UIM?

[8]  Q    Yes.

[9]  A    I am not certain.  I do not believe so.  I

[10] am not certain of that.

[11]  Q    Uninsured motorist and underinsured

[12] motorist, are first party benefits?

[13]  A    Right.

[14]  Q    And, wage loss is a first party benefit?

[15]  A    Yes.

[16]  Q    And medical is a first party benefit?

[17]  A    Yes.

[18]  Q    Okay.  And it would be possible for someone

[19] to handle all of those first party benefits claims,

[20] all on the same -- all for the same person, under the

[21] same policy?

[22]  A    Correct.

[23]  Q    And an adjuster who is handling one of

[24] those claims, will have access to all of the material

[25] that's put in?

**Page 44**

[1]        In other words --

[2]  A    Can another adjuster review somebody else's

[3] notes?

[4]  Q    Right.

[5]  A    Yes.

[6]  Q    You understood my question, better than I

[7] understood my question.

[8]        When you are handling a first party

[9] benefits claim, do you have an obligation to be honest

[10] and candid with the insured?

[11]  A    Yes.

[12]  Q    Do you have an obligation to be honest and

[13] candid with the insured's counsel?

[14]  A    Yes.

[15]  Q    Do you have an obligation to place the

[16] interests of the insured on equal footing with the

[17] interests of American Commerce?

[18]  A    Yes.

[19]  Q    Do you have an obligation to promptly

[20] respond to inquiries from either the claimant, or

[21] claimant's counsel?

[22]  A    Yes.

[23]  Q    Now, when handling Pennsylvania claims, do

[24] you have an understanding as to whether American

[25] Commerce Insurance Company was obligated to follow the

Page 45

[1] Pennsylvania insurance regulations?

[2] **A** I would assume so.

[3] **Q** Okay. Would you assume that in any state

[4] where American Commerce handles claims, they are going

[5] to have to follow the laws of that state?

[6] **A** Yes.

[7] **Q** So whether Tennessee, or Pennsylvania, or

[8] Oklahoma, or wherever, if you are handling claims in

[9] that state, you are following their laws?

[10] **A** Yes. I am not a lawyer, but, yes, my

[11] understanding is generally, yes. Generally, yes.

[12] **Q** Okay.

[13] **MR. SCIARRINO:** Let me see the exhibit --

[14] do you have an exhibit list, Tim?

[15] **MR. GEORGE:** I do.

[16] **THE WITNESS:** Do you want to see mine?

[17] **MR. SCIARRINO:** No, we have a list over

[18] here, I just want to make sure.

[19] **THE WITNESS:** Okay.

[20] **MR. GEORGE:** I think the next one is 14.

[21] **MR. SCIARRINO:** I am going back to some of

[22] the other ones.

[23] **MR. GEORGE:** Yes, sure.

[24] **BY MR. SCIARRINO:**

[25] **Q** I would like you to look at what's

Page 46

[1] Exhibit 2.

[2] Now, that document was provided as part of

[3] the discovery process by counsel, and that was in

[4] response to our request for claims manual materials.

[5] There were some additional materials that were

[6] provided today, but I just want to ask you some

[7] questions about these materials that we received.

[8] **A** Okay.

[9] **Q** On page 1675 --

[10] **A** I am not sure where you are getting at

[11] those numbers.

[12] **MR. BUTCHER:** There is a --

[13] **THE WITNESS:** Are they out of order?

[14] **MR. BUTCHER:** No.

[15] **THE WITNESS:** They look like they are out

[16] of --

[17] **MR. BUTCHER:** I'm sorry. Mechanics --

[18] **MR. SCIARRINO:** They got juxtaposed.

[19] **MR. BUTCHER:** Yeah.

[20] **Q** On page 1675, on the materials there is an

[21] area that has an indication, and has the Commonwealth

[22] of Pennsylvania, and at the top of the page it says,

[23] "unfair Claims Settlement Practices - Regulations

[24] continued."

[25] **A** Uh-huh.

Page 47

[1] **Q** And I am going to represent to you that

[2] this was provided, and that we were advised that this

[3] came from the Gateway system.

[4] **A** Okay.

[5] **Q** Does that look familiar to you, in any way?

[6] **A** No, it doesn't.

[7] **Q** Okay. If this material would be on the

[8] Gateway system, would this be something that you would

[9] have access to?

[10] **A** I would assume so, yes.

[11] **Q** So if you had any questions about the

[12] Pennsylvania rules and regulations regarding unfair

[13] claims settlement practices, you could go to this and

[14] find out what the appropriate Pennsylvania regulations

[15] were, so that you could review them?

[16] **A** Possibly. I am not familiar with this, so

[17] I don't know how to exactly answer your question.

[18] As far as looking this information up?

[19] **Q** Right.

[20] **A** Yes. Uh-huh.

[21] **Q** Now, do you from time to time ever review

[22] regulations for any of the states in which you handle

[23] claims?

[24] **A** No. I mean, not something that I normally

[25] do.

Page 48

[1] **Q** Okay. Have you ever done it, that you can

[2] recall?

[3] **A** With the unfair claims settlement practice?

[4] **Q** Yes.

[5] **A** No, not that I can recall, offhand.

[6] **Q** I think you indicated that you do not

[7] recall ever having been trained relative to the unfair

[8] claims settlement practices, or the unfair -- or the

[9] UIPA, Unfair Insurance Practices Act.

[10] **A** Well, I am not saying I haven't been,

[11] because we are talking over 35 years of claims

[12] handling, I don't recall right offhand, though.

[13] Nothing with -- that I can remember, with American

[14] Commerce.

[15] **Q** I'm going to bring your attention to what

[16] is Exhibit 5, which is part of the Pennsylvania

[17] Code. Which is in that material.

[18] **A** Here.

[19] Pennsylvania Administrative Code.

[20] **Q** Right.

[21] **A** Okay.

[22] **Q** I would like you to turn to -- there is

[23] code sections, there is a Section 146.4. It's a

[24] couple of pages in.

[25] **A** Okay.

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

Page 49

[1] **Q** And I am going to ask you to read the
[2] section (a) to yourself, and I am going to read it
[3] into the record.
[4] "Section 146.4, Misrepresentation of policy
[5] provisions.
[6] "(a) An insurer or agent may not fail to
[7] fully disclose to first party claimants pertinent
[8] benefits, coverages or other provisions of an
[9] insurance policy or insurance contract under which a
[10] claim is presented."
[11] **A** Uh-huh. Okay.
[12] **Q** Did I read that properly?
[13] **A** Yes, you did.
[14] **Q** Do you have an understanding that this code
[15] section would be applicable to American Commerce
[16] Insurance Company?
[17] **A** Yes, I do.
[18] **Q** And would you understand that to mean, that
[19] American Insurance -- American Commerce Insurance
[20] Company must fully disclose to all first party
[21] claimants, the applicable benefits, coverages or
[22] provisions of an insurance policy?
[23] **A** Yes.
[24] **Q** All right.
[25] I would like you to go down to letter (e).

Page 50

[1] **A** Okay.
[2] **Q** And that is Section 146.4(e), and then (e)
[3] reads, "An insurer may not request a first party
[4] claimant to sign a release that extends beyond the
[5] subject matter that gave rise to the claim payment."
[6] **A** Okay.
[7] **Q** Okay.
[8] And do you understand that to be applicable
[9] to American Commerce Insurance Company?
[10] **A** Yes.
[11] **Q** So, and do you understand that to mean that
[12] you cannot seek a release for a benefit other than the
[13] benefit paid?
[14] **A** Yes.
[15] **Q** And those would be provisions that would
[16] apply to all first party benefits in the Commonwealth
[17] of Pennsylvania?
[18] **A** Yes, based on this code, yes.
[19] **Q** Okay.
[20] Do you have an understanding as to the
[21] reserving policy and philosophy of American Commerce
[22] Insurance Company?
[23] **A** Yes, I do.
[24] **Q** And what is the philosophy, as you
[25] understand it?

Page 51

[1] **A** We set the reserve up based on the injuries
[2] and damages that the injured party is claiming,
[3] without any reduction of comparative negligence, or
[4] any arguments concerning damages.
[5] **Q** And did that apply to wage loss claims?
[6] **A** Yeah.
[7] Well, I don't know exactly what you mean by
[8] that, but I mean if -- yes, if they were -- you would
[9] possibly set the reserve up, if they were claiming
[10] that total amount of meds.
[11] **Q** Let me ask the question this way:
[12] **A** Okay.
[13] **Q** When a coverage -- when a claim is made on
[14] a coverage --
[15] **A** Uh-huh.
[16] **Q** -- does a reserve need to be set?
[17] **A** Yes.
[18] **Q** So if someone says, "I was hurt, and I have
[19] medical bills," that triggers the setting up of a
[20] reserve --
[21] **A** Right.
[22] **Q** -- under the first party medical benefit?
[23] **A** Right.
[24] **Q** Similarly, if someone contacts -- an
[25] insured contacts American Commerce and says, "I was

Page 52

[1] hurt, and I missed work, and I lost wages," that would
[2] trigger the opening of a -- of that policy coverage,
[3] and the reserve being set?
[4] **A** Yes.
[5] **Q** Okay.
[6] Are the rules regarding reserving
[7] philosophy the same for wage loss, first party medical
[8] benefit, and UI/UIM?
[9] **A** I would think so, yes.
[10] You don't -- well, let me clarify that.
[11] I -- you don't -- with first party
[12] benefits, you are not necessarily applying comparative
[13] negligence, and things of that sort, but you would set
[14] the reserve up on what you feel you might potentially
[15] have to pay out, or pay out.
[16] **Q** Now, as part of your role as a claims
[17] representative, you handle first party medical
[18] benefits. What are the guidelines for payment of
[19] first party medical benefits?
[20] **A** When you have sufficient -- you are talking
[21] about when -- when you have sufficient documentation,
[22] and to evaluate or, again, depending on what you have,
[23] if it's just a straight first party medical case, when
[24] they provide the sufficient documentation, and then we
[25] would consider it, make a payment, or injury, again,

Page 53

[1] that might depend on the investigation that you are
[2] doing.
[3]    **Q**   I want to just talk about the first party
[4] medical benefits --
[5]    **A**   Just medical.
[6]    **Q**   -- claims only.
[7]    **A**   Okay.
[8]    **Q**   Just for a moment.
[9]    **A**   Okay.
[10]    **Q**   I want to talk about those, just focus in
[11] on them.
[12]        Okay?
[13]    **A**   All right.
[14]    **Q**   Are there any rules regarding what triggers
[15] payment; in other words, what criteria have to be met,
[16] when a medical bill is sent in to America Commerce, to
[17] get that bill paid?
[18]    **A**   The individual would send the bill in, we
[19] might request for an authorization, so we can gather
[20] proper documentation to consider that bill, and when
[21] the sufficient documentation is provided to consider
[22] it, then we will pay it.
[23]    **Q**   What do you want to see out of that
[24] documentation, what does that documentation have to
[25] show?

Page 54

[1]    **A**   That it was something that was suffered in
[2] the accident, and was reasonable.
[3]    **Q**   Okay.
[4]    **A**   Necessary.
[5]    **Q**   So what we are looking for, is:  Does that
[6] medical bill represent treatment that was related to
[7] the motor vehicle accident, and is the charge
[8] reasonable and necessary?
[9]    **A**   Correct.
[10]    **Q**   Did I say that right?
[11]    **A**   Yes, uh-huh.
[12]    **Q**   So that's sort of a two-pronged test?
[13]    **A**   Yes.
[14]    **Q**   Okay.
[15]    **A**   All right.
[16]    **Q**   That's what they teach us to say in law
[17] school.  There is two components.
[18]    **A**   Yes.
[19]    **Q**   You have to meet both?
[20]    **A**   Yes.  Usually.
[21]    **Q**   And when both are met, then it is paid?
[22]    **A**   I would say yes.
[23]    **Q**   Okay.
[24]        Now, on this particular case, I'm going to
[25] ask you to bring your attention to what is Exhibit 4,

Page 55

[1] which is the log notes.
[2]        Now, you have reviewed that in anticipation
[3] of your deposition today; correct?
[4]    **A**   Yes.
[5]        Not in great detail, but yes, I went
[6] through it.
[7]    **Q**   Okay.  And based upon my review, it appears
[8] that your first entry on the file was March 29th,
[9] 2004.
[10]    **A**   Correct.
[11]    **Q**   Okay.  And it looks like on February 3rd,
[12] 2004, there was an indication that the file was
[13] reassigned to you.
[14]    **A**   Yes.
[15]    **Q**   And we are looking at Bates page 1664.
[16]    **A**   I don't -- oh, okay.  This one is cut off.
[17] Okay.
[18]    **Q**   Now, by the way, there is an LSNODGR.  Who
[19] is that?  At line --
[20]    **A**   I don't know.  You know, I don't.  I think
[21] that was one of our clerical.
[22]    **Q**   Now, when a file is reassigned to you, from
[23] another adjuster --
[24]    **A**   Uh-huh.
[25]    **Q**   -- let's first talk about the mechanics of

Page 56

[1] it.  What physically happens?  Does somebody grab the
[2] physical file, and take it over and give it to you?
[3]    **A**   No.
[4]        But I can't tell you exactly all what, the
[5] process that it goes through.
[6]        I think -- I would be guessing.  I don't
[7] know.
[8]        I know they bring it to the supervisor's
[9] attention, but now, how that all goes about, I don't
[10] know, before it gets to me.
[11]    **Q**   Now, when there are physical documents, how
[12] do those -- those are ultimately delivered to you;
[13] correct?
[14]    **A**   What type of documents are you referring
[15] to?
[16]    **Q**   Oh, medical records --
[17]    **A**   They come through --
[18]    **Q**   -- accident reports.
[19]    **A**   -- the mail, yes.
[20]    **Q**   I am asking if the file is reassigned from
[21] other adjusters?
[22]    **A**   Oh, meds first.
[23]        Yes, depending on what's reassigned to me,
[24] they will start providing the information to me.
[25]    **Q**   Are the records that have already been

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

**Page 57**

[1] gathered by American Commerce, given to you as well?

[2] **A**   Yes.

[3] **Q**   So you --

[4] **A**   The file is transferred to me.

[5] **Q**   So you get the file?

[6] **A**   Yes, I do.

[7] **Q**   Electronically, does anything have to

[8] happen?  Do you have to somehow be entered into the

[9] system, so that you can work onto the -- work or make

[10] log entries on that file?

[11] **A**   I don't have to be electronically entered

[12] in, but they do change the adjuster codes and

[13] information, and they will make this entry here.

[14] **Q**   Now, are you prompted by the computer

[15] system, in any way, like if there is not an entry

[16] every so often, does the computer say --

[17] **A**   No.

[18] **Q**   -- come up and say, "no entry for X number

[19] of days," or anything like that?

[20] **A**   Other than the diary, that we follow.

[21] **Q**   Okay.  Is the diary automatic, or is it

[22] something that you have to follow?

[23] **A**   That's something we have to follow.

[24] **Q**   And, what, are there diary rules, like how

[25] often there have to be entries?

---

**Page 58**

[1] **A**   I don't know of any strict rules, no.

[2] **Q**   Are there any guidelines?

[3] **A**   I think it's within reason.  I don't know.

[4] I mean, it could be 30, 60 days, I don't know for

[5] certain.

[6]   I think it all depends upon the claim,

[7] also, how long you are going to keep a diary.

[8]   I generally like to try to do 30, 60 days,

[9] again, depending on the type of claim.

[10] **Q**   When you say "keep a diary," do you then

[11] have to make an entry into the system, and does the

[12] system then prompt you --

[13] **A**   We will get a readout, occasionally, once a

[14] week, on our current diary notes.

[15] **Q**   How many files do you have at any given

[16] time, on average?

[17] **A**   That varies.

[18]   On average, I would say around 100 -- I

[19] shouldn't say files, it is features is what we go

[20] by.

[21] **A** feature could be any type of claim that

[22] is set up on a particular file, so for example one

[23] feature would be a med pay feature, another feature

[24] might be a UM feature, another one could be a

[25] collision feature, so my total features that I handle

---

**Page 59**

[1] is around -- roughly around 130, 135, in that area.

[2] **Q**   Okay.  And those might -- some of those

[3] might be one file that has multiple features open?

[4] **A**   Right.  Right.  Correct.

[5] **Q**   Okay.  I understand.

[6]   When you get transferred a file that's been

[7] handled by another adjuster, and it gets transferred

[8] over to you, is there any -- what's the first thing

[9] you have to do?

[10] **A**   That would still again depend upon what

[11] type of case it is.

[12] **Q**   Well, do you review the file?  Do you

[13] review --

[14] **A**   I review the file.  I was going to say

[15] generally you review the file, look at past entries

[16] that were made, get yourself up to date on the case,

[17] and if there is anything further from there, then you

[18] would go at that point.

[19] **Q**   Let's break down reviewing the file.

[20] **A**   Uh-huh.

[21] **Q**   Would reviewing the file include reviewing

[22] the log notes?

[23] **A**   Yes.

[24] **Q**   Okay.

[25]   Would that be the first -- the very first

---

**Page 60**

[1] thing you would do?

[2] **A**   No, not necessarily.  I might start

[3] reviewing the file first.

[4] **Q**   And when you say "reviewing the file," now

[5] we are talking about the documents?

[6] **A**   Yes.  When I get the -- right, when I get

[7] the documents.

[8] **Q**   And that's the physical file that would

[9] have correspondence, records?

[10] **A**   Correct.

[11] **Q**   A variety of things?

[12] **A**   Correct.

[13] **Q**   Okay.

[14]   So, would you also confirm coverage?

[15] **A**   Not if it had already indicated that the

[16] coverage was confirmed.

[17] **Q**   Okay.  So if another adjuster had confirmed

[18] coverage, you would not go back and re-visit that

[19] subject?

[20] **A**   Not necessarily, no.

[21] **Q**   Okay.

[22] **A**   I don't see any reason why I would need to.

[23] **Q**   Do you -- do you review the computer

[24] screen, that has the coverages?

[25] **A**   Not if it's already entered in the adjuster

---

Page 61

[1] notes, I don't necessarily.
[2]  **Q**   Now, do you review the reserve?
[3]  **A**   Yes.
[4]      **MR. BUTCHER:** Tony, we have been going
[5] about and hour and 15 minutes.
[6]      **MR. SCIARRINO:** I was just going to say, we
[7] are at 3:00, do you want to take a --
[8]      **MR. BUTCHER:** Five minute break.
[9]      **MR. SCIARRINO:** -- a couple of minute
[10] break.
[11]      **THE WITNESS:** Okay.
[12]      **MR. SCIARRINO:** Okay. This is a good time
[13] to stop.
[14]      **MR. SCHERM:** We are off the record, the
[15] time is 2:57 p.m.
[16]      (Recess taken.)
[17]      **MR. SCHERM:** We are back on the record, the
[18] time is 3:16 p.m.
[19] **BY MR. SCIARRINO:**
[20]  **Q**   Miss Hericks, we took a break, and went off
[21] the record for a moment, and we are back.
[22]      And I will confess, I lost track of the
[23] entry.
[24]      We had -- we were discussing the -- you had
[25] initially, your first entry on the claim was

Page 62

[1] March 29th, 2004?
[2]  **A**   Yes.
[3]  **Q**   And, you did your initial review?
[4]  **A**   Yes.
[5]  **Q**   Do you recall whether or not you reviewed
[6] the documents in the file, as well as the log notes?
[7]  **A**   To say for certain, no, I can't say for
[8] certain. More than likely I did.
[9]  **Q**   In reviewing your notes, are you able to
[10] tell?
[11]  **A**   I -- I can't say for certain.
[12]      As I said, I normally do, but I can't say
[13] for certain.
[14]  **Q**   Okay.
[15]      The next day, on --
[16]  **A**   Oh -- no. I mean, more than likely I did,
[17] because I do see, now reading on here, I indicate
[18] there was a lot of documentation that was not
[19] presented, so I would assume so.
[20]  **Q**   On March 30th, 2004, you have an entry that
[21] was made, and you indicate at line 398, "considering
[22] worst case scenario I recommend we increase the
[23] reserve to the full 50,000 UM limit"?
[24]  **A**   Uh-huh. Yes.
[25]  **Q**   So at that point, it was your understanding

Page 63

[1] that the uninsured motorist policy limit, for the
[2] Margaret Wisinski claim, was $50,000?
[3]  **A**   Yes.
[4]  **Q**   And that was in fact erroneous; correct?
[5]  **A**   It was found out later on it was not
[6] correct, yes.
[7]  **Q**   In fact, the under -- uninsured motorist
[8] limit, on this policy, was $50,000 -- was $100,000;
[9] correct?
[10]  **A**   With the stacking, yes.
[11]  **Q**   Okay. And, that would be information that
[12] would be available, if you review the policy; correct?
[13]  **A**   Yes.
[14]  **Q**   Okay.
[15]  **A**   Well -- yes. Somewhat, yes.
[16]      Because I think there was -- if I remember
[17] this case, there was a question of an endorsement that
[18] was in the policy, if you base the stacking on the
[19] individual, or the insured, or the vehicle.
[20]  **Q**   Okay. Are you aware that in the
[21] Commonwealth of Pennsylvania, it is based upon the
[22] number of vehicles?
[23]  **A**   Yes, I am.
[24]  **Q**   Okay. Were you aware of that at the time?
[25]  **A**   No.

Page 64

[1]  **Q**   Okay.
[2]  **A**   Not necessarily, no.
[3]  **Q**   You are aware that that would be something
[4] that would be contained in the Pennsylvania Motor
[5] Vehicle Financial Responsibility Law?
[6]  **A**   Yes, I would say so.
[7]  **Q**   Okay.
[8]      And the Motor Vehicle Financial
[9] Responsibility Law, for the Commonwealth of
[10] Pennsylvania, would apply to all policies issued in
[11] the Commonwealth of Pennsylvania; correct?
[12]  **A**   Yes.
[13]  **Q**   Okay. And, the policy did note that there
[14] was an endorsement which provided stacked coverage?
[15]      If you want to -- if you want to refer to
[16] the policy, that might help you in answering that
[17] question.
[18]  **A**   Are you talking, in the policy itself?
[19]  **Q**   Yes.
[20]  **A**   If you look at the policy, yes, you can see
[21] that there is an endorsement in there, if that's what
[22] you are asking me, yes.
[23]  **Q**   And the endorsement -- endorsement
[24] indicates stacked --
[25]  **A**   Coverage.

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

Page 65

[1]  **Q**  -- uninsured motorist coverage?

[2]  **A**  Uh-huh.

[3]  **Q**  And there were two cars on that policy?

[4]  **A**  Yes.

[5]  **Q**  And so that would double the coverage?

[6]  **A**  Again, I am not clear on that endorsement,

[7]  I am not certain.

[8]  I thought the wording in the endorsement

[9]  indicated possibly per person, instead of per vehicle,

[10]  but my understanding is later on, with counsel

[11]  involved, that that was something that's cleared up.

[12]  **Q**  Okay.

[13]  **A**  That it should be per vehicle.

[14]  **Q**  And as a claims representative, it's your

[15]  obligation to be familiar with the rules and laws of

[16]  the various states in which you handle claims?

[17]  **A**  Yes.

[18]  **Q**  Now, in that same entry, there is at line

[19]  400 an entry that begins with the initials POA?

[20]  **A**  Yes.

[21]  **Q**  Does that stand for plan of action?

[22]  **A**  Yes.

[23]  **Q**  And it says, "Re-eval Miss Wisinski's

[24]  injury when her medical history received - may

[25]  consider getting a professional review"?

Page 66

[1]  **A**  Yes.

[2]  **Q**  Now, when you made that entry, were you

[3]  referring to a records review, or a defense medical

[4]  examination?

[5]  **A**  Could have been either one, depending on

[6]  what type of documentation I would get in.

[7]  **Q**  Okay. And in response to your entry of

[8]  March 30th, 2004, your supervisor, Miss Dorger,

[9]  authorized the reserve increase to $50,000?

[10]  **A**  Yes. According to here, uh-huh.

[11]  **Q**  And that was required, because that was

[12]  above your individual authority?

[13]  **A**  Correct.

[14]  **Q**  Now, in reviewing the Margaret Wisinski

[15]  uninsured motorist claim, can we agree that there was

[16]  no liability question in this case?

[17]  **A**  Yes.

[18]  **Q**  And for the purposes of your analysis, you

[19]  assumed 100 percent liability on the part of the tort

[20]  feasor, whose name was Kowalski?

[21]  **A**  When you refer to the analysis, the

[22]  evaluation that I did?

[23]  **Q**  Yes.

[24]  **A**  Yes, uh-huh.

[25]  **Q**  And Mr. Kowalski, I believe at the time you

Page 67

[1]  assumed the file, had already passed on?

[2]  **A**  Yes.

[3]  **Q**  Now, I want to bring your attention to an

[4]  entry on page 1666.

[5]  You know what, strike that, I want to go

[6]  back. I apologize. I want to go back in time.

[7]  When you reviewed the file, you indicated

[8]  that you would have reviewed the log.

[9]  **A**  These notes?

[10]  **Q**  Yes. These log notes?

[11]  **A**  Yes, uh-huh.

[12]  **Q**  And on page 1659, there was an entry by

[13]  Kelly Bihn.

[14]  **A**  Yes.

[15]  **Q**  And at line 205, there is an entry that

[16]  says, "insured filed bankruptcy."

[17]  **A**  Okay.

[18]  **Q**  So when you reviewed this file, when you

[19]  initially got the file, you would have been aware that

[20]  Miss Wisinski was in bankruptcy?

[21]  **A**  Possibly, if I read the note, yes.

[22]  **Q**  Okay.

[23]  **A**  I can't say I read this -- these notes,

[24]  word for word.

[25]  **Q**  Well, you would be reading to look for

Page 68

[1]  important facts; correct?

[2]  **A**  I would have been looking through it, yes.

[3]  **Q**  Okay.

[4]  **A**  I say if I caught that, I am not certain.

[5]  **Q**  And this is a first party benefits claim,

[6]  for wage loss, and uninsured motorist claims; right?

[7]  **A**  Yes. Well -- yes.

[8]  **Q**  Okay. And the insured was in bankruptcy,

[9]  and was making a claim for wage loss, along with

[10]  personal injuries, under uninsured motorist coverage;

[11]  correct?

[12]  **A**  I -- yes, I guess.

[13]  As I said, I am not certain if I read this

[14]  note, per se, at that point, or if I was definitely

[15]  aware of that at the time.

[16]  **Q**  Well, I am just asking you if knowing that

[17]  the insured was in bankruptcy, would be an important

[18]  fact that you would want to know?

[19]  **A**  Oh. Possibly, yes.

[20]  **Q**  Now, also in your review, you would have

[21]  noticed that Miss Wisinski had had knee surgeries, and

[22]  that those -- the medical billings for those knee

[23]  surgeries, at least in part, had been paid by American

[24]  Commerce?

[25]  **A**  Yes. I believe there was something

Page 69

[1] mentioned in there by my colleague, yes.
[2] Q   And that was mentioned in the log?
[3] A   Yes, as I said, I possibly would have read
[4] that, yes.
[5] Q   And that would be, again, information that
[6] would be available to you?
[7] A   Yes.
[8] Q   And that would be important information,
[9] that you would want to know about?
[10] A   Yes.
[11] Q   Okay.
[12]     Now, going back to where we were, at page
[13] 1666.
[14] A   Okay.
[15] Q   There is an entry at line 457.
[16] A   Okay.
[17] Q   Okay.
[18]     And, that was a -- an entry that you had
[19] received notice from CMS Mutual/Benefit -- I'm sorry,
[20] CMS/Mutual of Omaha, regarding Medicare benefits?
[21] A   Yes.
[22] Q   So that was a lien notice letter?
[23] A   Yes.
[24] Q   And that exists to put you on notice that
[25] there is -- that CMS/Mutual of Omaha is making a claim

Page 70

[1] for part of his Wisinski's benefits?
[2] A   Correct.
[3] Q   And is that an important fact?
[4] A   Yes.
[5] Q   And, I think we have that letter.
[6]     Don't worry about it, moving on.
[7]     At that point, you would have been aware
[8] that there had been billings and charges for medical
[9] care that had been paid by Medicare?
[10] A   Correct.
[11] Q   And that now Medicare was seeking
[12] reimbursement?
[13] A   Yes.
[14] Q   And you would also be aware that that would
[15] be a element of special damages?
[16] A   Possibly.
[17] Q   Okay.
[18]     I'm not saying they are necessarily all
[19] related, no. I am saying it is something you would
[20] take into consideration, yes.
[21] Q   Okay. Just so that we are understanding
[22] each other, for something to be considered as a
[23] special damage, it has to be related to the accident?
[24] A   Yes.
[25] Q   Correct?

Page 71

[1]     But, Medicare was putting you on notice
[2] that they were taking a position that they had paid
[3] bills that were related to the accident?
[4] A   Okay.
[5] Q   Okay.
[6]     Now, I want to move forward in time, to
[7] page 1667.
[8]     MR. BUTCHER: The copy where we redacted
[9] the reserve amounts, and then under that, the way
[10] copies are prepared, and since we have already
[11] unredacted them, I am permitting her to see the
[12] unredacted copy. That's all.
[13]     MR. SCIARRINO: Okay.
[14] BY MR. SCIARRINO:
[15] Q   There is an entry at page -- I'm sorry, at
[16] line 482, that's dated December 9th, 2005.
[17] A   I see it.
[18] Q   And that's an entry that was made by you?
[19] A   Yes, it is.
[20] Q   And it indicates that you received a letter
[21] from Miss Wisinski, and it also along with that letter
[22] had a report from her orthopedic surgeon, Dr. Steele.
[23] A   Yes.
[24] Q   And you summarized the content of the
[25] letter and Dr. Steele's report in that entry?

Page 72

[1] A   Probably, yes.
[2]     MR. SCIARRINO: And can I have a copy of
[3] that. The Margaret Wisinski letter, with
[4] Dr. Steele's report.
[5]     (Thereupon, Deposition Exhibit No. 14 was
[6] marked for identification.)
[7] BY MR. SCIARRINO:
[8] Q   Okay.
[9]     Do you recall receiving that letter?
[10] A   Not -- no, not -- I mean, just by knowing
[11] it's here, yes.
[12] Q   Well, having looked at it now --
[13] A   I am sure I read it, yes.
[14] Q   -- does this refresh your recollection in
[15] light of the log note?
[16] A   Yes. I mean, the fact that I received it,
[17] probably, yes.
[18] Q   Now, in that letter, Miss Wisinski made
[19] a -- a demand for the $50,000 policy limit.
[20] A   Yes.
[21] Q   Okay. And, she also attached a report of
[22] Dr. Steele?
[23] A   Yes.
[24] Q   Now, based upon that letter, did you
[25] conclude Miss Wisinski believed her policy limit to be

**Page 73**

[1] $50,000?

[2] **A** Yes.

[3] **Q** Okay. And, that would be incorrect?

[4] **A** We later learned, yes.

[5] **Q** Okay. Did you correct her?

[6] **A** No, because of at the time I believed it

[7] was 50,000 also.

[8] **Q** When you received that letter, did you take

[9] any steps to confirm the policy coverages?

[10] **A** No. Because I had no indication there was

[11] a question, with her own attorney indicating that they

[12] thought it was 50,000, too.

[13] **Q** Do you rely on opposing counsel --

[14] **A** No, I'm just saying that they had a

[15] certified copy of the policy, and they had indicated,

[16] along with our adjuster, so I had no reason to believe

[17] there was a question with regards to that, to check

[18] it.

[19] **Q** Okay. So, you believed that it was $50,000

[20] based upon what had already been entered into the log

[21] by the prior adjuster, and by the assertions of --

[22] **A** Her counsel.

[23] **Q** -- her counsel?

[24] **A** Yes.

[25] **Q** You did not ever independently verify that?

**Page 74**

[1] **A** No. As I said, I didn't have any reason to

[2] believe there was a question.

[3] **Q** Did you review the narrative report from

[4] Dr. Steele?

[5] **A** Yes.

[6] **Q** Okay.

[7] Now, after reviewing the narrative report

[8] of Dr. Steele, you decided that you were going to

[9] increase the offer on this file?

[10] **A** Not on the letter of Dr. Steele, I believe

[11] that was on the prior evaluation that Kelly Bihn had

[12] done.

[13] **Q** Well --

[14] **A** I was just making an offer in attempt to

[15] continue to negotiate with her to try to solve the

[16] case.

[17] **Q** Let me back up.

[18] **A** Okay.

[19] **Q** When you took over the file, there was a

[20] standing offer of $7,798.

[21] **A** Okay.

[22] **Q** You received a letter from

[23] Margaret Wisinski --

[24] **A** Uh-huh.

[25] **Q** -- requesting the policy limit, and you

**Page 75**

[1] received a narrative attached to that letter From

[2] Dr. Steele.

[3] **A** Yes.

[4] **Q** You reviewed the letter and Dr. Steele's

[5] report?

[6] **A** I did.

[7] **Q** Okay.

[8] And then, that same day, if you look at

[9] line 512 and 513 --

[10] **A** Uh-huh.

[11] **Q** -- you increased the offer by $1,002.

[12] **A** Yes. But it wasn't based on necessarily

[13] the information that she provided from Dr. Steele.

[14] In that letter and offer, that -- I guess

[15] it was a letter, I am pretty sure it was a letter that

[16] I sent to her, is that I had informed her that we

[17] still needed additional information to further

[18] consider her claim, and the offer was sent based on

[19] the prior information that was given to us.

[20] **Q** So -- and I don't want to put words in your

[21] mouth -- what you are saying is that the narrative

[22] report from Dr. Steele did not change your evaluation

[23] in any way, and that you merely increased the offer by

[24] a thousand and two dollars, based upon the prior

[25] information?

**Page 76**

[1] **A** Because there was still a question, if any

[2] of the knee, continuing knee problems, was related to

[3] the accident.

[4] **Q** Would it be fair for me to characterize

[5] American Commerce's position during the time that you

[6] handled the file, that American Commerce did not

[7] accept that Miss Wisinski's knee replacement surgeries

[8] were accelerated by the motor vehicle accident of

[9] December 20th, 2001?

[10] **A** I can't speak for what the other adjusters

[11] were thinking.

[12] I -- you know, I -- I believe -- based

[13] again on the information that I had seen in the file

[14] prior to me getting assigned this, we needed

[15] sufficient additional documentation to make that

[16] decision, so I don't think that decision was made.

[17] **Q** I'm asking about the time you handled the

[18] file.

[19] **A** At the time I was reassigned it, I still

[20] needed additional documentation to make a decision.

[21] **Q** Okay.

[22] From the time you -- that you received the

[23] file --

[24] **A** Uh-huh.

[25] **Q** -- until the time that the file was

---

**Page 77**

[1] closed --

[2] **A**   Yes.

[3] **Q**   -- was it American Commerce's position that

[4] Miss Wisinski's knee replacement surgeries were not

[5] accelerated by the motor vehicle accident of

[6] December 20th, 2001?

[7] **A**   It was never a definite decision one way or

[8] the other.

[9]       I guess what I am saying is, I don't

[10] believe at the point when we closed this file out, it

[11] was clear that the acceleration was accident related.

[12] **Q**   Okay.

[13] **A**   If that's what you are saying, yes.

[14] **Q**   So -- and again, I am not trying to put

[15] words in your mouth --

[16] **A**   Yeah.

[17] **Q**   -- I am trying to understand your position.

[18]       Your position was --

[19] **A**   It was still questionable, if that's what

[20] you are saying.

[21] **Q**   -- that you neither accepted nor denied, it

[22] was related?

[23] **A**   Well, it was still very questionable, yes.

[24] **Q**   Shortly after your $9,000 offer, you

[25] received correspondence from Attorney George

---

**Page 78**

[1] indicating that he had accepted Miss Wisinski as a

[2] client, and that he was pursuing a claim; that he was

[3] seeking the policy limit of $50,000, and that he was

[4] demanding arbitration.

[5]       He had also filed suit in the Court of

[6] Common Pleas.

[7]       Do you recall that?

[8] **A**   Yes.

[9] **Q**   There is an entry on page 1667 by a BSEESE?

[10] **A**   Bob Seese.

[11] **Q**   Okay.

[12]       It says, "Notice of suit received, logged

[13] and given to supv."

[14] **A**   Supervisor.

[15] **Q**   Okay.

[16]       Now, is suit against the -- is suit against

[17] the American Commerce Insurance Company, a reason to

[18] involve the claims manager?

[19] **A**   Not necessarily.

[20] **Q**   Do you know why Mr. Seese was involved in

[21] this?

[22] **A**   Not for certain, no.

[23]       It's possible that maybe it came in the

[24] mail, and a clerk would have showed it to him.

[25] **Q**   Now, on December -- on page 1668, there is

---

**Page 79**

[1] an entry on December 28th, 2005.  It says, "We have no

[2] counsel close to where this suit was filed.  Sent

[3] e-mail to SShiner for defense

[4] recommendations/approval."

[5] **A**   Uh-huh.

[6] **Q**   Who is SShiner, S-h-i-n-e-r?

[7] **A**   Steve Shiner.  He is an examiner in home

[8] office.

[9] **Q**   Okay.

[10]       Was he the home office examiner on this

[11] particular file?

[12] **A**   No, I don't believe so.  I don't think he

[13] was involved in it at this point, until we got notice

[14] of the suit.

[15]       He did a lot of our examinings, so I think

[16] that's why we contacted him.

[17] **Q**   And did he make a recommendation?

[18] **A**   He did.

[19]       If I could clarify that, the reason, one of

[20] the reasons why we called examining, is if a attorney

[21] is not within a two-hour range to -- they like us to

[22] consult, that would be assigned to it.

[23] **Q**   Is that for cost reasons?

[24] **A**   Possibly, yes.

[25] **Q**   Okay.

---

**Page 80**

[1] **A**   That among other reasons, I am assuming

[2] that, one of the reasons.

[3] **Q**   Because the attorney is going to charge for

[4] travel?

[5] **A**   Yes.

[6] **Q**   Okay.

[7]       Now, the -- later that day, it indicates at

[8] line 526, that you spoke with Attorney Godshall?

[9] **A**   Yes.

[10] **Q**   Attorney George had requested that this

[11] case be arbitrated.

[12]       Was that your understanding?

[13] **A**   Yes.

[14] **Q**   What was -- strike that.

[15]       Was there a reason why you did not want to

[16] arbitrate this case?

[17] **A**   Because of the causality issue, and just

[18] prefer a jury of ten to 12 making a verdict decision,

[19] rather than a panel of three arbitrators.

[20] **Q**   Is there a reason why you prefer a jury of

[21] ten to 12, as opposed to a panel of three arbitrators?

[22] **A**   Well, it is just not a straightforward

[23] case, and possibly some more information would come

[24] out with a jury, and more people to make a decision on

[25] that.

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

Page 81

[1] **Q** Does American Commerce have any guidelines
[2] regarding when the file should be arbitrated, and when
[3] a file should be jury trial?
[4] **A** Possibly, yes.
[5] **Q** Did you review any of the guidelines?
[6] **A** As far as I -- I did see it once, yes, sir,
[7] a couple of times, yes.
[8] **Q** Are there any advantages to arbitrating a
[9] file?
[10] **A** I would imagine there is, yes.
[11] **Q** Are the costs associated with arbitration
[12] generally lower than those associated with jury
[13] trials?
[14] **MR. BUTCHER:** Objection.
[15] **THE WITNESS:** I was going to say I don't
[16] know.
[17] **MR. BUTCHER:** Wait. Objection. I believe
[18] that calls for speculation, but go ahead and
[19] answer.
[20] **A** As I say, I don't know, I have no idea. --
[21] **Q** Have you handled any cases, as a -- in your
[22] capacity in American Commerce, where they were
[23] arbitrated to conclusion?
[24] **A** Yes.
[25] You know, I am not positive. I don't

---

Page 82

[1] know. I can't -- I don't know if I can say that for
[2] certain.
[3] I have handled claims to conclusion with
[4] arbitration, but I can't say for certain it was with
[5] American Commerce.
[6] **Q** Okay.
[7] In your time as an adjuster, did you ever
[8] handle a file that was arbitrated to verdict or
[9] conclusion?
[10] **A** Yes.
[11] **Q** Okay. Do you recall whether that was one
[12] of your prior employers, or with American Commerce?
[13] **A** I have had cases go to trial with American
[14] Commerce. Again, I can't say for certain if I did
[15] have any with arbitration.
[16] **Q** Okay.
[17] **A** I might have.
[18] As I say, I don't -- I can't tell you right
[19] now for certain if I did.
[20] **Q** Do you have any understanding, or did you
[21] have a belief as to the verdict range for arbitrations
[22] versus jury trials?
[23] **A** Everything's different, you know.
[24] **MR. SCIARRINO:** Do we have this as an
[25] exhibit?

---

Page 83

[1] **BY MR. SCIARRINO:**
[2] **Q** I am going to show you a document which is
[3] dated July 25th, 2006, it is a claim file analysis, it
[4] has "American Commerce Insurance Company" at the top.
[5] (Thereupon, Deposition Exhibit No. 15 was
[6] marked for identification.)
[7] **Q** I would like to bring your attention to
[8] Bates page 473.
[9] There is a heading, No. 9, "Plan for
[10] Resolution."
[11] **A** Yes.
[12] **Q** I'm going to say, the -- it's about the
[13] fifth or sixth sentence into that paragraph, it reads,
[14] "I have not had much success with Arbitration on past
[15] cases and our counsel feels it is highly likely that
[16] no matter what the IME and disability evidence shows,
[17] insured will get an award which equals or exceeds
[18] policy limits."
[19] Did I read that properly?
[20] **A** Yes.
[21] **Q** When you said, "I have not had much success
[22] with arbitration on past cases," what did you mean?
[23] **A** That I have found that some of the
[24] verdicts are coming in I don't necessarily agree
[25] with.

---

Page 84

[1] **Q** Okay.
[2] **A** They are higher than I evaluated.
[3] **Q** Now, you had told me that you cannot recall
[4] handling an arbitration case to conclusion.
[5] **A** No, I said with American Commerce, I am not
[6] certain.
[7] **Q** Okay. You have handled cases --
[8] **A** I have handled arbitration, yes. Yes.
[9] **Q** That went to verdict, an arbitration
[10] verdict?
[11] **A** Yes. Yes.
[12] **Q** And in those other cases, you were employed
[13] for one of your other two employers?
[14] **A** Yes.
[15] **Q** And in those cases the verdicts came back
[16] higher than you thought they should have come back?
[17] **A** That's one of the reasons, yes, that I
[18] wasn't satisfied with arbitration, necessarily.
[19] **Q** Okay.
[20] **A** I am not saying I am totally against it,
[21] but some experience I have had with it.
[22] **Q** Now, arbitrations generally occur more
[23] quickly, than jury trials; would you agree with that?
[24] **MR. BUTCHER:** objection. That calls for
[25] speculation.

---

Page 85

[1]      Go ahead.
[2]    **A**   I can't answer.
[3]    **Q**    In your experience in handling files that
[4]  were both taken to a jury trial to conclusion versus
[5]  those cases which you handled where they were
[6]  arbitrated to conclusion, on average, which took less
[7]  time?
[8]    **A**   I don't know.  I think that varies.
[9]    **Q**    Okay.
[10]    **MR. SCIARRINO:**  Would you hand me that?
[11]    **MR. GEORGE:**  Which.
[12]    **MR. SCIARRINO:**  That.
[13]  **BY MR. SCIARRINO:**
[14]    **Q**    This is a document that was provided to us
[15]  today, and purports to be part of the Gateway
[16]  information.
[17]    **A**   Uh-huh.
[18]    **Q**    It does not have a Bates page, it will at
[19]  some point in the future.
[20]    **MR. BUTCHER:**  Just for the record's
[21]  clarity, please note that this is -- he is
[22]  referring to Deposition Exhibit 3.
[23]    **MR. SCIARRINO:**  Right.
[24]    **MR. BUTCHER:**  Just so --
[25]    **MR. SCIARRINO:**  Thank you, Joe.

Page 86

[1]    **MR. BUTCHER:**  Can I see that, Tony, for a
[2]  minute, I just want to see if there is another
[3]  way to reference it, other than just one page.
[4]    **MR. SCIARRINO:**  Well, I was -- I am going
[5]  to attempt that.
[6]    **MR. BUTCHER:**  Okay.  That's fine.  As long
[7]  as somebody attempts.
[8]    **MR. SCIARRINO:**  This is the part that's
[9]  under the American Commerce Insurance Company
[10]  claims training, and then there is a heading that
[11]  says "Arbitration,"
[12]    **MR. BUTCHER:**  Okay.
[13]    **MR. SCIARRINO:**  And there is a six page
[14]  chapter.
[15]    **MR. BUTCHER:**  That's fine.  Thank you.
[16]    **MR. SCIARRINO:**  Page 3 of 6, is the page we
[17]  are going to reference.
[18]      And, about half way through, there is a
[19]  heading that says, "Benefits of Arbitration."
[20]    **A**   Okay.
[21]    **Q**    Now, this is from the American Commerce
[22]  Insurance Company Gateway program.
[23]      Would you read into the record the first
[24]  three headings?
[25]    **A**   It is:  "Cost Savings:  The cost of

Page 87

[1]  litigation can be very expensive because of discovery
[2]  process, pretrial motions and trial preparation.  The
[3]  cost of arbitration is significantly less expensive
[4]  than that of litigation.
[5]      "Time Savings.  Litigation through the
[6]  courts can be a long process, and further delayed by
[7]  the backlog of pending cases.  Arbitration on the
[8]  other hand, can be a hearing scheduled within days of
[9]  submission."
[10]    **Q**    Could you read the next heading as well?
[11]    **A**   "Convenience.  Unlike court scheduled
[12]  trials, the parties to the dispute can select a mutual
[13]  convenient place and time."
[14]    **Q**    Okay.  Thank you.
[15]      Now, after having reviewed the information
[16]  provided in the American Commerce Insurance Company
[17]  Gateway materials, does that aid you in analyzing
[18]  whether or not generally arbitration cases can be
[19]  brought to a conclusion more quickly?
[20]    **A**   I -- I guess it's a guide, but I don't --
[21]  yeah, it is something to consider.
[22]    **Q**    Did you review this material when making a
[23]  decision as to whether or not you wanted to arbitrate
[24]  the claim of Margaret Wisinski?
[25]    **A**   No.

Page 88

[1]    **Q**    Is there a reason why you didn't review
[2]  this material?
[3]    **A**   No.
[4]    **MR. SCIARRINO:**  We digress for housekeeping
[5]  matters.  I apologize.
[6]  **BY MR. SCIARRINO:**
[7]    **Q**    Now, you -- you took the position, in the
[8]  claim of Margaret Wisinski, that American Commerce
[9]  Insurance Company was not required to arbitrate her
[10]  claim, and that the American Commerce Insurance
[11]  Company did not wish to arbitrate Margaret's claim,
[12]  and instead wanted it to be placed into the Court of
[13]  Common Pleas, which would lead to a jury trial, if it
[14]  was not resolved?
[15]    **A**   That is along with the advice of counsel.
[16]    **Q**    Okay.
[17]      Did you rely on your counsel in that
[18]  representation, or did you suggest to him that you do
[19]  not wish to arbitrate this matter?
[20]    **A**   I think it was -- I don't recall the exact
[21]  discussion, but I'm sure it was an agreement that we
[22]  both made.
[23]    **Q**    So you were both involved in the
[24]  decision-making process?
[25]    **A**   Possibly, yes.

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

Page 89

[1]  **Q**   Okay.

[2]  **A**   But I -- a lot of it relied on counsel, but

[3]  I am sure I had a little bit of input in it.

[4]  **Q**   You did not just blindly turn that over to

[5]  him?

[6]  **A**   No, not --

[7]  **Q**   So this was involvement by both yourself,

[8]  and Attorney Godshall --

[9]  **A**   But --

[10]  **Q**   -- in that decision?

[11]  **A**   Well, I guess again, I'm not sure

[12]  specifically what you are referring to there.

[13]  Now, as far as what legal steps can be

[14]  taken, I was relying on him, entirely, and that was

[15]  just a discussion if did we want to arbitrate, or did

[16]  we want it to go to trial, there might have been --

[17]  yes, there was possibly discussion with that.

[18]  **Q**   Again, not trying to put words in your

[19]  mouth --

[20]  **A**   As I said, I just want to make certain I'm

[21]  clear also. I wasn't calling the shots, as far as

[22]  what legal things we can do.

[23]  **Q**   Let me see if I can understand your

[24]  response --

[25]  **A**   Okay.

---

Page 90

[1]  **Q**   -- and if I misstate your answer, please

[2]  let me know.

[3]  **A**   Okay.

[4]  **Q**   The decision -- decisions regarding the

[5]  legal procedures to take, would have been something

[6]  you relied upon Mr. Godshall for?

[7]  **A**   Yes, pretty much so, yes.

[8]  **Q**   The decision whether or not you wanted to

[9]  arbitrate, would have been something that you would

[10]  have been involved in?

[11]  **A**   Along with counsel.

[12]  **Q**   Right.

[13]  **A**   Yes.

[14]  **Q**   But the final call, as to whether or not

[15]  you wanted to arbitrate the case, would be for you to

[16]  decide, not for Attorney Godshall?

[17]  **A**   Possibly.

[18]  Again, I -- I relied on a lot of his

[19]  recommendations, so if he was making a strong

[20]  recommendation, I am going to consider it.

[21]  **Q**   Now, the Attorney Godshall indicated to

[22]  Attorney George that he was objecting on behalf of

[23]  American Commerce Insurance Company, to placing

[24]  Margaret's claim in arbitration.

[25]  **A**   Yes.

---

Page 91

[1]  **Q**   Okay.  And then there was subsequently a

[2]  series of hearings?

[3]  **A**   I don't know series, but I know there was a

[4]  hearing by the judge, yes.

[5]  **Q**   I believe there were two hearings,

[6]  actually.

[7]  **A**   Okay.

[8]  **Q**   Ultimately, there was a decision by

[9]  Judge Bozza.

[10]  **A**   Uh-huh.  Yes.

[11]  **Q**   And Judge Bozza decided that, in fact,

[12]  American Commerce Insurance Company had to arbitrate

[13]  Margaret Wisinski's claim?

[14]  **A**   Yes.

[15]  **Q**   Okay.

[16]  And in fact, Judge Bozza assigned the

[17]  neutral arbitrator?

[18]  **A**   I don't know what all was taking place.

[19]  **Q**   I am going to bring your attention to

[20]  page 1669.

[21]  And there is an entry on March 3rd, 2006.

[22]  **A**   Yes.

[23]  **Q**   And it indicates that Judge Boza would have

[24]  a motion court decision relative to whether or not

[25]  Margaret Wisinski's claim had to be arbitrated.

---

Page 92

[1]  **A**   I am not seeing where -- I'm sorry, I am

[2]  not seeing where you are referring to.

[3]  Oh, up further.

[4]  **Q**   March 3rd, 2006.

[5]  **A**   Okay.

[6]  **Q**   It is line --

[7]  **A**   Okay.  I see it.

[8]  **Q**   -- 560, and there is an entry that goes to

[9]  570.

[10]  **A**   Okay.

[11]  I would have probably took that information

[12]  off of something that Mr. Godshall had provided.

[13]  **Q**   We are going to back up in time just a

[14]  little bit.

[15]  I am going to show you a letter that was

[16]  sent by Attorney George on December 9th, 2005.

[17]  (Thereupon, Deposition Exhibit No. 16 was

[18]  marked for identification.)

[19]  **BY MR. SCIARRINO:**

[20]  **Q**   Do you recall receiving that letter?

[21]  **A**   Well, I am relying again on the log notes,

[22]  and the information you provided me, yes, I would say

[23]  I probably received it, yes.

[24]  **Q**   And just for the record, that letter from

[25]  Attorney George, dated December 9th, 2005, is Bates

---

Page 93

[1] page 135 and 136?

[2]   A   Yes.

[3]   Q   And, that letter would be the letter that

[4] was referenced in your log on page 1667, on

[5] December 28th, 2005?

[6]   A   Yes.  What date?  I'm sorry, what date were

[7] you saying?

[8]   Q   December 28th, 2005, line 515?

[9]   A   Oh, okay.  Yes, uh-huh.

[10]   Q   I am also going to next show you a

[11] facsimile dated December 28th, 2005, which is Bates

[12] page 130 and 131.

[13]      (Thereupon, Deposition Exhibit No. 17 was

[14] marked for identification.)

[15] BY MR. SCIARRINO:

[16]   Q   And could you read the -- read that fax to

[17] yourself, for a moment, please?

[18]   A   Yes.

[19]      Okay.

[20]   Q   In this facsimile to Mr. Godshall, you ask,

[21] "Should we/Do we need to agree to Arbitration?"

[22]   A   Yes.

[23]   Q   Were you indicating, at the time that you

[24] sent that facsimile, that you did not wish to

[25] arbitrate Miss Wisinski's claim?

Page 94

[1]   A   No.  I think primarily I just wanted to

[2] know if there was an option.

[3]   Q   Okay.

[4]   A   And then I could make a decision from

[5] there.

[6]   Q   You wanted to know whether or not you had

[7] an option?

[8]   A   Yes.

[9]   Q   If you had an option, what was your

[10] preference?

[11]   A   Again, I don't know, because I think the

[12] discussion was with Doug Godshall, and there was, in

[13] my past experience, that I didn't necessarily like

[14] some of the results of arbitrations, so --

[15]   Q   Now, you referred this matter to

[16] Mr. Godshall; correct?

[17]   A   Yes, Uh-huh.

[18]   Q   I am going to show you a document which is

[19] dated December 29th, 2005.  It is Bates page 125

[20] through 129.

[21]      (Thereupon, Deposition Exhibit No. 18 was

[22] marked for identification.)

[23] BY MR. SCIARRINO:

[24]   Q   Is this the mechanism by which you referred

[25] the case to Attorney Godshall?

Page 95

[1]   A   One of them.

[2]      There is a transmittal that we first fax

[3] over, with the complaint -- that there -- to the

[4] attorney, making them aware that there is a suit

[5] coming.

[6]   Q   Okay.

[7]      There is a -- there appears to be

[8] essentially two forms here.  One is a cover letter,

[9] and another one is a transmittal.

[10]      Are they part of the same, or are they

[11] separate?

[12]   A   I don't know what you are referring to.

[13]   Q   The --

[14]   A   Oh, this?

[15]   Q   No.  No.  The stapled document behind it.

[16]      MR. BUTCHER:  The second document.

[17]   A   Oh.  Okay.

[18]      Now, could you ask the question again?

[19]   Q   Are those part of the same document, or are

[20] those separate?

[21]   A   Those are separate.

[22]   Q   Okay.  Were these sent separately?

[23]   A   I would say they were.  There should be a

[24] date on this.  December 28th, and this would have been

[25] sent the day before, probably, the fax, and the

Page 96

[1] following day, December 29th, this information was

[2] sent.

[3]   Q   Okay.

[4]      Why don't we do this, then, because I

[5] understood them to be part of the same thing.

[6]   A   Okay.

[7]   Q   The -- let's correct the record.

[8]      The document that was marked Deposition

[9] Exhibit 18, is a two-page document, which is a letter

[10] dated December 29th, 2005, and is Bates page 125 and

[11] 126.

[12]      The next document, which is American

[13] Commerce Insurance new litigation transmittal, we will

[14] mark as 19, and it is a three-page document, Bates

[15] page 127 through 129.

[16]      (Thereupon, Deposition Exhibit No. 19 was

[17] marked for identification.)

[18] BY MR. SCIARRINO:

[19]   Q   Now, let's talk about the document that is

[20] the new litigation transmittal, which is Exhibit 19.

[21]   A   Okay.

[22]   Q   This new litigation transmittal document,

[23] was this prepared by you?

[24]   A   I think so.  Yes, I believe so.

[25]   Q   And it says, "Fax Date:  12-28-05"?

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

Page 97

[1]   **A**   Yes.
[2]   **Q**   And then across the bottom of the first
[3] box, there is a series of things that says, "Suit,
[4] Arbitration, Mediation," and of course "Subpoena."
[5]   **A**   Yes.
[6]   **Q**   And you indicated "Suit."
[7]   **A**   Yes.
[8]   **Q**   Okay.
[9]        And on the third box, you indicate that the
[10] coverage type being pursued is uninsured motorist
[11] coverage, and that the coverage limit is
[12] 50,000/100,000; correct?
[13]   **A**   Yes.
[14]        Can you point out where you are looking at
[15] there, just to make sure I am looking at -- Okay.
[16] Yes. Uh-huh.
[17]   **Q**   And that split limit means 50,000 per
[18] person, 100,000 per accident?
[19]   **A**   Correct.
[20]   **Q**   Okay.
[21]        And so that entry there, regarding the
[22] coverage limits, that would be incorrect?
[23]   **A**   That would we later found, yes.
[24]   **Q**   And then it notes the reserve of $50,000?
[25]   **A**   Correct.

---

Page 98

[1]   **Q**   All right.
[2]        And this was faxed to Attorney Godshall, on
[3] December 28th, 2005?
[4]   **A**   I would say yes.
[5]   **Q**   Okay. Now, these two documents, the letter
[6] of December 29th, and the fax of December 28th, were
[7] the -- essentially the opening documents for
[8] Mr. Godshall, giving him this file to handle?
[9]   **A**   Yes.
[10]   **Q**   All right.
[11]   **A**   Well -- yes. With this file should have
[12] been a copy of the claim going along with that, I
[13] would think.
[14]        Normally I do, let's put it that way. I
[15] believe the file material is sent along with this
[16] letter here.
[17]   **Q**   Okay.
[18]   **A**   With the referral
[19]   **Q**   And when you say "the file material,"
[20] that's, you are talking about the records?
[21]   **A**   A copy of it.
[22]   **Q**   A copy of all of those documents?
[23]   **A**   Yes, uh-huh.
[24]   **Q**   All right.
[25]        Now, had you dealt with Attorney Godshall

---

Page 99

[1] before?
[2]   **A**   Yes, I had.
[3]   **Q**   Attorney Godshall's office is in Akron,
[4] Ohio?
[5]   **A**   Yes.
[6]   **Q**   Is that correct?
[7]        Now, you are in Cincinnati, Ohio.
[8]        You handle claims in five states.
[9]   **A**   Correct.
[10]   **Q**   At that time, maybe even more than five,
[11] there might have been Pennsylvania, and I think you
[12] said maybe like Tennessee as well?
[13]   **A**   Yes.
[14]   **Q**   What state do you handle the most claims
[15] for?
[16]   **A**   I don't know if I can answer that. There
[17] is -- I mean, there is a lot.
[18]        I mean, I would be guessing, again, I
[19] don't -- I can't say for certain.
[20]   **Q**   Well, you handle -- right now, you handle
[21] five states?
[22]   **A**   Right.
[23]   **Q**   Is there any one or two states where you
[24] know you clearly have more claims than another, or is
[25] it fairly equally divided?

---

Page 100

[1]   **A**   I would say I can pinpoint it down to three
[2] of them.
[3]        Here, let me think.
[4]        At that time I am not certain.
[5]        Right now, we primarily handle a lot of the
[6] Oklahoma, Kentucky, Ohio. Well, I guess. As I said,
[7] that's hard to say, because I -- I get the other ones,
[8] too, so I am not certain.
[9]   **Q**   How many files do you recall having
[10] handled, prior to this one, with Attorney Godshall?
[11]   **A**   I couldn't even give you, put a number on
[12] that either.
[13]        Quite a few.
[14]   **Q**   Okay. So you knew him fairly well?
[15]   **A**   Yes, until, this one I got with American
[16] Commerce, I did not work with him prior to that.
[17]   **Q**   Okay, And you got this file in 2004?
[18]   **A**   Yes.
[19]   **Q**   And you had started with American Commerce,
[20] I believe in 1996?
[21]   **A**   No.
[22]   **Q**   I'm sorry.
[23]   **A**   No, American Commerce, I have been there
[24] for about five years so around 2 -- I am going to
[25] guess 2003, in that area.

---

Page 101

[1] Q Okay.

[2] And, so you would have been interacting

[3] with Attorney Godshall for four or five years, at that

[4] point?

[5] A No. A year. 2003, and I started in 2004;

[6] right?

[7] Q Let me double check my notes. I just want

[8] to make sure I am understanding you.

[9] A Okay.

[10] I didn't start working with Doug until I

[11] came to American Commerce, which would have been

[12] roughly around 2003.

[13] Q Okay.

[14] A And if we are talking about, I believe, I

[15] started handling this file around 2004; correct? So

[16] it would have been roughly a year.

[17] Q And when you referred the file to him, it

[18] would have been the end of 2005?

[19] A Possible, yes, that could be. As I said, I

[20] don't know what date it was. That's true, 2005.

[21] Q And so you would have been working with

[22] him, at that point, two or three years?

[23] A Maybe two, yeah.

[24] Q And you said you had numerous files with

[25] him?

Page 102

[1] A Yes, quite a few.

[2] Again I can't put a number on it, I don't

[3] know, but I did have, I was familiar with him.

[4] Q And was there a reason why a lawyer from

[5] Ohio was selected to handle a Pennsylvania claim?

[6] A The only reason that I can recall, and this

[7] is -- I don't know we had a Pennsylvania attorney at

[8] that time.

[9] Q Did you --

[10] A Which again, located right in Pennsylvania,

[11] to make it clear.

[12] And Doug handled Pennsylvania. So --

[13] Q Did you rely on Mr. Shiner's direction to

[14] refer the file to Mr. Godshall?

[15] A Yes.

[16] Q Do you recall handling any other

[17] Pennsylvania claims, wherein counsel was Mr. Godshall,

[18] or his firm?

[19] A Not that I recall.

[20] Q Other than Margaret Wisinski's claim, do

[21] you recall handling any other Pennsylvania claims,

[22] yourself, at all?

[23] A That, again, I can't answer that, I'm not

[24] certain.

[25] MR. SCIARRINO: Why don't we take a break

Page 103

[1] for a couple of minutes. It is 4:15. It's been

[2] about an hour.

[3] MR. BUTCHER: That's fine, yeah, it's been

[4] about --

[5] MR. SCHERM: We are off the record, the

[6] time is 4:11 p.m.

[7] (Recess taken.)

[8] MR. SCHERM: We are back on the record, the

[9] time is 4:27 p.m.

[10] BY MR. SCIARRINO:

[11] Q Ma'am, I am going to show you a

[12] correspondence from Attorney Godshall to you, dated

[13] March 14th, 2006, it's Bates page 1051.

[14] A 1051.

[15] (Thereupon, Deposition Exhibit No. 20 was

[16] marked for identification.)

[17] Q This letter is from Attorney Godshall to

[18] you?

[19] A Yes.

[20] Q Do you recall receiving it?

[21] A Just with me looking at it here again.

[22] Q Okay.

[23] And it indicates that Judge Bozza had

[24] overruled American Commerce Insurance Company's motion

[25] for reconsideration, and Mr. Godshall wrote, "As

Page 104

[1] things now stand, we have been ordered to arbitrate

[2] and have an arbitrator appointed with whom we have no

[3] confidence. I am reviewing this matter to what our

[4] options are with respect to an appeal. Very truly

[5] yours," signed by Attorney Godshall.

[6] Did I read that properly?

[7] A Yes, you did.

[8] Q Okay.

[9] Did you understand this letter to indicate

[10] that American Commerce Insurance Company was now

[11] compelled to arbitrate the uninsured motorist claim of

[12] Margaret Wisinski?

[13] A No. Because he indicates here there is a

[14] possibility of appeal.

[15] Q Okay. Did you have an understanding as to

[16] whether or not any appeal would be taken prior to, or

[17] after the arbitration?

[18] A Oh, I was -- I'm not certain, actually, I

[19] don't know, at the time.

[20] I would assume that would have been after

[21] the arbitration.

[22] Q Now, as of March 14th, 2006, would you have

[23] understood that there was going to be an arbitration

[24] on the Margaret Wisinski matter, if it did not

[25] settle -- if it did not settle?

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

**Page 105**

[1]   A   I -- no, I don't know for certain.

[2]   I don't remember what the conversations

[3]   were. The correspondence was after this letter, I

[4]   would have to say.

[5]   Q   Did you review your log notes?

[6]   A   I can't remember offhand, that's why -- I

[7]   can look at them.

[8]   Q   Why don't you take a look at the log notes

[9]   for that time frame.

[10]   A   Well, actually after this letter was sent

[11]   to me, is when her deposition was taken, where I make

[12]   the next entry, so I don't -- as I say, I don't know

[13]   offhand.

[14]   Q   Did you proceed as though this matter was

[15]   going to arbitration?

[16]   A   I can't answer that. As again, he is

[17]   indicating here there is a possible appeal, so I don't

[18]   know what I was perceiving at that point.

[19]   Q   Okay.

[20]   A   And investigation was still going on, so --

[21]   Q   But you did not understand whether or not

[22]   the appeal would take place prior to any arbitration

[23]   hearing, or after an arbitration hearing?

[24]   A   I don't recall what I perceived.

[25]   Q   Okay.

**Page 106**

[1]   I am going to provide with you a letter

[2]   that is Bates page 1050, it is dated March 15th, 2006,

[3]   it's from Attorney Godshall to you.

[4]   (Thereupon, Deposition Exhibit No. 21 was

[5]   marked for identification.)

[6]   **BY MR. SCIARRINO:**

[7]   Q   I would like you to read the first

[8]   paragraph of that letter.

[9]   A   "We have taken a look at the procedure

[10]   issues, which have been placed in front of us by Judge

[11]   Bozza's decision and let this go" -- oh, "to let this

[12]   go to arbitration. Unfortunately, his ruling is not

[13]   appealable at this time. We will have to go forward

[14]   through the arbitration and then petition the Court to

[15]   vacate the arbitration award based on our policy.

[16]   Given the Court's ruling against us, it is highly

[17]   unlikely that he would so rule."

[18]   Q   And the next line is, "We would then have

[19]   an appeal"?

[20]   A   Yes, uh-huh.

[21]   Q   Okay. So now that you have reviewed that

[22]   letter, do you have an understanding of what the

[23]   procedure -- what you understood the procedure to be?

[24]   A   Yes, and I don't know it was in relation to

[25]   the letter you showed me, but based on this, yes.

**Page 107**

[1]   Q   Okay. So you understood that there was now

[2]   going to be an arbitration on this file, if the case

[3]   didn't settle?

[4]   A   Pretty much what he is saying there, yes.

[5]   Q   And if there was going to appeal -- if

[6]   there was going to appeal, you would then appeal after

[7]   that arbitration?

[8]   A   Correct. Uh-huh.

[9]   Q   All right.

[10]   THE WITNESS: That was later.

[11]   MR. BUTCHER: Yes.

[12]   THE WITNESS: Oh, we are done with that?

[13]   Q   Now, you indicated that the next entry that

[14]   you made was on May 3rd, 2006?

[15]   A   No, other than a bill coming in.

[16]   THE REPORTER: I'm sorry?

[17]   A   Other than a medical -- or, I'm sorry, not

[18]   a medical bill, a legal bill came in it looks like I

[19]   might have paid on April 17th.

[20]   Q   Now, the next entry that you made, that was

[21]   not relative to a legal bill --

[22]   A   Yes.

[23]   Q   -- was on May 3rd, 2006?

[24]   A   Yes.

[25]   Q   And I'm not going to have you read the

**Page 108**

[1]   entire thing into the record, but this was a summary

[2]   of the deposition as it was summarized to you by

[3]   Attorney Godshall?

[4]   A   More likely, yes.

[5]   Q   Okay.

[6]   Do you recall whether this was based upon

[7]   his oral report of the deposition, or was this based

[8]   upon his written report of the deposition?

[9]   A   I can't say for certain. I am assuming it

[10]   would have to be on his verbal report.

[11]   Q   All right.

[12]   Do you -- do you recall whether you ever

[13]   reviewed the actual deposition transcript or

[14]   Miss Wisinski's statement under oath?

[15]   A   I don't recall.

[16]   Q   Okay.

[17]   Now, there is an entry on May 3rd, 2006,

[18]   and I would like you to read into the record the

[19]   first, I believe three sentences.

[20]   A   "Attorney George is adamant on wanting

[21]   policy limits and is never going to get below. He

[22]   feels even an aggravation of a pre-existing condition

[23]   with 60,000 in bills justifies the payment of 50,000

[24]   under UM and the 25,000 wage loss."

[25]   Q   Could you continue reading? Continue

Page 109

[1] reading to the end of page --

[2]    **A**   Oh, okay.

[3]    **Q**   -- or to the end of line 637.

[4]    **A**   Okay.

[5]       "An IME has been set up. Our counsel

[6] believes that if we arbitrate this matter, no matter

[7] what the IME and disability evidence shows, we will

[8] get an award which will equal or exceed insured's

[9] limits."

[10]    **Q**   Okay.

[11]       So, you had an understanding that if this

[12] matter went to an arbitration, that the verdict would

[13] be equal to or greater than the policy limit?

[14]    **A**   Based on what Mr. Godshall --

[15]    **Q**   Okay.

[16]    **A**   -- had told us. I think this is actually a

[17] continuation of the first part of this.

[18]       Yeah.

[19]    **Q**   Do you think -- and I am not trying to put

[20] words in your mouth.

[21]    **A**   Yeah.

[22]    **Q**   Are you indicating that the entry, the log

[23] entry that starts on page 1669 and goes on to 1670 --

[24]    **A**   It might have been.

[25]    **Q**   -- this is merely a continuation of that?

Page 110

[1]    **A**   Yes. I'm just saying it might have been,

[2] if he provided a letter to me. I do not know.

[3]    **Q**   Okay.

[4]       Now, on the next page, 1670, it has a plan

[5] of action.

[6]    **A**   1671?

[7]    **Q**   Yes, 1671, starting at page 649.

[8]    **A**   I see it.

[9]    **Q**   Line 649.

[10]    **A**   Uh-huh.

[11]    **Q**   Could you read that plan of action?

[12]    **A**   "We will proceed to further evaluate

[13] claimant's injury after our IME report is received.

[14] If we still cannot get plaintiff counsel off their

[15] limits demand then determine if we should offer or

[16] proceed further with litigation."

[17]    **Q**   Okay. Now, had the -- as of that date, do

[18] you know whether or not the IME had been set up?

[19]    **A**   I don't think. No, I don't know how to

[20] answer that, I don't know for certain.

[21]    **Q**   Do you -- do you recall whether you played

[22] any role in the selection of the IME physician?

[23]    **A**   That would have been on advice of

[24] counsel.

[25]    **Q**   Okay.

Page 111

[1]    **A**   No. I don't believe so.

[2]    **Q**   Did Attorney Godshall tell you who he was

[3] selecting?

[4]    **A**   I'm sure he did at one point, but I don't

[5] know when.

[6]    **Q**   Okay. He ended up selecting a Dr. Abraham?

[7]    **A**   Yes.

[8]    **Q**   Had you ever dealt with Dr. Abraham prior

[9] to this claim?

[10]    **A**   Not that I am aware of, no.

[11]    **Q**   Okay. Did you play any role in selecting

[12] Dr. Abraham?

[13]    **A**   As I said, I don't believe so, no.

[14]    **Q**   Does American Commerce Insurance Company

[15] have a panel of IME --

[16]    **A**   No.

[17]    **Q**   -- physicians that they regularly use?

[18]    **A**   No.

[19]    **Q**   Okay.

[20]       Is it American Commerce's practice and

[21] policy to allow defense counsel to select the IME

[22] physician, or does American Commerce select the

[23] physician?

[24]    **A**   It's not necessarily a policy. It just

[25] depends on the type of claim, where it's at.

Page 112

[1]    **Q**   On page 1670, there is an entry dated --

[2] I'm sorry, 1671, there is an entry dated June 21st,

[3] 2006.

[4]    **A**   I see it, yes.

[5]    **Q**   It says, "plaintiff counsel has asked

[6] whether we view that coverage should be stacked. Doug

[7] did some research which indicated he could."

[8]       Did I read that properly?

[9]    **A**   Yes.

[10]    **Q**   Okay.

[11]       "I checked with our underwriting

[12] department/Jolene Murphy - she confirmed that UM can

[13] be stacked. Insured has 100,000 UM. She also opted

[14] for full torte."

[15]       Did I read that accurately?

[16]    **A**   Yes, you did.

[17]    **Q**   Okay.

[18]       I'm going to show you a document which is

[19] an e-mail dated May 12th, 2006, purports to be from

[20] Jolene Murphy to Diane Hericks. It is Bates paged

[21] 991.

[22]       (Thereupon, Deposition Exhibit No. 22 was

[23] marked for identification.)

[24]    **Q**   Have you reviewed this e-mail previously,

[25] ma'am?

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

Page 113

[1] **A**   Yes, I apparently did.

[2] **Q**   Okay.

[3]      Is this Jolene Murphy's e-mail to you,
[4] responding to your inquiries about stacking of
[5] uninsured motorist coverage?

[6] **A**   I would assume so, yes.

[7] **Q**   Okay.

[8]      After you reviewed this letter -- or this
[9] e-mail, did you come to a conclusion as to what
[10] Miss Wisinski's policy limit was?

[11] **A**   Well, I think I came to the conclusion,
[12] along with what Doug had informed me at that point.

[13]      I think this was -- if I remember right,
[14] this was a confirmation of Doug had contacted me in
[15] regards to it.

[16] **Q**   I am going to show you a document which is
[17] a memoranda which is dated May 2nd, 2006, it's from
[18] the law firm of Hanna, Campbell & Powell, to
[19] Doug Godshall, from a John Chlysta, C-h-l-y-s-t-a, and
[20] it is Bates page 1009 to 1011.

[21]      (Thereupon, Deposition Exhibit No. 23 was
[22] marked for identification.)

[23] **Q**   Are we ready?

[24] **A**   Yes. I am looking through it.

[25] **Q**   Do you recall having previously reviewed

Page 114

[1] this document, ma'am?

[2] **A**   No.

[3] **Q**   Now I am going to provide you with another
[4] document, which is a letter from Attorney Godshall,
[5] dated May 4th, 2006, it's Bates page 1008, and it's a
[6] letter to you from Mr. Godshall.

[7]      (Thereupon, Deposition Exhibit No. 24 was
[8] marked for identification.)

[9] **BY MR. SCIARRINO:**

[10] **Q**   Ma'am, have you had a chance to review that
[11] letter?

[12] **A**   I did.

[13] **Q**   Do you recall having reviewed that letter
[14] previously?

[15] **A**   I mean, other than me seeing it now.

[16] **Q**   I -- could you read the first paragraph of
[17] that letter?

[18] **A**   "Enclosed you will find a research
[19] memorandum we have prepared on the coverage
[20] issue. Plaintiff's counsel asked whether or not we
[21] consider his view that the coverage should be
[22] 'stacked'. Unfortunately, our research indicates that
[23] they can, given the Claimant's hundred" -- "given the
[24] Claimant's 100,000 of uninsured motorist benefits."

[25] **Q**   So did you understand that Miss Wisinski

Page 115

[1] had $100,000 in coverage?

[2] **A**   Yes.

[3] **Q**   Okay. You had indicated earlier that the
[4] underwriting memo from Jolene Murphy was confirmation
[5] of what you had received from Attorney Godshall?

[6] **A**   I actually -- no, I don't know now, because
[7] it might have had something to do with the wage
[8] information, in the second paragraph, that he has
[9] indicating here. I'm not -- as I said, I am not -- I
[10] can't remember exactly what I was doing with Jolene.

[11] **Q**   When did you increase the reserve from
[12] 50,000 to 100,000?

[13] **A**   I have to go back to the notes to tell you
[14] that.

[15]      It would have been with that report that
[16] I'm -- had drawn up.

[17]      July 25th of 2006, is when I completed the
[18] CFA, a report to the office.

[19] **Q**   So that's when you increased the reserve?

[20] **A**   I didn't physically, that's when I made the
[21] recommendation --

[22] **Q**   Okay.

[23] **A**   -- of the increase.

[24] **Q**   And then who authorized the increase?

[25] **A**   I would have to refer to the notes. I hope

Page 116

[1] it shows here.

[2]      Steve Shiner.

[3]      There is some entries on July 28th, line
[4] 892 and 891, where Mr. Shiner had reviewed it.

[5]      I am not certain, I'm assuming that's
[6] possibly when the reserve was increased.

[7]      Sometimes our office will go ahead and put
[8] the reserve up, and then also they will then look at
[9] it --

[10] **THE REPORTER:** I'm sorry.

[11] **THE WITNESS:** I'm sorry.

[12] **A**   Sometimes -- can you hear me?

[13]      Okay.

[14]      I was going to say, sometimes we might go
[15] ahead and set the reserve up, and then have the
[16] examiner look at it, but that's not normally the case.

[17] **Q**   The -- can you tell from your review of the
[18] log, when you received the defense medical examination
[19] report, from Dr. Abraham?

[20] **A**   You want the actual report; right?

[21] **Q**   Yes.

[22] **A**   I don't know I am certain of that. There
[23] is some notation of the exam that was done on
[24] June 21st, 2006.

[25]      I don't know if we actually got a report

Page 117

[1] then, because I think he wanted some additional
[2] information, but it's shown here.
[3]   Q    Now, when a defense medical examination is
[4] performed, are there any guidelines for the selection
[5] of the physician who will perform the examination?
[6]   A    Not necessarily.
[7]   Q    Well --
[8]   A    I mean --
[9]   Q    -- do you, for an orthopedic injury, select
[10] a podiatrist?
[11]   A    No.
[12]   Q    So, would one of the guidelines be to
[13] select a physician in the appropriate specialty?
[14]   A    Possibly, yes.
[15]        Again, on this situation, we went with
[16] Doug's suggestion.
[17]   Q    Okay, I am speaking globally --
[18]   A    Yeah.
[19]   Q    -- for American Commerce?
[20]   A    Possibly, yes.
[21]   Q    When -- when a defense examination is
[22] performed, do you want to select a physician who is
[23] objective?
[24]   A    Yes.
[25]   Q    Do you want to select a physician who is

Page 118

[1] fair?
[2]   A    Yes.
[3]   Q    Do you want -- you do not want to select a
[4] physician who has a bias one way or the other?
[5]   A    No.
[6]   Q    You indicated that you had no knowledge of
[7] Dr. Abraham --
[8]   A    Correct.
[9]   Q    -- prior to this?
[10]   A    I don't believe so, no.
[11]   Q    And did you take any steps to investigate
[12] Dr. Abraham?
[13]   A    No.
[14]   Q    Other than talking to Attorney Godshall
[15] about him, did you discuss Dr. Abraham with anyone
[16] else?
[17]   A    For what reason?
[18]        I don't know.
[19]   Q    Did you talk to any of your management and
[20] say, "Hey, have you run into this doctor before" --
[21]   A    Oh, no.
[22]   Q    -- "is he a good doctor?"
[23]   A    No.
[24]   Q    Did you talk to any adjusters in the
[25] office, say, "Hey, have you heard of this guy, what do

Page 119

[1] you think of him?"
[2]   A    No.
[3]   Q    So other -- would it be fair for me to say,
[4] that other than talking to Attorney Godshall, you took
[5] no other investigative steps relative to identifying
[6] the qualities and qualifications of Dr. Abraham?
[7]   A    Yes, that's a true statement.
[8]   Q    Okay.
[9]   A    Or pretty true statement, as best I know,
[10] yes.
[11]   Q    Well, what about it wasn't true?
[12]   A    Yeah, it wasn't.  That's what I am trying
[13] to say.
[14]   Q    Okay.
[15]        Now, in your experience as an adjuster, is
[16] the defense medical examiner doctor supposed to be an
[17] advocate, or is he supposed to be impartial?
[18]   A    Impartial.
[19]   Q    Okay.  Now -- bear with me for a second.
[20] I'm going to show you a letter dated
[21] May 11th, 2006, from Diane Hericks to -- or, to
[22] Diane Hericks from Doug Godshall, it is Bates page 994
[23] and 995.
[24]        (Thereupon, Deposition Exhibit No. 25 was
[25] marked for identification.)

Page 120

[1] BY MR. SCIARRINO:
[2]   Q    Ma'am, could you read the first paragraph
[3] of Attorney Godshall's letter to you?
[4]   A    "I received a call from Dr. Abraham, our
[5] independent medical examiner.  He believes that in
[6] general he can support our case if he can get
[7] Dr. German's records.  Dr. German was orthopod who was
[8] treating her before the accident as well as after the
[9] accident.  I am not certain" -- or, "I am not sure
[10] that the records will be that much more helpful but
[11] Dr. Abraham clearly understands the issue."
[12]   Q    Do you recall reviewing this letter?
[13]   A    Not necessarily.  Again, I probably
[14] received it, you have it here.
[15]   Q    Okay.
[16]        When you reviewed this letter from
[17] Attorney Godshall, did you review it appropriate that
[18] Dr. Abraham contact him, to tell him that he could
[19] support your case?
[20]   A    No, I -- first of all, I don't recall what
[21] exactly I -- how I interpreted it at the time, but I
[22] wouldn't necessarily take that from what he wrote
[23] here.
[24]   Q    Did you --
[25]   A    It is basically saying to me is saying that

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

Page 121

[1] he needs some more documentation. He did make some
[2] conclusions, but he wanted to receive some more
[3] documentation to make a final decision.
[4]    **Q**   Do you want to read the second sentence
[5] again?
[6]    **A**   "Dr. German was the orthopod who was
[7] treating her for the accident as well as after the
[8] accident."
[9]    **Q**   That's the third sentence.
[10]    **A**   Oh. "He believes that the" -- "that in
[11] general he can support our case if he can get
[12] Dr. German's records."
[13]    Okay.
[14]    **Q**   And my question was: Do you think it's an
[15] appropriate statement, for a, quote, "independent
[16] medical examiner," to contact counsel to tell him that
[17] he can support his case?
[18]    **A**   I don't see why it isn't appropriate, no.
[19]    **Q**   So you think that's fine; there is nothing
[20] troubling in that letter to you?
[21]    **A**   That he wanted additional records?  No.
[22]    Let me -- the way I am interpreting this
[23] here, is the podiatrist was the doctor that was
[24] treating her foot before the accident, and he just
[25] wanted to see what that condition was in comparison to

---

Page 122

[1] the records he has with regards to the knees.
[2]    **Q**   So your understanding was that Dr. German
[3] was the podiatrist?
[4]    **A**   No. Wait a minute.
[5]    Oh, okay, I guess not. I'm sorry. I have
[6] that wrong.
[7]    Once again, I really don't know how to say
[8] how I would have interpreted that.
[9]    I would say it looks as though the -- based
[10] on the information he had, that it was supporting some
[11] of our opinion on the case.
[12]    **Q**   Now, ultimately there were depositions
[13] taken of Dr. Steele and Dr. Abraham.
[14]    Did you understand that to be the case?
[15]    **A**   I don't know about Dr. Steele. I know
[16] Dr. Abraham I thought we did.
[17]    Well, actually, let me -- I would have to
[18] look at the notes.
[19]    August 30th there is a notation there that
[20] Dr. Abraham's deposition was taken.
[21]    **Q**   Okay. Let me direct your attention to
[22] Bates page 1673.
[23]    **A**   Okay. All right. I see those.
[24]    **Q**   On July 18th, 2006, there is an entry that
[25] appears to be relative to Dr. Steele's deposition?

---

Page 123

[1]    **A**   Yes, it does.
[2]    **Q**   And Dr. Steele was Margaret Wisinski's
[3] treating orthopedic surgeon?
[4]    **A**   Yes.
[5]    **Q**   And he was the doctor who did her two knee
[6] replacements?
[7]    **A**   Yes.
[8]    **Q**   And he was to be the plaintiff's expert
[9] witness in the arbitration?
[10]    **A**   That, I am uncertain of. I would assume.
[11] I knew she was seeing Dr. German also, so --
[12]    **Q**   Okay. Well, you knew that Dr. Steele was
[13] going to be a witness?
[14]    **A**   Correct.
[15]    **Q**   And his deposition was being taken to be
[16] presented at the arbitration?
[17]    **A**   Yes. Well, you asked the prime, I -- yes.
[18]    **Q**   Okay.
[19]    Now, this summary that you have here, on --
[20] on pages -- on page 1673, was that based upon
[21] Attorney Godshall's letter?
[22]    **A**   I would think so, yes.
[23]    **Q**   Okay.
[24]    I am going to show you a letter that's
[25] dated June 22nd, 2006, to Diane Hericks from

---

Page 124

[1] Doug Godshall, Bates page 6 -- I'm sorry, 769 to 770.
[2]    (Thereupon, Deposition Exhibit No. 26 was
[3]    marked for identification.)
[4] **BY MR. SCIARRINO:**
[5]    **Q**   Ma'am, do you recall having reviewed that
[6] letter previously?
[7]    **A**   No, other than looking at it here, and
[8] knowing that I probably got it.
[9]    **Q**   When you look at the -- the letter of
[10] August 22nd, 2006, and then you look at your log entry
[11] on page 1673 of July 18th, 2006, is your log entry
[12] your review of the August --
[13]    **A**   This is June 22nd.
[14]    **Q**   I'm sorry. I'm looking at the wrong one.
[15] I apologize.
[16]    Let me back up. What is the page number on
[17] that?
[18]    **A**   Which one are you looking at the page
[19] number? It's 0769, if that helps you.
[20]    **Q**   All right. I'm sorry, let me back up,
[21] because I was looking at the wrong letter, let me
[22] restate the question.
[23]    In looking at the letter from
[24] Attorney Godshall to you, dated June 22nd, 2006, which
[25] is Bates page 6 -- 769 and 770, and then looking at

---

---

Page 125

[1] your log entry on page 1673, dated July 18th, 2006, is
[2] that log entry your summary of Attorney Godshall's
[3] letter?
[4]    **A**    I'm not sure.  Let's see.
[5]          It appears to be.
[6]    **Q**    Okay.
[7]          Now, your note on July 18th, 2006,
[8] concludes with, "Doug, overall, felt Dr. Steele
[9] appeared poorly."
[10]          Did I read that correctly?
[11]    **A**    Based on information he gave here,
[12] apparently.  I make a notation on it.
[13]    **Q**    Did I read that properly?
[14]    **A**    You did.
[15]    **Q**    Okay.
[16]          So, your summary of Attorney Godshall's
[17] letter concluded with that Attorney Godshall felt that
[18] Dr. Steele appeared poorly?
[19]    **A**    I don't remember.
[20]          I don't know if there is something
[21] mentioned in here, that I picked it up, or what.
[22]          No, he put it in the letter, I am just
[23] rephrasing what he stated in the letter.
[24]    **Q**    Right.
[25]          And at page 770, on his letter of

---

Page 126

[1] June 22nd, 2006, Attorney Godshall indicated, quote,
[2] "I thought the deposition went well."
[3]    **A**    What?  I'm sorry.
[4]    **Q**    Page 770.
[5]    **MR. BUTCHER:**  Right here.
[6]    **A**    Oh, okay.  Yes.
[7]    **Q**    Okay.
[8]    **A**    Okay.
[9]    **Q**    So, based upon your review of
[10] Attorney Godshall's letter, your understanding was
[11] that the deposition of Dr. Steele, the plaintiff's
[12] witness, had gone well for American Commerce?
[13]    **A**    Yes.
[14]    **Q**    Okay.
[15]    **A**    Based on what he is saying.
[16]    **Q**    Now, on page 1677, there is an entry at the
[17] very bottom, dated August 30, 2006, it's by you.
[18]    **A**    Yes.
[19]    **Q**    And it talks about the deposition of
[20] Dr. German being scheduled, and that the deposition of
[21] Dr. Abraham had taken place.
[22]    **A**    Yes, uh-huh.
[23]    **Q**    Okay.
[24]          And, I'm going to show you a document
[25] that's a letter dated August 22nd, 2006, it's from

---

Page 127

[1] Attorney Godshall, it is to you, and it's Bates paged
[2] 671 and 672.
[3]          (Thereupon, Deposition Exhibit No. 27 was
[4]    marked for identification.)
[5] **BY MR. SCIARRINO:**
[6]    **Q**    Have you seen this letter before, ma'am?
[7]    **A**    I would assume so yes.
[8]    **Q**    And is the letter that is the August 22nd,
[9] 2006 letter, is your summary on August 30th, 2006,
[10] your summary of that letter?
[11]    **A**    It appears to be, yes.
[12]    **Q**    Okay.  And at line 934 and 935, your
[13] summary reads, "The trial deposition of IME physician
[14] Dr. William Abraham was taken on 8/8/06.  The depo
[15] went well."
[16]          Did I read that properly?
[17]    **A**    Yes.
[18]    **Q**    Okay.
[19]          And, so that we all understand, Dr. Abraham
[20] was the physician retained by American Commerce
[21] Insurance Company?
[22]    **A**    Yes.
[23]    **Q**    And he was going to be a witness, and his
[24] deposition was going to be presented at the
[25] arbitration hearing; is that correct?

---

Page 128

[1]    **A**    I assume so, yes.
[2]    **Q**    Well, you wouldn't take his deposition --
[3]    **A**    As I say, I don't know.  That was to do
[4] this one, yes.
[5]    **Q**    Okay.  So that was your understanding?
[6]    **A**    Yes.
[7]    **Q**    That his deposition would be presented at
[8] the arbitration?
[9]    **A**    Yes.
[10]    **Q**    So, and your understanding was that the
[11] deposition went well?
[12]    **A**    Based on what he provided, yes.
[13]    **Q**    Okay.  So, back in -- back in March of
[14] 2006, the arbitration panel was set.
[15]    **A**    Okay.  I don't -- are you asking me?  I
[16] don't know if I knew that or not.
[17]    **Q**    Okay.  Well, let's go back and see.
[18]    **A**    You are just telling me.
[19]    **A**    We can look at the log.
[20]    **A**    Okay.
[21]    **Q**    And we can look at the exhibits.
[22]          It was March of 2006 when Attorney Godshall
[23] sent you the -- the order from Judge Bozza, overruling
[24] the motion for reconsideration.
[25]    **A**    Let's see.  What date did you say?

---

Page 129

[1]     **Q**    It was March of 2006.  It is one of the
[2]  exhibits.  We can pull that out.
[3]     **A**    Oh, okay.  Okay.
[4]     **MR. BUTCHER:**  I will show you.
[5]     **A**    Okay.
[6]     **Q**    So in March -- to set the time line now, in
[7]  March of 2006, the arbitration panel was set.
[8]  Okay?
[9]     **A**    If that's what this means, yes.
[10]    **Q**    Right.  And we know an arbitration was
[11]  going to take place?
[12]    **A**    Yes.
[13]    **Q**    There might be an appeal afterwards, but we
[14]  knew that arbitration was going to be the next step,
[15]  if the case didn't settle?
[16]    **A**    Okay.  All right.  Yes.
[17]    **Q**    Okay.  Am I stating that accurately?
[18]    **A**    I would assume so, yes.
[19]    **Q**    Okay.  Now, in furtherance of that
[20]  arbitration taking place, two expert depositions took
[21]  place.  One --
[22]    **A**    Okay.
[23]    **Q**    -- was Dr. Steele, and that was the
[24]  plaintiff's witness?
[25]    **A**    Yes.

Page 130

[1]     **Q**    Now, Mr. Godshall told you that the
[2]  deposition of Dr. Steele went well for American
[3]  Commerce?
[4]     **A**    Yes.
[5]     **Q**    Okay.  And you believed him?
[6]     **A**    Yes.
[7]     **Q**    Okay.
[8]           Then the deposition of Dr. Abraham took
[9]  place, and Dr. Abraham was going to be American
[10]  Commerce's expert witness; correct?
[11]    **A**    Yes.
[12]    **Q**    And doctor -- and Mr. Godshall told you
[13]  that the deposition of Dr. Abraham went well?
[14]    **A**    Yes.
[15]    **Q**    So, two depositions took place, and they
[16]  both went well for American Commerce?
[17]    **A**    Based on what Doug was providing, yes.
[18]    **Q**    And you believed that?
[19]    **A**    Yes.
[20]    **Q**    Okay.
[21]           In between that time, did you receive any
[22]  medical information that changed your analysis
[23]  relative to the causal relationship between the
[24]  accident and Miss Wisinski's knee surgeries?
[25]    **A**    I don't know.  I don't -- it would be based

Page 131

[1]  if I had some information, I would say, in these
[2]  notes, but --
[3]     **Q**    Do you --
[4]     **A**    Other than that, no.
[5]     **Q**    In your review of the notes, do you recall
[6]  there being any new information?
[7]     **A**    Not that I am aware of, no, unless Doug had
[8]  something I am not aware of.
[9]     **Q**    Okay.
[10]    **MR. SCHERM:**  Mr. Sciarrino, I need to close
[11]  the tape.
[12]    **MR. SCIARRINO:**  Okay.
[13]    **MR. SCHERM:**  This concludes tape 1 of the
[14]  deposition of Diane Hericks, we are off the
[15]  record, the time is 5:16 p.m.
[16]         (Recess taken.)
[17]    **MR. SCHERM:**  This begins tape 2 of the
[18]  deposition of Miss Diane Hericks, we are back on
[19]  the record, the time is 5:24 p.m.
[20]  **BY MR. SCIARRINO:**
[21]    **Q**    Miss Hericks, we went off the record for a
[22]  little bit.
[23]         I am going to show you a document that is
[24]  dated July 21, 2006, it is called "American Commerce
[25]  Insurance Company Settlement Evaluation," it is Bates

Page 132

[1]  page 429 to 436.
[2]         (Thereupon, Deposition Exhibit No. 28 was
[3]  marked for identification.)
[4]     **Q**    Ma'am, is that a document that you
[5]  prepared?
[6]     **A**    Yes, it is.
[7]     **Q**    Now, is this a -- essentially, a
[8]  computerized case evaluation form?
[9]     **A**    It's something that you enter in on a
[10]  computer.  Some of it calculates out on the
[11]  information that you input into the system.
[12]    **Q**    Is this a Colossus style --
[13]    **A**    No.
[14]    **Q**    -- where it spits out the evaluation for
[15]  you, or do you put in numbers, and then --
[16]    **A**    We put the numbers in.
[17]    **Q**    Okay.
[18]         So this is more like a -- more of a
[19]  spreadsheet, almost?
[20]    **A**    Yes, right.
[21]    **Q**    Okay.  Now, the first two pages, page 429
[22]  and 430, there is a category at the top that says,
[23]  "Special Damages."
[24]         Now, the -- where are the special damages
[25]  totaled out; where can we see that on this form?

Diane L. Hericks
August 6, 2008

Page 133

[1]   A   On the -- over here on the right, on the
[2] top here.
[3]   Q   Okay.
[4]   A   That's where they total out.  The top line,
[5] on the very far right.
[6]   Q   So that we are understanding the form, on
[7] page 429, the entries are made on the left-hand side,
[8] and then the total is carried over on the right-hand
[9] side?
[10]   A   Correct.
[11]   Q   And, on the right-hand -- or on the
[12] left-hand side, the -- is the low range, and then on
[13] the next to that to the right is the high range?
[14]   A   Correct.
[15]   Q   And, as far as medical charges go, the high
[16] range -- or the low range was 4,000 -- I'm sorry,
[17] $3,453.92?
[18]   A   Correct.
[19]   Q   And the high range was $82,776.66.
[20]       Did I read that properly?
[21]   A   Total special damages, yes.
[22]   Q   And did you obtain those figures by
[23] reviewing the medical billings?
[24]   A   Yes.
[25]   Q   Okay.

Page 134

[1]       Now, beneath that are the general damages.
[2] Would general damages include pain and suffering?
[3]   A   Yes.
[4]   Q   Loss of life's pleasures?
[5]   A   Yes.
[6]   Q   And would that include embarrassment,
[7] inconvenience?
[8]   A   Yes.
[9]   Q   Okay.  So that would be what we sometimes
[10] refer to as noneconomic losses?
[11]   A   Yes.
[12]   Q   Okay.  Now, on the low range, on the left,
[13] it says, "Partial disability," and it has 12-20-01 to
[14] 1-21-02.  And that's 4.7 weeks at 300?
[15]   A   Yes.
[16]   Q   That's $300 a week?
[17]   A   Yes.
[18]   Q   Okay.  And how did you come up with $300 a
[19] week?
[20]   A   Just based on my past experience and
[21] knowledge of how to evaluate a claim.
[22]   Q   Okay.
[23]       So you -- for partial disability, you
[24] assumed that $300 per week was a fair assessment of
[25] pain and suffering?

Page 135

[1]   A   Yes, based on contusions suffered, and
[2] strains and sprains.
[3]   Q   And then the next entry is January 22nd,
[4] 2002 through March 6th, 2002.  And that is $275 a
[5] week.
[6]   A   Yes.
[7]   Q   Now, why did the pain and suffering go from
[8] $300 a week to $275 a week?
[9]   A   Based on some information further back, I
[10] am looking up.
[11]       You know, I can't say for certain exactly
[12] why I placed that figure on there.  I am just going by
[13] what I am reading here.
[14]       I see there was some improvement, as to why
[15] I reduced those figures down, or less treatment at
[16] that point.
[17]   Q   Now, the next entry on that is March 7th,
[18] 2002 through March 27, 2002 --
[19]   A   Uh-huh.
[20]   Q   -- which is approximately three weeks, and
[21] now the pain and suffering component is $204 a week?
[22]   A   Yes.
[23]   Q   And why did the pain and suffering go from
[24] 300 to 275 to 204?
[25]   A   It was based on the soft tissue injuries,

Page 136

[1] they were improving.
[2]   Q   Why not 205?
[3]   A   I -- I'm not certain.  I don't know
[4] offhand.
[5]   Q   Is -- 204 seems like an odd number.
[6]   A   Right.
[7]   Q   Is there any reason why you selected 204?
[8]   A   I don't know.  No, I don't.
[9]   Q   Now, in the high range, there is entries
[10] under "Total Disability."
[11]   A   Yes.
[12]   Q   Okay.  Now, the initial period of
[13] December 20th, 2001 through July 24th, 2002, and there
[14] you enter $350 a week?
[15]   A   Yes.
[16]   Q   Okay.
[17]       Now, did the value of the pain and
[18] suffering on the total disability increase because you
[19] assumed a more serious injury?
[20]   A   It was taken into consideration, yes.
[21]   Q   Okay.  Now, there is an entry right below
[22] that, that says "July 25th, 2002," one day, "$3,000."
[23]   A   Uh-huh.  Yes.
[24]   Q   What does that represent?
[25]   A   I'm assuming -- I don't know.  this should

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

Page 137

[1] be in here, let me go back here.

[2]     She underwent the right knee arthroscopy,

[3] partial medial menisectomy.

[4]   Q   Okay. So that -- so that --

[5]   A   Underwent a surgical procedure.

[6]   Q   Okay. So that surgical procedure, was --

[7]   A   For that, yes, that time, she went in and

[8] stayed, and underwent that procedure, yes.

[9]   Q   Okay.

[10]     I'm not going to go through every single

[11] one of your entries.

[12]     I notice on January 10th, 2003, there is

[13] another one day entry, and this time it's $2,500.

[14]     Do you see that?

[15]   A   Yes, uh-huh.

[16]   Q   Why was that entry made for $2,500?

[17]   A   Underwent the left knee arthroscopy, with

[18] partial medial menisectomy and abridgement, the media

[19] femoral cut off.

[20]   Q   Now, why was that surgery valued $500 less

[21] than the prior arthroscopic surgery?

[22]   A   I am not certain. I'm assuming she had

[23] some other problems and complaints going on at that

[24] time, too, not just with that.

[25]     There is other issues. I mean, there are

---

Page 138

[1] other things that are considered, when you -- when you

[2] put these figures in there. I can't -- I can't tell

[3] you for certain what that all was.

[4]     At that point she also had some improvement

[5] with the surgery on the right knee.

[6]   Q   The one day amount, was for the surgery?

[7]   A   No. Well, no, it's taking into

[8] consideration her condition at that point, and what

[9] treatment she received that day.

[10]   Q   Miss Wisinski had a right total knee

[11] replacement, and a left total knee replacement;

[12] correct?

[13]   A   Yes.

[14]   Q   Those are both surgical procedures?

[15]   A   Yes.

[16]   Q   And do you have an understanding of what's

[17] involved in those surgical procedures?

[18]   A   General understanding, yes.

[19]   Q   What's your understanding of what goes on,

[20] in a knee replacement procedure?

[21]   A   They put some plastic in, to replace the

[22] knee.

[23]   Q   Okay.

[24]   A   That's the condition that was deteriorated.

[25]   Q   Now, do you have an understanding as to

---

Page 139

[1] whether or not a knee replacement surgery is a more

[2] serious procedure than an arthroscopic surgery?

[3]   A   As far as risk and so forth, not

[4] necessary -- I don't know. Not necessarily.

[5]   Q   You don't know whether or not a knee

[6] replacement is considered to be a more serious

[7] surgery?

[8]   A   Well, more involved surgery, yes.

[9]   Q   Okay. It involves basically cutting the

[10] knee completely open; correct?

[11]   A   Yes. I would assume, yes.

[12]   Q   Okay. Well, they have to take material

[13] out, and put material in?

[14]   A   Right. Right.

[15]   Q   And, again, if you had any questions about

[16] what is involved in these procedures, that's something

[17] that you could find out via the Internet?

[18]   A   By reading a report, yes.

[19]   Q   Okay. You could look at the operative

[20] report, and you could also find out just generally

[21] about what happens in those sorts of procedures?

[22]   A   Yes.

[23]   Q   Whether it be through a medical treatise,

[24] or whether through the Internet, or WebMD, something

[25] like that?

---

Page 140

[1]   A   Yes.

[2]   Q   Do you recall doing any of that in this

[3] case?

[4]   A   I am sure I read something, you know,

[5] reports, medical reports, yes.

[6]   Q   Okay. You reviewed the medical reports,

[7] from the various physicians?

[8]   A   Yes.

[9]   Q   Do you recall doing any outside research,

[10] beyond that?

[11]   A   No, I don't recall.

[12]   Q   Okay.

[13]     Now I'm going to represent to you that on

[14] January 13th, 2006, Miss Wisinski had had a left total

[15] knee replacement, performed by Dr. Steele.

[16]     My question is: Why is there no entry for

[17] any sort of amount, for that day?

[18]   A   I do have it, on the high end.

[19]   Q   Where is it at?

[20]   A   January 13th through January 16th of

[21] '06. It's on here.

[22]   Q   January 13th --

[23]   A   To January 16, '06. Underwent left total

[24] knee reconstruction surgery.

[25]   Q   Okay. And that was $500 a day, for four

---

Diane L. Herick
August 6, 2008

Margaret Wisinski v.
American Commerce, Inc. and et al.

---

Page 141

[1] days?

[2]   A   Yeah.  I reduced -- I put in here I reduced

[3] my daily allowances for pain and suffering, due to

[4] insured's preexisting conditions.  The surgeries were

[5] also going to be eventually needed, even if the motor

[6] accident -- motor vehicle accident didn't occur.

[7]   Q   So you reduced the pain and suffering,

[8] because she had preexisting --

[9]   A   Conditions.

[10]   Q   -- conditions in those knees?

[11]   A   Yes.

[12]   Q   Is it your understanding that her

[13] preexisting condition made her knee surgery less

[14] painful?

[15]   A   No.

[16]       But what I am doing here is that her doctor

[17] had even indicated that she was going to need these

[18] surgeries, no matter if the motor accident occurred,

[19] so I was giving it some allowance towards that, not to

[20] say that she didn't possibly feel more pain and

[21] suffering as a result, but that that allowance was

[22] indicated.

[23]   Q   Do you -- do you have an understanding of

[24] whether or not knee replacement -- knee replacements

[25] are permanent, and never -- and will never need to be

---

Page 142

[1] done or not; redone or not?

[2]   A   I can't say.  I don't know for certain, no.

[3]   Q   Okay.  Did you do any research on that?

[4]   A   No, I didn't do research.  I mean, I have

[5] an understanding there is a possibility that they

[6] could possibly require surgery later on, if that's

[7] what you are asking me.

[8]   Q   And you would then have an understanding

[9] that if a knee replacement surgery is done earlier in

[10] life, the odds of a second knee replacement surgery go

[11] up?

[12]   A   Yes.

[13]   Q   And so whenever a knee replacement surgery

[14] is accelerated, the risk of a second procedure

[15] increases?

[16]   A   Possibly.  It depends on the individual.

[17]   Q   Okay.

[18]   A   And every situation.

[19]   Q   And do you recall how old Miss Wisinski

[20] was?

[21]   A   No, not offhand, I don't.  It might be on

[22] here.

[23]   Q   Do you recall -- do you recall reviewing

[24] any materials that indicated the average life-span of

[25] a knee replacement --

---

Page 143

[1]   A   No, not offhand.

[2]   Q   -- the actual material?

[3]   A   No, not offhand.

[4]   Q   If you had done such research, would that

[5] be noted in your file?

[6]   A   No.  No, not necessarily.

[7]   Q   Would that be -- if you had done such

[8] research, you might not have put that in anywhere?

[9]   A   General research, no.

[10]   Q   As you are here today, do you have any

[11] recollection of doing any research relative to knee

[12] arthroscopies, or knee replacement surgeries, during

[13] any of the time that you were involved in the handling

[14] of the Margaret Wisinski file?

[15]   A   I can't say, because I do occasionally look

[16] up information, but I can't say particularly in the

[17] situation on this case.

[18]   Q   Did you do any research into the life

[19] expectancies of individuals?

[20]   A   We have certain guides that we go by.  To

[21] say I did on this one, no, I don't know for certain.

[22]   Q   Can you recall doing it?

[23]   A   No.

[24]   Q   Is it noted in the file?

[25]   A   I don't believe so.  I don't -- again, I

---

Page 144

[1] don't think so.

[2]   Q   Now, there was a earlier knee replacement

[3] surgery for Margaret Wisinski, and it appears, looking

[4] at your settlement evaluation, that there is an entry

[5] for December 6, 2004 to December 11, 2004, for five

[6] days?

[7]   A   Yes.

[8]   Q   Is that for Miss Wisinski's right knee

[9] total replacement?

[10]   A   Yes.

[11]   Q   Okay.  So, Miss Wisinski had four knee

[12] surgeries?

[13]   A   Yes.

[14]   Q   The first one was July 25th, 2002, there

[15] was an arthroscopic procedure, the second one was

[16] January 10th, 2003, it was also an arthroscopic

[17] procedure, then there was a knee replacement procedure

[18] on December 6th, 2004, and then there was a second

[19] knee replacement procedure on January 13th, 2006.

[20]       Do I have that right?

[21]   A   Yes.

[22]   Q   Now, the December 6th, 2004 knee

[23] replacement surgery, you have five days at $325 a day.

[24]   A   Yes.

[25]   Q   Did I read that properly?

---

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

Page 145

[1]   **A**   Yes, uh-huh.

[2]   **Q**   Now, why was the one knee replacement
[3] surgery valued at $325 a day, and the other knee
[4] replacement surgery was valued at $500 a day?

[5]   **A**   I put in the January 13th entry, I did not
[6] reduce my pain and suffering allowances to the extent
[7] that I did with the right knee replacement. Her left
[8] knee arthritis wasn't as bad as the right, and minimal
[9] medical care was needed for the left knee prior to the
[10] accident.

[11]   **Q**   So, you reduced the right knee more than
[12] the --

[13]   **A**   The left.

[14]   **Q**   -- the left knee for pain and suffering.

[15]   **A**   Well, again, based on the allowances, also,
[16] that I was giving for the surgeries, to begin with,
[17] too.

[18]   **Q**   Now, correct me if I am wrong, but you are
[19] indicating that prior to the accident, your
[20] understanding was that Mrs. Wisinski had more problems
[21] with her right knee, than her left knee?

[22]   **A**   That's what -- that's what my notes are
[23] saying here, yes.

[24]   **Q**   Okay.

[25]   Now, when she had the right knee

Page 146

[1] arthroscopy, you evaluated that at $3,000, and then
[2] the left knee arthroscopy, you evaluated it at $2,500,
[3] and based upon your testimony the left knee was the
[4] better knee. So I want to know why there is a
[5] difference?

[6]   **A**   Because that was more the exploratory
[7] surgery, than -- that could have been a question, if
[8] it was related to the accident or not.

[9]   The doctors --

[10]   **Q**   Wait a minute. Hold on.

[11]   Are you indicating that you thought that
[12] the left knee arthroscopy --

[13]   **A**   No.

[14]   **Q**   -- was exploratory in nature?

[15]   **A**   Well, not exploratory. Okay. Wrong way of
[16] putting it.

[17]   But it's -- I guess what I am trying to say
[18] here is, that the -- her doctor had indicated the
[19] replacements were going to be something that was
[20] eventually going to be needed, no matter if the
[21] accident occurred or not, so that's where the
[22] difference is.

[23]   **Q**   I am asking about the arthroscopies right
[24] now.

[25]   **A**   Yeah. Oh, I thought you were asking me in

Page 147

[1] comparison why I was making allowance or the
[2] replacements.

[3]   **Q**   No.

[4]   **A**   Okay.

[5]   **Q**   I want to know about the arthroscopies
[6] first.

[7]   **A**   Okay.

[8]   **Q**   We will talk about the replacements next.

[9]   You indicated that it was your
[10] understanding that prior to the motor vehicle accident
[11] of December 20th, 2001, that Miss Wisinski had more
[12] problems with her right knee, than her left knee.

[13]   **A**   Yes.

[14]   **Q**   That's what you said?

[15]   **A**   Yes.

[16]   **Q**   Okay.

[17]   Now, for the right knee arthroscopy, you
[18] gave a value of $3,000, and then for the left knee
[19] arthroscopy, you gave a value of $2,500.

[20]   And what I want to know is, is why if the
[21] left knee was in better shape, and required surgery,
[22] would it be valued less.

[23]   **A**   Because you are still going to have similar
[24] pain with that, but there could have been other things
[25] that were going on, as to why I gave the 3,000 figure.

Page 148

[1]   It could have been other --

[2]   **Q**   Well --

[3]   **A**   Wait. -- certain impacts on her time at
[4] that point, or I don't know if she had any other
[5] complaints of pain, or something of that nature,
[6] during that time.

[7]   **Q**   Did you note anything in the record, from
[8] which you can now determine why you assessed more
[9] dollar damages for the right knee arthroscopy, than
[10] the left knee arthroscopy?

[11]   **A**   I have to review that, again, I don't know.

[12]   I don't see anything down offhand, no.

[13]   **Q**   Going on, I notice on January 13th, 2006 --
[14] I'm sorry, November 17th, 2006 -- strike that.

[15]   Let me ask you a question: On the second
[16] to last entry there is an entry that says, "11-17-06
[17] to 3-13-06," is that a typo, is that supposed to be
[18] 1-17-06?

[19]   **A**   That's what it looks like.

[20]   Let me see something here real quick.

[21]   Yes, it is supposed to be 1-17-06 to
[22] 3-3-06.

[23]   **Q**   Okay. So that is just a -- just an extra 1
[24] that got inserted?

[25]   **A**   Yes, it is on this other sheet, it is

Page 149

[1] corrected, it says 1-17.

[2]   Q    I am going to then ask the question this

[3] way: From January 17th, 2006 through March 3rd, 2006,

[4] which is a seven-week period, you assigned $404 per

[5] week.

[6]   A    Uh-huh.

[7]   Q    And that would be for the -- basically the

[8] seven weeks post surgery; is that accurate?

[9]   A    Yes.

[10]   Q    And that's the post replacement surgery,

[11] knee replacement surgery?

[12]   A    The left knee replacement.

[13]   A    Is that right?

[14]   A    Is what is noted here.

[15]   Q    And again, you selected $404. Any reason

[16] why 404, as opposed to 400, or 410?

[17]   A    I can't tell you that, no, I don't know.

[18]   Q    When we back up, and look at December 12th,

[19] 2004 to January 13th, 2005, that is the four and a

[20] half-week period immediately after the first knee

[21] replacement surgery -- that's the right knee

[22] replacement surgery?

[23]   A    Yes. It looks like.

[24]   Q    Why is that post surgical time frame $350 a

[25] week for pain and suffering, and the second post

Page 150

[1] surgical period $404 per week?

[2]      What's the difference?

[3]   A    I -- I -- again, I am just going by my

[4] notation. I am indicating here my weekly disability

[5] allowance would have been normally higher, but I took

[6] into the consideration the motor vehicle accident only

[7] allegedly aggravated her underlying condition --

[8]      THE REPORTER: I am sorry, I can't hear.

[9]      "But I took into consideration the motor

[10]    vehicle" --

[11]   A    The motor vehicle accident only allegedly

[12] aggravated her underlying arthritic accident --

[13] arthritis. The accident did not change the eventual

[14] outcome that she was going to need knee replacement.

[15]   Q    And that was your position relative to both

[16] knees, though; correct?

[17]   A    Yes.

[18]   Q    So, that doesn't really explain the $54

[19] difference per week?

[20]   A    No, I -- no, not necessarily.

[21]   Q    Okay.

[22]      Ultimately, all of those, multiplying,

[23] total up.

[24]   A    Now, it could be she had nursing care. No,

[25] I don't know. I guess I can't -- no, never mind, I

Page 151

[1] really don't know.

[2]   Q    Okay.

[3]      Now --

[4]   A    It's been too long to really say what I was

[5] thinking.

[6]   Q    Okay.

[7]      Now, ultimately, those all carry over, and

[8] multiply out, and lead to totals; right?

[9]   A    Yes.

[10]      But I -- some of those I have to total up

[11] myself, when I get into that many lines.

[12]   Q    Okay.

[13]      Now, the range then becomes the total

[14] range, adding in the --

[15]   A    Yes.

[16]   Q    -- low -- the low for the special damages,

[17] and the low for the general damages, those two add up

[18] together, to give you the low range for the total?

[19]   A    Yes.

[20]   Q    And then the high range for the specials,

[21] and the high range for the general damages, total up,

[22] to give you the total high range damages?

[23]   A    Yes.

[24]   Q    And that leads you to a settlement range;

[25] right?

Page 152

[1]   A    Yes.

[2]   Q    And that range in this case was $7,208.78

[3] to $149,306.68.

[4]   A    That's my range.

[5]   Q    Okay.

[6]      So that's a range and I'm using rough

[7] numbers here, of about $142,000?

[8]   A    Okay. Yes.

[9]   Q    That's a pretty big gap.

[10]   A    Well, it is, but there is a big difference

[11] here on what you are looking at.

[12]      If it is just a soft tissue injury she

[13] suffered, that would have resolved within a short

[14] period of time, compared to four surgeries. That

[15] makes a difference.

[16]   Q    So, your analysis was, that there was

[17] essentially two really opposite views of the case.

[18]      There was one view of the case that was

[19] American Commerce's position, that this was a soft

[20] tissue case, and then there was the claimant's

[21] position that this was a serious case, that required a

[22] series of orthopedic surgeries?

[23]   A    Well, not that clear cut.

[24]      The evaluation is based on that on the low

[25] end, yes, that there was opinion that she had just

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

Page 153

[1] suffered a soft tissue injury; on the high end, there
[2] is the risk that the individual, injured party, could
[3] convince the jury, or an arbitration board, that the
[4] surgeries were all related.

[5]    **Q**   And then you have a target settlement of
[6] $75,000?

[7]    **A**   Yes.

[8]    **Q**   Why $75,000, as the target settlement?

[9]    **A**   That was just based on potential weaknesses
[10] of the case.

[11]    I believe at that point is when I was
[12] looking at, that -- I wasn't looking -- well, as far
[13] as the threat to go to arbitration, the panel, yes.

[14]    **Q**   So, at that point you placed it at the
[15] range of $75,000, based primarily upon the forum that
[16] the case was going to be heard in at that time?

[17]    **A**   Partially, yes.

[18]    **Q**   Okay. And the forum, that was an important
[19] part of the decision?

[20]    **A**   The forum?

[21]    **Q**   In other words, the forum being an
[22] arbitration versus being in front of a jury, that was
[23] an important part of your analysis?

[24]    **A**   It was just a part of it, yes. Not -- I
[25] don't know what you mean by important, but yes, it was

---

Page 154

[1] taken into consideration.

[2]    **Q**   Okay. Well, there is -- when I say
[3] important, there is trivial things that we don't
[4] really put a lot of weight on, and then there is
[5] important things that we put a lot of weight on.

[6]    **A**   When I evaluated this I was basing it
[7] mainly on the injuries, and the procedures that she
[8] was going through, and that was in the back of my mind
[9] that, yes, there is a chance here, when you refer to
[10] the high and low, that there is that potential, if it
[11] went to arbitration, that she could possibly get an
[12] arbitration board to agree with that, her allegations
[13] that she was making.

[14]    **Q**   Okay.

[15]    Now, that was your analysis, and that led
[16] to your recommendation, then, that the reserve be set
[17] at $100,000?

[18]    **A**   Yes.

[19]    **Q**   And that was the reserve that was then
[20] approved on --

[21]    **A**   It looks like around July 28th.

[22]    **Q**   July 28th?

[23]    **A**   Roughly in there.

[24]    **Q**   Okay.

[25]    And we are looking at Bates page 1676?

---

Page 155

[1]    **A**   Yes.

[2]    **Q**   And there is a -- and 1675?

[3]    **A**   Wait a minute. Actually -- let's see.

[4]    He has got an entry -- well, it is still
[5] July 28th, is when the med entry there, on page 1677,
[6] it's just a continuation it looks like, of a note,
[7] where he started the prior page.

[8]    **Q**   All right.

[9]    And when you say he, we are talking about
[10] Mr. Shiner?

[11]    **A**   Mr. Shiner, yes, uh-huh.

[12]    **Q**   Okay. And with regard to this particular
[13] reserve, when we look at Bates page 1675, your entry
[14] is on page 1674 going on 1675. Is that correct?

[15]    **A**   That's the summary, it goes with the --

[16]    **Q**   That's the summary of your evaluation?

[17]    **A**   -- report.

[18]    Yes. Yes.

[19]    **Q**   And then on 1676, that was reviewed by your
[20] claims manager, Mr. Seese?

[21]    **A**   Yes. Along with the report that I sent to
[22] him.

[23]    **Q**   Okay. And, he notes on July 27, 2006, his
[24] review?

[25]    **A**   Yes.

---

Page 156

[1]    **Q**   And then the next day, the -- Mr. Shiner,
[2] the examiner, in Massachusetts, he reviews it, and he
[3] authorizes the reserve being increased to $100,000?

[4]    **A**   I'm assuming so, yes. I mean, again, I'm
[5] not certain exactly when the reserve was put up, but,
[6] yes, he is agreeing with that.

[7]    **Q**   Okay.

[8]    Now I'm looking at Mr. Shiner's entry on
[9] page 1677. And I'm going to start at line 913. It
[10] says, "If we were to go forward with arbitration we
[11] will have to undertake two additional expert
[12] depositions (Drs. German and Abraham) at
[13] approximately" -- and it is deleted -- "apiece and an
[14] expensive appeal process as the lower court judge is
[15] not likely to grant our appeal so we would have to
[16] take it up to a higher court. In addition, this case
[17] is going to boil down to competing experts, and there
[18] is no guaranty a jury wouldn't accept the
[19] aggravation/acceleration argument. Accordingly, I
[20] will extend settlement authorization to the 100,000
[21] PL. That said, we should continue negotiating this
[22] case as if we have every intention of taking it to
[23] arbitration (with plans of appealing an adverse
[24] decision) and if necessary, proceed with the next
[25] scheduled deposition to demonstrate our commitment to

---

Page 157

[1] the PC."
[2]     Did I read that properly?
[3]   A   Yes.
[4]   Q   Now, is it your understanding, that the
[5] expenses associated with litigating this claim, played
[6] a part in the authority -- in you being granted the
[7] authority -- settlement authority to $100,000?
[8]   A   No.
[9]     No.
[10]   Q   So it's your understanding that the
[11] expenses of litigating the case, and the expense --
[12] and the future expenses of appealing the case, were
[13] irrelevant to you being granted the authority of a
[14] hundred thousand dollars?
[15]   A   I -- I -- I don't -- I can't speak for
[16] Mr. Shiner, as far as why he gave me that
[17] authority.  I don't -- I don't know if the expense
[18] necessarily came into play or not.
[19]     He makes a notation here, that there is
[20] going to be expense involved, if we continue.
[21]   Q   But you have no idea whether that played
[22] any role in his decision?
[23]   A   No, because I -- I don't know if he
[24] reviewed the -- based on my information again, there
[25] is other things to consider, as to why he would make

Page 158

[1] it a hundred thousand.
[2]   Q   I am not asking if it was the only reason.
[3]   A   Okay.
[4]   Q   I am asking you if it was a reason?
[5]   A   I don't -- just going on what we are
[6] reading here, I don't know.
[7]   Q   Okay.
[8]     Now, when you review Mr. Shiner's note of
[9] July 28th, 2006, did you understand that you had been
[10] given settlement authority to $100,000?
[11]   A   Yes, I did.
[12]   Q   At that point, July 28th, 2006, was it
[13] clear to you that no arbitration would occur, as you
[14] would extend the policy limit offer prior to that?
[15]   A   That the arbitration wouldn't go forward,
[16] if we offered limits?
[17]   Q   That it wasn't going to go forward, because
[18] you were going to ultimately offer --
[19]   A   Oh, if we offered.
[20]   Q   -- limits, if --
[21]   A   If we -- well, there wasn't a decision
[22] then, if we were definitely going to or not -- well, I
[23] guess -- okay.  I'm sorry, rephrase it again.
[24]   Q   Okay.
[25]   A   It's getting late.

Page 159

[1]   Q   I understand, and I appreciate your
[2] patience.
[3]     Based upon your review of this notation --
[4]   A   Okay.
[5]   Q   -- by Mr. Shiner --
[6]   A   Uh-huh.
[7]   Q   -- was it clear to you that there was not
[8] going to be an arbitration, because if push came to
[9] shove, you were going to extend the $100,000 policy
[10] limit as an offer?
[11]   A   No, I don't read it that way.
[12]   Q   So you thought there was still a chance
[13] that you might go to arbitration?
[14]   A   Well -- well, let me see here.
[15]     We were going to go to arbitration, I
[16] guess, and possibly appeal it.  Is that -- let me see
[17] here.
[18]     The way I am reading it is that we were
[19] going to continue to negotiate, prepare for the
[20] arbitration, and possibly appeal afterwards.
[21]   Q   Well, if that was the case, why would you
[22] be given a hundred thousand dollars, which was the
[23] policy --
[24]   A   Well --
[25]   Q   -- limit, to -- in settlement

Page 160

[1] authorization?
[2]   A   I -- he wanted me to continue to negotiate,
[3] so at one point if we decided to change it, he gave us
[4] that authority.
[5]   Q   So you understood that there was still a
[6] risk that there was going to be an arbitration?
[7]   A   Yes.  That's what it looks like here.  We
[8] are taking it to arbitration, yes.
[9]   Q   Now, approximately a month later -- let's
[10] back up for a moment.
[11]     As of July 28th, 2006, what was your offer?
[12]   A   I don't know that we offered 20, I am
[13] trying to see when that was done.
[14]     I think I offered the 20, after -- here it
[15] is.
[16]     August 30th, I offered the 20,000.
[17]   Q   Okay.  So as of --
[18]   A   The 28th.
[19]   Q   -- July 28th, your offer was $9,000 then?
[20]   A   Yes.
[21]   Q   Okay.
[22]     So on July 28th, you are given authority,
[23] settlement authority of a hundred thousand dollars,
[24] and on that date your standing offer was $9,000?
[25]   A   Yes.  Because it -- right.

Margaret Wisinski v.
American Commerce, Inc. and et al.

---

Page 161

[1]   Q   Approximately a month later, you authorize
[2] defense counsel to extend an offer of $20,000.
[3] Correct?
[4]   A   Yes.
[5]   Q   And then on July -- I'm sorry, on
[6] August 30th, 2006, which is Bates page 1678 and 1679,
[7] you authorized defense counsel to offer a hundred
[8] thousand dollars.
[9]       Is that correct?
[10]   A   Yes.
[11]   Q   And then on September 18th, 2006, defense
[12] counsel offered the $100,000; is that correct?
[13]   A   That, I am not certain of, what the exact
[14] date was; that is what I was informed, that he had
[15] offered the hundred thousand dollars.
[16]   Q   So it may have happened --
[17]   A   It might, yeah.
[18]   A   -- a day or two different from that, but
[19] that's when you found out?
[20]   A   Right.
[21]   Q   Now, I want to look at your entry of
[22] August 30th, 2006. The one that carries on, and goes
[23] and concludes on 1679.
[24]   A   Okay.
[25]   Q   Could you read your last sentence of that

Page 162

[1] entry, into the record?
[2]   A   "I gave our counsel up to 100,000 to settle
[3] and told him to make certain our settlement included
[4] any and all claims (including any alleged bad faith)
[5] and that all liens will need to be protected."
[6]   Q   Okay.
[7]   A   I put that in parentheses, "(including any
[8] alleged bad faith)".
[9]   Q   Was any part of the $100,000 settlement
[10] offer, a settlement of any bad faith claims?
[11]   A   No.
[12]   Q   Okay.
[13]       Was the $100,000 settlement offer solely an
[14] offer for uninsured motorist benefits?
[15]   A   Yes.
[16]   Q   Okay.
[17]       What changed between July -- strike that.
[18]       What changed between when you extended the
[19] $20,000 offer, to when you authorized
[20] Attorney Godshall to extend the $100,000 offer?
[21]   A   I don't recall specifically. I know there
[22] was discussion as far as the -- the panel.
[23]   Q   Did anything change?
[24]   A   Well, yes, I'm sure it did.
[25]   Q   Well, let's -- let's find out what changed.

Page 163

[1]       The panel was set in March of 2006;
[2] correct?
[3]   A   Yes. As far as, again, what you are
[4] telling me, yes, based on that information.
[5]   Q   So that's when Judge Bozza entered his
[6] order?
[7]   A   Yeah.
[8]   Q   Denied the motion for reconsideration, and
[9] set the arbitration panel, and put the case into
[10] arbitration?
[11]   A   Uh-huh. Yeah.
[12]   Q   So that was set in March of 2006?
[13]   A   Right.
[14]       I don't know when Doug was aware of the
[15] panel, when it set who was going to be on the panel.
[16]   Q   Well, I think in his letter, he indicates
[17] he is aware of the panel in March of 2006.
[18]   A   Did he have the initials for it? I didn't
[19] catch that.
[20]   Q   Did you want to go back and look at the --
[21]   A   No, I know what letter you are referring
[22] to, but I don't know if he specifically states in
[23] there, if he is aware who was going to be on the
[24] panel, unless I don't understand the letter.
[25]       Maybe I have to read it.

Page 164

[1]   Q   Why don't we get that letter back.
[2]   A   Okay.
[3]       He has his arbitrator appointed.
[4]   Q   Okay.
[5]   A   Oh, wait a minute.
[6]   MR. BUTCHER: Wait, before you say
[7] anything.
[8]   THE WITNESS: Okay. I'm sorry. I didn't
[9] read it.
[10]   MR. BUTCHER: Take your time again.
[11]   THE WITNESS: Okay. I didn't read it.
[12]   Q   Okay. Now that you have read it, are you
[13] prepared to --
[14]   A   Okay. Let me see. I -- okay. Yes, he
[15] does say -- he does state that.
[16]   Q   Okay.
[17]       Okay.
[18]   Q   So Attorney Godshall knew who the panel was
[19] in March of 2006?
[20]   A   Apparently.
[21]   Q   And he advised you?
[22]   A   Apparently. Well, it didn't say
[23] specifically, but yes, he was concerned about the
[24] panel, yes.
[25]   Q   But he knew the panel was set, it was

Page 165

[1] fixed?

[2] **A** Yes.

[3] **Q** And you knew the panel was set?

[4] **A** Yes.

[5] **Q** Because you relied upon what he told you?

[6] **A** Yes.

[7] **Q** And, you might not know the names of the

[8] people, but frankly, they are all people from Erie,

[9] and you wouldn't know who they were anyways?

[10] **A** Right. Well, I am going on information

[11] he has provided to me, yes.

[12] **Q** Okay. So, the panel was set. The medical

[13] depositions of Dr. Abraham and Dr. Steele had already

[14] taken place; correct?

[15] **A** Yes.

[16] **Q** And the arbitration was scheduled.

[17] My question is, is what changed, that led

[18] you to change your offer from 20,000 to a hundred

[19] thousand?

[20] **A** Well, again, I was going on a lot of things

[21] that Doug was advising me, and suggesting.

[22] If I remember correctly, there was some

[23] other concerns that were also considered, when we

[24] offered a hundred thousand.

[25] **Q** Well, we are looking at a time frame --

Page 166

[1] **A** Well, it was discussions, I thought what

[2] you were referring to.

[3] I would have to look at the notes.

[4] I think, again, I -- well, I -- I know I --

[5] one of the things, I think he had tried -- he had made

[6] an offer, and that discussions with possibly coming off

[7] the policy, and that didn't occur.

[8] I think that was some of the information he

[9] had informed me also, that they were just -- they were

[10] insisting on the hundred thousand.

[11] **Q** And that was actually consistent; wasn't

[12] it?

[13] **A** The hundred?

[14] **Q** Yes.

[15] **A** Yes.

[16] **Q** Attorney George, from the time he got into

[17] the file, until the day the check was mailed, insisted

[18] the case was worth a hundred thousand dollars policy

[19] limit?

[20] **A** Yes, but things changed based on as

[21] discovery goes on, so we didn't know if that would

[22] change any.

[23] **Q** My question to you is, is at no point

[24] did -- did you understand the plaintiff's position to

[25] change?

Page 167

[1] **A** No. But I -- I'm not certain if it

[2] wouldn't change.

[3] **Q** Okay.

[4] So, your offer of 10,000 -- I'm sorry, of

[5] $20,000, was based upon the hope that the plaintiff

[6] would change their position?

[7] **A** Yes, based on the new discovery that was

[8] taken.

[9] **Q** Okay. What was the new discovery?

[10] **A** The depositions, and whatever information

[11] we gathered up until that point.

[12] **Q** Okay.

[13] And, then you went from 20,000 to a hundred

[14] thousand. And I want to know why you went from 20,000

[15] to a hundred thousand?

[16] **A** Because I gave Doug up to a hundred

[17] thousand, so I don't know what discussions Doug had,

[18] but I -- Doug had come back to me at one point and

[19] told my that they were not going to negotiate off --

[20] negotiate off the hundred thousand. So he already had

[21] that authority, from what I know, I recall.

[22] **Q** Well, you had authorized him to extend an

[23] offer of 20,000?

[24] **A** 20, and to negotiate from there.

[25] **Q** And then you had, subsequent to that, given

Page 168

[1] him authority up to a hundred.

[2] **A** Okay.

[3] **Q** And I want to know, why you -- why you

[4] increased your authority to Mr. Godshall, from 20,000

[5] to a hundred thousand; what made you change?

[6] **A** Because -- I'm looking, because I don't

[7] know if that's correct. I thought -- let's see.

[8] I'm just trying to see when I gave him the

[9] 20, and when we talked about the hundred.

[10] As I say, I am not sure what point of --

[11] what -- if I informed him what authority I had. It

[12] appears on July 28th, is when we just had the

[13] discussion about possibly two -- trying to continue to

[14] negotiate it, and we agreed to start at 200 -- or the

[15] 20,000 figure.

[16] **Q** Let me direct your attention to page 1675,

[17] let me try to help you here.

[18] **A** Okay.

[19] **Q** On July 26th, 2006, there is an entry on

[20] August -- that is line 861, it talks about

[21] Dr. Abraham's deposition can be rescheduled.

[22] **A** Okay. There it is.

[23] **Q** And then "We agreed to get an offer to

[24] opposing counsel right away offering $20,000."

[25] **A** Okay.

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

Page 169

[1]  **Q**  So, on --

[2]  **A**  Okay.  I didn't have the authority at that
[3]  point, is what it looks like.

[4]  **Q**  So on July 26th, 2006, you authorized
[5]  Mr. Godshall to extend an offer of $20,000?

[6]  **A**  Yes, it appears after that, then I had the
[7]  authority from the examining office, based on my CFA
[8]  that I submitted in.

[9]  **Q**  Where was your authority at prior to that?

[10]  **A**  30.

[11]  **Q**  And when was that given to you?

[12]  **A**  I always had authority up to 30.

[13]  **Q**  Oh, so you had your own authority, up to
[14]  30?

[15]  **A**  Up to 30, yes.

[16]  **Q**  Why did you offer 20, instead of 30?

[17]  **A**  Well, why would I offer 30 instead of 20?
[18]  I -- you know, it is a good starting figure, to start
[19]  at.

[20]  **Q**  You were at 9?

[21]  **A**  But that was based on, again, information
[22]  that I didn't have, as the discovery went along.  That
[23]  changes every time you get more information in.

[24]  **Q**  So, I'm just trying to understand your
[25]  thought processes.

---

Page 170

[1]         You go from 9,000 to 20,000, and then --

[2]  **A**  Yes.

[3]  **Q**  -- from 20,000 to a hundred thousand.

[4]  **A**  But my thought process is, when I made the
[5]  offer of 9,000, we had very little information at that
[6]  time, and that was based on, again, our believe is
[7]  that it was a soft tissue injury, and I was going on
[8]  Kelly Bihn's evaluation.

[9]         Long time, before then, that offer was
[10]  made.

[11]         Since that time, a lot of discovery took
[12]  place, a lot of additional information came in.

[13]         I started to evaluate the case, and
[14]  completed my evaluation, and made the offer of 20
[15]  based on my preliminary evaluation that I made.

[16]         Then, at that point it appears I got
[17]  additional authority from examining, and we tried to
[18]  continue to negotiate from there.

[19]  **Q**  Now, you actually prepared your settlement
[20]  evaluation on July 21st, 2006.

[21]  **A**  Yes.

[22]  **Q**  And, at that point you had set the range
[23]  between $7,208 and $149,306?

[24]  **A**  Yes.

[25]  **Q**  And you had set your target settlement at

---

Page 171

[1]  75; correct?

[2]  **A**  Yes.

[3]  **Q**  And then you submitted that, and then five
[4]  days after you had done that, was when you had
[5]  authorized Attorney Godshall to offer 20,000?

[6]  **A**  Yes.

[7]  **Q**  So, you were already placing the settlement
[8]  range at 75, and you were authorizing him to offer
[9]  20?

[10]  **A**  The 75 was a target of where we were hoping
[11]  to finally reach the settlement, so you start out
[12]  lower, you know, to negotiate the case.

[13]  **Q**  And, again, why 20 instead of 30, if your
[14]  target was 75?

[15]  **A**  It's just a good -- I don't -- I can't
[16]  answer that particular reason, other than I don't know
[17]  why I would necessarily offer 30, as compared to 20,
[18]  it is a good starting figure to start at.

[19]  **Q**  Now, on September 18th, 2006, you have an
[20]  entry where it indicates that you indicate that you
[21]  were advised that Attorney George would not compromise
[22]  off the $100,000 policy limit, and he is -- and he,
[23]  Attorney Godshall, offered the 100,000.

[24]         You indicate later on in that note, that
[25]  you contacted Doug and told him "with Medicare

---

Page 172

[1]  involved, we either need their name included on the
[2]  check, or if we have a letter from Medicare as to what
[3]  they will accept, we can issue separate checks."

[4]         Now, where did you base that conclusion on?

[5]  **A**  What conclusion?

[6]  **Q**  The conclusion that you needed to put
[7]  Medicare's name on the settlement check, or issue a
[8]  separate check to Medicare?

[9]  **A**  It is just my general understanding, that
[10]  Medicare has a lien against it, that we have to
[11]  protect.

[12]  **Q**  Do you deal with other forms of liens,
[13]  other than Medicare?

[14]  **A**  Yes.  But my understanding is Medicare has
[15]  a stronger lien.

[16]  **Q**  Okay.

[17]         And, do the other -- in the other cases,
[18]  where there is a lien other than Medicare, do you
[19]  require that a separate check be sent to the lien
[20]  holder?

[21]  **A**  Sometimes we do.

[22]  **Q**  Okay.  And on what types of liens do you do
[23]  that?

[24]  **A**  It depends upon the state --

[25]  **Q**  Okay.

---

Diane L. Hericks
August 6, 2008

Margaret Wisinski v.
American Commerce, Inc. and et al.

---

Page 173

[1] **A** -- and what -- again, you know --

[2] **Q** In the Commonwealth of Pennsylvania, are

[3] you aware of any lien that you have to issue a

[4] separate check to the lien holder?

[5] **A** No, I am not aware of that, I don't know.

[6] **Q** Okay.

[7] Ultimately, you did not have to issue a

[8] separate check to Medicare, nor did you have to put

[9] Medicare's name on the settlement check in this case;

[10] did you?

[11] **A** I'm not agreeing to that, no.

[12] **Q** Well, let me ask you this: Do you have a

[13] copy of the check?

[14] **A** Well, that was because it went through the

[15] court, and they made a decision that way.

[16] **Q** Because the bankruptcy court approved it?

[17] **A** Yes.

[18] **Q** Okay. So in this case, you did not have to

[19] get Medicare's --

[20] **A** No. And tell me what other process is

[21] correct.

[22] **Q** Is there a copy of the check in the file?

[23] **A** Their name is not on it, if that's what you

[24] are asking me.

[25] **Q** So Medicare's name isn't on the check?

---

Page 174

[1] **A** No, it is not.

[2] **Q** Was a separate check issued to Medicare?

[3] **A** No.

[4] **Q** Okay. So in this case, a separate check

[5] was not required to be issued to Medicare, nor was

[6] Medicare's name required to be on the settlement

[7] check?

[8] **A** Ultimately --

[9] **MR. BUTCHER:** I object, asked and

[10] answered.

[11] But go ahead and answer.

[12] **A** I was going to say, ultimately, yes, that's

[13] how it ended up.

[14] **Q** Okay.

[15] Now, when was the check ultimately issued?

[16] **A** I don't know for certain, of that.

[17] **MR. BUTCHER:** Keep going.

[18] **THE WITNESS:** Keep going?

[19] **A** Oh, okay.

[20] On page 1682, it looks like entry 1110, the

[21] Webster office indicates that the check was

[22] received -- or printed out of Webster office, and she

[23] signed it, and sent it to Doug Godshall.

[24] **Q** So that the check was actually issued in

[25] January -- on January 12th of 2007?

---

Page 175

[1] **A** Yes.

[2] **Q** And that would have been approximately

[3] three months after the offer of $100,000 was made?

[4] **A** I will go by what you are telling me, yes,

[5] based on what date you are looking at.

[6] **Q** September of 2006 to January of 2007, is

[7] usually three months?

[8] **A** Okay. I didn't know what date you were

[9] looking at, so I didn't remember the date.

[10] **Q** Okay.

[11] **MR. SCIARRINO:** Why don't you give us just

[12] a minute.

[13] **MR. SCHERM:** We are off the record, the

[14] time is 6:29 p.m.

[15] (Recess taken.)

[16] **MR. SCHERM:** We are back on the record, the

[17] time is 6:36 p.m.

[18] **BY MR. SCIARRINO:**

[19] **Q** Miss Hericks, we took a short break, and we

[20] are back on the record, and we are right in the

[21] homestretch. I just have a couple of wrapping up

[22] questions to ask.

[23] And if I have repeated any of these, I

[24] apologize, I am trying not to.

[25] My recollection is that you testified that

---

Page 176

[1] there was no liability or comparative negligence issue

[2] in this case of any type?

[3] **A** Correct.

[4] **Q** Also, during your handling of the file, you

[5] corresponded and -- with Attorney George?

[6] **A** Yes.

[7] **Q** Would it be fair to characterize

[8] Attorney George as being cooperative with you?

[9] **A** Well, to a point.

[10] I believe we were trying to get some

[11] medical information from him, that he wasn't providing

[12] right away, unless that was the prior attorney.

[13] **Q** Attorney George took over in December --

[14] **A** Right prior to the suit. Yes, then --

[15] **Q** December of 2005.

[16] **A** Then, he -- he probably did.

[17] I think we -- I mainly just dealt with him

[18] through litigation, other than the first letter he

[19] sent to me --

[20] **Q** Okay.

[21] **A** -- right prior to that, yes.

[22] **Q** So understanding that Attorney George

[23] became involved in November-December of 2005 --

[24] **A** Yeah.

[25] **Q** -- would you agree that he was cooperative

---

Margaret Wisinski v.
American Commerce, Inc. and et al.

Diane L. Hericks
August 6, 2008

---

Page 177

[1] with you?

[2]    **A**    Yes, because I think at that point he just
[3] informed me that he was representing the client at
[4] that point.

[5]    **Q**    Okay.  And his interaction was then
[6] primarily with Attorney Godshall?

[7]    **A**    Yes, right.

[8]    **Q**    And did Attorney Godshall complain that
[9] Attorney George was uncooperative?

[10]    **A**    Not that I can recall.

[11]    **Q**    And to the extent that you had any dealings
[12] with Margaret Wisinski, was she cooperative with you?

[13]    **A**    Yes, to a point.

[14]    Again, I -- I didn't have much dealings
[15] with Miss Wisinski when I had the case, because it was
[16] only a short time frame in between that she had
[17] counsel, and that was when I had sent the letter out
[18] requesting she could provide some medical
[19] authorizations, so that we could go ahead and continue
[20] to review and consider her case, at that point is when
[21] she got counsel, so --

[22]    **Q**    Okay.  So you had very limited dealings
[23] with her?

[24]    **A**    Very limited, yes.

[25]    **Q**    To the extent that you did, was she

---

Page 178

[1] cooperative with you?

[2]    **A**    Yes.  I mean, she didn't get me the
[3] authorizations, but I don't know at what point she
[4] got.

[5]    **Q**    And those materials that you requested,
[6] Attorney George ultimately provided you with them?

[7]    **A**    Yes, I believe so

[8]    Well, I don't know -- I can't say that for
[9] certain, I don't know how much history was provided, I
[10] don't think the wage documentation was ever provided,
[11] so not exactly, no.

[12]    **Q**    Do you have an understanding as to whether
[13] or not the wage component of this claim remains as an
[14] open coverage?

[15]    **A**    No, I don't know for certain.

[16]    **Q**    Actually, it think the term you used was
[17] open feature.

[18]    **A**    Yes.  But I don't know if it's still open
[19] or not, if that's what you are asking me, or
[20] available.  I don't know.

[21]    I don't know if there was time limits on
[22] it, is what I -- I am not certain of.

[23]    **Q**    Well, suit was filed --

[24]    **A**    Yeah.

[25]    **Q**    -- back in 2005.

---

Page 179

[1]    **A**    I know.  I don't --

[2]    **Q**    Okay.  So you don't know whether --

[3]    **A**    I really don't know.

[4]    **Q**    Are you involved in any way with that
[5] feature being -- remaining open?

[6]    **A**    Possibly, as again I don't even -- I don't
[7] know if it's even open at this point.

[8]    **Q**    Okay.

[9]    **A**    It might have been closed out of them, I
[10] don't -- I can't remember that, it's been a while
[11] since that --

[12]    **Q**    Okay.

[13]    Do you have -- are you in any way involved
[14] in handling this file, as of today?

[15]    **A**    Yes, I am -- well, no, actually, I am not.

[16]    **Q**    You are involved in being deposed, but you
[17] are not involved --

[18]    **A**    Yes, I am not, I am not handling the case
[19] any more.

[20]    **Q**    Okay.  That's what I was trying to
[21] understand.

[22]    **A**    Yes, I am not.

[23]    **MR. SCIARRINO:**  Okay.

[24]    I think that's all I have for you.  Thank
[25] you, for your patience and cooperation.

---

Page 180

[1]    See that?

[2]    I don't know if Attorney Butcher has any
[3] questions.

[4]    **MR. BUTCHER:**  We will read.

[5]    **MR. SCHERM:**  There being no further
[6] questions this deposition is completed, we are
[7] off the record, the time is 6:40 p.m.

[8]    - - -

[9]    (Thereupon, at 6:40 o'clock p.m., the
[10] deposition was concluded.)

[11]    - - -

[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Diane L. Hericks
August 6, 2008

Margaret Wisinski v.
American Commerce, Inc. and et al.

Page 181

```
[1]                    SIGNATURE PAGE
[2]
[3]
[4]
             _____
             Diane L. Hericks
[5]
             Subscribed and sworn to before me this
[6]
    _____ day of _____, 2008
[7]
[8]
             _____
[9]          Notary Public
[10]
                       - - -
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

Page 182

```
[1]                    CERTIFICATE
[2]  COMMONWEALTH OF PENNSYLVANIA, )
                                   ) SS:
[3]  COUNTY OF ALLEGHENY.          )
[4]       I, Eugene C. Forcier, do hereby certify that
     before me, a Stenographer-Commissioner in and for the
[5]  Commonwealth aforesaid, personally appeared
     DIANE L. HERICKS, who then was by me first duly
[6]  cautioned and sworn to testify the truth, the whole
     truth, and nothing but the truth in the taking of her
[7]  oral deposition in the cause aforesaid; that the
     testimony then given by her as above set forth was by
[8]  me reduced to stenotypy in the presence of said
     witness, and afterwards transcribed by means of
[9]  computer-aided transcription.
[10]      I do further certify that this deposition was
     taken at the time and place in the foregoing caption
[11] specified, and was completed without adjournment.
[12]      I do further certify that I am not a relative,
     counsel or attorney of either party, or otherwise
[13] interested in the event of this action.
[14]      IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Pittsburgh,
[15] Pennsylvania, on this _____ day of _____,
     2008.
[16]
[17]
[18]      _____
         Eugene C. Forcier
[19]     Stenographer-Commissioner
[20]                   - - -
[21]
[22]
[23]
[24]
[25]
```

Page 183

```
[1]                    I-N-D-E-X
[2]  EXAMINATION BY:  Mr. Sciarrino - Page 4
[3]  DEPOSITION EXHIBITS:                          PAGE
     14 - Letter, Wisinski to Hericks, 11-22-05
[4]       w/attachment                               72
[5]  15 - Claim file analysis, 7-25-06              83
[6]  16 - Letter, George to Hericks, 12-9-05        92
[7]  17 - Fax, Hericks to Godshall, 12-28-05        93
          w/attachment
[8]
[9]  18 - Letter, Hericks to Godshall, 12-29-05     94
[10] 19 - New Litigation Transmittal, 12-28-05      96
[11] 20 - Letter, Godshall to Hericks, 3-14-06     103
[12] 21 - Letter, Godshall to Hericks, 3-15-06     106
[13] 22 - E-mail, Murphy to Hericks, 5-12-06       112
[14] 23 - Memo, Chlysta to Godshall, 5-2-06        113
[15] 24 - Letter, Godshall to Hericks, 5-4-06      114
[16] 25 - Letter, Godshall to Hericks, 5-11-06     119
[17] 26 - Letter, Godshall to Hericks, 6-22-06     124
[18] 27 - Letter, Godshall to Hericks, 8-22-06     127
[19] 28 - Settlement Evaluation, 7-21-08           132
[20]
[21]                   - - -
[22]
[23]
[24]
[25]
```